# 24-2299-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT APPENDIX
## Volume 1 of 4 (Pages JA-1 to JA-286)

---

STEVEN WU
PHILIP TISNE
NEW YORK COUNTY
  DISTRICT ATTORNEY'S OFFICE
APPEALS BUREAU
One Hogan Place
New York, New York 10013
(212) 335-9326

*Attorneys for Plaintiff-Appellee*

TODD BLANCHE
EMIL BOVE
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant*
*President Donald J. Trump*

i

# JOINT APPENDIX
# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... JA-1

Notice of Removal, dated May 4, 2023 ..................... JA-11

Affirmation of Susan R. Necheles, in Support of
Removal, dated May 4, 2023 ................................. JA-20

Exhibit A to Necheles Affirmation -
Indictment Filed in *New York v. Trump* ................. JA-22

Exhibit B to Necheles Affirmation -
Morgan Lewis White Paper .................................... JA-39

Exhibit C to Necheles Affirmation -
DANY's Motion for Protective Order Filed in
Redacted Form in *New York v. Trump*, dated April
24, 2023 ................................................................. JA-46

Exhibit D to Necheles Affirmation -
Opposition to Motion for Protective Order Filed
in *New York v. Trump*, dated May 1, 2023 ............ JA-77

Exhibit E to Necheles Affirmation -
Statement of Facts Filed in *New York v. Trump*,
dated April 4, 2023 ................................................ JA-95

Declaration of Matthew Colangelo in Support of
Motion to Seal, dated May 30, 2023
(omitted herein)

Exhibit 2 to Colangelo Declaration -
DANY's Response to Request for Bill of
Particulars Filed in Redacted Form in *New York v.
Trump*, dated May 12, 2023 ................................... JA-109

Exhibit 4 to Colangelo Declaration -
@realDonaldTrump Tweets .................................... JA-120

ii

**Page**

Exhibit 5 to Colangelo Declaration -
Statement from Rudy Giuliani ............................... JA-123

Exhibit 6 to Colangelo Declaration -
Transcript of Rudy Giuliani Interview ................... JA-127

Exhibit 7 to Colangelo Declaration -
Transcript of Rudy Giuliani Interview ................... JA-162

DANY's Memorandum of Law in Support of
Motion For Remand, dated May 30, 2023 ............. JA-189

Memorandum of Law in Opposition to Motion For
Remand, dated June 15, 2023 ............................... JA-229

Reply Memorandum in Support of Motion For
Remand, dated June 23, 2023 ............................... JA-263

Letter from Matthew Colangelo to The Honorable
Alvin K. Hellerstein, dated June 29, 2023
(omitted herein)

Exhibit 26 to Colangelo Letter -
Transcript of News Conference ............................ JA-287

Transcript of Proceedings Held Before The
Honorable Alvin K. Hellerstein on
June 27, 2023 ........................................................ JA-315

Order and Opinion of The Honorable Alvin K.
Hellerstein Granting Motion to Remand, dated
July 19, 2023 ........................................................ JA-407

Mandate of the U.S. Court of Appeals for the
Second Circuit, dated November 15, 2023 ............ JA-432

Second Notice of Removal, dated August 29, 2024 .. JA-433

Affirmation of Emil Bove in Support of Second
Notice of Removal, dated August 29, 2024 ........... JA-497

iii

**Page**

Exhibit F to Bove Affirmation -
Memorandum of Law in Support of Omnibus
Motions Filed in Redacted Form in *New York v.
Trump*, dated September 29, 2023 ........................   JA-501

Exhibit G to Bove Affirmation -
Decision and Order of Justice Juan M. Merchan
in *New York v. Trump*, dated February 15, 2024 ....   JA-559

Exhibit H to Bove Affirmation -
DANY's Motions *in Limine* Filed in *New York v.
Trump*, dated February 22, 2024...........................   JA-590

Exhibit I to Bove Affirmation -
Decision and Order of Justice Juan M. Merchan
on DANY's Motions *in Limine* in *New York v.
Trump*, dated March 18, 2024................................   JA-648

Exhibit J to Bove Affirmation -
DANY's Proposed Jury Instructions Filed in *New
York v. Trump*, dated May 13, 2024 ......................   JA-662

Exhibit K to Bove Affirmation -
President Donald J. Trump's Proposed Jury
Instructions Filed in *New York v. Trump*, dated
May 14, 2024.........................................................   JA-670

Exhibit L to Bove Affirmation -
DANY's Response to President Donald J.
Trump's Proposed Jury Instructions Filed in *New
York v. Trump*, dated May 17, 2024 ......................   JA-702

Exhibit M to Bove Affirmation -
Excerpts of Transcript from the Trial in *New York
v. Trump* ...............................................................   JA-726

Exhibit N to Bove Affirmation -
Presidential Immunity Motion Filed in Redacted
Form in *New York v. Trump*, dated March 7, 2024   JA-780

iv

**Page**

Exhibit O to Bove Affirmation -
Opposition to Presidential Immunity Motion
Filed in *New York v. Trump*, dated March 13,
2024 ........................................................................ JA-807

Exhibit P to Bove Affirmation -
Decision and Order of Justice Juan M. Merchan
Denying Presidential Immunity Motion in *New
York v. Trump*, dated April 3, 2024 ........................ JA-822

Exhibit Q to Bove Affirmation -
President Donald J. Trump's Motion Regarding
Presidential Immunity Filed in *New York v.
Trump*, dated April 15, 2024 .................................. JA-830

Exhibit R to Bove Affirmation -
Opposition to Motion Regarding Presidential
Immunity Filed in *New York v. Trump*, dated
April 16, 2024 .......................................................... JA-833

Exhibit S to Bove Affirmation -
Mandate of the Supreme Court of the United
States in *Trump v. United States*, dated August 2,
2024 ........................................................................ JA-835

Exhibit T to Bove Affirmation -
Motion Requesting Leave to File Post-Trial
Presidential Immunity Motion in *New York v.
Trump*, dated July 1, 2024 ...................................... JA-839

Exhibit U to Bove Affirmation -
Letter Order of Justice Juan M. Merchan in *New
York v. Trump*, dated July 2, 2024 .......................... JA-842

Exhibit V to Bove Affirmation -
President Donald J. Trump's Post-Trial
Presidential Immunity Motion Filed in Redacted
Form in *New York v. Trump*, dated July 10, 2024 .. JA-845

v

**Page**

Exhibit W to Bove Affirmation -
Opposition to Post-Trial Presidential Immunity
Motion Filed in Redacted Form in *New York v.
Trump*, dated July 24, 2024 ..................................... JA-901

Exhibit X to Bove Affirmation -
Reply in Support of Post-Trial Presidential
Immunity Motion Filed in Redacted Form in *New
York v. Trump*, dated July 31, 2024 ........................ JA-971

Exhibit Y to Bove Affirmation -
Memorandum of Law in Support of Recusal
Motion Filed in *New York v. Trump*, dated May
31, 2023 .................................................................. JA-995

Exhibit Z to Bove Affirmation -
Decision and Order of Justice Juan M. Merchan
on Recusal Motion Filed in Redacted Form in
*New York v. Trump*, dated August 11, 2023 ........... JA-1013

Exhibit AA to Bove Affirmation -
Recusal Motion Filed in *New York v. Trump*,
dated April 3, 2024 ................................................. JA-1025

Exhibit BB to Bove Affirmation -
Affirmation of Todd Blanche in Support of
Recusal Motion Filed in *New York v. Trump*
(without the referenced exhibits), dated April 3,
2024 ........................................................................ JA-1063

Exhibit CC to Bove Affirmation -
*Irish Star* Article, dated May 18, 2024 .................. JA-1096

Exhibit DD to Bove Affirmation -
Motion for Recusal Filed in *New York v. Trump*,
dated July 31, 2024 ................................................. JA-1100

Exhibit EE to Bove Affirmation -
Letter from the U.S. House of Representatives
Committee on the Judiciary to Loren Merchan ..... JA-1103

vi

**Page**

Exhibit FF to Bove Affirmation -
Letter Order of Justice Juan M. Merchan in *New
York v. Trump*, dated August 5, 2024 ..................... JA-1108

Exhibit GG to Bove Affirmation -
Decision of Justice Juan M. Merchan on Motion
for Recusal in *New York v. Trump*, dated August
13, 2024 ................................................................ JA-1111

Exhibit HH to Bove Affirmation -
Motion to Adjourn Sentencing filed in *New York
v. Trump*, dated August 14, 2024 .......................... JA-1115

Exhibit II to Bove Affirmation -
DANY Exhibits 407-F through 407-I from the
Trial in *New York v. Trump* .................................... JA-1118

Exhibit JJ to Bove Affirmation -
DANY Exhibit 207 Filed in Redacted Form from
the Trial in *New York v. Trump*.............................. JA-1129

Exhibit KK to Bove Affirmation -
Excerpts from DANY Exhibit 81 from the Trial
in *New York v. Trump*............................................. JA-1133

Exhibit LL to Bove Affirmation -
Letter from the U.S. Attorney's Office for the
Southern District of New York Regarding *United
States v. Michael Cohen*, 18 Cr. 602 (WHP),
Filed in Redacted Form, dated July 15, 2019 ........ JA-1136

Memorandum of Law in Support of Motion For
Leave to File Second Removal Notice, dated
September 3, 2024 ................................................. JA-1139

Notice of Appeal, dated September 3, 2024 .............. JA-1141

Order and Opinion of The Honorable Alvin K.
Hellerstein Denying Motion for Stay, dated
September 6, 2024 ................................................. JA-1142

JA-1

SDNY CM/ECF NextGen Version 1.7      https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?127781262527845-L_1_0-1

**Query**   **Reports**▾   **Utilities**▾   **Help**   **Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:23-cv-03773-AKH

People of The State of New York v. Trump
Assigned to: Judge Alvin K. Hellerstein
Case in other court: New York Supreme Court, New York
                County, 71543-23
Cause: 28:1442nr Notice of Removal

Date Filed: 05/04/2023
Date Terminated: 07/19/2023
Jury Demand: None
Nature of Suit: 540 Mandamus & Other
Jurisdiction: Federal Question

**Plaintiff**

**People of The State of New York**      represented by   **Matthew Colangelo**
                                                       NY County District Attorney's Office
                                                       1 Hogan Place
                                                       New York, NY 10013
                                                       212-335-3464
                                                       Email: colangelom@dany.nyc.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Rebecca Grace Mangold**
New York County District Attorney's
Office
80 Centre Street
New York, NY 10013
212-335-9000
Email: mangoldr@dany.nyc.gov
*LEAD ATTORNEY*

**Catherine McCaw**
New York County District Attorney's Offi
1 Hogan Place
New York, NY 10013
212-335-9732
Email: mccawc@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

**Christopher Conroy , I**
New York County District Attorney's Offi
Investigation Division
One Hogan Place
Ste 751
New York, NY 10013
212-335-3743
Fax: 212-335-9800

JA-2

Email: conroyc@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

**Katherine Caldwell Ellis**
New York County District Attorney's Offi
80 Centre Street
New York, NY 10013
212-335-9000
Email: ellisk@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

**Philip Vyse Tisne**
Manhattan District Attorney's Office
One Hogan Place
New York, NY 10013
212-335-3824
Email: tisnep@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

**Steven Chiajon Wu**
New York County District Attorney
1 Hogan
New York, NY 10013
212-335-9326
Email: wus@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

**Susan D. Hoffinger**
New York County District Attorney's
Office
1 Hogan Place
New York
New York, NY 10013
212-335-9000
Email: hoffingers@dany.nyc.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Donald J. Trump**                    represented by    **Todd Blanche**
Blanche Law
99 Wall Street
New York, NY 10005
212-312-1860
Email: toddblanche@blanchelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emil Bove**

JA-3

Blanche Law
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1250
Email: emil.bove@blanchelaw.com
*ATTORNEY TO BE NOTICED*

**Susan Rose Necheles**
NechelesLaw LLP
1120 6th Ave
4th Floor
New York, NY 10036
212-997-7400
Email: srn@necheleslaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/04/2023 | 1 | NOTICE OF REMOVAL from Supreme Court, County of New York. Case Number: 71543-23. (Filing Fee $ 402.00, Receipt Number ANYSDC-27699019).Document filed by Donald J. Trump. (Attachments: # 1 Affidavit declaration and exhibits).(Necheles, Susan) (Entered: 05/04/2023) |
| 05/04/2023 | 2 | NOTICE OF APPEARANCE by Susan Rose Necheles on behalf of Donald J. Trump.. (Necheles, Susan) (Entered: 05/04/2023) |
| 05/04/2023 | 3 | NOTICE OF APPEARANCE by Matthew Colangelo on behalf of People of The State of New York..(Colangelo, Matthew) (Entered: 05/04/2023) |
| 05/05/2023 |  | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Susan Rose Necheles. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo)** (Entered: 05/05/2023) |
| 05/05/2023 |  | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Ronnie Abrams. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(jgo) (Entered: 05/05/2023) |
| 05/05/2023 |  | Magistrate Judge Barbara C. Moses is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (jgo) (Entered: 05/05/2023) |
| 05/05/2023 |  | Case Designated ECF. (jgo) (Entered: 05/05/2023) |
| 05/05/2023 | 4 | NOTICE OF CASE REASSIGNMENT to Judge Alvin K. Hellerstein. Judge Ronnie Abrams is no longer assigned to the case. (laq) (Entered: 05/05/2023) |

| | | |
|---|---|---|
| 05/05/2023 | 5 | NOTICE OF APPEARANCE by Todd Blanche on behalf of Donald J. Trump.. (Blanche, Todd) (Entered: 05/05/2023) |
| 05/08/2023 | 6 | CONSENT MOTION for Conference re: 1 Notice of Removal, . Document filed by People of The State of New York..(Colangelo, Matthew) (Entered: 05/08/2023) |
| 05/09/2023 | 7 | NOTICE OF APPEARANCE by Catherine McCaw on behalf of People of The State of New York..(McCaw, Catherine) (Entered: 05/09/2023) |
| 05/09/2023 | 8 | ORDER REGULATING PROCEEDINGS granting 6 Motion for Conference re: 6 CONSENT MOTION for Conference re: 1 Notice of Removal, . I have studied the notice of removal and attendant papers as required by 28 U.S.C. § 1455 (b)(4). In order that an evidentiary hearing may promptly be held, 28 U.S.C. § 1455 (b)(5), the following schedule shall be observed: Any motion for remand, and supporting papers, shall be filed by May 30, 2023; Opposition papers shall be filed by June 15, 2023; Reply papers shall be filed by June 23, 2023. An evidentiary hearing, to the extent that there are disputed issues of fact, and argument as to the law, shall be held June 27, 2023, 2:30 pm, 500 Pearl Street, New York, NY 10007, Courtroom 26A. In the meantime, proceedings may continue in the Supreme Court of the State of New York, New York County. See 28 U.S.C. § 1455 (b)(3). SO ORDERED. ( Evidentiary Hearing set for 6/27/2023 at 02:30 PM in Courtroom 26A, 500 Pearl Street, New York, NY 10007 before Judge Alvin K. Hellerstein.). (Signed by Judge Alvin K. Hellerstein on 5/9/23) (yv) (Entered: 05/09/2023) |
| 05/09/2023 | 9 | NOTICE OF APPEARANCE by Susan D. Hoffinger on behalf of People of The State of New York..(Hoffinger, Susan) (Entered: 05/09/2023) |
| 05/09/2023 | | Set/Reset Deadlines: Motions due by 5/30/2023. Responses due by 6/15/2023. Replies due by 6/23/2023. (yv) (Entered: 05/26/2023) |
| 05/15/2023 | 10 | NOTICE OF APPEARANCE by Katherine Caldwell Ellis on behalf of People of The State of New York..(Ellis, Katherine) (Entered: 05/15/2023) |
| 05/18/2023 | 11 | NOTICE OF APPEARANCE by Christopher Conroy, I on behalf of People of The State of New York..(Conroy, Christopher) (Entered: 05/18/2023) |
| 05/24/2023 | 12 | NOTICE OF APPEARANCE by Rebecca Grace Mangold on behalf of People of The State of New York..(Mangold, Rebecca) (Entered: 05/24/2023) |
| 05/26/2023 | 13 | NOTICE OF APPEARANCE by Steven Chiajon Wu on behalf of People of The State of New York..(Wu, Steven) (Entered: 05/26/2023) |
| 05/30/2023 | 14 | NOTICE OF APPEARANCE by Philip Vyse Tisne on behalf of People of The State of New York..(Tisne, Philip) (Entered: 05/30/2023) |
| 05/30/2023 | 15 | MOTION to Seal . Document filed by People of The State of New York..(Mangold, Rebecca) (Entered: 05/30/2023) |
| 05/30/2023 | 16 | MEMORANDUM OF LAW in Support re: 15 MOTION to Seal . . Document filed by People of The State of New York..(Mangold, Rebecca) (Entered: 05/30/2023) |
| 05/30/2023 | 17 | MOTION to Remand . Document filed by People of The State of New York.. (Colangelo, Matthew) (Entered: 05/30/2023) |
| 05/30/2023 | 18 | DECLARATION of Matthew Colangelo in Support re: 15 MOTION to Seal ., 17 MOTION to Remand .. Document filed by People of The State of New York. (Attachments: # 1 Exhibit 1 (slipsheet for sealed exhibit), # 2 Exhibit 2 (People's |

| | | |
|---|---|---|
| | | Response to Defendant's Request for a Bill of Particulars (May 12, 2023)), # 3 Exhibit 3 (slipsheet for sealed exhibit), # 4 Exhibit 4 (Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018)), # 5 Exhibit 5 (May 4, 2018 Statement from Rudy Giuliani), # 6 Exhibit 6 (Transcript of Rudy Giuliani interview, Hannity (Fox News broadcast May 2, 2018)), # 7 Exhibit 7 (Transcript of Rudy Giuliani interview, This Week (ABC News broadcast May 6, 2018)), # 8 Exhibit 8 (slipsheet for sealed exhibit), # 9 Exhibit 9 (slipsheet for sealed exhibit), # 10 Exhibit 10 (slipsheet for sealed exhibit), # 11 Exhibit 11 (slipsheet for sealed exhibit), # 12 Exhibit 12 (slipsheet for sealed exhibit), # 13 Exhibit 13 (Complaint, Trump v. Cummings, No. 19-cv-1136 (D.D.C. filed Apr. 22, 2019)), # 14 Exhibit 14 (Complaint, Trump v. Deutsche Bank AG, No. 1:19-cv-03826 (S.D.N.Y. filed Apr. 29, 2019)), # 15 Exhibit 15 (1982 Office of Legal Counsel memo), # 16 Exhibit 16 (Brief for United States as Amicus Curiae, Blassingame v. Trump, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023)), # 17 Exhibit 17 (2018 Office of Special Counsel advisory), # 18 Exhibit 18 (2000 Office of Legal Counsel memo), # 19 Exhibit 19 (1973 Office of Legal Counsel memo), # 20 Exhibit 20 (Decision & Order, People v. The Trump Corporation (Sept. 6, 2022)), # 21 Exhibit 21 (Information, US v. Cohen, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018)), # 22 Exhibit 22 (Hearing Transcript, US v. Cohen, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018)), # 23 Exhibit 23 (1974 Office of Legal Counsel memo), # 24 Exhibit 24 (Protective Order, People v. Trump (May 8, 2023))). (Colangelo, Matthew) (Entered: 05/30/2023) |
| 05/30/2023 | 19 | MEMORANDUM OF LAW in Support re: 17 MOTION to Remand . . Document filed by People of The State of New York..(Colangelo, Matthew) (Entered: 05/30/2023) |
| 06/01/2023 | 20 | ENDORSED LETTER addressed to Matthew Colangelo, Esq.from Alvin K. Hellerstein United States District Judge (Senior) dated 6/1/23 re: conflict. ENDORSEMENT: Any comments or objections' shall be filed with the Clerk of Court on or before June 15, 2023. This letter will be made part of the court records. (Signed by Judge Alvin K. Hellerstein on 6/1/23) (yv) (Entered: 06/01/2023) |
| 06/05/2023 | 21 | LETTER addressed to Judge Alvin K. Hellerstein from Matthew Colangelo dated June 5, 2023 re: the Court's June 1, 2023 letter to counsel (ECF No. 20). Document filed by People of The State of New York..(Colangelo, Matthew) (Entered: 06/05/2023) |
| 06/05/2023 | 22 | LETTER addressed to Judge Alvin K. Hellerstein from Todd Blanche dated 6/5/23 re: conflict. Document filed by Donald J. Trump..(Necheles, Susan) (Entered: 06/05/2023) |
| 06/06/2023 | 23 | ORDER granting 15 Letter Motion to Seal. It is hereby ORDERED that the People's Motion to Seal is GRANTED; and it is further ORDERED that Exhibits 1, 3, 8, 9, 10, 11, and 12 of the May 30, 2023 Declaration of Matthew Colangelo (ECF No. 18) are hereby sealed; and it is further ORDERED that the People shall re-file the Declaration of Matthew Colangelo on ECF with the restrictions necessary for sealed filing. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 6/6/2023) (jca) Modified on 6/6/2023 (jca). (Main Document 23 replaced on 6/6/2023) (jca). (Entered: 06/06/2023) |
| 06/08/2023 | 24 | ***SELECTED PARTIES***DECLARATION of Matthew Colangelo in Support re: 15 MOTION to Seal ., 17 MOTION to Remand .. Document filed by People of The State of New York, Donald J. Trump. (Attachments: # 1 Exhibit 1 (sealed exhibit), # 2 Exhibit 3 (sealed exhibit), # 3 Exhibit 8 (sealed exhibit), # 4 Exhibit 9 (sealed exhibit), # 5 Exhibit 10 (sealed exhibit), # 6 Exhibit 11 (sealed exhibit), # 7 Exhibit 12 (sealed exhibit))Motion or Order to File Under Seal: 23 .(Colangelo, Matthew) (Entered: 06/08/2023) |

JA-6

SDNY CM/ECF NextGen Version 1.7       https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?127781262527845-L_1_0-1

| 06/12/2023 | 26 | DR. LEWIS BROOKS MCKENZIE'S MOTION TO INTERVENE, Re: to Intervene. (sc) (Additional attachment(s) added on 6/15/2023: # 1 Errata Declaration) (sc). (Entered: 06/15/2023) |
|---|---|---|
| 06/12/2023 | 27 | NOTICE OF PRO SE APPEARANCE. Document filed by Lewis B. McKenzie, Proposed Intervenor. (sc) (Entered: 06/15/2023) |
| 06/12/2023 | 28 | CONSENT TO ELECTRONIC SERVICE. Document filed by Lewis B. McKenzie, Proposed Intervenor. (sc) (Entered: 06/15/2023) |
| 06/12/2023 | 29 | INTERVENOR LEWIS BROOKS MCKENZIE'S NOTICE OF CONSTITUTIONAL QUESTIONS REGARDING THE FEDERAL ELECTION CAMPAIGN ACT. (sc) (Entered: 06/15/2023) |
| 06/12/2023 | 30 | INTERVENOR(Proposed)LEWIS BROOKS MCKENZIE'S MOTION TO CERTIFY QUESTIONS TO THE SECOND CIRCUIT COURT OF APPEALS. (Attachments: # 1 Declaration)(sc) (Entered: 06/15/2023) |
| 06/12/2023 | 31 | MOTION FOR PERMISSION FOR ELECTRONIC CASE FILING. Document filed by Lewis B. McKenzie, Proposed Intervenor. (sc) (Entered: 06/15/2023) |
| 06/12/2023 | 32 | NOTICE OF MOTION TO INTERVENE. Document filed by Lewis B. McKenzie, Proposed Intervenor. (sc) (Entered: 06/15/2023) |
| 06/12/2023 | 33 | NOTICE OF MOTION TO CERTIFY TO 2ND COA, re: to certify questions to the USCA-2nd Circuit . Document filed by Lewis B. McKenzie, Proposed Intervenor. (sc) Modified on 6/15/2023 (sc). (Entered: 06/15/2023) |
| 06/14/2023 | 25 | ORDER DENYING INTERVENTION, McKenzie's motion to intervene is denied. Since McKenzie has no right to intervene, he has no right to have questions certified to the Court of Appeals. The Clerk of the Court shall docket the papers presented by Lewis Brooks McKenzie with this Order. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 6/14/23) (yv) (Entered: 06/14/2023) |
| 06/15/2023 | 34 | MEMORANDUM OF LAW in Opposition re: 17 MOTION to Remand . . Document filed by Donald J. Trump..(Blanche, Todd) (Entered: 06/15/2023) |
| 06/15/2023 | 35 | AFFIRMATION of Todd Blanche in Opposition re: 17 MOTION to Remand .. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit, # 2 Exhibit).(Blanche, Todd) (Entered: 06/15/2023) |
| 06/22/2023 | 36 | JOINT LETTER addressed to Judge Alvin K. Hellerstein from Matthew Colangelo dated June 22, 2023 re: June 27, 2023 Hearing. Document filed by People of The State of New York..(Colangelo, Matthew) (Entered: 06/22/2023) |
| 06/23/2023 | 37 | ORDER REGULATING PROCEEDINGS: The court confirms receipt of the parties' letter, dated June 22, 2023, concerning the June 27, 2023, hearing at 2:30 PM in Courtroom 26A. The order of proceedings at that hearing will be as follows: 1. Arguments from both parties as to whether or not the Court has jurisdiction pursuant to 28 U.S.C. § 1442(a)(1) or must remand the case to the New York Supreme Court. 2. Identification of any factual issues that must be decided and establishment of dates and procedures with regard to such issues. The court acknowledges Defendant's waiver of any right to be physically present at the June 27th hearing. The Court accedes to Defendant's request not to be present. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 6/23/2023) (vfr) (Entered: 06/23/2023) |

| 06/23/2023 | 38 | REPLY MEMORANDUM OF LAW in Support re: 17 MOTION to Remand . . Document filed by People of The State of New York..(Colangelo, Matthew) (Entered: 06/23/2023) |
| 06/23/2023 | 39 | DECLARATION of Matthew Colangelo in Support re: 17 MOTION to Remand .. Document filed by People of The State of New York. (Attachments: # 1 Exhibit 25 (Mem. Supp. Mot. to Dismiss, Thompson v. Trump, No. 21-cv-400-APM (D.D.C. May 26, 2021))).(Colangelo, Matthew) (Entered: 06/23/2023) |
| 06/27/2023 | | Minute Entry for proceedings held before Judge Alvin K. Hellerstein: Evidentiary Hearing held on 6/27/2023. (Court Reporter Sadie Herbert) (Jones, Brigitte) (Entered: 07/06/2023) |
| 06/29/2023 | 40 | LETTER addressed to Judge Alvin K. Hellerstein from Matthew Colangelo dated June 29, 2023 re: hearing exhibits. Document filed by People of The State of New York. (Attachments: # 1 Exhibit 26 (Transcript of Jan. 11, 2017 news conference), # 2 Exhibit 27 (check and check stubs dated 08/01/17)).(Colangelo, Matthew) (Entered: 06/29/2023) |
| 07/17/2023 | 41 | TRANSCRIPT of Proceedings re: HEARING held on 6/27/2023 before Judge Alvin K. Hellerstein. Court Reporter/Transcriber: Sadie Herbert, (212) 805-0310. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/7/2023. Redacted Transcript Deadline set for 8/17/2023. Release of Transcript Restriction set for 10/16/2023..(McGuirk, Kelly) (Entered: 07/17/2023) |
| 07/17/2023 | 42 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 6/27/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 07/17/2023) |
| 07/19/2023 | 43 | ORDER AND OPINION GRANTING MOTION TO REMAND re: 17 MOTION to Remand . filed by People of The State of New York. Trump has failed to show that the conduct charged by the Indictment is for or relating to any act performed by or for the President under color of the official acts of a President. Trump also has failed to show that he has a colorable federal defense to the Indictment. For either or both of these reasons, the People's motion to remand the case is granted. The Clerk shall remand the case file to the New York Supreme Court, New York County. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 7/19/23) (yv) Transmission to Docket Assistant Clerk for processing. (Entered: 07/19/2023) |
| 07/19/2023 | | CASE REMANDED OUT from the U.S.D.C. Southern District of New York to the State Court - Supreme Court of the State of New York, County of New York. Sent certified copy of docket entries and remand order. Mailed via UPS Tracking Number 1ze22e533710077453 on 7/20/23. (yv) (Entered: 07/21/2023) |
| 07/28/2023 | 44 | NOTICE OF APPEAL from 43 Memorandum & Opinion,,. Document filed by Donald J. Trump. Filing fee $ 505.00, receipt number ANYSDC-28071497. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Stern, Gedalia) (Entered: 07/28/2023) |

| | | |
|---|---|---|
| 07/28/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 44 Notice of Appeal. (km) (Entered: 07/28/2023) |
| 07/28/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 44 Notice of Appeal filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (km) (Entered: 07/28/2023) |
| 11/15/2023 | 45 | MANDATE of USCA (Certified Copy) as to 44 Notice of Appeal filed by Donald J. Trump USCA Case Number 23-1085. Appellant moves to dismiss this appeal pursuant to Federal Rule of Appellate Procedure 42(b). IT IS HEREBY ORDERED that the motion is GRANTED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 11/15/2023. (tp) (Entered: 11/15/2023) |
| 11/15/2023 | | Transmission of USCA Mandate/Order to the District Judge re: 45 USCA Mandate. (tp) (Entered: 11/15/2023) |
| 08/29/2024 | 46 | **FILING ERROR - DEFICIENT PLEADING**- NOTICE OF REMOVAL from Supreme Court, County of New York County. Case Number: 71543-23. (Filing Fee $ 405.00, Receipt Number ANYSDC-29823550).Document filed by Donald J. Trump..(Bove, Emil) Modified on 8/30/2024 (vf). (Entered: 08/29/2024) |
| 08/29/2024 | 47 | AFFIRMATION of Emil Bove re: 46 Notice of Removal *Second Notice of Removal*. Document filed by Donald J. Trump. (Attachments: # 1 Exhibit F (September 29, 2023 Memorandum of Law (Redacted)), # 2 Exhibit G (February 15, 2024 Decision and Order), # 3 Exhibit H (February 22, 2024 DANY Motions in Limine), # 4 Exhibit I (March 18, 2024 Decision and Order), # 5 Exhibit J (May 13, 2024 DANY Proposed Jury Instructions), # 6 Exhibit K (May 14, 2024 President Trump Proposed Jury Instructions), # 7 Exhibit L (May 17, 2024 DANY Response To Proposed Jury Instructions), # 8 Exhibit M (Excerpts of Trial Transcript), # 9 Exhibit N (March 7, 2024 Memorandum of Law (Redacted)), # 10 Exhibit O (March 13, 2024 Memorandum of Law), # 11 Exhibit P (April 3, 2024 Decision and Order), # 12 Exhibit Q (April 15, 2024 Letter), # 13 Exhibit R (April 16, 2024 Letter), # 14 Exhibit S (August 2, 2024 Letter), # 15 Exhibit T (July 1, 2024 Letter), # 16 Exhibit U (July 2, 2024 Letter), # 17 Exhibit V (July 10, 2024 Memorandum of Law (Redacted)), # 18 Exhibit W (July 24, 2024 Memorandum of Law (Redacted)), # 19 Exhibit X (July 31, 2024 Memorandum of Law (Redacted)), # 20 Exhibit Y (May 31, 2023 Memorandum of Law), # 21 Exhibit Z (August 11, 2023 Decision (Redacted)), # 22 Exhibit AA (April 3, 2024 Memorandum of Law), # 23 Exhibit BB (April 3, 2024 Affirmation), # 24 Exhibit CC (May 18, 2024 Article), # 25 Exhibit DD (July 31, 2024 Letter), # 26 Exhibit EE (August 1, 2024 Letter), # 27 Exhibit FF (August 5, 2024 Letter), # 28 Exhibit GG (August 13, 2024 Decision), # 29 Exhibit HH (August 14, 2024 Letter), # 30 Exhibit II (DANY Trial Exhibits 407-F through 407-I), # 31 Exhibit JJ (DANY Trial Exhibit 207 (Redacted)), # 32 Exhibit KK (Excerpts of DANY Trial Exhibit 81), # 33 Exhibit LL (July 15, 2019 Letter (Redacted))).(Bove, Emil) (Entered: 08/29/2024) |
| 08/30/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Emil Bove to RE-FILE re: Document No. 46 Notice of Removal. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the pleading is not correct; the wrong event type was used to file the pleading; Court's leave has not been granted; the order granting permission to file the pleading was not attached. Re-file the pleading using the event type Amended Notice of Removal found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/ |

JA-9

| | | |
|---|---|---|
| | | **filers - select the individually named party/parties the pleading is against. File the Exhibit to Pleading event found under the event list Other Documents and attach either opposing party's written consent or Court's leave. (vf)** (Entered: 08/30/2024) |
| 09/03/2024 | 48 | MOTION for Leave to File Second Removal Notice . Document filed by Donald J. Trump..(Bove, Emil) (Entered: 09/03/2024) |
| 09/03/2024 | 49 | MEMORANDUM OF LAW in Support re: 48 MOTION for Leave to File Second Removal Notice . . Document filed by Donald J. Trump. (Attachments: # 1 Exhibit A. Second Removal Notice).(Bove, Emil) (Entered: 09/03/2024) |
| 09/03/2024 | 50 | ORDER AND OPINION DENYING MOTION FOR LEAVE TO FILE REMOVAL PAPERS re: 48 MOTION for Leave to File Second Removal Notice . filed by Donald J. Trump. It "clearly appears on the face of the notice and... exhibits attached thereto" that removal should not be permitted. Good cause has not been shown, and leave to remove the case is not granted. The Clerk shall terminate ECF No. 48. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 9/3/24) (yv) (Entered: 09/03/2024) |
| 09/03/2024 | 51 | NOTICE OF APPEAL from 50 Memorandum & Opinion,. Document filed by Donald J. Trump. Filing fee $ 605.00, receipt number ANYSDC-29838364. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Bove, Emil) (Entered: 09/03/2024) |
| 09/04/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 51 Notice of Appeal. (tp) (Entered: 09/04/2024) |
| 09/04/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 51 Notice of Appeal filed by Donald J. Trump were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/04/2024) |
| 09/04/2024 | 52 | MOTION to Stay re: 50 Memorandum & Opinion, . Document filed by Donald J. Trump..(Bove, Emil) (Entered: 09/04/2024) |
| 09/04/2024 | 53 | MEMORANDUM OF LAW in Support re: 52 MOTION to Stay re: 50 Memorandum & Opinion, . . Document filed by Donald J. Trump..(Bove, Emil) (Entered: 09/04/2024) |
| 09/06/2024 | 54 | ORDER AND OPINION DENYING MOTION FOR STAY re: 52 MOTION to Stay re: 50 Memorandum & Opinion, . filed by Donald J. Trump. Since I denied leave to file for removal, and thus there has been no removal petition properly filed, there is no action in my order of October 3, 2024 to stay. The motion is denied as academic. The Clerk of Court shall terminate ECF No. 52. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 9/6/24) (yv) (Entered: 09/06/2024) |
| 09/12/2024 | 55 | TRUE COPY ORDER of USCA as to 51 Notice of Appeal filed by Donald J. Trump USCA Case Number 24-2299. USCA Case Number 24-2299. Appellant moves to stay the district court's September 4, 2024 order, which denied leave to file a second removal notice. See 28 U.S.C. § 1455(b)(1), (2). In light of the state court's adjournment of sentencing until November 26, 2024, it is hereby ORDERED that the motion for an emergency administrative stay is DENIED. See CA2 Local Rule 27.1(d). Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 9/12/2024.(km) (Entered: 09/12/2024) |
| 09/12/2024 | | Transmission of USCA Mandate/Order to the District Judge re: 55 USCA Order.(km) (Entered: 09/12/2024) |

SDNY CM/ECF NextGen Version 1.7                    https://ecf.nysd.uscourts.gov/cgi-bin/DktRpt.pl?127781262527845-L_1_0-1

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/10/2024 09:18:33 | | | |
| **PACER Login:** | cpnycpara16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-03773-AKH |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

JA-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— )
                                          )
THE PEOPLE OF THE STATE                   )
OF NEW YORK,                              )        23-cv-3773
                                          )
                                          )        NOTICE OF REMOVAL
        v.                                )
                                          )        Removed from:
                                          )
DONALD J. TRUMP,                          )        Supreme Court of the State of New
                                          )        York County of New York
                       Defendant.         )        Ind. No. 71543-23
———————————————————— )

To:    The Clerk of the United States District Court for the Southern District of New
       York.

**<u>DONALD J. TRUMP'S NOTICE OF REMOVAL</u>**

President Donald J. Trump, by and through undersigned counsel, hereby removes this

case from the Supreme Court of the State of New York, County of New York, to the United

States District Court for the Southern District of New York, pursuant to 28 U.S.C. §§ 1442 and

1455.

1.     The pending action is styled *People of the State of New York v. Donald J. Trump,*

Indictment No. 71543/2013, before the Supreme Court of the State of New York, County of New

York, located at 100 Centre Street, New York, New York, 10007.  A true and correct copy of the

indictment filed in this matter is attached as **Exhibit A.**

2.     As explained below, this Court has original subject matter jurisdiction over this

criminal action because the case involves important federal questions since the indictment

charges President Trump for conduct committed while he was President of the United States that

was within the "color of his office," and the charges involve alleged federal and state election

law violations that have a federal preemption defense.

1

3.      This case is unprecedented in our nation's history.  Never before has a local elected prosecutor criminally prosecuted a defendant either for conduct that occurred entirely while the defendant was the sitting President of the United States or for conduct that related to federal campaign contribution laws.  As explained below, removal is required.

## I.      THE NOTICE OF REMOVAL IS TIMELY

4.      This removal is timely, since it is filed within 30 days of April 4, 2023, the date on which President Trump was arraigned. *See* 28 U.S.C. §1455(b)(1) ("A notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court").

## II.      VENUE IS PROPER IN THE SOUTHERN DISTRICT OF NEW YORK

5.      Under 28 U.S.C. § 112, the United States District Court for the Southern District of New York is the proper venue for removal under 28 U.S.C. § 1455(a), because the Southern District of New York encompasses New York County, where this state action is now pending.

## III.      BACKGROUND

6.      The allegations against President Trump in this case are based on checks allegedly written to Michael Cohen by President Trump in 2017, while he was President of the United States.  The District Attorney's Office alleges that these checks, which President Trump allegedly signed while sitting in the Oval Office, as well as related records, are false because they characterize these payments as "legal expenses" and "retainer" payments when, according to the District Attorney's Office, they were allegedly reimbursements to Michael Cohen for payment made by Cohen to Stormy Daniels for campaign purposes.  The defense denies that these were false records.

7.      After investigating this case for five years, on March 30, 2023, a grand jury returned a 34-count Indictment against President Trump. All 34 counts charge the same offense, *i.e.*, felony falsifying business records in violation of New York Penal Law §175.10.

8.      The misdemeanor falsifying business records offenses is contained in New York Penal Law §175.05. As relevant to this matter, it punishes as a misdemeanor one who, with intent to defraud, "[m]akes or causes a false entry in the business records of an enterprise." §175.05(1).

9.      Under New York law, the misdemeanor offense is elevated to a felony when the person "commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof." N.Y. Penal Law §175.10.

10.     The District Attorney's Office alleges that the other crime that President Trump intended to commit or conceal was election law violations in connection with the 2016 federal election for President of the United States.

11.     This is a novel theory—that President Trump committed a felony under New York law because the payments to Michael Cohen were supposedly mischaracterized in the records of an enterprise, and that this mischaracterization was allegedly done in order to conceal an election law crime. There has never been a prosecution under New York State law based on an alleged violation of election law pertaining to a federal election. And there are serious federal preemption issues with such a prosecution.

12.     Indeed, as noted by the Hon. Mary Kay Vyskocil in a recent decision, a former ADA who wrote a book about this case conceded, *inter alia*, the following about the legal theory underlying this case:

3

- The facts surrounding the payments did not amount to much in legal terms as paying hush money is not a crime under New York State law, even if the payment was made to help an electoral candidate.

- There appeared to be no felony state crime in play.

- The Trump investigation should have been handled by the U.S. Department of Justice, rather than by the Manhattan district attorney's office.

- Federal prosecutors previously looked into the Clifford "hush money payment" and did not move forward with the prosecution.

*See Bragg v. Jordan,* 2023 WL 2999971 at *3–6 (S.D.N.Y. April 19, 2023) (bullet points in the original).

13.    Judge Vyskocil also recognized that D.A. Bragg faced political pressure to bring this case, writing that Bragg "is an elected prosecutor in New York County with constituents, some of whom wish to see Bragg wield the force of law against the former President and a current candidate for the Republican presidential nomination." *Id.* at *36.

**IV.    REMOVAL IS REQUIRED**

14.    Pursuant to 28 U.S.C. §1442 (a)(1), upon the application of the federal officer, a "criminal prosecution that is commenced in a State court and that is against or directed to" any "officer" of the United States, "in an official or individual capacity for or relating to any act under color of such office" must "be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending."

15.    The removal statute applies to former officers of the United States if the charged conduct relates to conduct performed while in office.

16.    In officer-removal cases, a district court applies a two-step test: "First, the officer

must 'raise a colorable federal defense.'" *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) (citations omitted). "The federal defense need only be colorable, not clearly sustainable." *Id.* Second, "the officer must show that the suit is one 'for or relating to any act under color of [his] office.'" *Id.* For the second step, it "is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 471 (3d Cir. 2015).

17.    President Trump satisfies both of these elements.

**A.  President Trump Will Raise a Number of Colorable Federal Defenses**

18.    President Trump, in his defense of this case, will raise a number of federal defenses.

19.    President Trump will assert that the statements in the purported business records at issue were in fact truthful statements because the money paid to Michael Cohen was, in part, "retainer" or legal payments to Michael Cohen to act as President Trump's personal attorney.  At the time of his election, there was some public expressions of concern about potential conflicts of interest, corruption, and possible constitutional violations due to President Trump's extensive business interests and wealth.  Thus, shortly before assuming the Office of the Presidency, and in order to assure the American public that he had separated his personal business from his public duties, *see* Morgan Lewis White Paper, attached as **Exhibit B**, as well as to fulfill various constitutional obligations, *e.g.,* the Foreign Emoluments Clause, Art. I, sec. 9, cl. 8, and the Take Care Clause, Art. II, sec. 3, President Trump, in an abundance of caution, placed his businesses in a Trust.  Additionally, President Trump hired a personal lawyer—Michael Cohen—to handle

his personal affairs.  These steps were taken solely because he was President of the United States.

20.     As such, President Trump's decision to retain Michael Cohen to act as his personal lawyer arose out of his duties as President and therefore gives rise to a federal defense to the charges in this case.

21.     Moreover, the District Attorney's Office has made clear in court filings that the felony charges in this case are predicated on an alleged intent to violate New York Election Law § 17-152 and the Federal Election Campaign Act, 52 U.S.C. § 30101. *See* People's Motion for a Protective Order, at 3, attached as **Exhibit C** ("Defendant caused business records associated with the repayments to be falsified to disguise his and others' criminal conduct including violations of New York Election Law § 17-152 and violations of the individual and corporate campaign contribution limits under the Federal Election Campaign Act, 52 U.S.C. § 30101 et seq.").

22.     President Trump will raise a federal defense—preemption—to both of these predicate charges. *See Orange County Water Dist. V. Unocal Corp. (In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.)*, 364 F. Supp.2d 329, 336 (S.D.N.Y. 2004) ("conclud[ing] that preemption is a colorable federal defense for purposes of the federal officer removal statute").

23.     New York Election Law § 17-152 makes it a misdemeanor offense for "[a]ny two or more persons [to] conspire to promote or prevent the election of any person to a public office by unlawful means and which conspiracy is acted upon by one or more of the parties thereto." Applying §17-152 to President Trump, who has only been a candidate for federal office, would violate the preemption provisions of 52 U.S.C. § 30143, which provides that "[t]he provisions of

[the Federal Election Campaign] Act, and of rules prescribed under this Act, supersede and preempt *any provision of State law* with respect to election to Federal office." (emphasis added). *See also* 11 C.F.R. § 108.7.

24.     Similarly, that preemption provision preempts the ability of a state prosecutor to charge a crime where an element of that crime is a federal campaign contribution violation, as the District Attorney's Office attempts to do here.

**B**. **The Underlying Conduct Relates to Acts Performed Under Color of Office**

25.     In determining whether the underlying conduct "relat[es] to" acts performed under color of office, within the meaning of the federal removal statute, "the officer must show a nexus, a causal connection between the charged conduct and asserted official authority." *Trump Old Post Office LLC*, 951 F.3d at 507.

26.     President Trump more than adequately satisfies this standard.

27.     All of the indictment's charges relate to a claim that President Trump falsified business records maintained by the Trump Organization by allegedly falsely indicating that the payments to Michael Cohen were for "legal expenses" or "retainer" payments when, according to the District Attorney's Office, the money was in fact reimbursement for payments made by Cohen.

28.     As discussed, *supra* ¶¶17-18, as part of his defense in this case, President Trump will demonstrate that Mr. Cohen was in fact his personal lawyer who was only hired as a direct result of President Trump's role as President of the United States and his obligations under the Constitution, and in order to separate his business affairs from his public duties.

29.     Additionally, acts taken as part of the election to the office of President of the United States "relat[e] to," § 1442(a)(1), President Trump's position as President, and therefore conduct underlying the charges "relat[es] to" acts performed under color of office.

30.     In other words, there is a clear nexus between the payments to Mr. Cohen and former President Trump's position as President of the United States.

**C.  This Court Has Protective Jurisdiction**

31.     Finally, because the instant indictment is politically motivated and was brought because a local politician—here D.A. Bragg—disfavored President's Trump's acts and policies as President of the United States, federal courts have so-called "protective jurisdiction" over this case. Although the Supreme Court has never definitively decided whether §1442 provides federal protective jurisdiction in cases of state hostility to the federal officer, at least some Justices has said it does. *See Mesa v. Cal,fornia*, 489 U.S. 121, 140 (1989) (Brennan, J. concurring) ("It is not at all inconceivable, however, that Congress' concern about local hostility to federal authority could come into play in some circumstances [even] where the federal officer is unable to present any 'federal defense.' . . . Such harassment could well take the form of unjustified prosecution for traffic or other offenses, to which the federal officer would have no immunity or other federal defense.  The removal statute, it would seem to me, might well have been intended to apply in such unfortunate and exceptional circumstances."). *See also Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020) (recognizing "the possibility that state prosecutors may have political motivations" for prosecuting federal officials).

32.     For this additional reason, this case is removable.


WHEREFORE, this case should be removed to Federal Court.

8

Dated:     New York, New York
           May 4, 2023

                                          Respectfully submitted,

Todd Blanche                                    /s
Blanche Law                               _____
99 Wall Street, Suite 4460                Susan R. Necheles
New York NY 10005                         NechelesLaw LLP
212-716-1250                              1120 Sixth Avenue, 4th Floor
toddblanche@blanchelaw.com                New York, NY 10036
                                          212-997-7400
_____          srn@necheleslaw.com

                                          Joseph Tacopina
                                          Tacopina Seigel & DeOreo
                                          275 Madison Avenue, 35th Floor,
                                          New York, New York 10016
                                          212-227-8877
                                          jtacopina@tacopinalaw.com

                                          *Attorneys for President Donald J. Trump*

JA-20

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                :

THE PEOPLE OF THE STATE OF NEW YORK,   :

                                 :       23-cv-3773

       - against -                   :

                                 :

DONALD TRUMP,                   **: AFFIIRMATION OF SUSAN R.**

                                 **: NECHELES IN SUPPORT OF**

                  Defendants.    **: REMOVAL**

                                 :

                                 :

                                 :

                                 :

------------------------------------------------------------------x

Susan R. Necheles, a partner at the law firm Necheles Law LLP, duly admitted to practice in the

courts of the State of New York, hereby declare, pursuant to 28 U.S.C. 1746, the following to be

true and correct:

       1.     I represent Donald Trump in this matter and submit this declaration in support of

Donald J. Trump's removal of the case *People of the State of New York v. Donald J. Trump*, Ind.

No. 71543/2013 (New York County Supreme Court), to United States District Court for the

Southern District of New York.

       2.     I incorporate by reference all factual statements made in the accompanying Notice

of Removal.

       3.     Exhibit A is a true and accurate copy of the Indictment in People of the State of

New York v. Donald J. Trump.

       4.     Exhibit B is a true and accurate copy of a Morgan Lewis White Paper called

Conflicts of Interest and the President.

5.      Exhibit C is a true and accurate copy of the Motion for a Protective Order filed by the People in *People v. Donald J. Trump*.

6.      Exhibit D is a true and accurate copy of Donald J. Trump's Opposition to the People's Motion for a Protective Order in *People v. Donald J. Trump*.

7.      Exhibit E is a true and accurate copy of the Statement of Facts filed by the People in *People v. Donald J. Trump*.

8.      Exhibits A, C, D, and E are copies of the "process, pleadings, and orders served upon" 28 U.S.C. § 1455(a), Donald J. Trump in *People v. Donald J. Trump*.

Dated: May 4, 2023
        New York, N.Y.

By: _____

Susan R. Necheles
NechelesLaw LLP
1120 6th Ave., 4th Floor
New York N.Y. 10036
212-997-7400
srn@necheleslaw.com

JA-22

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

---

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 14, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.


SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842457, and kept and maintained by the Trump Organization.

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842460, and kept and maintained by the Trump Organization.


FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated February 14, 2017, bearing check number 000138, and kept and maintained by the Trump Organization.


FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 16, 2017 through March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 16, 2017 and transmitted on or about March 16, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 846907, and kept and maintained by the Trump Organization.

SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated March 17, 2017, bearing check number 000147, and kept and maintained by the Trump Organization.


EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about April 13, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated April 13, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.


NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858770, and kept and maintained by the Trump Organization.

TENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002740, and kept and maintained by the Trump Organization.

ELEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated May 22, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWELFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 855331, and kept and maintained by the Trump Organization.

THIRTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 23, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated May 23, 2017, bearing check number 002700, and kept and maintained by the Trump Organization.

FOURTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 16, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated June 16, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

FIFTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858772, and kept and maintained by the Trump Organization.

SIXTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002741, and kept and maintained by the Trump Organization.

SEVENTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

JA-30

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated July 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

EIGHTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 861096, and kept and maintained by the Trump Organization.

NINETEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated July 11, 2017, bearing check number 002781, and kept and maintained by the Trump Organization.

TWENTIETH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated August 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-FIRST COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 863641, and kept and maintained by the Trump Organization.

TWENTY-SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated August 1, 2017, bearing check number 002821, and kept and maintained by the Trump Organization.


TWENTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated September 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.


TWENTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 868174, and kept and maintained by the Trump Organization.

TWENTY-FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 12, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated September 12, 2017, bearing check number 002908, and kept and maintained by the Trump Organization.

TWENTY-SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated October 18, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 872654, and kept and maintained by the Trump Organization.

TWENTY-EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated October 18, 2017, bearing check number 002944, and kept and maintained by the Trump Organization.

TWENTY-NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated November 20, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

THIRTIETH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 876511, and kept and maintained by the Trump Organization.

THIRTY-FIRST COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 21, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated November 21, 2017, bearing check number 002980, and kept and maintained by the Trump Organization.

THIRTY-SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated December 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

THIRTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 877785, and kept and maintained by the Trump Organization.

THIRTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 5, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J.

JA-37

Trump account check and check stub dated December 5, 2017, bearing check number 003006,

and kept and maintained by the Trump Organization.

ALVIN L. BRAGG, JR.
District Attorney

GJ #8-5

Filed:

NA

No.

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

INDICTMENT

FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE, P.L. §175.10, 34 Cts

ALVIN L. BRAGG JR., District Attorney

A True Bill

Foreperson

ADJOURNED TO PART _____ ON _____

JA-39

# EXHIBIT B

# Morgan Lewis

## WHITE PAPER

### Conflicts of Interest and the President

Background for President-Elect Trump's January 11, 2017 Press Conference
Prepared by Morgan, Lewis & Bockius LLP[1]

## I. OVERVIEW

From President Washington to Vice President Rockefeller to President-Elect Trump, many of this Nation's leaders have been extraordinarily successful businessmen. Neither the Constitution nor federal law prohibits the President or Vice President from owning or operating businesses independent of their official duties, as a careful textual and historical analysis shows.

Generally speaking, federal conflict-of-interest laws prohibit "officers" or "employees" of the United States from taking positions against the country's interests, maintaining outside employment, receiving an outside salary for official duties, or taking official acts that affect their personal financial interests.[2]

But these laws have historically not applied to the President or Vice President. As then-Assistant Attorney General Antonin Scalia observed in an Office of Legal Counsel memorandum, the term "officer" typically includes neither the President nor Vice President.[3] And since 1989, Congress has approved this tradition by expressly excluding the President and Vice President—along with Members of Congress and federal judges—from most conflict-of-interest laws.[4] The Office of Government Ethics has recently re-affirmed that these conflict-of-interest laws do not apply to the President.[5]

Though Congress has long exempted the President and Vice President from federal conflict-of-interest laws, consistent with a tradition extending back to the Founding, many of these public servants have nevertheless sought to provide extra assurances that their undivided commitment is to the good of the country. For example, Presidents Johnson and Carter voluntarily stepped away from their broadcasting stations and peanut farms.[6]

Today, President-Elect Trump wishes to announce his own plans to transfer management of his businesses and to voluntarily limit those businesses' ability to engage in transactions that could pose any conflict-of-interest concerns.

---

[1]   Authored by: Sheri Dillon, Fred F. Fielding, Allyson N. Ho, Michael E. Kenneally, William F. Nelson, and Judd Stone.

[2]   *See generally* 18 U.S.C. §§ 203, 205, 207-09.

[3]   Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice President* (Dec. 1974).

[4]   18 U.S.C. § 202(c) (stating that, unless otherwise provided, "officer" and "employee" do not include President or Vice President).

[5]   Letter from Walter M. Shaub, Jr., Director, Office of Government Ethics, to Senator Thomas R. Carper, at 2 (Dec. 12, 2016) ("[T]he primary criminal conflicts of interest statute, 18 U.S.C. § 208, is inapplicable to the President[.]").

[6]   *See* Megan J. Ballard, *The Shortsightedness of Blind Trusts*, 56 KAN. L. REV. 43, 54-56 (2007).

## II.  THE PRESIDENT-ELECT'S PLAN

### Leadership and Management of The Trump Organization

President-Elect Trump will relinquish management of his investment and business assets for the duration of his Presidency.  To accomplish this, all of President-Elect Trump's investment and business assets, commonly known as The Trump Organization—comprised of hundreds of entities—have been or will be conveyed to a Trust, which will be managed for the duration of his Presidency by his sons, Don and Eric, and a Trump executive, Allen Weisselberg.  Collectively—and unanimously—Allen, Don, and Eric will have the authority to manage The Trump Organization and have full decision-making authority for the duration of the Presidency, without any involvement whatsoever by President-Elect Trump.  To implement this transfer, President-Elect Trump will resign from all official positions he holds with The Trump Organization entities.

Further, to ensure that The Trump Organization continues to operate in accordance with the highest ethical standards, President-Elect Trump is appointing an Ethics Advisor to the management team.  Under the terms of the Trust Agreement, written approval of the Ethics Advisor is required for all actions, deals, and transactions that could potentially raise ethics or conflict-of-interest concerns.  President-Elect Trump, as well as Don, Eric, and Allen are committed to ensuring that the activities of The Trump Organization are beyond reproach, and that the Organization avoids even the appearance of a conflict of interest, including through any advantage derived from the Office of the Presidency.

As part of her family's transition to Washington, D.C., President-Elect Trump's daughter, Ivanka Trump will resign from all of her positions in The Trump Organization and the Ivanka Trump brand/fashion business and will have no involvement with the management or operations of either organization.  As she and her husband Jared move their family to D.C. in the coming weeks, Ms. Trump will be focused on settling her children into their new home and schools.

### Status of President-Elect Trump's Investments

President-Elect Trump has already disposed of his investments in publicly traded or easily liquidated investments.  As a result, the Trust will hold only two kinds of assets:  liquid assets, such as cash, obligations of the United States government, and positions in a government-approved diversified portfolio, and the President-Elect's preexisting, illiquid, very valuable business assets.  These include Trump-owned, operated, and branded golf clubs, commercial rental property, resorts, hotels, and rights to royalties from preexisting licenses of Trump marks, productions, books, goods, and similar assets. Examples of these assets include Trump Tower, Mar-a-Lago, Trump International Hotels, and Trump Vineyard Estates.

### Status of The Trump Organization's Deals and Rules for Entering into New Deals

The President-Elect also recognizes that his election was a significant event for the country—and one from which he should not benefit personally.  The President-Elect therefore directed The Trump Organization to terminate all pending deals—over 30 in number—which resulted in an immediate financial loss of millions of dollars, not just for President-Elect Trump but for Don, Ivanka, and Eric as well.

Since then, The Trump Organization has not sought or entered into any new deals.  It has in essence been functioning only as an asset management company, and will continue to do so until after the new management and ethics review structure, as set forth in the Trust Agreement, is in place.  Going forward, the Trust Agreement places severe restrictions on new deals to avoid any possible conflicts of interest or concerns that The Trump Organization is exploiting the Office of the Presidency.

JA-42

First, the Trust Agreement prohibits—without exception—new foreign deals during the duration of President-Elect Trump's Presidency.  Specifically, the Trust and The Trump Organization will be prohibited at all times during the Presidency from engaging in any new deals with respect to the use of the "Trump" brand or any trademark, trade name, or marketing intangibles associated with The Trump Organization or Donald J. Trump in any foreign jurisdictions.

Second, new domestic deals will go through a rigorous vetting process.  At a minimum, new deals shall require:   (i) the unanimous vote of approval of the Trustees, and (ii) written confirmation from the Ethics Advisor that the proposed transaction is both substantively and procedurally an arm's-length transaction, that it involves an appropriate counterparty, and that it does not raise potential conflicts of interest or similar ethics issues.   President-Elect Trump will have no role in deciding whether The Trump Organization engages in any new deal, and he will be completely sequestered from any information regarding the Organization's decisions; in other words, he will learn about them only through the media, as the American People would.

Third, the Trust Agreement prohibits The Trump Organization from entering into any new transaction or contract with a foreign country, agency, or instrumentality thereof, including a sovereign wealth fund, foreign government official, or member of a royal family, the United States government or any agency or instrumentality thereof, or any state or local government or any agency or instrumentality thereof, other than normal and customary arrangements already undertaken before the President-Elect's election.

**Further Measures Taken to Isolate President-Elect Trump from The Trump Organization**

To further reinforce the President-Elect's separation from The Trump Organization, the Trust Agreement will sharply limit the information that the President-Elect receives regarding the Trust's assets.  Reports transmitted to the President-Elect will only reflect the profit or loss of the Company as a whole.  The reports will not include an accounting of the performance of each individual business within the Company.  Conversely, the President-Elect will not share nonpublic information with The Trump Organization or the Trust, and the Trust will not make use of any nonpublic information, from any governmental source, to engage in financial transactions on the Company's behalf.

To assist its employees in operating at the highest level of integrity and ethical standards, The Trump Organization has established the new position of Chief Compliance Officer.  The sole responsibility of the Chief Compliance Officer is to ensure that The Trump Organization businesses are operating at the highest levels of integrity and are not taking any actions that actually exploit, or even could be perceived as exploiting, the Office of the Presidency.  In addition, The Trump Organization has directed that no communications of the Organization, including social media accounts, will reference or otherwise be tied to President-Elect Trump's role as President of the United States or the Office of the Presidency.

In summary, President-Elect Trump is taking these extraordinary steps to ensure that the Office of the Presidency is isolated from The Trump Organization.  President-Elect Trump promised the American People that he would Make America Great Again:  he takes these steps to assure the American People that his sole focus is on that pledge—and that he intends only for the American People to benefit from his term as President.

## III.  THE FOREIGN EMOLUMENTS CLAUSE

Some commentators have claimed that the Constitution prevents the President-Elect from owning interests in businesses that serve foreign customers.  In particular, they object to the Trump International Hotel in Washington, D.C.

On assuming office, the President-Elect will be bound by—and will scrupulously abide by—his obligations under the Constitution.  That includes the obligations created by the constitutional provision that these

commentators highlight, the Foreign Emoluments Clause.  That provision prohibits an individual holding an "Office of Profit or Trust" under the United States from "accept[ing]" a "present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without congressional approval.[7] But these commentators are wrong to suggest that business in the ordinary course at any of the Trump International Hotels, or at any of the President-Elect's businesses, risks violating this obligation.

The scope of any constitutional provision is determined by the original public meaning of the Constitution's text.[8]  Here that text, understood through historical evidence, establishes that foreign governments' business at a Trump International Hotel or similar enterprises is not a "present, Emolument, Office, or Title."  So long as foreign governments pay fair-market-value prices, their business is not a "present" because they are receiving fair value as a part of the exchange.[9]  It clearly is not an "Office"[10] or a "Title"[11] from that government.  These commentators therefore must rest their argument on the final category of prohibited benefit:  "Emolument."

As shown below, an emolument was widely understood at the framing of the Constitution to mean any compensation or privilege associated with an *office*—then, as today, an "emolument" in legal usage was a payment or other benefit received as a consequence of discharging the duties of an *office*.  Emoluments did not encompass all payments of any kind from any source, and would not have included revenues from providing standard hotel services to guests, as these services do not amount to the performance of an office, and therefore do not occur as a consequence of discharging the duties of an office.

The Constitution's text shows that the word had this more limited meaning.  Apart from the Foreign Emoluments Clause, the term emolument appears twice more in the Constitution, and both times refers to compensation associated with an office.  First, the Incompatibility Clause bars congressmen from assuming "any civil Office . . . the Emoluments whereof shall have been encreased during" the congressman's tenure.  U.S. CONST. art. I, § 6, cl. 2.  Second, the Compensation Clause, which guarantees the President's compensation during his term of office, prohibits him from "receiv[ing] within that Period any other Emolument from the United States, or any of them."  *Id.* art. II, § 7, cl. 7.

Although the Supreme Court has never interpreted the scope of the Foreign Emoluments Clause, it long ago understood "emolument" this way in another context.  The Court explained that "the term *emoluments* . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of [an] office."  *Hoyt v. United States*, 51 U.S. 109, 135 (1850).  Other legal experts early in the Nation's history used the word the same way, including Alexander Hamilton and James Madison in *The Federalist Papers*[12] and Attorneys General in numerous formal opinions.[13]

Supporting this understanding is parallel language in the nearly adopted Titles of Nobility Amendment to the Constitution.  In 1810, Congress voted by overwhelming margins to extend the Foreign Emoluments Clause to all citizens, not just federal officials.[14]  The proposed amendment would have prohibited private citizens' acceptance of "any present, pension, office, or emolument, of any kind whatever, from any

---

[7]   U.S. CONST. art. I, § 9, cl. 8.

[8]   *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 78-92 (2012); Antonin Scalia, *Originalism:  The Lesser Evil*, 57 U. CIN. L. REV. 849, 862-64 (1989).

[9]   *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "gift" as "[t]he voluntary transfer of property to another without compensation").

[10]   *See id.* (defining "office" as "[a] position of duty, trust, or authority, esp. one conferred by a governmental authority for a public purpose").

[11]   As suggested by the immediately preceding prohibition on the granting of titles of nobility, U.S. CONST. art. I, § 9, cl. 8, "Title" refers to official titles of honor or distinction.

[12]   *See, e.g.*, THE FEDERALIST 2, 177, 243, 268, 340, 379-80 (G. Carey & J. McClellan eds., 2001).

[13]   *E.g.*, *Salaries of Officers of Arkansas Territory*, 1 Op. Att'y Gen. 310, 310 (1819); *Salaries to Ministers and Consuls*, 2 Op. Att'y Gen. 470, 471 (1831); *Marshal of Florida*, 6 Op. Att'y Gen. 409, 410 (1854).

[14]   20 ANNALS OF CONGRESS 671, 2050-51 (1853).

Emperor, King, Prince, or foreign Power," stripping violators of their citizenship and barring them from state or federal office.[15]  The amendment came within two states of ratification—indeed, because of a publishing mistake, several generations believed it *was* part of the Constitution.[16]

Yet there is no evidence anyone at the time thought the proposed amendment restricted citizens' ability to engage in commerce with foreign nations, their governments, their representatives, or their instrumentalities.  That suggests that the public did not understand the prohibition on accepting foreign emoluments to prohibit commerce with foreign states or their representatives through fair-market-value exchanges—and, by implication, that the Foreign Emoluments Clause does not reach these transactions.  Given the importance of foreign trade in the Nation's early decades, the absence of any indication that the proposed amendment would have had this effect further supports understanding "emolument" not to encompass fair-market-value transactions—consistent with the term's other uses in the Constitution, its common legal use at the Founding, and the Supreme Court's explanation of the term.

There are further problems with understanding "emoluments" to include any kind of benefit an individual might receive.  For one thing, it would have been redundant to list "present" and "Emolument" in the Clause separately, because any present would already qualify as a benefit.  For another thing, it would lead to absurd results.  For example, if the Constitution's Article II prohibition on the President receiving "any other Emolument from the United States, or any of them" refers to *any* benefit, including fair-market-value transactions, then the President violates the Constitution by purchasing Treasury bonds or receiving interest on a retirement account from federal or State bonds.[17]  That cannot be correct.

Commentators who argue for a more expansive understanding of the Clause tend to focus not on the Constitution's original public meaning, but on more subjective conceptions of the policies behind the Clause.  Moreover, while non-judicial opinions provided to guide members of the Executive Branch have suggested that the Clause has a broad scope, none of the published opinions has gone so far as to classify fair-market-value transactions as emoluments.  And the factual circumstances giving rise to opinions finding Foreign Emoluments Clause violations are different from those here.[18]

Other opinions fully accord with the Constitution's original public meaning and are incompatible with the notion that the Constitution prohibits the President-Elect's businesses from renting hotel rooms to foreign governments at fair-value rates.  One opinion, for example, declined to view a pension as an emolument because it was neither a gift nor a salary.[19]  Another reached a similar conclusion about civil damages paid to a victim of Nazi persecution because they were "not paid as profit, gain, compensation, perquisite, or advantage flowing to him as an incident to possession of an office or as compensation for services rendered."[20]  Still another acknowledged that emoluments were "profit[s] arising from office or

---

[15]  *Id.* at 671.

[16]  *See* Gideon M. Hart, *The "Original" Thirteenth Amendment:  The Misunderstood Titles of Nobility Amendment*, 94 MARQ. L. REV. 311, 313-15 (2010); Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment:  A Historical and Bibliographic Nightmare*, 88 LAW LIBR. J. 121, 126 (1996) ("[T]hree or more generations of Americans grew up assuming that the amendment was law.").

[17]  *See* Andy Grewal, *Should Congress Impeach Obama for His Emoluments Clause Violations?*, YALE J. ON REG.: NOTICE & COMMENT (Dec. 13, 2016), http://yalejreg.com/nc/should-congress-impeach-obama-for-his-emoluments-clause-violations/.

[18]  *See, e.g.*, *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 820–21 (1970) (informant for Columbian government); *In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382, 383 (1986) (employment by Royal Saudi Navy); *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 96 (1986) (work on contract with Taiwanese government); *Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*, 12 Op. O.L.C. 67, 69 (1988) (foreign law-enforcement agents); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (partnership in law firm that represented foreign government); *Emoluments Clause and World Bank*, 25 Op. O.L.C. 113, 114 (2001) (contractual employment relationship).

[19]  *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 191 (1981).

[20]  *Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 334 (1955).

employment" and generally required services for a foreign government amounting to accepting an office from a foreign state.[21]

In short, the Constitution does not forbid fair-market-value transactions with foreign officials.  To put to rest any concerns, however, the President-Elect is announcing he will donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury.  Historically, when federal officers received a gift or emolument from a foreign state, they surrendered possession of it to the federal government,[22] though they were permitted to retain amounts necessary to offset their business expenses.[23]  Although the Constitution does not require the President-Elect to do the same for profits from his businesses' fair-market-value transactions, he wants to eliminate any distractions by going beyond what the Constitution requires.

---

[21]   *To C.C. Gordon, U.S. Coast Guard*, 44 Comp. Gen. 130, 130-31 (1964); *see also Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537, 538 (1871) ("[A] minister of the United States abroad is not prohibited by the Constitution from rendering a friendly service to a foreign power, even that of negotiating a treaty for it, provided he does not become an officer of that power.").

[22]   *E.g.*, 12 ANNALS OF CONGRESS 443 (1851).

[23]   REMINISCENCES OF JAMES A. HAMILTON 210 (1869) (officer who received horses as gift from foreign state was entitled to be paid for "expenses incident to their transportation and keeping"); *cf. Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (objecting to retention of law firm profits, not pre-expense revenues).

JA-46

# EXHIBIT C

JA-47

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | NOTICE OF MOTION |
| -against- | Ind. No. 71543-23 |
| DONALD J. TRUMP, | PARTIALLY EX PARTE AND UNDER SEAL |
| Defendant. | |

PLEASE TAKE NOTICE that the People will move this Court, located at 100 Centre Street, New York, New York on May 4, 2023, at 9:30 a.m., or as soon thereafter as counsel may be heard for the following relief: the issuance of a protective order pursuant to Criminal Procedure Law 245.70(1) to restrict or defer, and make such other orders as appropriate, regarding the discovery and inspection of material and information otherwise discoverable pursuant to Article 245 of the Criminal Procedure Law in the above-captioned case, and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By: _____
Catherine McCaw
Assistant District Attorney

Dated:      New York, New York
            April 24, 2023

JA-48

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

               Defendant.

------------------------------------------------------------

PARTIALLY EX PARTE AND
UNDER SEAL

AFFIRMATION AND
MEMORANDUM OF LAW
IN SUPPORT OF A MOTION
FOR A PROTECTIVE ORDER
PURSUANT TO CPL 245.70(1)

Ind. No. 71543-23

Catherine McCaw, an attorney admitted to practice before the courts of this state, affirms under penalty of perjury that:

1.  I am an Assistant District Attorney in the New York County District Attorney's Office. I am assigned to the prosecution of the above-captioned case, and as such I am familiar with the facts and circumstances underlying the case.

2.  I submit this affirmation in support of a motion for a protective order pursuant to CPL 245.70(1).  Article 245 of the Criminal Procedure Law permits the court, for good cause shown, to enter a protective order that grants the Defense access to discovery materials subject to safeguards that will protect the integrity of the materials, avoid disruption of the proceedings, and reduce the risk of harassment to witnesses and participants in these proceedings.  Initially, the People sought to negotiate the terms of a protective order with defense counsel.  Defense counsel has since indicated that they will not consent to a protective order, so the People are now moving for such an order.  As other courts have recognized, and as set forth in more detail below,

2

Defendant Donald J. Trump ("Defendant") has a longstanding and perhaps singular history of attacking witnesses, investigators, prosecutors, trial jurors, grand jurors, judges, and others involved in legal proceedings against him, putting those individuals and their families at considerable safety risk.  See, e.g., Mem. & Order Denying Access to Juror Names, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2871045, at *1 & nn.1-2 (S.D.N.Y. Apr. 10, 2023); Mem. Opinion re Anonymous Jury, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2612260, at *1-2, 4-5 & nn. 7, 15-16 (S.D.N.Y. Mar. 23, 2023) ("Mr. Trump repeatedly has attacked courts, judges, various law enforcement officials and other officials, and even individual jurors in other matters.") (collecting examples).  The People therefore respectfully submit that good cause is shown for the reasonable restrictions requested in this application.

3.   Defendant is charged with thirty-four counts of Falsifying Business Records in the First Degree, PL § 175.10.  These charges arise from Defendant's efforts to conceal an illegal scheme to influence the 2016 presidential election.  As part of this scheme, Defendant requested that an attorney who worked for his company pay $130,000 to an adult film actress shortly before the election to prevent her from publicizing an alleged sexual encounter with the Defendant.  Defendant then reimbursed the attorney for the illegal payment through a series of monthly checks.  Defendant caused business records associated with the repayments to be falsified to disguise his and others' criminal conduct including violations of New York Election Law § 17-152 and violations of the individual and corporate campaign contribution limits under the Federal Election Campaign Act, 52 U.S.C. § 30101 et seq.

4.  The statements in this affirmation are made upon information and belief, the sources of which include a review of the records and files of the New York County District Attorney's Office ("DANY"), a review of the grand jury minutes, and a review of publicly available material, including Defendant's social media posts, court filings, and news articles.

5.  I respectfully submit portions of this affirmation and memorandum of law ex parte, and request that the unredacted version of this motion be sealed and remain under seal upon filing.  See People v. Bonifacio, 179 A.D.3d 977, 979 (2d Dept. 2020) ("Article 245 logically and expressly permits a court, when appropriate, to consider evidence and arguments ex parte when considering whether to issue a protective order.").  A redacted version of the People's papers, which does not reveal the nature of sensitive discovery materials in advance of the entry of a protective order, will be provided to the Defense. In the copy of this submission provided to the Court, information that is redacted in the defense copy is highlighted in green. Should witness testimony be necessary, it is further requested that such testimony occur ex parte and in camera, and that the resulting transcript be sealed pursuant to CPL 245.70(1).

**PROTECTIVE ORDER REQUESTS UNDER CPL 245.70(1)**

6.  The People seek the following restrictions, deferrals, and/or other orders limiting the discovery and inspection of information and materials otherwise discoverable pursuant to Article 245 of the Criminal Procedure Law:

    a.  REQUIRING that any materials and information provided by the People to the Defense in accordance with their discovery obligations as well as any other

4

documents, materials, or correspondence provided to or exchanged with defense counsel of record on the above-captioned matter ("Defense Counsel"), in any form or component part, with the exception of any materials provided to the People by Defendant, the Trump Organization, or any company owned in part or entirely by Defendant or the Donald J. Trust Revocable Trust (the "Covered Materials") shall be used solely for the purposes of preparing a defense in this matter;

b.  REQUIRING that any person who receives the Covered Materials shall not copy, disseminate, or disclose the Covered Materials, in any form or by any means, to any third party (except to those employed by counsel to assist in the defense of the above-captioned criminal proceeding) including, but not limited to, by disseminating or posting the Covered Materials to any news or social media platforms, including, but not limited, to Truth Social, Facebook, Instagram, WhatsApp, Twitter, Snapchat, or YouTube, without prior approval from the Court;

c.  DELAYING until the commencement of jury selection disclosure of the names and identifying information of New York County District Attorney's Office personnel, other than sworn members of law enforcement and assistant district attorneys, and permitting the People to redact such names and identifying information from any of the Covered Materials;

5

d. REQUIRING that those of the Covered Materials that are designated by the People as limited dissemination (the "Limited Dissemination Materials"), whether in electronic or paper form, shall be kept in the sole possession and exclusive control of Defense Counsel and shall not be copied, disseminated, or disclosed in any form, or by any means, by Defense Counsel, except to those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding;

e. REQUIRING that Defendant is permitted to review the Limited Dissemination Materials only in the presence of Defense Counsel, but Defendant shall not be permitted to copy, photograph, transcribe, or otherwise independently possess the Limited Dissemination Materials; and

f. REQUIRING that forensic images of witness cell phones shall be reviewed solely by Defense Counsel and those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding, except that, after obtaining consent from the People, Defense Counsel may show Defendant portions of the forensic images that relate to the subject matter of the case.

7. Although the People seek limitations before providing the Covered Materials to the Defense, the limitations largely relate to how the Defense must handle the materials and what they may do with them. In this application, the People seek to defer the Defense only from learning the identity of DANY support staff. Thus, this application is narrowly tailored to assure the integrity of the discovery materials, the integrity of these proceedings, and witness

6

safety, while still allowing the Defense to use and review the materials to prepare a defense at trial.

## FACTUAL BACKGROUND[1]

8.   Defendant and his associates have been the subject of several investigations during and after his time in office, including a special counsel investigation into allegations that his campaign coordinated with the Russian government, two impeachment inquiries, two additional special counsel investigations into allegations of mishandling of classified documents and concerning the events of January 6, 2021, and a Georgia grand jury investigation into allegations of improper influence on the 2020 Georgia presidential election results.  Defendant has posted extensively regarding these investigations on social media and has discussed these investigations in speeches, at political rallies, and during television appearances.  His posts have included personal attacks on those involved in the investigation, including witnesses, jurors, and those involved in conducting or overseeing the investigations. In many instances, he has even posted regarding their family members.  Defendant has begun to mount similar attacks against those involved in the instant criminal case, publicly disparaging  witnesses associated with the case, as well as the District Attorney, District Attorney's Office personnel, and the Court.  This pattern, particularly given that Defendant is currently under federal investigation for his handling of classified materials, gives rise to

---

[1] The facts and circumstances of this case are summarized for the specific purpose of establishing good cause for a protective order and do not constitute a comprehensive summary of all facts gathered during the investigation and prosecution of the case.

7

significant concern that Defendant will similarly misuse grand jury and other sensitive materials here.

## I.  Defendant's History of Attacking Those Associated with Prior Investigations

9.  On May 5, 2017, Robert S. Mueller III ("Mueller") was appointed to serve as Special Counsel to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump" and other associated matters, an inquiry that came to be known as the Mueller Investigation. Exhibit 1.  Dep't of Justice Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters.

10.  During the course of the Mueller Investigation, Defendant launched numerous social media attacks on individuals associated with the investigation, ranging from the prominent to the obscure.  He posted frequently regarding James Comey ("Comey"), the former director of the Federal Bureau of Investigation ("FBI"), a witness in the investigation who alleged that Defendant had pressured him to end the FBI's probe into Russian campaign interference.  On April 13, 2018, Defendant referred to Comey as an "untruthful slime ball" in a social media post.[2]  On December 9, 2018, a day after Comey testified before Congress, Defendant stated in another post, "Leakin' James Comey must have set a record for who lied the most to Congress in one day.  His Friday testimony was so untruthful!"

---

[2] All social media posts referenced in this document are collected in Exhibit 2.

8

11. Less prominent individuals associated with the probe were also the subject of attacks. For example, Defendant repeatedly attacked Bruce Ohr ("Ohr"), a Department of Justice ("DOJ") attorney involved with the investigation into Russian campaign interference. On August 14, 2018, he posted regarding both Ohr and his wife, stating, "Bruce Ohr of the 'Justice' Department (can you believe he is still there) is accused of helping disgraced Christopher Steele 'find dirt on Trump.' Ohr's wife, Nelly, was in on the act big time – worked for Fusian GPS on Fake Dossier." He also regularly posted regarding Lisa Page and Peter Strzok, two FBI employees associated with the investigation. On June 5, 2018, for example, Defendant posted, "Wow, Strzok-Page, the incompetent & corrupt FBI lovers, have texts referring to a counter-intelligence operation into the Trump Campaign dating way back to December, 2015. SPYGATE is in full force! Is the Mainstream Media interested yet? Big stuff!"

12. In September 2019, the United States House of Representatives began an impeachment inquiry into Defendant, based on allegations that Defendant attempted to use military aid to Ukraine as a bargaining chip in return for Ukraine to begin investigations into his political rival, Joseph Biden. Again, Defendant launched public social media attacks on those associated with the investigation, including two public servants who testified in connection with the inquiry, Marie Yovanovitch and Alexander Vindman ("Vindman"). On November 15, 2019, Defendant posted, "Everywhere Marie Yovanovitch went turned bad. She started off in Somalia, how did that go? Then fast forward to Ukraine, where the new Ukrainian President spoke unfavorably about her in my second phone call with him. It is a U.S. President's absolute right to appoint ambassadors." On February 8, 2020, he posted regarding Vindman, "[H]e was very

9

insubordinate, reported contents of my 'perfect' calls incorrectly & was given a horrendous report by his superior, the man he reported to, who publicly stated that Vindman had problems with judgement [sic], adhering to the chain of command and leaking information.  In other words, 'OUT'."

13. Following the 2020 presidential election, Defendant became the subject of several inquiries involving his response to the election results.  These included an inquiry by the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol (the "House Select Committee") into the events of January 6, 2021; a separate federal criminal investigation into the events of January 6 currently headed by Special Counsel Jack Smith; and a Fulton County, Georgia grand jury investigation into efforts by Defendant and his allies to interfere with the Georgia election results.  In connection with these events, Defendant and his allies repeatedly publicly attacked two Fulton County poll workers, Ruby Freeman ("Freeman") and Wandrea ArShaye Moss, accusing them of election malfeasance.  Freeman was a temporary poll worker who worked to tabulate ballots in Fulton County, including for the 2020 presidential election. Freeman Interview 12:13-17 (May 31, 2022), Exhibit 3.

14. Defendant and his allies accused Freeman and her daughter of election misconduct involving suitcases full of ballots, beginning soon after the election and continuing through this year.  For example, on January 3, 2023, Defendant queried on social media, "What will the Great State of Georgia do with the Ruby Freeman MESS?"  On January 10, 2023, he posted, "Ruby, her daughter, and others who ran back into the counting room, grabbing cases from under the

'skirted' table, and then back to their counting machines where they came from prior to hearing 'water main break' (which never happened) have got a lot of explaining to do…"

15. Freeman described to the House Select Committee how these attacks from Defendant and his allies affected her personally. She stated that on the advice of the FBI, she was forced to vacate her home "for safety" for approximately two months, beginning around January 6, 2021. Freeman Interview 25:25-26:4 (May 31, 2022), Exhibit 3. She "received hundreds of racist, threatening, horrible calls and messages." Freeman Interview 7:23-24. She even stated that she was afraid to use her name in public: "Now I won't even introduce myself by name anymore. I get nervous when I bump into someone I know in the grocery store who says my name. I'm worried about who's listening. I get nervous when I have to give my name for food orders. I'm always concerned about who's around me." Freeman Interview: 6:17-20.

## II.   Defendant Has Begun to Launch Similar Attacks in this Case

16. In early 2023, press reports began to circulate that a New York County grand jury was conducting an investigation into Defendant. In response, Defendant began to launch a series of attacks against individuals who may testify at trial, including Stephanie Clifford (a/k/a Stormy Daniels) ("Clifford") and Michael Cohen ("Cohen"), and other personnel associated with this investigation. On March 15, 2023, he posted to social media, "I did NOTHING wrong in the 'Horseface' [*i.e.,* Clifford] case. . . . She knows nothing about me other than her conman lawyer, Avanatti, and convicted liar and felon, jailbird Michael Cohen, may have schemed up." On March 27, 2023, he posted, "I won a Federal lawsuit for almost $500,000 against Stormy 'Horseface' Daniels. Never had an 'affair' with her, and would never have wanted to!"

11

17. Defendant has also launched attacks against the District Attorney, referring to him on March 23, 2023 as a "SOROS BACKED ANIMAL," and a "degenerate psychopath that truely [sic] hates the USA" on March 24, 2023.  On March 23, 2023, he posted two images side-by-side that gave the appearance that he was taking aim at the District Attorney's head with a baseball bat.  He has directed attacks at the Court and his family after he became aware of the commencement of these proceedings.  Defendant has also repeatedly referenced an Assistant District Attorney assigned to this prosecution in his posts, including on March 16, 2023, March 27, 2023, March 31, 2023, and April 3, 2023.

## III.   Allegations that Defendant Mishandled Classified Materials

18.   According to information publicly filed by the DOJ, after Defendant left office in 2021, the National Archives and Records Administration ("NARA") began to communicate with Defendant's representatives to request the return of documents relating to his presidential administration.  Dep't of Justice Response to Motion filed August 30, 2022, 22-Civ-81294, S.D. Fla, Exhibit 4 at 4.  In response to a request from NARA, Defendant ultimately produced fifteen boxes of materials.  Id.  Upon reviewing materials, officials from NARA referred the matter to DOJ, observing that a review of the materials revealed that "highly classified records were unfoldered, intermixed with other records and otherwise unproperly [sic] identified." Exhibit 4 at 5.  The FBI began an investigation and later obtained a warrant authorizing the search of Defendant's property at Mar-a-Lago for additional documents.  Exhibit 4 at 12.  As a result of the execution of the warrant, the FBI seized thirty-three items consisting mostly of boxes.  Id.  Upon review of the material, investigators concluded that the materials included

more than a hundred unique documents with classification markings.  Exhibit 4 at 13.  Since the execution of the warrant, the investigation has been referred to Special Counsel Jack Smith. Recent press reports relay that the investigators have been asking witnesses about allegations that Defendant displayed a map with sensitive information to "aides and visitors."  Exhibit 5.

## IV.   Procedural History

19. In the days leading up to Defendant's April 4, 2023 arraignment, the People reached out to Defense Counsel in an attempt to negotiate the terms of a protective order on consent.  Both sides spoke on the phone on several occasions, and the People made several modifications to their original proposed order in response to the Defense Counsel's requests. On the afternoon before Defendant's arraignment, the parties reached an agreement in principle.  Following the arraignment, the People learned that  Defense Counsel would not consent to a protective order.

20. On April 12, 2023, Defendant filed a civil complaint in Florida against Cohen, eight days after Defendant was arraigned in this case.  Exhibit 6.  The complaint alleges that Cohen, an attorney formerly employed by Defendant's business, damaged Defendant by speaking about matters including the allegations that gave rise to the instant criminal case, alleging causes of action including breach of fiduciary duty and breach of contract.  E.g., Exhibit 6, ¶¶ 111-14.  He also alleges conversion with respect to a portion of the payment that related to the falsified business records in this case.  Exhibit 6, ¶¶ 161-65.

21. The protective order that the People now seek is substantially similar to the order that the parties agreed to in principle, with a couple of important modifications.  The parties

13

had originally agreed that they would litigate separately the issue of how to handle the public filing of references to discovery materials.  The People are now of the view that whatever protective order the Court enters will govern the filing of materials on the public docket.  In addition, Defendant's subsequently-filed suit against Cohen heightens the risk that Defendant will use the Covered Materials for purposes other than a defense of this case.  The People therefore seek additional limitations regarding who may be present when Defendant views the materials and additional protections for the contents of witness cell phones.

22. The People anticipate turning over a substantial number of materials in discovery. These materials include grand jury minutes, grand jury exhibits, materials received in response to grand jury subpoenas, materials obtained voluntarily from witnesses, and other materials relating to the case.  These materials also include forensic images of two cellular telephones obtained from a witness.

## MEMORANDUM OF LAW

Criminal Procedural Law Article 245 provides that, upon a showing of "good cause," the court may "at any time order that discovery or inspection of any kind of material or information . . . be denied, restricted, conditioned or deferred, or make such other order as is appropriate." CPL 245.70(1). It is well-settled that "[g]ood cause determinations are necessarily case-specific and therefore fall within the discretion of the trial court." People v. Linares, 2 N.Y.3d 507, 510 (2004). As the Court of Appeals has explained, "By its very nature, good cause admits of no universal, black-letter definition. Whether it exists, and the extent of disclosure that is appropriate, must remain for the courts to decide on the facts of each case."

14

In re Linda F.M., 52 N.Y.2d 236, 240 (1981). The judicial interpretation of "good cause" varies based upon the context in which it is used. See Matter of Molloy v. Molloy, 137 A.D.3d 47, 52-53 (2d Dept. 2016) ("Good cause should be read in context by considering the statute as a whole [and] should also be interpreted in accordance with legislative intent, as expressed in the legislative history").

CPL 245.70(4) sets forth a flexible list of factors that bear on the Court's determination of good cause, including, for example, danger to the safety of a witness and risk of witness intimidation or harassment, as well as lesser impositions such as "unjustified annoyance or embarrassment," risk of an "adverse effect on the legitimate needs of law enforcement," and whether the defendant has a history of witness intimidation or tampering. CPL 245.70(4). The statute is non-exhaustive, and also authorizes the Court to consider the "nature of the stated reasons" for the relief sought and other "similar factors" that "outweigh the usefulness of the discovery" to the defense. Id. Thus, at its core, the protective order statute embodies a discretionary balancing test that asks the Court to weigh the prosecutorial and public safety interests raised by the People in support of a protective order with the utility to the Defense of the subject information and materials.

Given the plain language of CPL 245.70 and its stated purpose in the legislative history, the statute's good cause requirement should be broadly interpreted and protective orders should be liberally granted. Regarding the plain language, a comparison of the factors listed in CPL 245.70(4) and the former CPL 240.50(1) confirms that the statute expands the use of protective orders to protect witnesses and the integrity of the criminal justice system. Both

15

sections list factors to consider in determining whether good cause exists; however, CPL 245.70(4) incorporates the factors included in the predecessor section while simultaneously reducing the threshold for determining risk to others and expanding the list of relevant factors. For example, while former CPL 240.50(1) authorized the Court to consider "a <u>substantial</u> risk of physical harm, intimidation, economic reprisal, bribery, or unjustified annoyance or embarrassment to any person," CPL 245.70(4) omits the word "substantial" and includes "harassment"—a fairly low level of impact—as a relevant factor. And, while the current and predecessor statutes each authorize the Court to consider "danger to the integrity of physical evidence," CPL 245.70(4) also authorizes the Court to consider "danger to the . . . safety of a witness."

It is clear from the text of CPL 245.70(4), which expands the non-exhaustive list of factors that may be considered by the Court in weighing good cause, that the statute imposes a more favorable standard on the movant than its predecessor. The legislative history confirms that such a result was intended by the statute's drafters. During floor debates, Senator Jamal Bailey, who served as a leader of the discovery reform efforts, noted that "there is a broader protective order under this bill than there is in the [then] current law." Senate Debate Transcript of Senate Print 1509C, Mar. 31, 2019, at 2602. Senator Bailey further stated that a protective order could be obtained under CPL Article 245 for good cause shown, which he described as a "very reasonable and . . . [l]enient standard." <u>Id.</u> at 2604. This language evinces an obvious intent on the part of the Legislature to establish an expanded protective order practice to counterbalance the statute's otherwise liberal discovery obligations in cases where

16

the non-exhaustive factors in CPL 245.70(4) outweigh the benefit of early disclosure. Cf.
People v. Phillips, 67 Misc.3d 196, 201 (Sup. Ct., Bronx Co. 2020) ("[I]t seems that the
legislature eased the 'good cause' showing required where a risk of witness safety or
harassment is alleged in part to balance the new requirement that witness names and contact
information and other sensitive discovery [such as grand jury testimony] be provided long
before a trial begins").[3]

The People seek a protective order that grants the Defense access to the Covered
Materials, while employing certain safeguards to protect the integrity of those materials and of
the proceedings.  Specifically, the People seek to shield the identity of DANY support staff to
prevent them from experiencing public harassment.  The People seek to prevent the Defense
from discussing or disseminating the Covered Materials publicly.  The People seek to prevent
Defense Counsel from leaving materials designated as Limited Dissemination Materials with the
Defendant.  And finally, the People seek to make forensic images of witness cell phones viewable
only to Defense Counsel in the first instance.  There is good cause to grant this motion under
CPL 245.70.  At bottom, the Defense will have near-complete access to the People's discovery

---

[3] As one appellate justice has observed on expedited review, the presumption of openness found in
CPL 245.20(7) does not apply to protective order motions. People v. Bonifacio, 179 A.D.3d 977, 978
(2d Dept. 2020). The presumption, by its own terms, applies exclusively to CPL 245.10 (setting forth
the timing of the parties' automatic disclosures), 245.20(1) (setting forth the scope of automatic
disclosures), and 245.25 (pertaining to disclosures prior to guilty pleas). It does not apply to
CPL 245.70, which is the section of the statute that deals with protective orders. On the contrary,
CPL 245.70 was designed to offset the presumption of openness and serve a broad license for a court
to limit the People's discovery obligations when factors such as witness safety outweigh the benefit of
early disclosure. The fact that the main proponent of the new legislation described CPL Article 245 as
embracing a more "lenient" standard for protective orders confirms that the omission of the
protective order section from the presumption of openness is an intentional feature of the statute.

17

materials pursuant to the People's proposed protective order.  This access will allow the Defense to defend this matter in Court, while still safeguarding against the improper use of the materials.

## I.     The People Seek Permission to Shield the Identities of DANY Support Staff

The People request that they be allowed to delay disclosure of the names and identifying information for DANY personnel, other than sworn members of law enforcement and assistant district attorneys, until the commencement of jury selection and that they be permitted to redact such names and identifying information from any of the discovery materials.  As described above, Defendant has an extensive history of publicly attacking individuals with connections to investigations into his conduct, including some who are only tangentially related.

Freeman's moving testimony highlights how Defendant's use of his bully pulpit can completely upend the lives of ordinary private citizens who were simply doing their jobs. When Defendant posts on social media, he commands a large audience, and certain of his followers have been willing to take action against those Defendant mentions online.  Freeman, a temporary poll worker, had to leave her home upon the advice of the FBI for two months, so great was the risk posed by Defendant's followers.  Indeed, in recognition of the unique risks posed by Defendant's "repeated" attacks against "courts, judges, various law enforcement officials and other public officials, and even individual jurors in other matters," Judge Lewis A. Kaplan, presiding over the civil trial between Defendant and E. Jean Carroll, took the unusual step of preventing even attorneys assigned to the case from learning the identities of potential jurors.  Mem. Opinion re Anonymous Jury, <u>Carroll v. Trump</u>, No. 22-cv-

18

10016, 2023 WL 2612260, at *2 & n.7 (S.D.N.Y. Mar. 23, 2023); see also Mem. & Order Denying

Access to Juror Names, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2871045 (S.D.N.Y. Apr.

10, 2023).

DANY support staff includes its dedicated paralegals.  For many DANY paralegals,

this is their first job after graduating from college.  While lawyers and sworn members of law

enforcement who work for the Office must do their work in public, there is no corresponding

need for its support staff to be identified to the world and potentially subject to Defendant's

attacks.  Courts routinely grant protective orders delaying disclosure of witness information

where there is a risk of harassment or intimidation, and appellate courts have even held that

to deny such a request by the People is an abuse of discretion.  See, e.g., People v. Brown, 180

A.D.3d 1107, 1109 (2d Dept. 2020).

Further, the prejudice to the Defense of granting such a request is minimal.  The

identities of support staff relate to the subject matter of the case only in limited ways.  ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  Paralegals also identify themselves as notetakers within witness notes,

but the identity of the paralegal as notetaker only becomes relevant to the extent that a witness

testifies at trial in a manner that is inconsistent with these notes.  If the Defense receives this

information upon commencement of jury selection, they will have ample time to make use of

19

this information in preparation for trial.  Given the risks posed by the Defendant's behavior and the minimal prejudice to the Defendant, the People request that the Court enter a protective order shielding the identity of DANY support staff in the form proposed by the People.

## II.   Defendant and the Defense Should Be Limited in the Ways They Use the Covered Materials

The People seek an order that Defendant and the Defense Counsel shall use the Covered Materials solely for the purposes of preparing a defense in this case and shall be prohibited from disclosing the materials to third parties or posting them on social media.  At the outset, it is important to note that the People are not at this time seeking a gag order in this case.  Defendant has a constitutional right to speak publicly about this case, and the People do not seek to infringe upon that right.  That said, neither Defendant nor  Defense Counsel have a First Amendment right to speak publicly regarding materials they receive through discovery.   See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33-34 (1984) (upholding a protective order preventing public disclosure of discovery materials in a civil case against a First Amendment challenge); see also United States v. Caparros, 800 F.2d 23, 25 (2d Cir. 1986) (following Seattle Times and holding the same in the context of criminal discovery); In re Ctr. on Priv. & Tech. v. New York City Police Dep't, 181 A.D.3d 503, 504 (1st Dep't 2020), recalled and vacated (Apr. 29, 2021) (following Seattle Times in the context of civil discovery).[4]

---

[4] This opinion was recalled and vacated upon the petition of the parties after the parties reached a settlement regarding the treatment of the underlying documents.  It does not appear that the vacatur was based on the merits of the case.  See Exhibit 7.

As the United States Supreme Court emphasized in upholding the protective order at issue in Seattle Times, "As the Rules authorizing discovery were adopted by the state legislature, the processes thereunder are a matter of legislative grace." 467 U.S. at 33. As described above, the People's ability to seek protective orders is integral to the functioning of Article 245. The law now requires the People to disclose a great deal of highly sensitive information shortly after arraignment, including grand jury testimony, material obtained by means of a grand jury subpoena, and victim name and contact information, to name just a few. There are strong public policy reasons why grand jury materials should be kept secret prior to trial, including "prevention of subornation of perjury and tampering with prospective witnesses at the trial" and "assurance to prospective witnesses that their testimony will be kept secret so that they will be willing to testify freely." People v. Di Napoli, 27 N.Y.2d 229, 235 (1970). Unlike the People, neither the Defendant nor Defense Counsel is bound by the requirements of grand jury secrecy, nor can they be prosecuted for Unlawful Grand Jury Disclosure, P.L. § 215.70. For these reasons, courts have routinely entered orders preventing defendants and their counsel from using discovery materials for purposes other than preparing a defense and from disseminating the materials to third parties.

The risk that this Defendant will use the Covered Materials inappropriately is substantial. Defendant has a long history of discussing his legal matters publicly—including by targeting witnesses, jurors, investigators, prosecutors, and judges with harassing, embarrassing, and threatening statements on social media and in other public forums—and he has already done so in this case. Further, Defendant may seek to use the Covered Materials

to advance his recently-filed lawsuit against Cohen. The legislature did not mandate broad disclosures by the People in advance of trial so that the People's discovery materials could be used for these purposes. Rather, the purpose of the discovery reforms was to allow defendants to make informed decisions about whether to plead guilty in criminal cases. See, e.g., Press Release, Governor Andrew Cuomo, In 9th State of the State Address, Governor Advances Agenda to Ensure the Promise of Full, True Justice for All, Exhibit 8 ("Defendants will also be allowed the opportunity to review whatever evidence is in the prosecution's possession *prior to pleading guilty to a crime*.") (emphasis added); Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., N.Y. Crim. Pro. CPL 245.10 ("Broader pre-trial discovery enables the defendant to make a more informed plea decision, minimizes the tactical and often unfair advantage to one side, and increases to some degree the opportunity for an accurate determination of guilt or innocence.") (quoting People v. Copicotto, 50 N.Y.2d 222, 226 (1980)). The proposed order will in no way prejudice Defendant in his ability to mount a defense to the allegations in court or to determine whether to plead guilty. By the very terms of the order, Defendant and Defense Counsel will be allowed to use the materials freely—with certain safeguards discussed, infra—in order to prepare a defense or consider any plea decision. The People therefore request that the Court enter the proposed order permitting Defendant and Defense Counsel to use the discovery materials solely for the purpose of preparing a defense in this matter and limiting their ability to provide the materials to third parties, including the press, or to post them to social media platforms.

22

### III.   Defendant Should be Permitted to Review Certain Discovery Materials Only in the Presence of Defense Counsel

The People seek the ability to mark certain materials as "Limited Dissemination Materials" and that such materials shall be kept solely in the possession of Defense Counsel, that Defendant may view these materials only in the presence of Defense Counsel, and that Defendant will not be allowed to copy, photograph, transcribe, or otherwise independently possess the materials. The People seek to apply this designation to any materials other than (1) materials that the People received from Defendant or any company owned in part or entirely by Defendant or the Donald J. Trump Revocable Trust or (2) third-party records that relate to an account that is in Defendant's name or in the name of a company that is owned in part or entirely by Defendant or the Donald J. Trump Revocable Trust.

These restrictions are reasonable and necessary to protect the discovery materials. Many of the materials the People will provide in discovery are highly sensitive in nature. Defendant is currently under a separate criminal investigation for mishandling classified materials. Investigators are also reportedly looking into whether Defendant improperly shared these materials with individuals who were not entitled to see them. Given these allegations, the restrictions the People propose are reasonable to prevent Defendant from mishandling the discovery materials. Further, these restrictions will have minimal impact on Defendant's ability to prepare a defense. He will have full access to these materials, so long as he is in the presence of Defense Counsel. This access will afford him ample opportunity to prepare a defense. See People v. Olivieri, 2022 WL 402744, at *4 (Sup. Ct., N.Y. Co. February 9, 2022)

23

(Statsinger, J.) (granting a protective order that allowed only defense counsel to watch certain videos and only in the prosecutor's office and further observing that while the proposed process might be "more inconvenient than simply viewing the videos along with his client, it will certainly be sufficient to allow counsel and the defendant to prepare a defense").

## IV.    The People Seek Additional Protections for Forensic Images of Witness Cell Phones

The People are prepared to disclose full forensic images of two cell phones belonging to a witness.[5]  Only a fraction of materials contained in these images relate to the subject matter of the case, and much of the content is highly personal in nature, including text messages with friends and family, vacation photos, and other materials that would be invasive for others to see.  See Riley v. California, 573 U.S. 373, 395 (2014) ("[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate.").  Defendant has an antagonistic relationship with witnesses in this case, referring to Clifford in social media posts as "horseface" and to Cohen as a "liar" and "jailbird." Exhibit 2.  Under these circumstances, it would be highly inappropriate to grant Defendant unfettered access to a witness's most personal materials.  See People v. Cole, 2020 NYLJ LEXIS 537, at *14 (Sup. Ct., Queens Co. 2020) ("Legislative debate concerning the enactment of the new

[5] ████████████████████████████████████████████████████████

24

discovery rules indicates that the ability to obtain a protective order was considered an important safeguard for the safety and privacy of victims and civilian witnesses.").

Nonetheless, the People acknowledge that these forensic images do contain materials that relate to the subject matter of the case and that the Defendant should be entitled to review such materials.  The People therefore propose that only Defense Counsel will be authorized to view the full forensic images.  Should Defense Counsel wish to share certain portions of the forensic images with the Defendant, they should first notify the People and may share the materials with the Defendant only if the People do not object.  This procedure strikes a fair balance between the People's interest in protecting the private information of a witness with the Defendant's interest in preparing a defense.  See People v. Olivieri, 2022 WL 402744, at *4.

## V.    The People Request that Defendant be Advised on the Record of the Terms of Any Protective Order the Court Enters

Should Defendant violate the terms of any protective order issued by the Court, the People may seek to enforce its terms by initiating a prosecution for Criminal Contempt in the Second Degree, P.L. § 215.50(3).  In advancing such a prosecution, the People will be required to show that Defendant had knowledge of the contents of the order.  "Notice of the contents of, and therefore of the conduct prohibited by, [a mandate of the court] may be given either orally or in writing or in combination."  People v. Clark, 95 N.Y.2d 773, 775 (2000).  The People request, therefore, that Defendant be advised on the record of the terms of any protective order the Court enters.  Such a proceeding would also permit the Court to

25

determine on its own whether any future noncompliance with a protective order is sanctionable under Judiciary Law § 750(A).

## **CONCLUSION**

Criminal Procedure Law 245.70 expressly permits broad restrictions and limitations of discovery materials and information upon a showing of good cause. The facts set forth above establish good cause to conclude that a protective order, in the form proposed above, is appropriate. The requested limitations are reasonable, narrowly written, and necessary to protect witnesses' safety and privacy interests and the legitimate needs of law enforcement.

No application for this or similar relief, other than that described herein, has been made in any court.

WHEREFORE, the People respectfully request that a protective order be granted pursuant to CPL 245.70, in the form annexed, and that the Court grant such other and further relief as it may deem just and proper.

Respectfully submitted,

Catherine McCaw
Assistant District Attorney

Dated:        New York, New York
              April 24, 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | PROTECTIVE ORDER |
| -against- | Ind. No. 71543-23 |
| DONALD J. TRUMP, | |
| Defendant. | |

The Court, being satisfied based upon the application of Assistant District Attorney Catherine McCaw, dated April 24, 2023 that good cause exists for an order to restrict, defer, and make such other order as is appropriate with respect to disclosure and inspection of discoverable materials and information, pursuant to Section 245.70 of the Criminal Procedure Law, it is hereby:

ORDERED that any materials and information provided by the People to the Defense in accordance with their discovery obligations as well as any other documents, materials, or correspondence provided to or exchanged with defense counsel of record on the above-captioned matter ("Defense Counsel"), in any form or component part, with the exception of any materials provided to the People by Defendant, the Trump Organization, or any company owned in part or entirely by Defendant or the Donald J. Trust Revocable Trust (the "Covered Materials") shall be used solely for the purposes of preparing a defense in this matter; it is further

ORDERED that any person who receives the Covered Materials shall not copy, disseminate, or disclose the Covered Materials, in any form or by any means, to any third party (except to those employed by counsel to assist in the defense of the above-captioned criminal

proceeding) including, but not limited to, by disseminating or posting the Covered Materials to any news or social media platforms, including, but not limited, to Truth Social, Facebook, Instagram, WhatsApp, Twitter, Snapchat, or YouTube, without prior approval from the Court; it is further

ORDERED that disclosure of the names and identifying information of New York County District Attorney's Office personnel, other than sworn members of law enforcement and assistant district attorneys, shall be delayed until the commencement of jury selection and permitting the People to redact such names and identifying information from any of the Covered Materials; it is further

ORDERED that those of the Covered Materials that are designated by the People as limited dissemination (the "Limited Dissemination Materials"), whether in electronic or paper form, shall be kept in the sole possession and exclusive control of Defense Counsel and shall not be copied, disseminated, or disclosed in any form, or by any means, by Defense Counsel, except to those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding; it is further

ORDERED that Defendant is permitted to review the Limited Dissemination Materials only in the presence of Defense Counsel, but Defendant shall not be permitted to copy, photograph, transcribe, or otherwise independently possess the Limited Dissemination Materials; it is further

ORDERED that forensic images of witness cell phones shall be reviewed solely by Defense Counsel and those employed by Defense Counsel to assist in the defense of the above-

JA-75

captioned criminal proceeding, except that, after obtaining consent from the People, Defense Counsel may show Defendant portions of the forensic images that relate to the subject matter of the case; it is further

ORDERED that, in the event Defendant seeks expedited review of this protective order under CPL 245.70(6)(a), any obligation that would exist on the part of the People to produce the information and materials that are the subject of this order is held in abeyance pending the determination of the intermediate appellate court; and it is further

ORDERED, that the portions highlighted in green in People's Motion in Support of a Protective Order dated April 24, 2023, and any accompanying documents, exhibits, or transcripts, are sealed pursuant to CPL 245.70(1).

DATED:     New York, New York

_____

So Ordered:

_____
                    Justice of the Supreme Court

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

MOTION FOR PROTECTIVE ORDER

Indictment No. 71543-23

Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x
                                                            :
THE PEOPLE OF THE STATE OF NEW                              :
YORK,                                                       :
                                                            :        Ind. No. 71543-23
                                                            :
        - against -                                        :
                                                            :
DONALD J. TRUMP,                                           : **MEMORANDUM OF LAW IN**
                                                            : **OPPOSITION TO THE**
                    Defendant.                              : **PEOPLE'S MOTION FOR A**
                                                            : **PROTECTIVE ORDER**
                                                            :
                                                            :
------------------------------------------------------------X

## INTRODUCTION

After the District Attorney's Office of New York ("DANY") held a press conference

accusing President Donald J. Trump of criminal conduct, both charged and uncharged, issued a

press release regarding those allegations, released a "Statement of Facts" that detailed numerous

factual allegations separate and apart from the substantive charges in the indictment,[1] stood back

and did nothing as a former employee wrote a purported tell-all book about the investigation of

President Trump,[2] and oversaw a grand jury process that repeatedly leaked to media outlets like

the *New York Times*,[3] DANY now seeks to limit President Trump's ability to talk about the

---

[1] Attached as Exhibit A.

[2] *See* Opinion Denying Motion for an Injunction, *Bragg v. Jordan,* 2023 WL 2999971 at *11 (SDNY Apr. 19, 2023) ("There is no evidence that DANY took *any action* before the book was published . . . . Similarly, after publication, DANY *again* took no action.  It did not request a gag order, seek an injunction, pursue Pomerantz for money damages, refer Pomerantz for an ethics inquiry, or even raise any concerns about the publication with Pomerantz." *Emphasis in original*)

[3] *See Bragg v. Jordan,* 2023 WL 2999971 at *9 n. 11 ("The Court notes that the secrecy of the grand jury proceedings in the pending criminal case was compromised before an indictment was even announced.").

evidence against him and prepare his own defense by asking this Court to impose an unduly restrictive Protective Order (the "People's Proposed Protective Order").

President Trump is the leading Republican candidate for President of the United States. To state the obvious, there will continue to be significant public commentary about this case and his candidacy, to which he has a right and a need to respond, both for his own sake and for the benefit of the voting public. The People's justification for seeking such an extraordinarily broad protective order is that President Trump has a history of "attacking" individuals involved in legal proceedings against him.  (People's Affirmation and Memorandum of Law in Support of a Motion for a Protective Order (the "Motion"), at 2).  This "history," according to the People, justifies an extremely restrictive protective order that, if entered, would severely hamper President Trump's ability to publicly defend himself and prepare for trial.

Upon analysis, however, the People have failed to establish good cause for the extreme protective order they seek.  The Affirmation submitted by the People mainly cites President Trump's conduct in other investigations where he has called witnesses or prosecutors names.  With respect to *this case*, however, the People's allegations are limited to allegations that President Trump made disparaging statements about two witnesses, Michael Cohen and Stephanie Clifford (a/k/a "Stormy Daniels"), and the District Attorney. People's Affirmation, ¶15-16.  Missing from the People's Affirmation, however, is the fact that these two witnesses have engaged in inflammatory conduct towards President Trump, both during the investigation and since the indictment, in attacking President Trump and discussing at length their version of the facts of the case, and that both the District Attorney and a lead former Assistant District Attorney have also made disparaging and obnoxious comments about President Trump and have also discussed at length the evidence and the facts of this case.

2

Thus, to date, the two witnesses in this case who the People complain that President Trump has attacked, Michael Cohen and Stormy Daniels, have over the course of the past five years continuously made extensive derogatory comments to the media and the public about President Trump that are at least as insulting as any statements which President Trump has made about them. For example, in one of Michael Cohen's books, he repeatedly calls President Trump disparaging names, including stating that President Trump was "a cheat, a liar, a fraud, a bully, a racist, a predator, a con man." *See* https://www.cbsnews.com/news/michael-cohen-memoir-says-trump-is-guilty-of-the-same-crimes-that-sent-him-to-prison/. Stormy Daniels also engages in extensive name calling and belittling of President Trump in the book she published, *Full Disclosure*.

The prosecutors note in their motion papers that President Trump previously called District Attorney Bragg an "animal," but fail to point out that the prosecutors in this case have similarly publicly made extensive derogatory statements about President Trump. For example, even before District Attorney Bragg was elected, he told the press that President Trump was guilty of criminal conduct (even though President Trump had never been charged with a crime) which he got away with because he was "a rich old white man:" District Attorney Bragg stated: "So, yeah, you are right, we got two standards of justice. Harvey Weinstein. Jeffrey Epstein. Being a rich old white man has allowed you to evade accountability in Manhattan. That includes [President] Trump and his children – they were engaged in fraud in a SoHo real estate deal with his children." https://www.politifact.com/article/2023/apr/12/heres-what-manhattan-district-attorney-alvin-bragg/. Former ADA Mark Pomerantz published a book entitled *People v. Donald Trump* in which he repeatedly likens President Trump to a mafia boss and worse.

3

Notably, the People's Proposed Protective Order does not, by its terms, prevent President Trump or any witness from continuing to comment negatively about each other on social media. Instead, what the People's Proposed Protective Order does is restrain President Trump from publicly commenting on the *evidence*.

However, in addition to calling President Trump names, the witnesses and the District Attorney's Office have repeatedly and extensively publicly discussed the *evidence* in this case, and the People's Proposed Protective Order would not stop them from doing so in the future. Michael Cohen and Stormy Daniels have made a living discussing the facts of this case in books, interviews, podcasts and on Twitter. Indeed, since the date of the indictment Stormy Daniels was featured on the front page of New York Magazine in an extensive interview discussing the facts of this case. Daniels previously wrote and published an entire book about the facts underlying her role in this case and discussed the facts with Michael Cohen on a podcast. Cohen has similarly opined on the instant case and other investigations involving President Trump repeatedly on podcasts, in his two books, on Twitter, and during countless interviews and questioning by the press. For every social media post the People cite and/or attach to their Motion, there are vile and dangerously inappropriate social media posts, podcasts or interviews by Cohen and Daniels.

With respect to the District Attorney's Office, former ADA Pomerantz discussed the facts of the instant prosecution in his book, *People v. Donald Trump*, prompting one federal court judge to find that if ever there was a work-product privilege with respect to the subject-matter of the book "the protection has been *waived* by DANY" based on its complete inaction both before and after publication in seeking to prevent Pomerantz's conduct. *Bragg v. Jordan*, 2023 WL 2999971 at *11. And immediately following the indictment of this case District Attorney Bragg released to the public an extensive "Statement of Facts" which reveals and quotes from grand jury material,

4

including evidence that does not in any way underlie the false business record charges in the indictment, and gave a press conference, in which he further discussed the grand jury evidence.

Given the conduct by the District Attorney's Office and its witnesses to date, imposing the People's Proposed Protective Order, which would restrain President Trump from discussing the very evidence which the witnesses and the District Attorney have repeatedly discussed publicly and which they would not be restrained from discussing in the future, would not be justified by "good cause" nor consistent with the goals of C.P.L. § 245.70, and would also be unconstitutional.

The Defense does not object to an appropriately fashioned protective order, consistent with C.P.L. § 245.70, but the People's Proposed Protective Order must be rejected. The Court should instead impose the protective order submitted by the Defense (the "Defense's Proposed Protective Order"), attached as Exhibit B, which is sufficient to achieve the goals underlying §245.70, while still allowing President Trump to effectively defend himself and prepare for trial.

## I.      FACTUAL BACKGROUND

Prior to the unsealing of the Indictment, attorneys for the defense and the prosecution had several productive discussions about an appropriate protective order in this case. The People had drafted a proposed protective order and the parties were close to an agreement, with one of the disagreements (which defense counsel believed would be worked out) being the defense's belief that the protective order must apply to both the defense and the prosecution. During these conversations, however, the People failed to disclose to the defense that: (1) the People intended to publicly release—and post to their website—an extensive Statement of Facts describing and quoting grand jury evidence, including evidence that had nothing to do with the falsifying business records violations charged in the indictment but instead concerned alleged "other bad acts," (2) that the People gratuitously intended to discuss the evidence at length in open court at

arraignment; and (3) that the District Attorney Bragg intended to give an extensive televised press conference—covered by all the major networks and by media all over the world— in which the District Attorney would lay out his version of the facts, based in part on grand jury evidence and then post a summary of his statement, including charts, to DANY's website.

After reviewing the Statement of Facts and the public statements and actions by the District Attorney, all of which would have violated the People's Proposed Protective Order if engaged in by President Trump or his attorneys,[4] defense counsel had further discussions with the prosecutors about an appropriate protective order. Those discussions did not result in an agreement. Surprisingly, the People apparently believe that New York law allows the District Attorney's Office and its witnesses to freely speak and quote from grand jury evidence, but not President Trump or his counsel. But President Trump cannot be the only interested party in this case whose speech about the evidence in the case is restricted by the Court. Recognizing the need to have appropriate guardrails in place, the Defense's Proposed Protective Order applies to both the People and President Trump and prohibits both parties from improperly using discovery or grand jury materials produced by the People, but would not prohibit (only) President Trump

---

[4] The "Statement of Facts" and the press release describe a "Scheme" whereby President Trump and "others agreed to identify and suppress negative stories about him" and describes extensive meetings and communications over five pages that, quite plainly, have nothing to do with the 34 counts of the indictment Exhibit A, pg. 2-7. Within this story, the People quote witness statements and rely on other evidence that most certainly is rooted in grand jury materials. *See also* Exhibit D (Transcript of Press Conference of District Attorney Alvin Bragg (Apr. 4, 2023)) Exhibit E (District Attorney, New York County, Press Release: District Attorney Bragg Announces 34-Count Felony Indictment of Former President Donald J. Trump (Apr. 4, 2023), https://manhattanda.org/district-attorney-bragg-announces-34-count-felony-indictment-of-former-president-donald-j-trump/. The District Attorney in his press conference referenced the purported evidence against President Trump derived from its grand jury investigation—evidence it now wants to bar President Trump from commenting on. If President Trump issued a "Statement of Facts" in similar fashion to what the People issued, relying on grand jury evidence and other materials provided by the People, he would be in violation of the People's Protective Order. We respectfully submit that this is patently unfair and inappropriate.

from engaging in the same type of public speech about the evidence which the District Attorney's Office and its witnesses have engaged in, both before and after the indictment.

Specifically, the Defense objects to the following aspects of the People's Proposed Protective Order:

- To the extent it does not apply to the People;

- To the extent that it prevents President Trump from talking about the evidence produced by the People (the Defense does not object to that portion of the People's Proposed Protective Order that prevents public posting of the evidence or other material provided by the People);

- To the extent that it delays identifying personnel employed by the District Attorney's Office who will be called by the People in their case-in-chief as witnesses or who were witnesses in the grand jury (the Defense does not object to delaying disclosure of the names of support staff, such as paralegals, who participated in witness interviews);

- Finally, to the extent that it requires consent from the People prior to showing any of the forensic images of witness cell phones to President Trump.

A red-line version comparing the People's Proposed Protective Order with the Defense's Proposed Protective Order is attached as Exhibit C.


## II.    ARGUMENT

The People's motion for such a restrictive protective order should be denied for several reasons. First, the People have failed to show "good cause" for the imposition of their extensive and draconian proposed protective order, as required by § 240.75.  Second, the proposed protective order would violate President Trump's First Amendment rights insofar as (a) it permits others, particularly DANY and key prosecution witnesses, to discuss the evidence in the case but not him, and (b) it interferes with his campaign for President of the United States because it prevents him from discussing with the public his qualifications for federal office. Third, the proposed protective

order violates federalism principles by transforming this Court into an arbiter of what a candidate for President may say to prospective voters.  Fourth, it limits President Trump's ability to prepare his defense by limiting his access to certain documents and interferes with his relationship with his counsel by requiring prior approval of the People before he may be given access to certain materials.

Instead of the overly broad and overly restrictive protective order offered by the People, President Trump proposes a reasonable alternative protective order that appropriately addresses legitimate privacy concerns but is consistent with President Trump's rights as both a charged defendant a candidate for the Office of President of the United States.

### A. The People Have Failed to Show That "Good Cause" Exists for the Proposed Protective Order

Criminal Procedure Law § 245.70 requires any party who seeks a protective order to establish that "good cause" exists for the restrictions included in such an order.  In determining whether good cause exists, the statute directs that courts should consider numerous factors including constitutional rights or limitations.

Here, the People's proffered good cause is primarily an allegation that President Trump publicly attacked the credibility of two expected witnesses, Stormy Daniels and Michael Cohen. Separately, the People attach and cite several examples of President Trump criticizing individuals he views as being dishonest, unjustly political, or acting in a way inconsistent with their duties. Notably, even though the People refer to numerous investigations into, and lawsuits against, President Trump, *they fail to point to even one instance where President Trump has misused discovery that was obtained by him or his lawyers*.  Rather, the People claim "good cause" exists for their extreme proposed protective order because President Trump has a purported history of

8

calling other people names.  Furthermore, the People's motion fails to address the significant fact that the two witnesses in this case about whom the People complain that President Trump has made derogatory comments have themselves made extensive and derogatory comments about President Trump, as well as the facts of this case in the public,[5] and are free to continue to do so without President Trump being allowed to impeach their false statements with evidence, as necessary. Similarly, the People relying on an on-going investigation by the Special Counsel in Washington, D.C. involving potentially classified materials is irrelevant as there has been no finding of wrongdoing, nor can there be a comparison between President Trump's rights to respond to public statements against him by the People and others and what the Special Counsel is investigating in Washington, D.C.

Thus, the People's "good cause" boils down to the fact that President Trump and two specific witnesses, who have thrust themselves into the public sphere by seeking out publicity and earning a living by attacking President Trump, are trading barbs and calling each other names. These facts do not establish a basis for the People's request that President Trump should be the only person in this case who is prohibited from discussing the evidence in this case.

**B. The Proposed Protective Order Infringes Upon the President's First Amendment Right to Discuss His Character and Qualifications for Federal Office and the First Amendment Right to the Public to Hear President Trump's Views**

The People have proposed what would be an unprecedented and extraordinarily broad muzzle on a leading contender for the presidency of the United States.  Prohibiting President Trump from publicly discussing the evidence against him, especially to the extent it relies on

---

[5] *See* pages 3-4 above.  Notably, when the Court requested that the People "speak to [their] witnesses" about not making public comments about the case, the People responded that "there is only so much we can do." Transcript of Arraignment at 12–13.

9

Cohen and Gifford, infringes on President Trump's constitutional right to make his case to the American people for why he should be elected President. Further exacerbating this constitutional infirmity, the People propose that this restriction apply only to President Trump, not to themselves or to their witnesses.

The People blithely cast aside concerns about the constitutional implications of their proposed protective order, asserting that "neither Defendant nor Defense Counsel have a First Amendment right to speak publicly regarding materials they receive through discovery." Motion at 20. To be sure, President Trump does not object to a reasonable protective order that accomplishes the goals of C.P.L. § 245.70, but the People's broad position overreads their primary case, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). Contrary to how it is portrayed by the People, Justice Brennan noted in *Seattle Times* that "[t]he Court today recognizes that pretrial protective orders, designed to limit the dissemination gained through the civil discovery process, are subject to scrutiny under the First Amendment." *Seattle Times*, 467 U.S. at 37 (Brennan, J., concurring). And the Supreme Court subsequently made clear that *Seattle Times* applied intermediate scrutiny to First Amendment claims relating to discovery, indicating that there is a First Amendment interest in speaking publicly about discovery materials. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) ("In *Seattle Times*, this Court applied heightened judicial scrutiny before sustaining a trial court order prohibiting a newspaper's disclosure of information it learned through coercive discovery."); *see also* Dustin B. Benham, *Dirt Secrets: The First Amendment in Protective-Order Litigation*, 35 Cordozo L. Re. 1781 (2014) (discussing a split in subsequent judicial interpretations of *Seattle Times*). Moreover, the Court has a statutory obligation to consider constitutional rights in assessing whether there is good cause. *See.* §

245.70(4) ("In determining good cause under this section the court may consider: constitutional rights or limitations[.]").

The People's Proposed Protective Order infringes upon President Trump's First Amendment right to freely discuss his own character and qualifications for federal office and the First Amendment rights of the American people to hear President Trump's side of the story. President Trump's ability to speak freely is particularly important in this case, which many "view as a manifest abuse of power and nakedly political prosecution … that has the potential to interfere with the exercise of presidential duties and with an upcoming federal election." *Bragg v. Jordan*, 2023 WL 2999971, at *12 (SDNY Apr. 19, 2023).

It is not surprising then that the Supreme Court has repeatedly emphasized "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United v. Federal Election Commission*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)) (cleaned up);[6] *see also Federal Election Commission v. Cruz*, 142 S. Ct. 1638, 1650 (2022) ("The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'") (quoting *Monitor Patriot v. Roy*, 401 U.S. 265, 272 (1971)).  "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1971). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at

---

[6] This Court made this exact point at arraignment, noting that free speech rights "apply doubly to Mr. Trump, because he is a candidate for the presidency of the United States. So, those First Amendment rights are critically important, obviously." Tr. at 12.

340 (2010).  Accordingly, "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution" and "[t]he First Amendment affords the broadest protection to such political expression." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

The Sixth Circuit's opinion in *United States v. Ford* is instructive on this point.  830 F.2d 596 (6th Cir. 1987).  *Ford* concerned a judicial limit on extrajudicial statements by a sitting U.S. Congressman who was also soon to be a candidate for reelection.  In this context, the court noted that "[a] criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him.  The defendant's interest in reply to the charges and to the associated adverse publicity, thus, is at a peak." *Ford*, 830 F.2d at 599.  The court went on to declare that the defendant "[was] entitled to attack the political motives of the [opposite party] administration which he claims is persecuting him because of his political views . . ." and "[was] entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress," even if "[o]ne may strongly disagree with the political view he expresses." *Ford*, 830 F.2d at 600-601.  The court further expressed concern that the defendant's "opponents will attack him as an indicted felon" and "[h]e will be unable to inform his constituents of his point of view. And reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance" if the court's order were allowed to stand. *Ford*, 830 F.2d at 601.  *See also United States v. Brown*, 218 F.3d 415, 430 (5th Cir. 2000) (upholding an order limiting extrajudicial commentary that "made special allowances for [the defendant's] re-election campaign by lifting most of the order . . . for the duration of the

campaign," allowing the defendant "to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race.").

The People have implicitly sought to distinguish their motion by claiming that "the People are not at this time seeking a gag order in this case." Motion at 20. But effectively they are. The People's proposed order is incredibly broad. It prohibits the President from publicly discussing *any* materials obtained through discovery that are not already in the President's possession. At the same time, the People have spoken and written freely in public about their case and the strength of their evidence, including by speaking to the press, giving press conferences, and a former ADA writing a nearly 300-page book on the investigation into President Trump, a book which discusses the facts of this case, extolls as a truthteller the People's main witness in this case, and disparages President Trump for his alleged conduct. Now, after attempting to damage his reputation in the eyes of the public with their characterizations of the facts of this case, the People seek to prevent President Trump from telling the American people about the many weaknesses of the People's case and the exculpatory evidence obtained in the discovery process. This is, in practice, an attempt to gag a leading candidate for the Presidency of the United States and it is a clear infringement upon the First Amendment rights of the President Trump and the American electorate.

Worse, the People's proposed protective order would *only* apply to the defense. The People have pointedly refused to create a judicially enforceable order that applies to both parties and the People's witnesses. This violates the principle that government cannot distinguish between speakers based on their identity. *See Citizens United*, 558 U.S. at 898 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

Finally, we submit that, given the People's extensive discussion of grand jury materials, before there was a protective order in place, and then, only after they were satisfied that they had made all the public statements that they wanted to make, asking for a protective order which would prevent the defendant from responding and publicly discussing discovery material, the People have "dirty hands" and should therefore not be entitled to ask for this relief from this Court. *Levy v. Braverman*, 24 AD2d 430, 430 (2nd Dep't 1965) ("The doctrine of 'clean hands' is a fundamental principle of equity as well as of public policy. Where a litigant has himself been guilty of inequitable conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse him affirmative aid.").

## C.    The Proposed Protective Order Raises Serious Federalism Concerns

The Constitution assigns the power to elect the President to the duly appointed electors of each state.  U.S. Const., art.2, § 1, cl. 2.  A state judicial order limiting the ability of a leading presidential candidate to discuss his own character and qualifications would improperly interpose the state court in the middle of a campaign for federal office.

The court in *Ford* recognized analogous concerns, holding "the doctrine of separation of powers—a unique feature of our constitutional system designed to ensure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communications between a congressman and his constituents." *Ford*, 830 F.2d at 601.  Similar concerns apply to a state court protective order in the context of a presidential campaign.  Limiting the substance of what a Presidential candidate can say about discovery materials—particularly after extensive pre-trial publicity by the People and the People's primary witnesses—would effectively makes a state court a player in a federal election.  That would undermine the federal basis of our presidential election system.

**D. The People's Proposed "Additional Protections" for Forensic Images of Witness Cell Phones are a Dramatic and Unjustified Intrusion into the Attorney-Client Relationship.**

The People's Proposed Protective Order requires Defense counsel to obtain permission—*from the People*—before sharing any portion of forensic images of cell phones that the People themselves acknowledge are relevant to the indictment and the defense of the case. If this restriction were imposed, the Defense would be required to share with the People the portions of evidence they believe strategically important to review with the client and allow the People to object or otherwise have an insider's view into the defense strategy. This is an unprecedented and unjustified intrusion into the attorney-client relationship. *See People v. Clarke*, 186 A.D.3d 1707, 1708–09 (App. Div. 2nd Dept, 2020) (holding "that the Supreme Court improvidently exercised its discretion in requiring defense counsel to seek approval of the court before exhibiting the subject recordings to investigators or others employed by counsel. Under the particular circumstances of this case, the court should have permitted defense counsel to disclose the recordings to those employed by counsel or appointed to assist in the defense, without prior approval from the Supreme Court.").

As a threshold matter, Defense counsel has no intention of spending any time or energy on the contents of cell phones of witnesses that have nothing to do with our defense of President Trump. Similarly, President Trump has no interest in the contents of cell phones of witnesses that have nothing to do with his defense. But requiring Defense counsel to inform the People which portions of a forensic image they intend to share with President Trump inappropriately inserts the People into the inner deliberations of the President Trump's legal team. Mere knowledge of which materials Defense Counsel believe to be significant or warrant discussion with the client has the potential to reveal information protected by the attorney-client privilege and attorney-work product

15

privilege. This creates a risk of the People reverse engineering Defense Counsel's trial strategy based on the information that Defense Counsel chooses to share with the client. It would further serve as a deterrent to Defense Counsel sharing information with their client, in an effort to avoid such consequences. There are countless possible examples of the harm this proposed restriction would entail, for example, if Defense Counsel identify communications between the witness and other individuals who could be potential witnesses for the Defense and would be required to provide those communications to the People and seek their "permission" to share those communications with our client. That is untenable.

This proposed requirement, that the People essentially exercise a veto over Defense Counsel's ability to share information with their client, is a gross violation of President Trump's right to review the evidence against him and the Defense team's right to prepare a vigorous defense. Defense Counsel should be able to share and discuss the information with their client that *they* believe is necessary to prepare an adequate defense. They should not have to ask permission from the prosecutor to do so.

A more reasonable restriction, if one is required at all, is reflected in the Defense's Proposed Protective Order, would be to require Defense counsel to provide the Court *ex parte* and *in camera* with any forensic materials it seeks to show President Trump that is not related to (1) President Trump, (2) the Trump Organization, (3) the efforts by witnesses to cooperate with law enforcement, or (4) the charges in the indictment. Such a limitation surely addresses the People's concern that Defense Counsel limit what forensic evidence they show to President Trump to the evidence that is significant to preparing a defense in this case.

**CONCLUSION**

The People's proposed protective order is not supported by "good cause," is inappropriately restrictive and, if agreed to by the Court, would represent a dramatic infringement

JA-94

on the First Amendment rights of the President and the American people and the Sixth Amendment

Rights of President Trump.   There is no good cause justifying the objected-to restrictions.

Accordingly, the Court should reject the People's Proposed Protective Order and sign the

Defense's Proposed Protective Order.

Dated:   New York, New York
         May 1, 2023

Respectfully submitted,

Todd Blanche
Blanche Law
99 Wall Street, Suite 4460
New York NY 10005
212-716-1250
toddblanche@blanchelaw.com

Susan R. Necheles
NechelesLaw LLP
1120 Sixth Avenue, 4th Floor
New York, NY 10036
212-997-7400
srn@necheleslaw.com

Joseph Tacopina
Tacopina Seigel & DeOreo
275 Madison Avenue, 35th Floor,
New York, New York 10016
212-227-8877
jtacopina@tacopinalaw.com

Attorneys for Donald J. Trump

17

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

-against-                                    STATEMENT OF FACTS
                                             IND-71543-23
DONALD J. TRUMP,

                                  Defendant.

----------------------------------------------

## INTRODUCTION

1.     The defendant DONALD J. TRUMP repeatedly and fraudulently falsified New York business records to conceal criminal conduct that hid damaging information from the voting public during the 2016 presidential election.

2.     From August 2015 to December 2017, the Defendant orchestrated a scheme with others to influence the 2016 presidential election by identifying and purchasing negative information about him to suppress its publication and benefit the Defendant's electoral prospects. In order to execute the unlawful scheme, the participants violated election laws and made and caused false entries in the business records of various entities in New York. The participants also took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme.

3.     One component of this scheme was that, at the Defendant's request, a lawyer who then worked for the Trump Organization as Special Counsel to Defendant ("Lawyer A"), covertly paid $130,000 to an adult film actress shortly before the election to prevent her from publicizing a sexual encounter with the Defendant. Lawyer A made the $130,000 payment through a shell corporation he set up and funded at a bank in Manhattan. This payment was illegal, and Lawyer A has since pleaded guilty to making an illegal campaign contribution and

1

served time in prison. Further, false entries were made in New York business records to effectuate this payment, separate and apart from the New York business records used to conceal the payment.

4.     After the election, the Defendant reimbursed Lawyer A for the illegal payment through a series of monthly checks, first from the Donald J. Trump Revocable Trust (the "Defendant's Trust")—a Trust created under the laws of New York which held the Trump Organization entity assets after the Defendant was elected President—and then from the Defendant's bank account. Each check was processed by the Trump Organization, and each check was disguised as a payment for legal services rendered in a given month of 2017 pursuant to a retainer agreement. The payment records, kept and maintained by the Trump Organization, were false New York business records. In truth, there was no retainer agreement, and Lawyer A was not being paid for legal services rendered in 2017. The Defendant caused his entities' business records to be falsified to disguise his and others' criminal conduct.

**BACKGROUND**

5.     The Defendant is the beneficial owner of a collection of business entities known by the trade name the Trump Organization. The Trump Organization comprises approximately 500 separate entities that, among other business activities, own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties. The Trump Organization is headquartered at 725 Fifth Avenue in New York County.

6.     From approximately June 2015 to November 2016, the Defendant was a candidate for the office of President of the United States. On January 20, 2017, he became President of the United States.

**THE SCHEME**

I.     **The Catch and Kill Scheme to Suppress Negative Information**

7.     During and in furtherance of his candidacy for President, the Defendant and others agreed to identify and suppress negative stories about him.  Two parties to this agreement have admitted to committing illegal conduct in connection with the scheme.  In August 2018, Lawyer A pleaded guilty to two federal crimes involving illegal campaign contributions, and subsequently served time in prison.  In addition, in August 2018, American Media, Inc. ("AMI"), a media company that owned and published magazines and supermarket tabloids including the *National Enquirer*, admitted in a non-prosecution agreement that it made a payment to a source of a story to ensure that the source "did not publicize damaging allegations" about the Defendant "before the 2016 presidential election and thereby influence that election."

       A.     **The 2015 Trump Tower Meeting**

8.     In June 2015, the Defendant announced his candidacy for President of the United States.

9.     Soon after, in August 2015, the Defendant met with Lawyer A and AMI's Chairman and Chief Executive Officer (the "AMI CEO") at Trump Tower in New York County.  At the meeting, the AMI CEO agreed to help with the Defendant's campaign, saying that he would act as the "eyes and ears" for the campaign by looking out for negative stories about the Defendant and alerting Lawyer A before the stories were published.  The AMI CEO also agreed to publish negative stories about the Defendant's competitors for the election.

       B.     **Suppressing the Doorman's Story**

10.    A few months later, in or about October or November 2015, the AMI CEO learned that a former Trump Tower doorman (the "Doorman") was trying to sell information regarding a child that the Defendant had allegedly fathered out of wedlock.  At the AMI CEO's

3

direction, AMI negotiated and signed an agreement to pay the Doorman $30,000 to acquire exclusive rights to the story. AMI falsely characterized this payment in AMI's books and records, including in its general ledger. AMI purchased the information from the Doorman without fully investigating his claims, but the AMI CEO directed that the deal take place because of his agreement with the Defendant and Lawyer A.

11. When AMI later concluded that the story was not true, the AMI CEO wanted to release the Doorman from the agreement. However, Lawyer A instructed the AMI CEO not to release the Doorman until after the presidential election, and the AMI CEO complied with that instruction because of his agreement with the Defendant and Lawyer A.

### C. Suppressing Woman 1's Account

12. About five months before the presidential election, in or about June 2016, the editor-in-chief of the *National Enquirer* and AMI's Chief Content Officer (the "AMI Editor-in-Chief") contacted Lawyer A about a woman ("Woman 1") who alleged she had a sexual relationship with the Defendant while he was married. The AMI Editor-in-Chief updated Lawyer A regularly about the matter over text message and by telephone. The Defendant did not want this information to become public because he was concerned about the effect it could have on his candidacy. Thereafter, the Defendant, the AMI CEO, and Lawyer A had a series of discussions about who should pay off Woman 1 to secure her silence.

13. AMI ultimately paid $150,000 to Woman 1 in exchange for her agreement not to speak out about the alleged sexual relationship, as well as for two magazine cover features of Woman 1 and a series of articles that would be published under her byline. AMI falsely characterized this payment in AMI's books and records, including in its general ledger. The AMI CEO agreed to the deal after discussing it with both the Defendant and Lawyer A, and on

the understanding from Lawyer A that the Defendant or the Trump Organization would reimburse AMI.

14.    In a conversation captured in an audio recording in approximately September 2016 concerning Woman 1's account, the Defendant and Lawyer A discussed how to obtain the rights to Woman 1's account from AMI and how to reimburse AMI for its payment.  Lawyer A told the Defendant he would open up a company for the transfer of Woman 1's account and other information, and stated that he had spoken to the Chief Financial Officer for the Trump Organization (the "TO CFO") about "how to set the whole thing up."  The Defendant asked, "So what do we got to pay for this?  One fifty?" and suggested paying by cash.  When Lawyer A disagreed, the Defendant then mentioned payment by check.  After the conversation, Lawyer A created a shell company called Resolution Consultants, LLC on or about September 30, 2016.

15.    Less than two months before the election, on or about September 30, 2016, the AMI CEO signed an agreement in which AMI agreed to transfer its rights to Woman 1's account to Lawyer A's shell company for $125,000.  However, after the assignment agreement was signed but before the reimbursement took place, the AMI CEO consulted with AMI's general counsel and then told Lawyer A that the deal to transfer the rights to Lawyer A's shell company was off.

### D.    Suppressing Woman 2's Account

16.    About one month before the election, on or about October 7, 2016, news broke that the Defendant had been caught on tape saying to the host of *Access Hollywood*: "I just start kissing them [women].  It's like a magnet.  Just kiss.  I don't even wait.  And when you're a star, they let you do it.  You can do anything. . . .  Grab 'em by the [genitals].  You can do anything."  The evidence shows that both the Defendant and his campaign staff were concerned that the tape would harm his viability as a candidate and reduce his standing with female voters in particular.

17.     Shortly after the *Access Hollywood* tape became public, the AMI Editor-in-Chief contacted the AMI CEO about another woman ("Woman 2") who alleged she had a sexual encounter with the Defendant while he was married.  The AMI CEO told the AMI Editor-in-Chief to notify Lawyer A.

18.     On or about October 10, 2016, the AMI Editor-in-Chief connected Lawyer A with Woman 2's lawyer ("Lawyer B").  Lawyer A then negotiated a deal with Lawyer B to secure Woman 2's silence and prevent disclosure of the damaging information in the final weeks before the presidential election.  Under the deal that Lawyer B negotiated, Woman 2 would be paid $130,000 for the rights to her account.

19.     The Defendant directed Lawyer A to delay making a payment to Woman 2 as long as possible.  He instructed Lawyer A that if they could delay the payment until after the election, they could avoid paying altogether, because at that point it would not matter if the story became public.  As reflected in emails and text messages between and among Lawyer A, Lawyer B, and the AMI Editor-in-Chief, Lawyer A attempted to delay making payment as long as possible.

20.     Ultimately, with pressure mounting and the election approaching, the Defendant agreed to the payoff and directed Lawyer A to proceed.  Lawyer A discussed the deal with the Defendant and the TO CFO.  The Defendant did not want to make the $130,000 payment himself, and asked Lawyer A and the TO CFO to find a way to make the payment.  After discussing various payment options with the TO CFO, Lawyer A agreed he would make the payment.  Before making the payment, Lawyer A confirmed with the Defendant that Defendant would pay him back.

21.     On or about October 26, shortly after speaking with the Defendant on the phone, Lawyer A opened a bank account in Manhattan in the name of Essential Consultants LLC, a new shell company he had created to effectuate the payment.  He then transferred $131,000 from his personal home equity line of credit ("HELOC") into that account.  On or about October 27, Lawyer A wired $130,000 from his Essential Consultants LLC account in New York to Lawyer B to suppress Woman 2's account.

**E.     Post-Election Communications with AMI CEO**

22.     On November 8, 2016, the Defendant won the presidential election and became the President-Elect.  Thereafter, AMI released both the doorman and Woman 1 from their non-disclosure agreements.

23.     The Defendant was inaugurated as President on January 20, 2017.  Between Election Day and Inauguration Day, during the period of the Defendant's transition to his role as President, the Defendant met with the AMI CEO privately in Trump Tower in Manhattan.  The Defendant thanked the AMI CEO for handling the stories of the Doorman and Woman 1, and invited the AMI CEO to the Inauguration.  In the summer of 2017, the Defendant invited the AMI CEO to the White House for a dinner to thank him for his help during the campaign.

**II.     The Defendant Falsified Business Records**

24.     Shortly after being elected President, the Defendant arranged to reimburse Lawyer A for the payoff he made on the Defendant's behalf.  In or around January 2017, the TO CFO and Lawyer A met to discuss how Lawyer A would be reimbursed for the money he paid to ensure Woman 2's silence.  The TO CFO asked Lawyer A to bring a copy of a bank statement for the Essential Consultants account showing the $130,000 payment.

25.     The TO CFO and Lawyer A agreed to a total repayment amount of $420,000. They reached that figure by adding the $130,000 payment to a $50,000 payment for another

expense for which Lawyer A also claimed reimbursement, for a total of $180,000. The TO CFO then doubled that amount to $360,000 so that Lawyer A could characterize the payment as income on his tax returns, instead of a reimbursement, and Lawyer A would be left with $180,000 after paying approximately 50% in income taxes. Finally, the TO CFO added an additional $60,000 as a supplemental year-end bonus. Together, these amounts totaled $420,000. The TO CFO memorialized these calculations in handwritten notes on the copy of the bank statement that Lawyer A had provided.

26.     The Defendant, the TO CFO, and Lawyer A then agreed that Lawyer A would be paid the $420,000 through twelve monthly payments of $35,000 over the course of 2017. Each month, Lawyer A was to send an invoice to the Defendant through Trump Organization employees, falsely requesting payment of $35,000 for legal services rendered in a given month of 2017 pursuant to a retainer agreement. At no point did Lawyer A have a retainer agreement with the Defendant or the Trump Organization.

27.     In early February 2017, the Defendant and Lawyer A met in the Oval Office at the White House and confirmed this repayment arrangement.

28.     On or about February 14, 2017, Lawyer A emailed the Controller of the Trump Organization (the "TO Controller") the first monthly invoice, which stated: "Pursuant to the retainer agreement, kindly remit payment for services rendered for the months of January and February, 2017." The invoice requested payment in the amount of $35,000 for each of those two months. The TO CFO approved the payment, and, in turn, the TO Controller sent the invoice to the Trump Organization Accounts Payable Supervisor (the "TO Accounts Payable Supervisor") with the following instructions: "Post to legal expenses. Put 'retainer for the months of January and February 2017' in the description."

29.     Lawyer A submitted ten similar monthly invoices by email to the Trump Organization for the remaining months in 2017.  Each invoice falsely stated that it was being submitted "[p]ursuant to the retainer agreement," and falsely requested "payment for services rendered" for a month of 2017.  In fact, there was no such retainer agreement and Lawyer A was not being paid for services rendered in any month of 2017.

30.     The TO Controller forwarded each invoice to the TO Accounts Payable Supervisor.  Consistent with the TO Controller's initial instructions, the TO Accounts Payable Supervisor printed out each invoice and marked it with an accounts payable stamp and the general ledger code "51505" for legal expenses.  The Trump Organization maintained the invoices as records of expenses paid.

31.     As instructed, the TO Accounts Payable Supervisor recorded each payment in the Trump Organization's electronic accounting system, falsely describing it as a "legal expense" pursuant to a retainer agreement for a month of 2017.  The Trump Organization maintained a digital entry for each expense, called a "voucher," and these vouchers, like vouchers for other expenses, became part of the Trump Organization's general ledgers.

32.     The TO Accounts Payable Supervisor then prepared checks with attached check stubs for approval and signature.  The first check was paid from the Defendant's Trust and signed by the TO CFO and the Defendant's son, as trustees.  The check stub falsely recorded the payment as "Retainer for 1/1-1/31/17" and "Retainer for 2/1-2/28/17."  The second check, for March 2017, was also paid from the Trust and signed by two trustees.  The check stub falsely recorded the payment as "Retainer for 3/1-3/31/17."

33.     The remaining nine checks, corresponding to the months of April through December of 2017, were paid by the Defendant personally.  Each of the checks was cut from the

Defendant's bank account and sent, along with the corresponding invoices from Lawyer A, from the Trump Organization in New York County to the Defendant in Washington, D.C. The checks and stubs bearing the false statements were stapled to the invoices also bearing false statements. The Defendant signed each of the checks personally and had them sent back to the Trump Organization in New York County. There, the checks, the stubs, and the invoices were scanned and maintained in the Trump Organization's data system before the checks themselves were detached and mailed to Lawyer A for payment.

34.     The $35,000 payments stopped after the December 2017 payment.

### III.   The Investigation into Lawyer A and the Defendant's Pressure Campaign

35.     On or about April 9, 2018, the FBI executed a search warrant on Lawyer A's residences and office. In the months that followed, the Defendant and others engaged in a public and private pressure campaign to ensure that Lawyer A did not cooperate with law enforcement in the federal investigation.

36.     On the day of the FBI searches, Lawyer A called to speak with the Defendant to let him know what had occurred. In a return call, the Defendant told Lawyer A to "stay strong."

37.     On or about April 21, 2018, the Defendant publicly commented on Twitter encouraging Lawyer A not to "flip," stating, "Most people will flip if the Government lets them out of trouble, even if . . . it means lying or making up stories. Sorry, I don't see [Lawyer A] doing that . . . ."

38.     In mid-April 2018, Lawyer A was also approached by an attorney ("Lawyer C"), who offered to represent him in the interest of maintaining a "back channel of communication" to the Defendant. On or about April 21, 2018, Lawyer C emailed Lawyer A, highlighting that he had a close relationship with the Defendant's personal attorney ("Lawyer D") and stating, "[T]his could not be a better situation for the President or you." Later that day, Lawyer C

emailed Lawyer A again, writing, "I spoke with [Lawyer D]. Very Very Positive. You are 'loved.' . . . [Lawyer D] said this communication channel must be maintained. . . . Sleep well tonight, you have friends in high places."

39.     On or about June 14, 2018, Lawyer C emailed Lawyer A a news clip discussing the possibility of Lawyer A cooperating, and continued to urge him not to cooperate with law enforcement, writing, "The whole objective of this exercise by the [federal prosecutors] is to drain you, emotionally and financially, until you reach a point that you see them as your only means to salvation."  In the same email , Lawyer C, wrote, "You are making a very big mistake if you believe the stories these 'journalists' are writing about you.  They want you to cave.  They want you to fail.  They do not want you to persevere and succeed."

40.     On August 21, 2018, Lawyer A pleaded guilty in the federal investigation.  The next day, on or about August 22, 2018, the Defendant commented on Twitter, "If anyone is looking for a good lawyer, I would strongly suggest that you don't retain the services of [Lawyer A]!"  Later that day, the Defendant posted to Twitter again, stating, "I feel very badly for" one of his former campaign managers who had been criminally charged, saying, "[U]nlike [Lawyer A], he refused to 'break' – make up stories in order to get a 'deal.'"

**IV.     Lawyer A and AMI Admit Guilt in Connection with Payoffs of Woman 1 and Woman 2**

41.     Ultimately, other participants in the scheme admitted that the payoffs were unlawful.

42.     In or about September 2018, AMI entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York in connection with AMI's payoff of Woman 1, admitting that "[a]t no time during the negotiation or acquisition of [Woman 1's] story did AMI intend to publish the story or disseminate information about it

publicly." Rather, AMI admitted that it made the payment to ensure that Woman 1 "did not

publicize damaging allegations" about the Defendant "before the 2016 presidential election and

thereby influence that election."

43.     In August 21, 2018, Lawyer A pleaded guilty to a felony in connection with his

role in AMI's payoff to Woman 1, admitting in his guilty plea that he had done so at the

Defendant's direction:

> [O]n or about the summer of 2016, **in coordination with, and at the direction of, a candidate for federal office**, I and the CEO of a media company at the request of the candidate worked together to keep an individual with information that would be harmful to the candidate and to the campaign from publicly disclosing this information. After a number of discussions, we eventually accomplished the goal by the media company entering into a contract with the individual under which she received compensation of $150,000. I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).

44.     Lawyer A also pleaded guilty to a felony in connection with his payoff of Woman

2 to secure her silence, again at the Defendant's direction. Lawyer A admitted as part of his

guilty plea:

> [O]n or about October of 2016**, in coordination with, and at the direction of, the same candidate,** I arranged to make a payment to a second individual with information that would be harmful to the candidate and to the campaign to keep the individual from disclosing the information. To accomplish this, I used a company that was under my control to make a payment in the sum of $130,000. The monies I advanced through my company were later repaid to me by the candidate. I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).[1]

---

[1] This Statement of Facts contains certain of the information that is relevant to the events described herein, and does not contain all facts relevant to the charged conduct.

DATED:       New York, New York
             April 4, 2023

                        ALVIN L. BRAGG, JR.
                        *District Attorney*
                        *New York County*

JA-109

# Exhibit 2

**JA-110**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>DONALD J. TRUMP,<br><br>                              Defendant. | PEOPLE'S RESPONSE TO DEFENDANT DONALD J. TRUMP'S APRIL 27 REQUEST FOR A BILL OF PARTICULARS<br><br>Ind. No. 71543-23 |

Pursuant to CPL 200.95(2) and 200.95(4), the People provide the following response to defendant Donald J. Trump's April 27, 2023 request for a bill of particulars, attached hereto as Exhibit 1.

## I.     Legal standard.

A bill of particulars specifies "items of factual information which are not recited in the indictment and which pertain to the offense charged . . . including the substance of each defendant's conduct encompassed by the charge which the people intend to prove at trial on their direct case." CPL 200.95(1)(a). "The sole function of a bill of particulars is to clarify . . . the indictment." *People v. Elliott*, 299 A.D.2d 731, 732 (3d Dep't 2002). A bill of particulars is not a statement of the prosecution's legal theory or a discovery device. *See* CPL 200.95(1)(a) (limiting a bill of particulars to "items of factual information"); *People v. Davis*, 41 N.Y.2d 678, 680 (1977) ("A bill of particulars serves to clarify the pleading; it is not a discovery device.").

To be entitled to a bill of particulars, a defendant must demonstrate that the requested information is "authorized to be included in a bill of particulars" and "necessary to

enable the defendant adequately to prepare or conduct his defense." CPL 200.95(4); *see* CPL 200.95(1)(b), 200.95(5).

The People "are not required to list every action undertaken by the defendant in the course of the crime." *People v. Kessler*, No. 11307/95, 1996 WL 903952, at *3 (Sup. Ct. N.Y. Cty. Dec. 2, 1996); *see also People v. Iannone*, 45 N.Y.2d 589, 599 (1978) ("To require a listing of every action undertaken by the defendant in the course of this crime would serve no useful purpose, and would instead mark a step back towards the needless complexities of the common-law indictment."); *People v. Rondon*, 67 Misc.3d 1228(A), at *5 (Cty. Ct. Orange Cty. 2020) (denying the defendant's "overly broad" request for "all factual information which is not recited in the indictment that pertains to each offense charged"). In addition, the People are not required to include "matters of evidence relating to how the people intend to prove the elements of the offense charged or how the people intend to prove any item of factual information included in the bill of particulars." CPL 200.95(1)(a).

**II.   The People are already providing defendant with more information than a bill of particulars would require.**

Defendant has already received and will receive far more factual information than the People are required to provide in a bill of particulars, and has more than sufficient information to prepare his defense.

First, the facts set forth in the Indictment and the accompanying Statement of Facts provide all the particulars to which defendant is entitled because they provide "the substance of . . . defendant's conduct encompassed by the charge[s] which the people intend to prove at trial on their direct case." CPL 200.95(1)(a). The 15-page, 34-count Indictment and 13-page Statement of Facts fully inform defendant of the nature of the charges against him,

2

including by specifying the business records defendant allegedly falsified and by describing

the details of his allegedly unlawful scheme.  *See, e.g., People v. Morris*, 28 Misc.3d 1215(A), at

*48-49 (Sup. Ct. N.Y. Cty. July 29, 2010) (denying the defendant's motion for a bill of

particulars where, among other things, the indictment included a 17-page narrative of the

allegedly unlawful scheme).

Second, as the People advised the Court and defendant at arraignment, the People are

prepared to provide millions of pages of discovery to defendant pursuant to CPL Article 245

once defendant has been advised on the record of the terms and content of, and conduct

prohibited by, the protective order entered by this Court on May 8, 2023.  *See* Tr. of Apr. 4,

2023 Arraignment at 16-17 (describing the People's intent to make rolling productions of

discovery in several stages once a protective order is in place).  That discovery will include

grand jury minutes, grand jury exhibits, prior witness statements, financial documents,

subpoena compliance, and extensive additional materials.  The production of these

voluminous discovery materials further ensures that defendant is fully informed of the

charges against him so he may prepare a defense.  *See, e.g., People v. Kyoung Ja Choi*, 259 A.D.2d

423, 424 (1st Dep't 1999) ("The indictment together with the People's response to

defendant's omnibus motion and discovery material provided to defendant gave adequate

notice of the charges against her and the prosecution was not required to include evidentiary

material in a bill of particulars."); *Morris*, 28 Misc.3d 1215(A), at *48-49 (denying motion for

a bill of particulars and noting that where the People "turned over two million documents it

had in its possession from its investigation into the defendants and their co-conspirators'

activities, . . . [the defendant] cannot in good faith complain that he needs a bill of particulars

in order to prepare for trial"); *see general'y Iannone*, 45 N.Y.2d at 598 ("[T]he development of modern discovery rules in criminal cases has diminished the significance of the indictment's function as a provider of information." (citing CPL Article 240, which was replaced in 2020 by the more expansive CPL Article 245)).

Third, to the extent that defendant asks the People to identify specific pieces of evidence or preview the People's legal strategy, defendant has failed to meet his burden of demonstrating that the requested information is "authorized to be included in a bill of particulars." CPL 200.95(4); *see also* CPL 200.95(1)(b), 200.95(5); *Davis*, 41 N.Y.2d at 680.

**III.   Responses to defendant's specific requests.**

The People's further responses to each of defendant's specific requests follow.

Request No. 1:  "Describe the substance of Donald J. Trump's conduct and specify as to each offense charged:"

People's Response to Request No. 1:  To the extent that Request No. 1 seeks factual information describing the substance of defendant's conduct as to each offense charged, that factual information is contained in the Indictment and Statement of Facts, and will be contained in the discovery that the People will provide pursuant to CPL Article 245. Defendant is not entitled to any further information in response to this request.  *See* CPL 200.95(1)(a).

To the extent that Request No. 1 is an attempt to incorporate Request Nos. 2, 3, and 4 into the request for information describing the substance of defendant's conduct as to each offense charged, the People refer to the responses below.

JA-114

Request No. 2:  "Specify the criminal statute (i.e., 'other crime') which Donald J. Trump is alleged to have committed or intended to commit or to aid or conceal the commission thereof by means of the allegedly false business record; a. If the 'other crime' you are relying on is N.Y. Elec. Law § 17-152, please identify (i) what are the 'unlawful means,' and (ii) who are the other members of the alleged conspiracy. b. If the 'other crime' is a tax crime, identify the tax returns which were intended to be incorrect or false and specify the manner in which they were intended to be false or incorrect."

People's Response to Request No. 2:  Defendant is not entitled to the information requested in Request No. 2.  Where an intent to commit or conceal another crime is an element of an offense, the People need not prove intent to commit or conceal a particular crime; thus, the indictment need not identify any particular crime that the defendant intended to commit or conceal, and defendant is not entitled to such information in a bill of particulars.  *See People v. Mackey*, 49 N.Y.2d 274, 277-79 (1980).  Notwithstanding that defendant is not entitled to the requested information, and expressly without limiting the People's theory at trial, *see People v. Barnes*, 50 N.Y.2d 375, 379 n.3 (1980); the People respond that the crimes defendant intended to commit or to aid or conceal may include violations of New York Election Law § 17-152; New York Tax Law §§ 1801(a)(3) and 1802; New York Penal Law §§ 175.05 and 175.10; or violations of the Federal Election Campaign Act, 52 U.S.C. § 30101 *et seq.*; and the People further refer defendant to certain facts, among others, set forth in the Statement of Facts relating to:

- an agreement to unlawfully suppress negative stories about defendant before an election in order to influence the outcome of the election (Statement of Facts ¶¶ 1-2, 7, 9-14, 17-21, 23);

- multiple false statements in the business records of different entities to advance that agreement, including but not limited to a series of false statements that both furthered the conspiracy and concealed earlier unlawful conduct and payments (Statement of Facts ¶¶ 2-4, 13, 26, 28-33);

- disguising reimbursement payments by doubling them and falsely characterizing them as income for tax reasons (Statement of Facts ¶¶ 2, 25); and

- multiple admissions of specific crimes by participants, including by guilty pleas to felonies (Statement of Facts ¶¶ 2-3, 7, 40, 42-44).

The factual information requested in Request Nos. 2(a)(i), 2(a)(ii), and 2(b) is contained in the Indictment and Statement of Facts, and will be contained in the discovery that the People will provide pursuant to CPL Article 245.

Request No. 3:  "Identify the person or entity who Donald J. Trump is alleged to have intended to defraud by means of the allegedly false business record."

People's Response to Request No. 3:  Defendant is not entitled to the information requested in Request No. 3.  Under Penal Law § 175.10, the People are not required to establish that a defendant "acted with intent to defraud a particular person or business entity."  *Morgenthau v. Khalil*, 73 A.D.3d 509, 510 (1st Dep't 2010); *see also People v. Coe*, 131 Misc. 2d 807, 813 (Sup. Ct. N.Y. Cty. 1986) ("Intent to defraud anyone is sufficient.").

Request No. 4:  "Identify what Donald J. Trump intend to defraud from the person or entity identified in response to item 1(b)."

People's Response to Request No. 4:  The People note that there is no item "1(b)" in defendant's requests and it is unclear what is requested by "[i]dentify what Donald J. Trump intend to defraud."  To the extent that Request No. 4 seeks factual information, that factual information is contained in the Indictment and Statement of Facts, and will be contained in the discovery that the People will provide pursuant to CPL Article 245.  To the extent that Request No. 4 seeks "matters of evidence relating to how the people intend to prove the elements of the offense charged," CPL 200.95(1)(a), that information is outside the scope of a bill of particulars.

Respectfully submitted,

/s/ *Becky Mangold*

_____
Becky Mangold
Assistant District Attorney


Dated:        New York, New York
              May 12, 2023

7

# Exhibit 1

**NechelesLaw, LLP**
1120 Avenue of the Americas
New York, NY 10036

Susan Necheles
srn@necheleslaw.com
212-997-7400

April 27, 2023

By Email
Susan Hoffinger, Esq.
Catherine McCaw, Esq.
New York County District Attorney's Office
1 Hogan Place, Room 847
New York, NY 10013
HoffingerS@dany.nyc.gov

Re: *People v. Donald Trump*, Ind. No. 71543-23

Dear ADAs Hoffinger and McCaw,

Pursuant to New York Criminal Procedure Law ("CPL") § 200.95 we request a Bill of Particulars on behalf of Donald J. Trump, We are entitled to this Bill of Particulars because the factual information sought by these requests is needed by the defense to adequately prepare and conduct the defense in this case. Specifically, the requests seek factual information that is not recited in either the indictment or the People's statement of facts and which pertains to the offenses charged. *See* CPL § 200.95(1)(a). Pursuant to CPL § 200.95(2), within fifteen (15) days of service of this request please serve upon the undersigned and file with the Court a Bill of Particulars specifying the following items of factual information for each count of the indictment:

For each count of the Indictment:

1. Describe the substance of Donald J. Trump's conduct and specify as to each offense charged:

2. Specify the criminal statute (*i.e.*, "other crime") which Donald J. Trump is alleged to have committed or intended to commit or to aid or conceal the commission thereof by means of the allegedly false business record;

    a. If the "other crime" you are relying on is N.Y. Elec. Law § 17-152, please identify (i) what are the "unlawful means," and (ii) who are the other members of the alleged conspiracy.

JA-119

NechelesLaw, LLP

     b.     If the "other crime" is a tax crime, identify the tax returns which were intended to be incorrect or false and specify the manner in which they were intended to be false or incorrect.

     3.     Identify the person or entity who Donald J. Trump is alleged to have intended to defraud by means of the allegedly false business record; and

     4.     Identify what Donald J. Trump intend to defraud from the person or entity identified in response to item 1(b).

                        Respectfully,

                          /s/

                        Susan R. Necheles, Esq.
                        Gedalia Stern, Esq.
                        NechelesLaw, LLP.

                        Todd Blanche, Esq.
                        Blanche Law, P.C.

                        Joseph Tacopina, Esq.
                        Law Offices of Tacopina, Seigel & Deoreo

# Exhibit 4

← **President Trump 45 Archived** ✔
11K Tweets



**Follow**

## President Trump 45 Archived ✔
@POTUS45

This is an archive of a Trump Administration account, maintained by the National Archives and Records Administration.

🔗 TrumpLibrary.gov    📅 Joined January 2017

**38** Following    **32.7M** Followers

**Tweets**        Tweets & replies        Media        Likes



**Donald J. Trump** ✔
@realDonaldTrump · **Follow**

Mr. Cohen, an attorney, received a monthly retainer, not from the campaign and having nothing to do with the campaign, from which he entered into, through reimbursement, a private contract between two parties, known as a non-disclosure agreement, or NDA. These agreements are......

6:46 AM · May 3, 2018                                     ⓘ

♥ 45.3K       💬 Reply       ⬆ Share

**Read 18.4K replies**

**Donald J. Trump** ✔
@realDonaldTrump · **Follow**

...very common among celebrities and people of wealth. In this case it is in full force and effect and will be used in Arbitration for damages against Ms. Clifford (Daniels). The agreement was used to stop the false and extortionist accusations made by her about an affair,......

6:54 AM · May 3, 2018                                     ⓘ

♥ 46.5K       💬 Reply       ⬆ Share this Tweet

**Read 16.4K replies**

**Donald J. Trump** ✔
@realDonaldTrump · **Follow**

...despite already having signed a detailed letter admitting that there was no affair. Prior to its violation by Ms. Clifford and her attorney, this was a private agreement. Money from the campaign, or campaign contributions, played no roll in this transaction.

7:00 AM · May 3, 2018                                     ⓘ

♥ 51.6K       💬 Reply       ⬆ Share

**Read 38.1K replies**

# Exhibit 5



## Full text: Rudy Giuliani issues statement clarifying his earlier remarks



"There is no campaign violation" regarding the payment to porn star Stormy Daniels, former New York Mayor Rudy Giuliani wrote in a statement. | Drew Angerer/Getty Images

By POLITICO STAFF
05/04/2018 02:26 PM EDT

   

*On Friday, former New York City Mayor Rudy Giuliani issued the following statement clarifying his previous remarks on a payment made to adult film star Stormy Daniels.*

AD

This is intended to clarify the views I expressed over the past few days.

These are my views:

First:
There is no campaign violation. The payment was made to resolve a personal and false allegation in order to protect the President's family. It would have been done in any event, whether he was a candidate or not.

Second:
My references to timing were not describing my understanding of the President's knowledge, but instead, my understanding of these matters.

Third:
It is undisputed that the President's dismissal of former Director Comey – an inferior executive officer – was clearly within his Article II power. Recent revelations about former Director Comey further confirm the wisdom of the President's decision, which was plainly in the best interests of our nation.

**FILED UNDER:** WHITE HOUSE, RUDY GIULIANI, DONALD TRUMP, (⋯)

## Breaking News Alerts

Sign up for POLITICO Breaking News Alerts to receive the latest updates in your inbox.

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▼

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# Exhibit 6

Rudy Giuliani on potential Trump interview for Mueller | Fox News

TRANSCRIPT · **Published** May 3, 2018 10 20am EDT

# Rudy Giuliani on potential Trump interview for Mueller

By | **Fox News**



**Rudy Giuliani on potential Trump interview for Mueller**

Will President Trump grant an interview to special counsel Robert Mueller? Attorney for the president Rudy Giuliani shares insight about this and more on 'Hannity.'

*This is a rush transcript from "Hannity," May 2, 2018. This copy may not be in its final form and may be updated.*

JA-129

SEAN HANNITY, FOX NEWS HOST: All right. Tucker, as always, thank you. Great show tonight.

We have an amazing show, a ton of ground to cover. The president's attorney, former New York City Mayor Rudy Giuliani is right here in studio for an exclusive interview. Now, the deep state is an overdrive. They all working as we've been pointing out to malign and destroy the presidency of Donald Trump, the person duly elected by you the American people.

Now, tonight, we're going to break down exactly why our two-tier justice system is targeting this administration. We'll show you the extreme measures that Robert Mueller is taking and others are taking to delegitimize this president and everyone who supports him.

And breaking tonight, President Trump is now beefing up his legal team in order to navigate the special counsel's well off the rails investigation. In my opinion, make no mistakes. These are very scary political times in America. There are real consequences for everyday Americans. And coming up, we'll explain why one for Trump political aide was forced to sell his home to pay his legal bills associated with this witch hunt.

So, it's time to dismantle the deep state, hold people accountable for acts they've committed and hold the corrupt media accountable as they are happily cheering for President Trump's political demise and completely ignoring an amazing list of accomplishments.

We'll have all the latest media madness coming up and developments on the Deputy Attorney General Rod Rosenstein's efforts to obstruct Republican members of Congress from doing their job and getting to the bottom of the FISA abuse scandal. The FBI's mishandling of the Clinton investigation and so much more.

JA-130

Rudy Giuliani on potential Trump interview for Mueller | Fox News

It's time for tonight's very important breaking news opening monologue.

(MUSIC)
HANNITY: So, this deep state that we have been warning you about now for a long time is going all out. This week, two separate major leaks from Robert Mueller's off the rails political witch-hunt are now revealing the special counsel's obsessive determination to set a perjury trap for President Trump.

"The New York Times" released a list of questions that Robert Mueller allegedly wants Donald from to answer. These questions are all open-ended. They're patently frankly ridiculous and they are designed to trap the president into committing perjury. Some of the questions even targeted the president's own thoughts. What does the president think about James Comey? What does the president think about the Sessions recusal? What does the president think about the special counsel?

So, let me get this straight: is Robert Mueller now the thought police? Is it now illegal in the United States of America for a sitting president of the United States to have private thoughts?

According to "The Washington Post", Robert Mueller has now even threatened the president with a subpoena if he refuses to sit down for an interview now forget that Robert Mueller was tasked with investigating Russian collusion and forget it after weeks when they have found zero evidence of any

JA-131

Rudy Giuliani on potential Trump interview for Mueller | Fox News

wrongdoing by the president. This is now a political takedown of the person that you chose to lead this country now should we be surprised well this investigation is being conducted by some of the same people who were totally complicit in using Hillary Clinton's bought and paid for Russian lies, you know, the unverified steel dossier as actual evidence to obtain a FISA warrant to spy on an American, a Trump campaign associate in the lead-up to an election.

In other words, the FBI used Democratic campaign material during an election, lied and passed it off as legitimate evidence in order to get a FISA warrant from a FISA judge to spy on the Trump campaign. That dossier was never verified, never corroborated, has now been debunked and they now -- literally, they never told the judge that Hillary Clinton and the DNC whose finances she was controlling paid for it. It is outrageous and this is the United States of America.

Remember, here's the who's who, if you will, of Robert Mueller who he hired to lead the special counsel investigation. What do we see? A bunch of big-time Democratic donors including who "The New York Times" referred to as his pit bull, Andrew Weissmann.

He's given thousands of dollars to Democrats and remember, we've disclosed Weissmann's very aggressive tactics. They have caused multiple overturns and wrongful convictions, ruining countless lives at Andersen accounting, Merrill Lynch, elsewhere, and let's not forget, that Trump aiding FBI lovebird Peter Strzok, he helped author Hillary Clinton's exoneration before overseeing the interview months later and, of course struck was so blatantly biased he was removed from the investigation of Robert Mueller. But then you have Robert Mueller's other top deep state Democrats they remain today.

In just a few minutes, Trump attorney, former New York City Mayor Rudy Giuliani will be here to give us an exclusive interview to discuss whether or not the president should ever agree to an interview with this band of many Trump-hating sycophants of Hillary Clinton.

JA-132

Giuliani will also help break down the brand-new charges and changes on Trump's legal team, including tonight's breaking news. Now, just hours ago, the White House announced that Ty Cobb will be retiring at the end of May and powerful longtime Washington attorney Emmet Flood will join his legal team. We'll have more on that in a minute.

But, first, we have a shocking story to bring you revealing the toll that this ongoing witch-hunt is taking on real people who have realized and frankly anyone who has ever worked with President Trump or on his campaign. Former Trump campaign communication adviser Michael Caputo, he recently told the Senate Intel Committee, their investigation has had a devastating financial impact on him and his family, forced him to sell his home because he had incurred over $100,000 in legal bills.

And during the closed-door session, Caputo told the Senate committee, quote, 'what America needs is an investigation of the investigators. I want to know who's paying for the spies work and coordinating this attack on President Donald Trump. I want to know who cost us so much money, who crushed our children, who forced us out of our home, all because you lost an election? I want to know because GD you to hell.'

Despite real-life consequences from Caputo and others associated with the Trump campaign and the Trump presidency, with literally no evidence of collusion, after months and months and months of multiple investigations, you still have your mainstream media there pushing forward almost in unison their effort to aid and abet the deep state with this non-stop 24/7 obsessive, negative Russia, Russia, Russia, Stormy, Stormy, Stormy coverage, and in the meantime, ignoring every major Trump accomplishment.

JA-133

Rudy Giuliani on potential Trump interview for Mueller | Fox News

Take a look at some of this week's coverage that is an example.

(BEGIN VIDEO CLIP)

RACHEL MADDOW, MSNBC: So, "The New York Time" is out tonight with a list of nine questions that special counsel Robert Mueller reportedly wants to ask President Trump in the Russia investigation, which means as of tonight, we've now got a list of 49 things that Robert Mueller wants to know from the president about the Russia investigation

ANDERSON COOPER, CNN  You're saying the president United States goes into the Situation Room to get away from the chiefs of staff and call his friends?

UNIDENTIFIED FEMALE: Well, I am told by one friend of the presidents and on more than one occasion, he has been called by the president from the Situation Room, yes

UNIDENTIFIED MALE  What this tells us is that the subject of collusion, despite what you hear from the White House, despite the fact that the president times a day tweets out that says, there was no collusion, it tells us that Robert Mueller is not done with the collusion question

DON LEMON, CNN: Sources tell CNN, President Trump's lawyers are preparing for a showdown with Robert Mueller that's over the special counsel's warning that he issued a subpoena forcing the president to appear before a grand jury.

UNIDENTIFIED MALE: The best argument is the Justice Department cannot charge a sitting president. He will not be a sitting president all his life. One day, he will walk outside, one glorious day, he will walk outside of those 16 acres of 1600 Pennsylvania Avenue and he will could be then charged with a crime.

UNIDENTIFIED FEMALE: There is so much evidence in the public domain of collusion we don't know if whether any of it rises to a criminal level, but there is simply no question that the Trump administration welcomed Russia's help in sabotaging Hillary Clinton's campaign. There's none.

RICHARD HAAS: That's why you need a deep state, that's why you need - - that's why you need people whose commitment is not to the person, but it's to the process and a lot.

(END VIDEO CLIP)

JA-135

Rudy Giuliani on potential Trump interview for Mueller | Fox News

HANNITY: Yes, well, forget about all of President Trump's historic accomplishments for example on the Korean peninsula. We're actually talking about denuclearization. Forget about all these developments, look at what the prime minister of Israel did yesterday, there is a nuclear program in Iran or the booming economy, record low unemployment in states in the United States now, record low unemployment for women in the workplace, Hispanics and African Americans record lows.

And the media wants you to believe the White House is in shambles? Not so. But you know better and that's why according to a brand new Rasmussen poll, President Trump has a higher approval rating in his second year than former President Obama.

And by the way, you're not going to hear that in the mainstream media, instead chances are, you'll probably see this guy, Michael Avenatti, a lawyer for Stormy Daniels. According to NewsBusters, Avenatti was on fake news CNN a whopping 59 times in less than two months.

And finally tonight we turn to the Deputy Attorney General Rod Rosenstein. As we speak, he continues to stonewall congressional efforts to do their job and get to the bottom of multiple serious issues, including FISA abuse, spying on American citizens, not telling the truth to a FISA court, presenting political information not telling the court, presenting unverified, uncorroborated information paid for by Hillary Clinton and the DNC, by a foreign national, lies from Russia.

Oh I thought Russian collusion and foreign nationals influencing our elections were bad.

Earlier today, President Trump tweeted, quote: 'A rigged system. They don't want to turn over documents to Congress, what are they afraid of? Why so much redacting? Why such unequal justice? At some point, I will have no choice but to use the powers granted to the presidency and get involved.'

And breaking today, Fox News has learned that some lawmakers still have not been given adequate access to the documents they have subpoenaed and they're requesting to the House Judiciary Committee and the House Oversight Committees.

Rod Rosenstein, if you have nothing to hide regarding the department's FISA practices, why not release them? Why not release all the documents, let the American people see it?

If you have nothing to hide on the handling of the Clinton investigation, hand over the documents. Nothing to hide on Russia collusion investigation, Hillary paying Christopher Steele funneling money through a law firm, Russian lies to manipulate the American people, to get a warrant to spy on a Trump campaign associate, hand it over.

Tonight, every single American needs to be asking just what is Rod Rosenstein hiding?
All right. Joining us now for the exclusive interview, he's the former mayor in New York City. He is the current president of -- attorney for the president, President Trump, Rudy Giuliani is with us.

All right.

RUDY GIULIANI, FORMER NYC MAYOR: Nice to be back, Sean.

HANNITY: Good to see you, Mr. Mayor.

GIULIANI: It's been a while.

HANNITY: We've been through a lot together. I was here when you're mayor, of course.

GIULIANI: Yes.

HANNITY: And the city is still benefiting from your --

GIULIANI: Thank you so much. That's so kind.

JA-138

HANNITY: Just -- why don't we start as simple -- give us the status of the special counsel and what's going on with the president?

GIULIANI  Well, the special counsel would like to interview the president  There's no secret about that. Every lawyer in America thinks he shouldn't be. We, meaning myself and Jay Sekulow, and the Raskins, and all the people involved in the investigation, and now, our new colleague, Emmett, we're going to have to decide, probably -- it falls more on us because he's on the government side, whether the president should grant an interview

Here's what it's all about  It's really simple  The American people can follow this along with me  Are the objective?

HANNITY: Are they?

GIULIANI: Well, right now, a lot of things point in the direction of, they made up their mind that Comey is telling the truth and not the president  When you look at those questions about what does the president think, what does the president feel, what does the president really desire, those are all questions intended to trap him in some weight and contradicting what is in fact a very, very solid explanation of what happened.

He fired Comey because Comey would not, among other things, say that he wasn't a target of the investigation  He's entitled to that  Hillary Clinton got that  Actually, he couldn't get that  So, he fired him and he said, I'm free of the guy, and he went on Lester Holt. Lester Holt's interview was as good as anybody could do, better than I think any of the people around Mueller could have done, and Lester Holt asked them, why did you do it? He said, I did it because I felt that I had to explain to the American people the president was not the target of the investigation

JA-139

And even Jake Tapper pushed him really hard, talking about Comey. Comey had no answer for why he didn't say this, even though he had done the same thing for Hillary.

So, you can't blame the president for feeling, I am not being treated the same way they were. I mean, I don't expect that we are going to have an interview with exonerating --

HANNITY: Exoneration?

GIULIANI: Already written.

(CROSSTALK)

HANNITY: I have a lot of questions for you.

GIULIANI: I can -- I would like to get one, not under oath. I want a videotape, not videotaped, but audiotapes, I want to make sure they don't misrepresent his answers. But this is an outrageous miscarriage of justice. Please consider whether you are Republican or a Democrat, whether you hate President Trump or you love him like we do, or like I do --

HANNITY: I think people know I am pretty supportive. I think the secret is out of the bag.

GIULIANI: OK, I want to let you off the hook, Sean --

HANNITY: Full disclosure now, everything. Rudy Giuliani and I once had a meal together. OK, go ahead.

JA-140

(LAUGHTER)

GIULIANI: I don't remember who paid.

So, you can't possibly -- you can't possibly not feel as a citizen of the world, that his negotiations with North Korea are much more significant than this totally garbage investigation.

HANNITY: You know, let me -- let me ask you first about the legal team.

GIULIANI: Good.

HANNITY: Ty Cobb, John Dowd, they are out. My understanding is Ty Cobb had been saying for some time he was going to retire. What happened there?

GIULIANI: Ty has been enormously helpful. He certainly helped me with my orientation. We wouldn't be where we are today, in a very strong position, if it wasn't for him and John.

John has been my friend and colleague for 35 years. I have nothing but the utmost respect for John Dowd. He had the right instincts about this, which is, you are going to get him to testify over my dead body because you are trying to trap him. He had those instincts way back when it was harder to see those. So, all that work didn't go for nothing. We got it all.

Jay has been the rock. He's been -- Jay Sekulow.

HANNITY: Jay Sekulow.

GIULIANI: He's been through this -- I couldn't do it without Jay. And I think I offer -- what I offer to this is something unique. I'm a lawyer who knows the criminal justice system as well as anybody in America. I'm also a very good friend of Donald Trump. And I think I have the respect of Mueller, the FBI, the Justice Department.

HANNITY: You should.

GIULIANI: Jeff Sessions was my colleague, not just in the campaign but back in 1981, when he was U.S. attorney in Alabama.

I don't think I'm going to -- they know the decision I make is going to be the best interest, not just in my client, but the United States. If their objective, we can work something out. If they're not, then we have to shake hands and basically go into a litigation over, do they have the power to subpoena? And I think they lost that power.

This is a completely tainted investigation.

HANNITY: Explain.

JA-141

GIULIANI: Well, you have an investigation in which Mueller is selected the day after he was turned down for FBI director by Rosenstein who was there when Mueller was turned down. There are thousands of people that could have been selected for that job. Also a friend of James Comey, and James Comey seems to be their core of their investigation. He's telling the truth, the president isn't.

I know James Comey. I know the president.

Sorry, Jim, you're a liar. A disgraceful liar. Every FBI agent in America has his head down because of you. It would have been good for god if god had kept you out of being head of the FBI.

HANNITY: Explain where he lied.

GIULIANI: Well, he lied about his conversation with McCabe. He knew all of McCabe's conflicts. McCabe should testify against him. He lied about his conversations with the president. He only told the truth when the president, I made -- we know Donald -- I'm sorry, Mr. President, he was Donald before.

He lied about the fact that they talked about whether the president was a subject or target, then he immediately changed it. It's one lie after another.

HANNITY: Rod Rosenstein -- everyone forgets when he wrote that recommendation to fire Comey. He said the FBI cannot be reestablished if he stayed at the helm.

GIULIANI: Yes, why? Because he's a liar. His conduct of the Hillary Clinton investigation was a total disgrace. If Hillary Clinton had been elected president, he wouldn't have lasted past day one. We know she would have fired him.

I don't think she would deny that today. She was right. We should have fired him. When I say we, I mean the collective we here, day one.

HANNITY: Let's talk about --

GIULIANI: Let me say one more thing.

HANNITY: Yes, sir.

GIULIANI: This is the best president in my memory. In two year -- even my hero, Ronald Reagan, he straighten the economy out the way President Trump did. But he didn't get this far ahead on foreign policy as fast as President Trump has.

Look at what's going on with North Korea. I told the president, you're going to get the Nobel Peace Prize. My proudest moment is when you tell him to shove it. Sorry.

HANNITY: By the way, no, no, no, this is cable. You're -- we're good here.

JA-142

You said about -- let's talk about the leak questions. You know, I mean, I have them here in front of me. What are your thoughts? What did you think about Comey? What did you think about Sessions?

GIULIANI: Comey should be prosecuted for leaking confidential FBI information when he leaked his report intended to develop a special prosecutor for the president of the United States. I have never, ever turned over a document -- you know me, Sean, you know me when I was U.S. attorney, a lot of allegations --

HANNITY: Took down the mob.

GIULIANI: -- never leaked a thing. I would have considered resigning if I ever did that, or if one of my assistant stated. Did the FBI leak? Did the SEC leak? I'm sorry, guys, you did.

HANNITY: Let me ask you this. There are so many lawyers that I respect, that you know and respect -- Alan Dershowitz, Joe diGenova, these are heavy hitters. Our own Gregg Jarrett --

GIULIANI: All my friends.

HANNITY: The president should never spend a minute -- you said it would be narrow and focused today, and you said no more than two or three hours. Do you believe Robert Mueller is setting a perjury trap for Donald Trump?

GIULIANI: Well, I have to remain, and Jay and our team has to remain open- minded about this because even though you and I see a clear avenue to quickly resolving this for the American people, we may, and we know that our president -- we know that our president will seek a resolution that gives him a clear path to getting it resolved.

So, I would -- I would say right now, the odds are, he wouldn't be interviewed. I don't close my mind to it.

HANNITY: I -- when we are talking about -- I mean, this is really important, because we are talking about a subpoena. And the subpoena, that means that the president of the United States -- I always said they should have the Hillary standard, at the Hillary standard is really simple. Not under oath, not --

(LAUGHTER)

HANNITY: Well, wait a minute. And you have a guy who hates Hillary and loves Donald Trump during the interview. That would be the Hillary standard. That's not going to happen with Robert Mueller.

GIULIANI: We're not going to get that. Could we accept something less than that? Yes. Could we accept a situation in which they are telling us basically we believe Comey, who is now a pathological liar, as opposed to Donald Trump? The answer to that is no.

HANNITY: All right. I have been probably the most outspoken, loudest critic in the country besides the president, about Robert Mueller, and a team of Democratic donors, no Republicans. People say, well, he's a Republican and he's a veteran -- OK, I applaud him for serving his country. I mean that.

Andrew Weissmann, tens of thousands of people lost their job at Enron, tens of thousands, a 9-0 decision against Andrew Weissmann. Who gets 9-0? Four Merrill executives in jail for a year, overturned by Fifth Circuit Court of Appeals and he was excoriated twice for withholding exculpatory evidence.

That appointment alone, sir, tells me that this is a biased team.

GIULIANI: Let me give you two different views of Bob. What do I know of Bob that I could testify to under oath? A patriot, an extraordinarily good man.

HANNITY: He served his country.

GIULIANI: He served his country. Did a good job with the FBI. I don't think he would be affected by malice or prejudice. However, I don't have an explanation for the people that he hired, not all of them. I've dealt with him very briefly. I think they are processional.

HANNITY: Weissmann?

GIULIANI: I did not deal with Weissmann much, Quarles, very good man.

HANNITY: Are you disturbed by his record?

GIULIANI: Yes, but, you know, he'd probably be disturbed by mine, too.

I have an open mind about Bob. I don't about Comey. I closed my mind about Comey. I know Comey much better. I have the indignity of unfortunately of having hired him for his first big job. I'm embarrassed that I hired him.

HANNITY: Let me go to a tweet by the president. This is -- he tweeted about John Dowd. This isn't some game. You're screwing with the work of the president of the United States of America. John Dowd, 2018. North Korea, China, the Middle East, so much.

Mr. Mayor, it's been going on, how many congressional investigations? This has been going on now almost a full year. There's no evidence of Trump- Russia collusion. How did we end up from there to Stormy Daniels?

GIULIANI: Because this is -- I think this is being done behind Mueller's back in a sense because they come to him with all kinds --

HANNITY: He doesn't read a newspaper?

JA-144

GIULIANI: Yes, self-serving statements. This has become a witch hunt like the president said. And if you look at the questions that are being asked, they are trap questions. A first year prosecutor would do better than that.

So, he's in very good hands now. I don't just mean me. I mean Jay and the whole team. And Ty gets a great deal of credit for all this, because he orchestrated it. I'm looking forward to working with Emmet, who handled the Clinton situation --

HANNITY: Very well respected attorney.

GIULIANI: And then Bush, and then Bush. So, this is not a political guy.

HANNITY: He said, if their objective meaning Mueller and his team, more likely will be willing to cooperate, less objective than we would be foolish to do that, you said. You also said there would be a decision in just a couple of weeks.

GIULIANI: Well, I can't imagine it would take much longer. It's coming to a head right now, and there's not much more to think about. If they can -- if they can -- if they can get us in to a position where we can recommend to the president -- you know President Trump.

HANNITY: Of course.

GIULIANI: You know he wants to be interviewed, right?

HANNITY: Yes, I do.

GIULIANI: If he doesn't, it's going to be because Jay and I and --

HANNITY: Others say no.

GIULIANI: And the Raskins and we would stand up there and say, you -- look, we are lawyers, you got to listen to us, Mr. President. I think, I think I'm there because I'm his friend.

HANNITY: Well, I think your background as an attorney, all the years and mayor -- the president -- I agree with the president's statement. And I have been very open in this and saying this, that this is a setup, that this is a subpoena, this is a perjury trap.

And let's walk through what if they issue a subpoena? What if they tell -- if he's decided not to talk, they sent him before a grand jury because it becomes tricky, as Alan Dershowitz has described on this show. If the president pleads the Fifth, which he doesn't want to do, he said he doesn't want to do, then they give him immunity, then what?

GIULIANI: OK. So, let's look at that. I think Alan pointed this out last night on your show coming out in detail. If they issue a subpoena, that will be -- that will be unprecedented in the sense that it's

JA-145

pretty clear that a president can't be subpoenaed to a criminal proceeding about him. Now, why is that? And fortunately -- or maybe unfortunately -- we have the real life circumstance going on that the Founding Fathers thought about, which is a president cannot be distracted by a criminal investigation. You can always prosecute him after. They can get him when he leaves the White House. You can always prosecute him after.

But we -- I could not -- if Mueller said to me tomorrow, bring him in, two hours, like you want, no questions that you don't want, we are pretty much ready to clear him. I could not go to the president and say, take two days off to get ready for that and screw the whole thing with North Korea. I -- how can any American do that?

He's our president. He is going to negotiate, I believe, a nonnuclear situation on the Korean peninsula.

HANNITY: Nobody thought about it.

GIULIANI: All right. And you're going to interfere with that? That's why the Founding Fathers created this immunity from prosecution and subpoena. Now, if it's a civil case, Clinton submitted because it was a civil case.

HANNITY: Why not written answers to or proffer?

GIULIANI: Which Ronald Reagan did.

HANNITY: Why not that?

GIULIANI: Because they said no to that. Because they said no to that.

HANNITY: So they want to then -- so the president says he'll do an interview and then they're going to what?

GIULIANI: At this point, I'm not sure I'd give them written answers because they're going to try to contradict them. I believe I believe that attorney general sessions, my good friend, and Rosenstein, who I don't know, I believe they should come in the interest of justice, end this investigation. There's been too much government misconduct. The crimes now have all been committed by the government, and their agents, the lies by Comey.

HANNITY: I'm going to go through this in a minute. Let me ask you --

GIULIANI: Oh, come on. It's terrible.

HANNITY: What are the parameters that you would insist on for any interview with Mueller beyond two to three hours narrowing the scope?

JA-146

GIULIANI: Never beyond two or three hours. Not going to happen. I'm not going to have my client, my president, my friend, and a president that's achieved more in a year and a half against all odds that anyone had a right to expect -- I'm not going to let him be treated worse than Bill Clinton, who definitely was a liar under oath. Not going to let him be -- I mean, he's being treated much worse than Hillary Clinton, who had no right to any of that stuff.

So, I'm not going to let him be treated worse than Hillary Clinton. I think Jay and I will insist that they will have to treat him the same way as Clinton. Two and half hours, we end, we walk out, give us your questions in advance. He's ready to --

(LAUGHTER)

HANNITY: I know him. I've interviewed him.

GIULIANI: He's ready to go.

HANNITY: I've interviewed him before he ran.

GIULIANI: And I -- you know, if we weren't careful lawyers, we would just let him go. I mean, he's about -- I remember the debates that I prepared him for in part with Chris Christie, Kellyanne Conway --

HANNITY: There's a real story behind that, I bet.

GIULIANI: Oh wow. But did he execute?

HANNITY: He did.

GIULIANI: I saw you after every debate.

HANNITY: You did.

GIULIANI: And he got better and better.

HANNITY: You know, I -- I've got to now talk about something that I never thought I'd talk about -- this is going to be a long-winded lead up to a question. I've been pointing out in this program, 18 USC 793, mishandling classified information, the Espionage Act, destroying it. By the way, it would apply to a lot of people.

I've talked about if I was subpoenaed, from all my emails, and I deleted 33,000, and then I acid washed my hard drive, nobody heard of Bleach Bit until Hillary Clinton, and Bleach Bit, and then had an aide bust up all my devices, like she had happened -- I never heard of an exoneration being written in May before you interview 17 key witnesses in the main person, Hillary Clinton, in July, the

JA-147

person that does the interview hates the opponent of Hillary Clinton. Then they exonerate her for I believe obvious felonies.

GIULIANI: Right.

HANNITY: Then they talk about Russia collusion, Hillary Clinton and the DNC funneled money through a law firm, Perkins Coie, and unbelievable to me, a foreign national who heard wasn't supposed to be involved in our elections, Christopher Steele, gets Russian sources.

The FBI never verifies it, they presented to a FISA court to spy on American citizens, a Trump campaign associate weeks before an election.

They never verified, they never corroborated, and they never told those judge in the original application, three subsequent applications that Hillary paid for it and they never verified it. Mr. Mayor, were lost broken? Let's start with Hillary. Did she–

(CROSSTALK)

GIULIANI: Yes. I've been on, look, we go back three years with this, Sean, when I produce my chart.

HANNITY: I remember.

GIULIANI: Thirteen crimes she committed.

HANNITY: Yes.

GIULIANI: Then we got up to about 18. I'm sorry, Hillary, I know you're very disappointed you didn't win. But you're a criminal. Equal justice would mean you should go to jail. I do not know why the Justice Department is not investigating here.

HANNITY: The James Comey?

(CROSSTALK)

GIULIANI: James Comey fixed the whole case.

HANNITY: It was rigged.

GIULIANI: Well, you can't read that stupid report that he wrote which is the beginning of his destruction in which he said we're not going to prosecute -- no reasonable prosecutor would indict her. No honest reasonable prosecutor would indict her.

HANNITY: He said today or yesterday, Comey, he said, Hillary deeply respects the rule of law, Comey said that.

JA-148

GIULIANI: Wow. This is a very perverted man. I feel so sorry.

HANNITY: Do we have a two tier justice system in America?

GIULIANI: Yes, we have one for Hillary and all of those Democrats, Bill Clinton.

HANNITY: Is equal justice under the law at risk?

GIULIANI: You and I have talked about this, I am very afraid, not just for our president, but for our country, there's going to be a witch hunt against Republicans. You had a man on who's lost all his money, for what reason, he didn't do anything wrong.

The president of the United States didn't do anything wrong. We are lucky that we have a president who can focus, in a way it almost hurts him because they feel they can do anything to him and he's going to remain focused on North Korea, Iran, what do we with China, how do we help Israel, what do we do about taxes?

HANNITY: The economy has an incredible story the media never focuses on. I actually had to write this down. If we have the Hillary standard, the interview would never be under oath, it would never be recorded, never be transcribed, and by the way--

(CROSSTALK)

GIULIANI: And all the witnesses that are favor with whom would be in the room, immunized. Jared would be immunized, Cohen would be immunized--

(CROSSTALK)

HANNITY: We write the exoneration before the interview then we would agree to destroying incriminating evidence, like they did in the case of Cheryl Mills and Hillary, and either you or Rush Limbaugh would do the interview.

GIULIANI: Rush and I would not object.

HANNITY: Or Mark Levin.

GIULIANI: Mark Levin.

HANNITY: Yes. There is a political report today basically suggesting Mueller would now consider Ivanka Trump a target. Look at Hope Hicks as one example.

GIULIANI: Come on.

HANNITY: She paid more in lawyers than she was ever paid.

JA-149

Rudy Giuliani on potential Trump interview for Mueller | Fox News

GIULIANI: Hope is, I wish the American people could get to know her. Hope is one of the nicest human beings you're ever going to meet. Yes, she is very loyal to Donald Trump. But I think the president would say this, she could stand up to him when she had to. What they did to her is outrageous. Absolutely outrageous.

Ivanka Trump? I would -- I think I would get on my charger and go right into the writer's room with a lance if go after Ivanka.

HANNITY: At this point, sir, I honestly agree with you I fear for the country. Let me go to--

(CROSSTALK)

GIULIANI: Now if they do to Ivanka, which I doubt they will, the whole country will turn on them. They are going after his daughter?

HANNITY: What about his son-in-law, they talked about him.

GIULIANI: I guess Jared is a fine man, you know that. But men are, you know, disposable. But a fine woman like Ivanka? Come on.

HANNITY: Andrew -- let's go through the different issues that we have brought up and spoke about almost exclusively on this show.

For example, you mentioned Hillary Clinton, she obviously committed felonies, we know what they are, you've identified them. I believe as you do, James Comey rigged that. Comey, look at Peter Strzok and Page. They hate the president, they hated the candidate, they talk about an insurance policy. All -- Andrew McCabe lying under oath, James Comey leaking for the purpose of getting a special counsel.

GIULIANI: Also Comey and McCabe contradicting each other. One of them has to be lying. I mean, I actually think Comey is lying. I think Comey is a big liar than McCabe. McCabe isn't a situational liar. He's a much big liar.

So, if this were equal system of justice, they would all be prosecuted.

HANNITY: Let me ask you because--

(CROSSTALK)

GIULIANI: It's my biggest regret, I'm sorry I have to say this--

(CROSSTALK)

HANNITY: You were offered the job.

JA-150

GIULIANI: Yes. It's my biggest regret in not having taken that job. I wanted to be secretary--

(CROSSTALK)

HANNITY: My biggest regret and I like Jeff Sessions, but he never should have recused himself.

GIULIANI: Well, he never should have appointed Rosenstein.

HANNITY: I've never heard of somebody being appointed or confirmed and recuse the next day.

GIULIANI: Do you know that Rosenstein was with Mueller the night or the day he was interviewed by President Trump to be FBI director? Worked out, knew that he was turned down and then appointed in the next day? There are- -

(CROSSTALK)

HANNITY: Did you know Rod Rosenstein, apparently, according to reports that we have on this program, signed off on one of the FISA extensions? The one with the unverified dossier, the bulk of information as the Grassley- Graham memo said? That he personally signed off, does that not conflict him out of all of this?

GIULIANI: How about he's also a witness to critical information. For a Justice Department that pontificates -- I told you. The only crimes committed here are by the government.

HANNITY: Let me ask about them. Andrew McCabe said without the dossier, there would've been a FISA application. I would ask you, doesn't the FBI according to FISA a lawyer very familiar with, an FBI protocol mandate that they verify, corroborate what they present to a FISA judge, isn't that mandatory? Wouldn't it be mandatory to identify that the dossier was created by an opposition party candidate and not as a political asterisk?

GIULIANI: Absolutely.

HANNITY: Is that a crime?

GIULIANI: Yes. Yes, obstruction of justice. Invasion of people's privacy on no basis at all. It's a civil rights violation.

HANNITY: Unreasonable search and seizure.

GIULIANI: Yes, civil rights violation. If they searched you or me based on that we would sue them for civil right violation. This is a Justice Department completely unhinged and out of control. It breaks my heart, Sean. I devoted most of my life at the Justice Department.

JA-151

I work for great attorney -- attorneys general. My friend Michael Mukasey was one of the greatest. And I watch it with great admiration--

HANNITY: Your partner.

GIULIANI: My partner. Great admiration for Michael. To watch this happen under a man that I love, Jeff Sessions, I just feel bad. I know the president is heartbroken over this, it isn't that he's angry, he's heartbroken. He never expected this from Jeff.

The two of them can redeem themselves, Sessions and Rosenstein. They should order the investigation over.

HANNITY: I don't think that's going to happen.

GIULIANI: Well, I don't think it's going to happen either but if they understood Justice Jackson's admonition to prosecute this that I always live by, which we're not supposed to get convictions, we're supposed to do justice.

HANNITY: Let me stay focused on this FISA issue for just a second. Because Rod Rosenstein after they had subpoenaed the documents went into Paul Ryan's office begging him not to release it. We never would've had the Nunes memo or the Grassley-Graham memo that said the bulk of the application was that the dossier Hillary paid for.

So my question is this. Not only that, there were three subsequent renewals with the same false information, the same lying by omission, if you will, by not telling the FISA judges that it was -- that Hillary paid for it.

HANNITY: If I stand up in court at some point in the next three or four months where I really like to be and I recite these facts, I think the judges are going to look at me and say I don't believe that's true.

How could the Justice Department have gone so far away from the fair and honest administration of justice under decent people? But I think the pressure on them was so great, they just caved in. And I -- once again I say, there is one way to redeem themselves, get control of this -- remember Senator Stevens case?

HANNITY: Sure. Yes. He lost an election, and then the judge overturned at all because they withheld exculpatory evidence.

GIULIANI: Because of government misconduct.

HANNITY: That's correct.

GIULIANI: Well, there's been more government misconduct in this case than there has been conduct.

JA-152

HANNITY: Are you concerned, this was supposed to be about the Trump campaign Russia collusion.

GIULIANI: Gone.

HANNITY: It's gone. OK. It never happened.

GIULIANI: He's been cleared of that.

HANNITY: So my question is, are you concerned in the process of this we did discover that a foreign national, Christopher Steele was paid through Fusion GPS, used Russian sources that not only weren't verified, were debunked -- are you concerned that was paid for, to manipulate the American people in the lead up to an election?

GIULIANI: Isn't that closer to the mandate than Michael Cohen?

(CROSSTALK)

HANNITY: Why isn't that -- where is Mueller on that, sir?

GIULIANI: Having something to do with paying some Stormy Daniels woman $130,000, I mean, which is going to turn out to be perfectly legal. That money was not campaign money, sorry, I'm giving you a fact now that you don't know. It's not campaign money. No campaign finance violation. So--

HANNITY: They funneled it through a law firm.

GIULIANI: Funneled it through a law firm and the president repaid it.

HANNITY: I didn't know he did?

GIULIANI: Yes.

GIULIANI: Zero.

HANNITY: So the president--

(CROSSTALK)

GIULIANI: Just like every, Sean--

HANNITY: So this decision was made by--

GIULIANI: Sean, everybody -- everybody was nervous about this from the very beginning. I wasn't. I knew how much money Donald Trump put in to that campaign. I said $130,000. You're going to do a

Rudy Giuliani on potential Trump interview for Mueller | Fox News

couple of checks for 130,000.

When I heard Cohen's retainer of $35,000 when he was doing no work for the president, I said that's how he's repaying -- that's how he's repaying it with a little profit and a little margin for paying taxes for Michael.

HANNITY: But do you know the president didn't know about this? I believe that's what Michael said.

GIULIANI: He didn't know about the specifics of it as far as I know. But he did know about the general arrangement that Michael would take care of things like this. Like, I take care of things like this for my clients. I don't burden them with every single thing that comes along. These are busy people.

HANNITY: What did you think of the raid on his office?

GIULIANI: One of the reasons we would hesitate to cooperate any further, and I think this is the breakdown with Dowd during -- during back in January that took them by surprise, that's beyond anything -- that is an outrageous violation of attorney-client privilege beyond Donald Trump's attorney-client privilege. A lot of innocent people.

HANNITY: I gave him 10 bucks or 20 bucks.

GIULIANI: How about innocent people like--

(CROSSTALK)

HANNITY: All right. We got to continue.

GIULIANI: We called you that night?

HANNITY: I'll talk to you about that. We'll get back more with the mayor of the president's attorney next, straight ahead.

(COMMERCIAL BREAK)

HANNITY: All right. As we continue our exclusive interview with President Trump's attorney, Rudy Giuliani.

I want to report to the American people the truth. And when I talk about a rigged investigation on Hillary, and I talk about the crimes that she committed and I interviewed you and other great attorneys. And I talked about FISA abuses and the FISA judge and a two-tiered justice system, equal justice under the law, have I been wrong at all? Tell me, I would love to tell the American people.

JA-154

GIULIANI: You are right way back in, I don't know, was it 2015 when we first started focusing on that big chart that I made, I still have it on my cell phone.

HANNITY: I'll bring it up tomorrow.

GIULIANI: And they are still not investigated. No, you're not wrong.

HANNITY: But Russia collusion what was wrong with Donald Trump.

GIULIANI: Russian collusion is a total fake news. Unfortunately, it has become the basis of the investigation. Mueller owes us a report saying that Russia collusion means nothing, it didn't happen. That means the whole investigation was totally unnecessary.

All the rest of it that came out of it, whether it's the personal or the political things. None of it is relevant. Meanwhile, the man is trying to deal with North Korea, come on.

HANNITY: Denuclearization of the Korean--

(CROSSTALK)

GIULIANI: Right. And they want me to go to him and say let's take two weeks off to get you ready for a deposition that never should takes place in the first place?

HANNITY: I think this has gotten personal for those that are after the president.

GIULIANI: Of course it has, yes. Of course, it's totally personal. Look at that -- look at the whole press corps. Look at the correspondent's dinner on Saturday night.

HANNITY: All right. This was a short segment, we got to take a break -- it was horrible. Going after Sarah Huckabee--

(CROSSTALK)

GIULIANI: Abortion applauding -- applauding--

HANNITY: -- Kellyanne.

GIULIANI: -- slaughtering embryos"

HANNITY: More with Rudy Giuliani. A longer segment, I promise that, straight ahead.

(COMMERCIAL BREAK)

JA-155

HANNITY: As we continue with President Trump's attorney former New York City Mayor Rudy Giuliani, I want to clarify something because I was asking you about Perkins Coie and you said the money was not campaign money -- I'm giving you a fact now that you don't know, it's not campaign money, no campaign violation and I said because they funneled through a law firm. I think we were talking about two different things there. I want to make sure--

GIULIANI: Sure. I was talking about the $130,000 payment.

HANNITY: Right.

GIULIANI: A settlement payment which is a very regular thing for lawyers to do. The question there was, the only possible violation there would be wasn't a campaign finance violation, which usually results in a fine by the way, not this big storm troopers coming in and breaking down his apartment and breaking down his office.

That was money that was paid by his lawyer, the way I would do out of his law firm funds or whatever funds, it doesn't matter. The president reimbursed that over a period of several months.

HANNITY: But he had said he didn't, I distinctly remember that he did it on his own--

GIULIANI: He did.

HANNITY: -- without asking.

GIULIANI: Look, I don't know, I haven't investigated that, no reason to dispute that, no reason to dispute my recollection. I like Michael a lot, you like Michael a lot.

HANNITY: A long time.

GIULIANI: I feel very bad he's been victimized like this. The president feels even worse. The fact is, just trust me, they're going to come up with no violations there.

HANNITY: All right. You mean, the payment--

(CROSSTALK)

GIULIANI: Yes, payments are perfectly legal.

HANNITY: Let me go back to the main crux--

(CROSSTALK)

GIULIANI: All documented.

JA-156

HANNITY: Let me go back to the main crux, and the crux is that we have a two-tiered justice system. The president is right when he says witch hunt?

GIULIANI: Yes. Sure. You can't explain this any other way. First of all, there never should have been an investigation. There was no Russian collusion. We're now a year and a half, two years into this, no Russian collusion, case over.

And falling all over themselves to investigate him, they have committed numerous violations including lies which are criminal, deception, outrageous search warrants like the one on Cohen. How about we go back to Manafort, breaking into his house?

HANNITY: In 2005--

(CROSSTALK)

GIULIANI: What is he, what is he, a drug dealer? I remember there was a phrase he wasn't a -- he wasn't violent criminal--

(CROSSTALK)

HANNITY: Where does this end, sir? I--

GIULIANI: What they did to Manafort, I used to do to the mafia not--

HANNITY: Drug dealers, mafia members.

HANNITY: And killers.

HANNITY: How was this -- how do you see this ending? And you talk to Mueller.

GIULIANI: You know, they're going to write a report, they can't indict him, I don't believe they can subpoena him. They are going to have to write a report, if we don't be interviewed or if we do get interviewed, they'll write the report based on the interview. They won't write it before by Hillary guy, because he's not a special person, he's been entrusted with the safety of the world.

HANNITY: Is this election in 2018 going to be a referendum on Donald Trump?

GIULIANI: Yes. We're going to go to the American people and say the following.

HANNITY: Real quick.

GIULIANI: You want to vote for impeachment? You want to impeach the president? They're not going to -- you want to have Nancy Pelosi running the House of Representatives? Forget it.

JA-157

Rudy Giuliani on potential Trump interview for Mueller | Fox News

HANNITY: Mr. Mayor, thank you for being with us.

GIULIANI: Sean--

HANNITY: Always good to see you.

GIULIANI: -- you're a patriot.

HANNITY: Thank you, sir.

When we come back, more Hannity after the break.

(COMMERCIAL BREAK)

HANNITY: All right. That's all the time we have left this evening. Now tomorrow night we'll have full complete analysis, reaction to our copes of interview tonight. We hope you tune in, the great one, Mark Levin among out many guests.

Remember, this show will always be fair and balanced. We are not the destroyed Trump media. We hope you'll set your DVR and don't forget us on Instagram, and on Twitter at Sean Hannity and we have a lot to talk about tomorrow. Let not your heart be troubled. The news continues here on Fox.

*Copy: Content and Programming Copyright 2018 Fox News Network, LLC. ALL RIGHTS RESERVED. Copyright 2018 ASC Services II Media, LLC. All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of ASC Services II Media, LLC. You may not alter or remove any trademark, copyright or other notice from copies of the content.*

## U.S.

Crime

Military

Education

Terror

Immigration

Economy

Personal Freedoms

Fox News Investigates

## Opinion

## Entertainment

Celebrity News

Movies

TV News

Music News

Style News

Entertainment Video

## World

U.N.

Conflicts

Terrorism

Disasters

Global Economy

Environment

Religion

Scandals

## Politics

Executive

Senate

House

Judiciary

Foreign Policy

Polls

Elections

## Business

Personal Finance

Economy

Markets

Watchlist

Lifestyle

Real Estate

Tech

## Lifestyle

Food + Drink

Cars + Trucks

Travel + Outdoors

House + Home

Fitness + Well-being

Style + Beauty

Family

Faith

## Science

Archaeology

Air & Space

Planet Earth

Wild Nature

Natural Science

Dinosaurs

## Tech

Security

Innovation

Drones

Computers

Video Games

Military Tech

## Health

Coronavirus

Healthy Living

Medical Research

Mental Health

Cancer

Heart Health

Children's Health

JA-161

## TV

Shows

Personalities

Watch Live

Full Episodes

Show Clips

News Clips

## About

Contact Us

Careers

Fox Around the World

Advertise With Us

Media Relations

Corporate Information

Compliance

## Other

Fox Business

Fox Weather

Fox Nation

Fox News Shop

Fox News Go

Fox News Radio

Outkick

Newsletters

Podcasts

Apps & Products

New Terms of Use   New Privacy Policy   Your Privacy Choices   Closed Captioning Policy   Help   Contact Us
Accessibility Statement

This material may not be published, broadcast, rewritten, or redistributed. ©2023 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

# Exhibit 7

Case 1:23-cv-03773-AKH Document 18-7 Filed 05/30/23 Page 2 of 27



VIDEO    LIVE    SHOWS    CLIMATE    ■    ■    ■    L(

# 'This Week' Transcript 5-6-18: President Trump's personal attorney Rudy Giuliani and Stormy Daniels' lawyer Michael Avenatti

This is a rush transcript for "This Week" on May 6, 2018.

By ABC News
May 6, 2018, 9:54 AM

Giuliani on when Trump learned of $130,000 payment: 'Don't know and doesn't matter'
George Stephanopoulos interviews Donald Trump's new personal lawyer, former New York City Mayor Rudy Giuliani, durin...    Read More

---

ANNOUNCER: This Week with George Stephanopoulos starts right now.

GEORGE STEPHANOPOULOS, HOST: A This Week exclusive: Rudy Giuliani.

DONALD TRUMP, PRESIDENT OF THE UNITED STATES: We love Rudy. He's a special guy.

STEPHANOPOULOS: The president's top attorney made headlines this week with that stunning revelation about hush money to Stormy Daniels.

RUDY GIULIANI, PRESIDENT TRUMP'S ATTORNEY: The president reimbursed that over a period.

STEPHANOPOULOS: Decimating Trump's previous denial.

UNIDENTIFIED FEMALE: Did you know about the $130,000 payment?

TRUMP: No. No.

STEPHANOPOULOS: Unleashing a firestorm.

UNIDENTIFIED FEMALE: I love Rudy, but they better have an explanation for that. That's a problem.

STEPHANOPOULOS: And an unusual retreat.

TRUMP: Started yesterday. He'll get his facts straight.

GIULIANI: The facts. The facts I'm still learning.

STEPHANOPOULOS: So what are the facts? What did the president know about his lawyer's deal with Stormy Daniels? When did he know it? Is this case now as great a threat as the Russia investigation?

Plus...

This Week Transcript 18: President Trump's Personal Attorney Rudy Giuliani, Stormy Daniels' Lawyer Michael Avenatti - …

TRUMP: I would love to see, but I have to find a way to be (inaudible).

STEPHANOPOULOS: Team Trump targets the special counsel as we learn what Mueller wants to ask the president and what he might do if the president refuses to comply.

Is this confrontation heading to the Supreme Court? Might Trump fire Mueller first? How will Rudy Giuliani handle the showdown?

All the tough questions ahead in our Sunday exclusive

Plus, a live response from the attorney for Stormy Daniels, Michael Avenatti, and analysis from our Powerhouse Roundtable

We'll break down the politics, smoke out the spin  The facts that matter this week

ANNOUNCER  From ABC News, it's This Week  Here now chief anchor George Stephanopoulos

STEPHANOPOULOS  Good morning  Let's get right to it  Our exclusive guest this week, the president's top attorney Rudy Giuliani  Mayor Giuliani, thanks for joining us this morning

GIULIANI  Good morning, George

STEPHANOPOULOS  The president said you didn't get the facts straight, so let's try to get some facts on the table to begin with  The president does acknowledge meeting Stormy Daniels, correct?

GIULIANI  You know, I'm not really involved in the    in the Daniels thing  So I don't    I don't know  I mean, he denies that it happened  She has written a letter denying it

STEPHANOPOULOS  Well we do have a picture of them together, so the the president

GIULIANI  Well, it depends on kind of what you mean by met her  Right?

STEPHANOPOULOS  Well, yes, there's the picture right there  I just want to get that fact on the table

GIULIANI: Well it looks like my friend Donald Trump before he was president, but -- and that looks like the woman who was on Saturday Night Live last night.

STEPHANOPOULOS: That's right. But does...

GIULIANI: Now that's pretty -- I -- I think she -- she kind of -- god, if I were her lawyer I'd be very upset. Fame and fortune, let me make money. How is she damaged? She's become rich as a result of this. The $130,000 doesn't mean anything. Boy, I wish that was my case.

STEPHANOPOULOS: So the president does deny any sexual relationship with Stormy Daniels?

GIULIANI: He has. I have not -- I'm not -- as I said, I'm not involved in that. But the reality is he denies it. She denied it. Then when -- when it was opportunistic, right before the election, she came forward and then of course the whole thing happened with Michael Cohen. And -- and it's history now because it wasn't a campaign anything that...

STEPHANOPOULOS: Well, but -- but let me just -- because you say it's history. When did the president first learn that Stormy Daniels wanted money to keep quiet about the relationship?

GIULIANI: Don't know and doesn't matter to me. What matters to me are two things. There are two relevant legal things, which is what my job is. Number one, it was not a campaign contribution because it would have been done anyway. This is the kind of thing that I've settled for celebrities and famous people. Every lawyer that does that kind of work has. And number two, even if it was considered a campaign contribution, it was entirely reimbursed out of personal funds, which I don't think we'll even get to, because the first one's enough. So...

STEPHANOPOULOS: Well...

GIULIANI: Case closed -- case closed for Donald Trump. And I think for -- for Michael Cohen, who I think got a big boost with Judge Ellis's comments the other day.

STEPHANOPOULOS: Well let's -- let's -- the other day you also told BuzzFeed, though, that at some point after the 2016 election, Michael Cohen had complained to some people that he hadn't been paid by Donald Trump. And then -- so then you said Cohen met with Trump and told him and Giuliani said that we'll cover your expenses, they work out this $35,000 a month retainer after that. So -- so the president did know about this after the campaign?

GIULIANI: Can't say that. I mean, at some point, yes but it could have been recently, it could have been a while back. Those are the facts that we're still working on. And that -- you know, may be in a little bit of dispute. This is more rumor than it is anything else. But...

STEPHANOPOULOS: But that's what you said. You said that to BuzzFeed.

GIULIANI: But here's the -- but here's the -- well, yes, I mean that -- that's one of the possibilities and one of the rumors. The reality is...

STEPHANOPOULOS: You stated it as fact.

GIULIANI: Well, maybe I did. But I -- right now, I'm at the point where I'm learning, and I can only -- I can't prove that. I can just say it's rumor. I can prove it's rumor, but I can't prove it's fact. Yet. Maybe we will.

STEPHANOPOULOS: But -- but you've said as -- it -- you've said as a matter of fact on Hannity and BuzzFeed, you talked to the Washington Post about it.

GIULIANI: I don't know -- I don't know how you separate fact and opinion.

STEPHANOPOULOS: Well, it's...

GIULLIANI: When I state an opinion, I'll say this is my opinion. And when I state a fact, I'll say this is a fact.

STEPHANOPOULOS: You said the president worked out a retainer agreement with Michael Cohen after the election in order to repay him...

GIULIANI: No, no...

STEPHANOPOULOS: ...for the settlement to Stormy Daniels.

GIULIANI: The second part -- the second part of it -- the last part of it, the -- the retainer agreement was to repay expenses, which turns out to have included this one to the woman that you saw on Saturday Night Live last night, trying to make more money and now our NDA with her seems to be irrelevant because she wants to break it up because she wants to make a lot more money than $130,000.

I never thought $130,000 -- I know this sounds funny to people there at home. I never thought $130,000 was a real payment, it's a nuisance payment. When I settle this -- when it was real or a real possibility, it's a couple million dollars, not -- not $130,000.

STEPHANOPOULOS: But you -- you -- you...

GIULIANI: People don't go away for $130,000 of a meritorious claim.

STEPHANOPOULOS: You -- you did call it a settlement payment. The president did make these payments to Michael Cohen over the course of 2017, according to you. Then why did -- on April 5, why did the president deny any knowledge of the payments when in fact, he had made the payments? GIULIANI: Well I don't know -- I don't know when the president learned about it, he could have learned about it after or not connected the whole thing at -- at that time. The reality is those are not facts that worry me as a lawyer.

Those don't amount to anything, what -- what is said to the press. That's political. What matters to me as a lawyer is...

STEPHANOPOULOS  It's OK to lie to the press?

GIULIANI  Gee, I don't know, you    you know a few presidents who did
that  I don't think that this president has done that  But in any event, that's
not the crime  The crime is was it a campaign contribution, not a campaign
contribution  100 percent, people want to avoid that conclusion because it
gets them out of trouble and it makes the whole investigation and    and
and the tactics that we use by the prosecutors totally repugnant

STEPHANOPOULOS  But as you know, the law says that any payment in
connection with the campaign could be considered something that has to
be reported

GIULIANI  Unless

STEPHANOPOULOS    hold on, let me just finish the question and then
you can respond  Michael Avenatti, Stormy Daniels' lawyer, says there's a
great deal of evidence, contemporaneous evidence at the time that they did
in fact discuss the campaign

GIULIANI  Michael Avenatti's going to say what he has to say to collect his
money  So I know he's coming on later and people can judge why the heck
he let her go on Saturday Night Live if this is a serious case and not a
comedy

But the reality is, here's the test, not of Michael Avenatti, not of me, but of
the Campaign Finance Commission  If it could be for any other purpose,
even if the purpose is campaign, any other purpose, if a man buys a suit, if
a woman buys a dress, it cannot be considered a campaign contribution
Now this was for another purpose, to protect him, to protect his family  It
may have involved the campaign, it doesn't matter  And it would've been
done under any other circumstances, if there was no campaign and I can
prove

STEPHANOPOULOS  If that's the case, then why wasn't

GIULIANI    and I can prove that it has been done on numerous times, not
necessarily with President Trump, but with many other people that I and
other lawyers have represented

STEPHANOPOULOS  If it could have been done at any other time, this
this became    she gave an interview back in 2011  There was a blog post
back in 2011  She was on radio shows earlier as well, why didn't the
president make the payment earlier?

GIULIANI  I don't know  Maybe she didn't demand it earlier  You're not
going to pay if you're not    if there's no demand  I have    I have no idea
what the history of her representation was

I do think it's suspect that she waits until the very last minute with regard
to the campaign, and where you could get the maximum personal damage
against the president  Back in 2011, he was    he was a celebrity  But he
wasn't running for president of the United States

Now that adds to the situation, it doesn't create any additional motivation, though. Primary motivation is personal. A long history of doing that that she and Avenatti and the other lawyers don't have anything to do with, and I'm very comfortable with that part of the case, George.

(CROSSTALK)

It's the Mueller -- it's the Mueller part of the case that I came in for, not the -- that one's gone, that one's gone. I think if you asked the prosecutors off the record, they would tell you that's gone.

STEPHANOPOULOS: Well there is -- we want to get to that because there were even interviews as late as this week where people said that it was clear to them coming out of those interviews that it wasn't gone.

But even the president's allies are having a -- are having a hard time -- having a hard time believing that Mr. Trump reimbursed Michael Cohen without knowing what it was for. Here's Andrew Napolitano on Fox.

(BEGIN VIDEO CLIP)

ANDREW NAPOLITANO, SENIOR JUDICIAL ANALYST, FOX NEWS: If Rudy wants the public to believe that Donald Trump reimbursed Michael Cohen $130,000 and didn't know what it was for, didn't know that it was going to silence Stormy Daniels, that is unworthy of belief.

(END VIDEO CLIP)

STEPHANOPOULOD: How do you respond to Andrew Napolitano?

GIULIANI: Well the judge doesn't know the facts of the case. He knows less about the facts case than I do. Wonderful guy, Judge Napolitano. But he really shouldn't be speculating on facts that he doesn't know. And I think he would regret that if he he thought about it.

$130,000 between a lawyer and a client and -- and a client who's worth, you know, billions, is not -- George, you know, I don't like saying this, but it's not a great deal of money.

$1.3 million is a great deal of money. That's the kind of money you would think of as a settlement. If I saw $130,000, I would never think it was to settle a substantial claims against my client.

STEPHANOPOULOS: Are you confident that Michael Cohen never told President Trump that I made this payment in order to have -- make a payment to Stormy Daniels?

GIULIANI: Number one, why would I be? And why would I be concerned when it's not campaign contribution. It -- it was done for other purposes in addition to possible campaign purposes. End of case.

STEPHANOPOULOS: But you do acknowledge...

GIULIANI: It was repaid. End of case.

STEPHANOPOULOS: But you acknowledge that Michael Cohen would tell the president this is what it's for?

GIULIANI: On October 15, 16, right before the election? $130,000 payment when there were other -- I did make clear -- and I don't know what they are yet. I will know. There were other things involved that had nothing to do with Stormy Daniels. In other words, other amounts of money. This was not uncommon for him to do that.

So no, I would not -- I would not -- if I were him and I were the president's lawyer and I had done this in the past and it had worked out in the past, I would not go to him and bother him two weeks before the election with this thing.

STEPHANOPOULOS: But certainly April 5, 2018 the president knew that Michael Cohen had made these payments, because he in fact had reimbursed Michael Cohen for it.

GIULIANI: I -- I don't know and I don't think it's at all relevant anymore. This is another tangent like, you know, chasing the Flynn tangent when it turns out that John Kerry is now violating the Logan Act and nobody seems to care. You haven't asked me about that.

STEPHANOPOULOS: Even -- even if this was not a campaign finance violation...

GIULIANI: We missed John Kerry.

STEPHANOPOULOS: Right. Even -- even if you -- if this was not a campaign finance violation, as you say, this was a liability to Michael Cohen. Why didn't the president include that liability on his financial disclosure form?

GIULIANI: Well how could he if he didn't know it? Right? I mean, first of all, it isn't a liability, it's an expense  I don't think those are included  So I'm representing the president, let's say  And I came down to Washington this weekend  That's a certain expense  I'd bill him for it three months from now or two months from now  That's not a loan  He's not loaning me money  I'm    I'm    my law firm or I    in this case, I, because I'm representing him individually, I lay out the money and then he pays me back  Sometimes those expenses go on for a couple years

STEPHANOPOULOS  But    but then you even called it a settlement payment  So this would be something that he owes Michael Cohen  He didn't file his financial disclosure until June of 2017  He knew he had this liability to Michael Cohen  He didn't include it on his financial disclosure form

GILUIANI  But, George    but it's not a loan, it's an expense  You don't you don't include all legal fees or all legal payments on your financial disclosure form  And how can you do it when you don't know about it? I don't think anyone believes that he knew about it at the time  I think there's a question about when did he find out

Case 1:23-cv-03773-AKH    Document 18-7    Filed 05/30/23    Page 10 of 27
This is a week-transcript-18-president-trumps-personal-attorney-rudy... Stormy Daniels payment | Michael Avenatti - ...

STEPHANOPOULOS: No, but before June 2017, you've said that he made this agreement with Michael Cohen before June 2017 in order to pay him back.

GIULIANI: The agreement with Michael Cohen, as far as I know, is a longstanding agreement that Michael Cohen takes care of situations like this then gets paid for them sometimes. Gets paid -- sometimes it's reimbursed in another way. It depends on whether it's business or personal.

STEPHANOPOULOS: Is Michael Cohen still the president's attorney?

GILULIANI: No, of course not. It would be a conflict right now for him to be the president's attorney. I am in this respect. So is Jay Sekulow, so are the Raskins, and then of course he has White House Counsel. As you know from working in the White House, that's not quite your attorney, that's really the president -- the presidency's attorney.

STEPHANOPOULOS: Correct.

And -- and you've said he -- he -- this was a regular arrangement he had with Michael Cohen. So did Michael Cohen make payments to other women for the president?

GIULIANI: I have no knowledge of that but I -- I -- I would think if it was necessary, yes. He made payments for the president, or he conducted business for the president, which means he had legal fees, monies laid out, and expenditures, which I have on my bills to my clients.

STEPHANOPOULOS  And are you confident that his testimony and the Stormy Daniels payment won't contradict the president?

GIULIANI  Not in any material respect

Look, if it didn't contradict it at all, then somebody would be lying  I remember that great cross examination when the person just repeated the things over and over again the same way  Of course there'll be minor details

On the two main facts, was it for the    was it for another purpose other than just campaign, even if it was campaign? Yes  It was to settle a personal issue that would be embarrassing to him and his wife  Number two, did he repay it over a period of time and then find out ultimately what it was about? Yes

STEPHAPNOPOULOS  They had

GIULIANI  I'm comfortable with that  That's 100 percent  That's why these people who think they're chasing this down are    are involved in the same witch hunt that Judge Ellis was so concerned about with Mueller

STEPHANOPOULOS  They had dinner in March, a phone call two weeks ago, any other communication? And are you sure they didn't discuss the Stormy Daniels payment during these conversations?

Case 1:23-cv-03773-AKH   Document 187   Filed 05/30/23   Page 1 of 27

GIULIANI: I -- I don't think it's a good idea for the -- for the two of them to talk right now, eventually they can. They are very good friends. I kind of miss Michael's advice. I think Jay does also.

But right now, the best thing to do is through the lawyers. We have a very good relationship with his two lawyers. And we're going to continue to -- to do that, and that has worked out for us.

If they had conversations before this, no harm. I mean, again that part of the case, George, I am very comfortable, is gone. I got to focus my attention on the -- on the Mueller -- on the Mueller part.

STEPHANOPOULOS: Are you concerned at all that Michael Cohen's going to cooperate with prosecutors?

GIULIANI: No. I expect that he is going to cooperate with them. I don't think they'll be happy with it because he doesn't have any incriminating evidence about the president or himself.

The man is an honest, honorable lawyer. And despite the Times article today, which is totally baseless, as far as I can tell, but you know, that's his lawyer's issue where they had to help. My issue is getting up to speed on the facts here. I'm about halfway there.

STEPHANOPOULOS: And has the president or any member of the president's team ever suggested to Michael Cohen in any way that the president would pardon him if he were indicted or convicted?

GIULIANI: That -- that -- we -- Jay and I have made it clear, and -- and Michael's lawyers all know that that obviously is not on the table. That's not a decision to be made now. There's no reason to pardon anybody now.

STEPHANOPOULOS: So it hasn't been discussed?

GIULIANI: It has not been discussed. And -- and would not be discussed. Does the president have the unfettered power, as President Clinton had, President Reagan? I used to -- I -- used to have the pardon attorney worked for me with President Reagan. He gave out 900 pardons, far fewer than -- than Obama or -- or President Trump.

I'm -- I'm a big believer in the pardon power. There are people I want to see get pardons like Michael Milken, who I prosecuted. But right now, pardons would be a bit -- they wouldn't be illegal to talk about, they'd be kind of confusing.

STEPHANOPOULOS: And let's talk about the Mueller investigation. The president said again on Friday that he wants to speak with Mueller, answer his questions. So are you prepared to make that happen?

GIULIANI: Not -- not after the way they've acted. I came into this case with a desire to do that, and -- and they just keep convincing not to do it. First they leak the questions. Then they do this whole thing with...

Case 1:23-cv-03773-AKH   Document 18-7   Filed 05/30/23   Page 12 of 27

STEPHANOPOULOS: Well let -- let me just stop you right there, because in fact -- in fact those -- those questions were written by Jay Sekulow after a meeting with Mueller and his team. And these were the -- your impression, the impression of the Trump team's take on the questions, and in fact it was a document made by the Trump team.

It wasn't something leaked by Mueller.

GIULIANI: It wasn't something leaked by us, I know that. I mean I -- look, it may not have been -- first of all I don't think Bob Mueller leaks, let's be clear about that. I think that people on a lower -- I don't think his -- his top guys leak or women, I think people below leak and a lot of people saw these different documents.

Could it have been somebody formerly on our side? Could it have been somebody formerly on theirs? I don't know. Main fact is I don't care. My client's prejudiced by that, but in a way we were helped by it.

So I guess that's why they suspect us. But we were helped inadvertently. We're helped because it shows he has no case. Three main issues, right, one is was there collusion? Come on, nobody believes anymore there was collusion.

STEPHANOPOULOS: Several questions on that list about collusion.

GIULIANI: Well there were questions about it because they don't have any answers, right. They don't -- they wouldn't have to ask us if they had answers, right.

(CROSSTALK)

STEPHANOPOULOS: I know that you and the president keep on saying that, but Michael Caputo who is -- who has worked on the campaign just met with Mueller's team this week. He came out saying they asked a lot of questions about -- about collusion.

He came away quite concerned about Paul Manafort, Roger Stone, Rick Gates, and others.

GIULIANI: Maybe he's less concerned now after Judge Ellis gave a pretty good indication that he might toss the case for government misconduct, that he might not even have authority to conduct this investigation, might have to go back to the east district of Virginia.

I would think Mr. Caputo to rest a little bit easy. Although the man has been tortured. He's a -- he -- he's one of the people that, you know, has to be looked at for some kind of compensation here. The man has been tortured. And what he's saying is they asked a lot of questions, but that doesn't mean they know anything?

STEPHANOPOULOS: Mayor, if the president has done nothing wrong, as you say, again and again, and he tells the truth.

GIULIANI: He hasn't done anything wrong, George.

STEPHANOPOULOS: I know -- and if he tells -- and he tells the truth, as you would advise him to do, what is the danger in answering Robert Mueller's questions?

GIULIANI: Because, they're trying to trap -- you can't -- you couldn't put a lawyer on this show, who wants to keep his law license, to tell you he should testify.

STEPHANOPOULOS: But it's only a trap if the president doesn't tell the truth.

GIULIANI: No, it isn't. It's only prosecutable if they have some built up, manipulated evidence to prove the president didn't tell the truth. How often has that happened?

STEPHANOPOULOS: If you have evidence that proves he doesn't tell the truth, then the president didn't tell the truth.

GIULIANI: No. People do things like lie. People lie. Could Comey be lying? Your damn right he could be lying, George. And we're going to walk ourselves into a trap like that? I couldn't...

STEPHANOPOULOS: If Mr. Comey lied to the special counsel then he is the one who is vulnerable to perjury. If the president tells the truth...

GIULIANI: But you've got to prove...

STEPHANOPOULOS: ...then he's not.

GIULIANI: And the special counsel has to be open to believing that. The special counsel so far seems to think that Comey is Moses. And I happen to think Comey is Judas.

STEPHANOPOULOS: But you believe the president is telling the truth. If you believe that, if you have that conviction, you're his attorney. Why don't you say go in, talk to Robert Mueller. Tell the truth.

GIULIANI: Because I wouldn't be an attorney if I did that, George, I'd be living in some kind of unreal fantasy world that everybody tells the truth. I'm not going to set -- they don't have a case on collusion. They don't have a case on obstruction, which is why they're asking all these cockamamie questions about what do you feel, what do you think. I'm going to walk him into a prosecution for perjury like Martha Stewart did? I mean, she'd tell you...

STEPHANOPOULOS: She didn't tell the truth.

GIULIANI: Martha Stewart would tell you that she told the truth and they set her up. I don't know that, but I don't want to get into that case. I don't know.

STEPHANOPOULOS: Right. But what happens if Robert Mueller subpoenas the president? Will you comply?

GIULIANI: Well, we don't have to. He's the president of the United States. We can assert the same privilege as other president's have. President Clinton negotiated a deal in which he didn't admit the effectiveness of the subpoena. They withdrew it.

STEPHANOPOULOS: Yeah, but he did testify -- yeah, but he did testify before the grand jury. Is the president willing to do that?

GIULIANI: But only for two-and-a-half hours, only with an arranged format. Would we be willing to do that? I would rather have the Hillary Clinton treatment.

(CROSSTALK)

STEPHANOPOULOS: Yeha, I think President Clinton was before the...

(CROSSTALK)

GIULIANI: But I would rather have the Hillary Clinton.

STEPHANOPOULOS: ... more than two-and-a-half hours.

GIULIANI: No, he was two-and-a-half hours in the grand jury, approximately, maybe three. We'll say three. But Hillary Clinton treatment is what I'm looking for. And that is no under oath, only a Q&A, and then we get the questions in advance, and they write the report two weeks before.

STEPHANOPOULOS: Well, you -- he has briefed you on the topics he wants to discuss. Are you confident the president will not take the Fifth in this case?

GIULIANI: How can I ever be confident of that? When I'm facing a situation with the president and all the other lawyers are, in which every lawyer in America thinks he would be a fool to testify, I've got a client who wants to testify, please, don't -- he said it yesterday.

And, you know, Jay and I said to ourselves, my goodness, you know, I hope we get a chance to tell him the risk that he's taking. So he may testify. And we may actually work things out with Bob Mueller, because working with him directly is good.

But if they keep undermining it. And we have situations like Judge Ellis saying that they're out of control and they're not authorized, and they refuse to give the judge their authorization, what's going on with that, George? God almighty.

STEPHANOPOULOS: Final question, do you still want Rod Rosenstein to shut down this investigation?

GIULIANI: I do. I believe that after Judge Ellis's remarks last night -- yesterday, rather, on Friday, there's no question that the amount of government misconduct is accumulating. I happen to believe it's greater than anybody realizes. Very embarrassing to my former Justice Department.

JA-176

And very embarrassing not to FBI agents, please, nobody attack an FBI agent, the Justice Department lawyers who are attacking the former leadership of both organizations.

STEPHANOPOULOS: Mr. Giuliani, thanks for your time this morning.

GIULIANI: George, you're always fair, thank you.

STEPHANOPOULOS: Take care.

Stormy Daniels's attorney Michael Avenatti responds live next. We'll be right back.

(COMMERCIAL BREAK)

STEPHANOPOULOS: Stormy Daniels on Saturday Night Live last night, we're joined now by her attorney. Michael Avanatti joins us live from Las Angeles this morning. Mr. Avenatti, thanks for joining us this morning.

You heard Mayor Giuliani say he thought you made a big mistake allowing your client to go on Saturday Night Live last night. He thinks this hurts your case.

MICHAEL AVENATTI, LAWYER: No, I -- I think that's ridiculous. I mean Donald Trump went on Saturday Night Live during the election. I -- I don't think it hurt our case at all.

But I just want to make sure, George, did that interview just happen? I mean I'm not being spoofed, right?

STEPHANOPOULOS: You heard -- you heard the whole thing, what's your reaction?

AVENATTI: It's an absolute unmitigated disaster for Rudy Giuliani and the president. It's a train wreck. I can't believe that that actually just happened. I mean what we witnessed by Rudy Giuliani may be one of the worst T.V. appearances by any attorney on behalf of a client in modern times.

He now expects the American people to believe that he doesn't really know the facts, that as to every key question you asked, he hasn't communicated with the president about it. I mean this guy's all over the map over the last 72 hours on some very simple facts that should be very straightforward.

I think it is obvious, George, to the American people that this is a cover up, that they are making it up as they go along, they don't know what to say because they've lost track of the truth.

STEPHANOPOULOS: Well let's try to break down some of those points right there. Number one, do you have evidence that this was in fact a campaign related payment? We know the timing of it, but do you have other evidence, any communication between Michael Cohen and -- and your client?

Any communication between Michael Cohen and the president that demonstrates this is connected to the campaign?

AVENATTI: There is significant amount of evidence, there is no question that this had everything to do with the campaign. In fact, if you go back and replay that interview, and that will be done I'm confident, and if you look at the answers, you're going to find an inconsistency with what Rudy Giuliani just told you.

Early in the interview he told you it has nothing to do with the campaign, later in the interview you asked him if there was going to be inconsistencies between Michael Cohen's testimony and Donald Trump and he equivocated.

He basically said that well it may have had something to do with the campaign, but it also has to do with personal issues. There's no question this had everything to do with the campaign. You could look at the timing associated with the payment.

The president could have paid this money or Michael could have paid the money or negotiated this in 2007, '08, '09, '10, '11, '12, '13.

STEPHANOPOULOS: Let me stop you there though, because one of the points that Rudy Giuliani made was that it was your client who was pressing for it in -- in -- during the campaign because that's when it was most valuable.

AVENATTI: That's -- that's absolutely false, that is not what happened, my client was preparing to tell her story, my client did not approach Michael Cohen, did not have anyone approach Michael Cohen, Michael Cohen approached my client in her council in an effort to shut her up in the days before the election. And that's --

(CROSSTALK)

STEPHANOPOULOS: And you can prove that?

AVENATTI: Yes. Absolutely. 100 percent. I wouldn't be sitting here on television if I couldn't, George. And look, all you have to do is look at what just happened in that interview to know that their attempting to snow (ph) the American people and when the facts and the evidence come out this is going to be a disaster for Michael Cohen, the president and now Rudy Giuliani. It is time for Rudy Giuliani to be put out to pasture.

STEPHANOPOULOS: Do you have any evidence that President Trump knew in real time about this agreement about this payment?

AVENATTI: George, we have evidence that the president knew in the -- in the months at least following the campaign of this payment, certainly knew it long before his statement on Air Force One in April of this year where he effectively stood there and lied to the American people about not knowing anything about this payment. And then of course Rudy Giuliani a few days ago goes out and contradicts that.

This Week Transcript 18: President Trump's personal attorney Rudy Giuliani and Stormy Daniels lawyer Michael Avenatti - …

And now they're trying to claim that Rudy Giuliani doesn't know the facts. I mean, any attorney that's worth anything could have a 30 minute meeting or conversation with his client and get to the bottom of this. This is not a complicated matter that takes months or years to get to the bottom of, George. I mean, this is absurd.

STEPHANOPOULOS: One of the other points we made with Rudy Giuliani, he said he didn't have any knowledge of payments made by Michael Cohen to other women but he -- but he couldn't rule it out either and has (ph) said that the payments might have been made if necessary. Do you have any evidence of any other -- that any other women were paid by Michael Cohen or other agents of the president?

AVENATTI: Women have come forward and contacted our office, George, as I've stated in the past. And we haven't completed vetting those stories but I think at the end of the day, there's going to be evidence of such payments. But I think it's also important to go back and -- and think about what we've just heard and what we've heard the last few days.

According to Rudy Giuliani, this was basically commonplace. The president had effectively an extramarital affair slush fund that was administered by Michael Cohen and that he would just be expected to take care of these things. They were a regular occurrence. I mean, that in and of itself should be very disturbing. Most people of means, most people of wealth and celebrity, they don't have extramarital affair slush funds and the suggestion is insulting.

STEPHANOPOULOS: That may -- that may be but in this case, isn't it possible that that would actually help the president's case in showing that he -- if he -- if he did indeed make other payments not connected to the campaign, that this was a regular occurrence for him and so this was just a pattern of practice for him and it was not connected to the campaign?

AVENATTI: Again, George, I don't think there's any question that this was connected to the campaign. You've got to look at the timing of it, you've got to look at the establishment of the LLC and when it occurred. I mean look, what they're trying to sell the American people is just not believable and they can't even keep their facts straight or their lies straight.

STEPHANOPOULOS: A few weeks back you put out that computer disk that you then did not reveal. I'm going to show that to our viewers right there. There, we see it right there. This picture's worth a thousand words. How many words is this worth? What is in that disk and when will you release it?

AVENATTI: Well George, I'm not going to disclose right now what's on the disk and we're going to be strategic and thoughtful about what evidence we're going to reveal and when. I mean, we've got a piece of litigation that we're in the middle of and I think that thus far, over the last few months we've been -- we've -- our batting average is -- is pretty high and we're going to be smart about it.

So I'm not going to disclose that right now. But what I will say is that the more Rudy Giuliani talks, the more Michael Cohen talks, the more statements that the president gives on Air Force One, the better our case gets with each passing day.

STEPHANOPOULOS: Do you think that Rudy Giuliani in this and other interviews this week has waived attorney-client privilege with the president?

AVENATTI: Well, I think he might have. I mean, I -- and I don't think it was smart, the way that he's gone about doing this. I think he's done considerable harm to the president. I think his representation has been nothing short of a disaster and they would have been better off not saying anything than attempting to peddle what they've attempted to peddle over the last 72 hours, that's for sure.

STEPHANOPOULOS: Michael Avenatti, thanks for your time this morning.

AVENATTI: Thank you, George.

STEPHANOPOULOS: Lots of news to discuss from this morning's interviews with Rudy Giuliani, Michael Avenatti. The roundtable's going to analyze it all, next.

(COMMERCIAL BREAK)

STEPHANOPOULOS: The "Roundtable" is ready to go. And all week long you can get the latest breaking news alerts on the ABC News app. Download it during the break.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

JONATHAN KARL, CHIEF WHITE HOUSE CORRESPONDENT, ABC: When the president so often says things that turn out not to be true, when (ph) the president in the White House show what appears to be a blatant disregard for the truth, how are the American people to trust or believe what is said here and what is said by the president?

SARAH HUCKABEE SANDERS, WHITE HOUSE PRESS SECRETARY: We give the very best information that we have at the time. I do that every single day and will continue to do that every day under this position.

(END VIDEO CLIP)

STEPHANOPOULOS: And that was the briefing room the day after Rudy Giuliani's first interview on Hannity that set this all off this week. We're going to talk about it now with our Chief White House Correspondent Jon Karl, you just saw him ask that question.

Our Chief Political Analyst Matthew Dowd, Wall Street Journal Columnist and Manhattan Institute Senior Fellow Jason Riley, and democratic strategist, former Clinton campaign spokesperson Karen Finney.

And -- and Jon, let's begin. I want to get back to that briefing later, but let's begin with these interviews. You're big takeaways, the big headlines.

KARL: Well I think what you're seeing now is a new war on Robert Mueller, a new war on the investigation. Mueller and the investigation are now central to the Trump mid term election strategy ad his re-election strategy.

They want to vilify, they want to delay this investigation, they want to draw it out, you'll see more interviews like this. They actually want this issue to be front and center because, George, they believe that the biggest motivator for the Trump base in the mid term elections will be fear of impeachment.

STEPHANOPOULOS: Well again (ph), pretty clear from -- from -- from that interview that the president isn't going to sit down with Robert Mueller any time soon (ph).

KARL: Absolutely not. If -- if there is subpoena, and I don't believe there will be, it'll be fought. They will -- they -- even if they believe they will lose, they will fight it just to draw it out -- draw it out as long as possible.

STEPHANOPOULOS: But Karen Finney, one of the other headlines right there, Rudy Giuliani did not rule out having the president take the fifth.

KAREN FINNEY, POLITICAL CONSULTANT: No, he did not, and it was something of a bizarre interview. I mean there are a number of things as we were just discussion, he sort of came out against the rule of law on (ph) ever speaking to a grand jury.

He ruled out taking the fifth, he seemed to suggest that maybe there was a slush fund and other women were paid. You know, look, I think the -- the reality here is they got caught telling the truth this week, and then I think we saw them trying to walk that back over the course of several days.

STEPHANOPOULOS: (Inaudible) that's the point, I mean Jason Riley, if you -- if you go back to Wednesday, clearly -- and maybe it was a mistake in strategy, but clearly on Wednesday night when Rudy Giuliani went on Hannity, he deliberately put out the idea that the president has reimbursed Michael Cohen even though there had been denial after denial (inaudible).

JASON RILEY, JOURNALIST, WALL STREET JOURNAL: And he spent 72 hours now in damage control and politically it's a very risky strategy. Jonathan, I -- going this route, you know, up until now this has been the story about a 10 year old affair with the president and the -- and Stormy Daniels.

Now we're insuring wall to wall coverage of the president and the porn star, and the -- the -- the administration is not out there talking about their agenda. You had unemployment fall to rates -- you know, we -- we've rarely seen, you know, since World War II ended, but nobody's talking about the jobs numbers.

Nobody's talking about the economy, we're talking about this instead. I also think, George, that he is -- he's sort of taking his supporters for granted

JA-181

here.

STEPHANOPOULOS: The president?

RILEY: The president. He put out a narrative there that he had not -- had no knowledge of this payment, his daughter Ivanka was defending this, Sarah Sanders was defending this, and now he's said we're going to put out their new -- a new strategy, and now I expect you to defend that as well.

STEPHANOPOULOS: Well yes, this was just April 5th, this was not that long ago, this was one month ago the president said he knew nothing about it, completely blown up.

MATTHEW DOWD, POLITICAL ANALYST, ABC: Yes, it wasn't April of 2017, it was April of 2018 that he made this statement in this. I mean I -- first of all, I think Rudy has come so far from when he was a U.S. prosecutor basically prosecuting people like Bob Mueller is doing and like James Comey has (ph) been investigating, and now he's come so far field from that.

He were (ph) -- he basically is saying don't ever cooperate with people that work for the Justice Department in this. I'd just like to take a step back because you never hear a single person who speaks on behalf of the president ever use this argument.

The president is a man of integrity, he's trustworthy and honest and we should believe what he says. You never hear those statements, what you hear from them is well if he lied, he lied.

Everybody lies, that's how it is, this is how it goes. It wasn't really a campaign violation because he did it for personal reasons. Well even if it was a campaign violation, then -- then you can't prosecute him because he paid it back.

All of the statements in all of this, Stormy Daniels, or whatever happens to be completely -- to me -- points out the fact that we've not come to a position in our politics where people don't seem to think integrity matters anymore.

FINNEY: Well, or that we -- lying has become sort of normalized. I mean, the way that people talk about this administration, they talk about what happens daily in the White House briefing room as -- I mean, if the best answer that Sarah Sanders can give is I only have the best information that I have because she knows that her boss may be tweeting something that is totally the opposite of what she might be telling the American people.

I think part of the problem with that, though -- you know, I kind of go back to that's not news. What is news is what are the Republicans who are running for Congress, running for reelection going to do about it. I mean, all of this -- I think Rudy did his job this week if his job was to create a shiny object and take us away -- you're right, we're not talking about the jobs numbers.

We're also not talking about North Korea and the sort of danger of the idea that -- of President Trump sitting down with the North Korean leader and what could come of that. So I think -- you know -- again -- and we're also not talking about the idea that Rod Rosenstein -- this is a sort of Archibald (ph) --

(CROSSTALK)

DOWD: I want to go back to what John's question was, which happened at that briefing (ph) which I think is really important. I think we've come to a position now where almost everybody that deals with the White House or listens to the president, default position is it's probably not true. Which is a awful position for a White House and a president to be in.

Donald Trump for the past week -- and Albert Pujols both got to the 3,000 club. Albert Pujols did it for hits, Donald Trump did it for -- for lies.

(CROSSTALK)

DOWD: -- story in this (ph). And when you have an administration -- if you can't believe them on any of this, can you believe them on North Korea? Can you believe them on Iran? Can you believe them on Military exercises?

STEPHANOPOULOS: And that's going to be the question, is -- John, I -- and you and I were texting during that briefing the other day and it did seem to hit a new low in that briefing. Sarah Sanders either couldn't answer the questions and just punted, but also couldn't clean up what the president had said before. It almost gets to the point where you shrug your shoulders and say listen, we don't know what's true, what's not, we're not going to get the answer from the podium.

KARL: Well, what striked (ph) me is the first part of my question, I said when the president chose a flagrant disregard for the truth. She didn't take issue with that statement. She didn't challenge that statement because how many times has she had to get up there, has she been told a -- a bit of information, passed it on and it's turned out not to be true?

FINNEY: But again --

RILEY: I -- I do want to make one point about the -- the Manafort case that Rudy Giuliani made with the judge in that case. I -- I do think that that judge spoke for a lot of Trump supporters when he said that the Mueller investigation seems to have gone well past what it's mandate was here. And -- and this goes back to Rosenstein and that is where the real anger coming from conservatives and Trump supporters is.

It is at Rosenstein, because he is the one that is supposed to be overseeing Mueller and he has allowed to go off on these tangents and -- and their question is why doesn't he reign Mueller in. And then --

(CROSSTALK)

RILEY: -- keep alive (ph).

JA-183

This Week Transcript 18: President Trump's personal attorney Rudy Giuliani, Stormy Daniels lawyer Michael Avenatti - …

STEPHANOPOULOS: The judge -- the judge was asking questions there and I think one of the things you have to be careful about is -- is getting to the idea that the Judge was reaching conclusions, because one of the things the judge did there was say let me see the -- the document from Rod Rosenstein that gives the mandate to Paul -- to -- Robert Mueller.

RILEY: And they're very reluctant to show him that. And -- which feeds these suspicions among many of Trump's supporters that say this isn't really about Manafort, this is about taking down a president.

(CROSSTALK)

DOWD: The big difference is -- is that's how the justice system works, right?

FINNEY: That's right.

DOWD: A federal judge stands up there and asks questions, he asks questions in the prosecution, he's asked questions this (ph). He's saying I've waited (ph) -- I have questions about this. That's how it all supposed to works (ph). What you didn't see is people that support Bob Mueller in this come out and say the federal judge should be removed.

(CROSSTALK)

RILEY: -- you do have Rod Rosenstein out there chastising Congress. That's part of the --

(CROSSTALK)

DOWD: -- the Trump fan club and the Trump supporters basically every time they are confronted with something in the legal system and Justice Department, they basically say the Justice Department is filled with Storm Troopers, they're anti-American. What you saw with this is a federal judge stood up and said this is how it works, we're going to raise questions. And you don't see people that support Bob Mueller say fire the judge.

FINNEY: But they're also asking Rod Rosenstein for information that he can't give Congress because as we know, Congress also is not particularly trustworthy right now. It leaks like a sieve. So if you're trying to protect your case and the integrity of your case and do your job, which is what I see Rosenstein trying to do -- and again, while we're talking about Stormy Daniels, we're not talking about this -- you know, the fight about Rod Rosenstein and whether -- impeaching him?

I mean tomorrow the House of Representatives is going to try to impeach Rod Rosenstein for doing his job (ph)?

(CROSSTALK)

KARL: Rosenstein has job security right now. Because again, if you -- you talk about the low unemployment, 3.9 percent, the maneuvers with -- with North Korea, they do have issues to talk about but I'm telling you (inaudible) talk to somebody very key working on the Trump political strategy for the midterms. And the -- and the argument that was made is

we tried running on tax cuts and deregulation in these -- in these special elections and we got beat. The only way to really turn people out is fear and anger at what Democrats would do when they take over.

STEPHANOPOULOS: Right, but the -- the argument they're going to make, though, they're going to look back at 1998 and say that this was when Bill Clinton was getting impeached. And he actually picked up seats.

KARL: Democrats picked up seats in the midterm election.

DOWD: And his job approval numbers were at the highest point they had in the midst of the Monica Lewinski...

STEPHANOPOULOS: It was a strong economy, as well.

But let me press the point on Rod Rosenstein's job security right there. That's the logical argument right there. Are you certain that the president's fortitude will last in the wake of another series of indictments from Robert Mueller, or a subpoena for his testimony, or perhaps a subpoena going after members of his family?

KARL: You cannot be sure of anything when it comes to Donald Trump, but, George, I am telling you that every senior person around the president, everybody who gives the president counsel on this, tells me he is not going to fire Rod Rosenstein, that he understand what it would mean and the disaster that would ensue, the political damage that Republicans would start fleeing from him on Capitol Hill.

But you just can't say for sure.

DOWD: George, one thing I want to go back to what something Rudy Giuliani said and many of the people that support Donald Trump, including Donald Trump has said. Basically, he's saying there's nothing here. We ought to get this over with. It ought to be done in this.

Benghazi was a four year investigation. There were zero indictments, right. Clinton email scandal was a two year investigation. There were zero indictments. This has been a 14 month investigation, there's been 23 indictments.

So, if you're going to make an argument that something hasn't existed, this is way far above and beyond what's happened in this.

STEPHANOPOULOS: I want to bring that question to Jason Riley, because you heard it again from Rudy Giuliani here, and we've heard it consistently from the president -- no collusion, no collusion, no collusion. That that conclusion has been reached. That defies every piece of evidence we've had from every person who has gone and talked to Robert Mueller's team.

RILEY: Well, we don't know. Mueller -- Giuliani also says that he doesn't think Mueller is a leaker, that his top agents are leaking in the case. We don't...

This is a transcript: Week 18 president trumps personal attorney rudy... Stormy Daniels... Michael Avenatti - ...

KARL  After he said that the questions were leaked by Mueller  It was a very interesting

RILEY  But that gets me back to what Judge Ellis said here, which is that he said to Mueller's team you do not have unfettered power here  You can't have unfettered power  You should be working within parameters  And many Trump supporters think that this is no longer about Paul Manafort's bank fraud or financial dealings, this is about doing whatever it takes to bring down Donald Trump  And people are very concerned about that  Trump supporters are very concerned that Mueller has not kept his eye on the ball, that he's gone outside of his mandate and that latitude has been given to him by Rod Rosenstein

FINNEY  But that goes to, Jon, what you were also talking about  If we talk about 2018, that is about firing up the Trump base to try to turn them out in 2018 when, you know, Democrats have already put it on the table  This is not going to be about impeachment, that's not what they're going to run on

I do think, though, rather than sort of popping the champagne about a blue wave, it is time for the Democrats to actually focus on a message we    in 2006, talked about the culture of corruption  I think they could talk about a culture of corruption on steroids here and how it is the Republicans in congress who are protecting this president  You know, they are trying to halt the Russia investigation  They are protecting all the various things that we he is doing  That's closer to a winning message than trying to    than letting the Republicans make it about impeachment

STEPHANOPOULOS  One of the questions can anything else break through at this time?

But Matthew Dowd, one of the things    you know, during this period    and there's been a lot of talk about Russia, a lot of talk about Stormy Daniels, the president's approval rating has been going up  The Democrats have actually lost a little bit of ground on the generic ballot against the Republicans coming up in the midterms

DOWD  Well, yeah  And I think we're in April  And I think the president's approval    the president's approval now is 42 or 43 percent  It was sitting at 37 or 38  It has bumped up, similar bump up to what happened to Bill Clinton, though Bill Clinton was at a much higher point in time

I think we should keep in mind as we go through this almost every single mid term is determined by a president's job approval rating, right  It wasn't really fundamentally determined about whatever the message was in 2006, or whatever the message was in 2010, it's always an anti incumbent    it's always an anti incumbent presidential move

If the president's job approval rating is at 42 or 43, and hasn't risen any more, the likelihood that the Democrats take back the house is huge

RILEY  Well, I think that the Republicans are concerned about turnout  And we saw that at Trump's speech to the NRA this week  That was about

This Week Transcript 18: President Trump's personal attorney Rudy and Stormy Daniels' Michael Avenatti - …

getting his base out there even though he's not on the ticket. So, they're not -- the Republicans aren't so much looking at his approval rating, is looking at whether Trump supporters will turn out when Trump isn't running. And that's what that speech was about, saying to the folks you've got to come out, even though I'm not on the ticket.

STEPHANOPOULOS: I wonder if that's an indication of where things are going forward, Jonathan Karl. I mean, there does seem to be a little bit of a disconnect between what the president wants to do for the next several months over this campaign, and what Republicans in the House and the Senate wanted to do.

KARL: The president's political team wants this to be the second Trump election. They want to put Trump on the ballot. They want to make it a referendum on Trump versus Democrats who want to try to impeach Trump.

Do you want Trump or do you want him impeached? That's their argument.

And Republicans that are running this strategy in terms of -- from Capitol Hill, don't necessarily want that. It's a district by district, state by state effort. Some of those candidates will have to distance themselves from Donald Trump. But the Trump political team believes that you have to make this all about -- you have to make this a referendum on impeachment, a referendum on the president.

FINNEY: And the Democrats cannot let that happen because I agree with you that is the way to fire up that base.

And, Matt, I disagree with you. I mean, part of why the messaging from the Democrats does matter is they've got to try to keep the president's numbers as low as they can and create as much of a wedge for Republicans who are either running for re-election or running in these races, as part of what we've seen, the challenge that they've had already in these special elections.

We've got to -- they've got to continue to draw this wedge. And they've got to make it, quite frankly, about, you know, while Republicans are sitting there trying to impeach Rod Rosenstein, they're not talking about your life and your jobs and your health care. And I think at the end of the day...

(CROSSTALK)

DOWD: If the Democrats...

FINNEY: ... that actually matters.

DOWD: Democrats and Republicans are both in a fiction land if they think this race -- this election is not going to be about Donald Trump.

FINNEY: Oh, it's absolutely going to be.

DOWD: 2018 is fundamentally about Donald Trump.

Week 18: President Trump's personal attorney Rudy Giuliani and the Stormy Daniels story by Michael Avenatti - ...

FINNEY: It's absolutely going to be about Donald Trump.

DOWD: And right now the people that strongly disapprove of Donald Trump are almost twice as large as the people that strongly approve of Donald Trump. That's fundamentally the problem for the Republicans this year.

KARL: And by the way, in the midst of all this talk of Mueller and the special counsel, there's the other investigation. There's the Southern District of New York. And if you talk to...

STEPHANOPOULOS: Michael Cohen.

KARL: Michael Cohen. That is the real existential threat to Donald Trump. That is the real threat. They don't know what is there. You could see that the fear is that he will go after the Trump Organization, the Trump Organization, which can be subpoenaed, but cannot be pardoned, cannot take the Fifth.

And who knows what is there. That is the real concern.

RILEY: And we can all conclude now that although Giuliani seems to have been brought on-board here to try to speed up this Mueller investigation and bring it to a conclusion, he has probably done just the opposite. He has probably extended it.

STEPHANOPOULOS: That is going to be the last word. Thank you all very much. We'll be right back.

(COMMERCIAL BREAK)

STEPHANOPOULOS: And now we honor our fellow Americans who serve and sacrifice. In the month of April, one soldier died overseas supporting operations in Afghanistan.

And that is all for us today. Thanks for sharing part of your Sunday with us. Check out "World News Tonight." And I'll see you tomorrow on GMA.



Promoted Links by Taboola

Look For Any High School Yearbook, It's Free
Classmates

Locate Almost Anyone By Entering Their Name (This Is Addicting!)
TruthFinder

Top Biologist: If Anyone Has Tinnitus (Ear Ringing) Do This Immediately
Goodlife-24

JA-188

This Week Transcript 18: President Trump's personal attorney Rudy Giuliani, Stormy Daniels' attorney Michael Avenatti - ...

ABC News Network | Privacy Policy | Your US State Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement | Terms of Use |
Do Not Sell or Share My Personal Information    Contact Us
Copyright © 2023 ABC News Internet Ventures. All rights reserved.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

　　　　　　　Defendant.

23 Civ. 3773 (AKH)

**PEOPLE'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR REMAND**

JA-190

**TABLE OF CONTENTS**

TABLE OF AFFIDAVITS AND EXHIBITS ................................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF THE CASE ................................................................................... 2

    I.    Defendant and His Private Business Entities. ................................................ 2

    II.   The Conduct Charged in the People's Indictment. ....................................... 3

ARGUMENT ............................................................................................................. 6

    I.    Defendant Fails to Establish That His Alleged Criminal Conduct Arose
          "Under Color of . . . Office." ...................................................................... 8

    II.   Defendant Fails to Allege a Colorable Federal Defense. ............................ 16

        A.    Defendant has not articulated a plausible immunity defense ................. 17

        B.    Defendant has not articulated a plausible federal preemption defense. ... 21

    III.  Defendant's Invocation of Protective Jurisdiction Fails. ........................... 26

    IV.  Defendant Is Not a Federal "Officer" Entitled to Seek Removal. .............. 30

CONCLUSION ........................................................................................................ 32

i

JA-191

## TABLE OF AFFIDAVITS AND EXHIBITS

The following affidavits and exhibits accompany this motion:

Declaration of Matthew Colangelo dated May 30, 2023 (appending exhibits).

Ex. 1      Sealed Exhibit.

Ex. 2      People's Response to Defendant Donald J. Trump's April 27 Request for a Bill of Particulars, *People v. Donald J. Trump*, Ind. No. 71543-23 (Sup. Ct. N.Y. Cnty. May 12, 2023).

Ex. 3      Sealed Exhibit.

Ex. 4      Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54 AM, and 7:00 AM).

Ex. 5      May 4, 2018 Statement from Rudy Giuliani, *reprinted in* Politico Staff, *Full text: Rudy Giuliani issues statement clarifying his earlier remarks*, Politico (May 4, 2018).

Ex. 6      Transcript of Rudy Giuliani interview, *Hannity* (Fox News broadcast May 2, 2018).

Ex. 7      Transcript of Rudy Giuliani interview, *This Week* (ABC News broadcast May 6, 2018).

Ex. 8      Sealed Exhibit.

Ex. 9      Sealed Exhibit.

Ex. 10      Sealed Exhibit.

Ex. 11      Sealed Exhibit.

Ex. 12      Sealed Exhibit.

Ex. 13      Complaint, *Trump v. Cummings*, No. 19-cv-1136 (D.D.C. filed Apr. 22, 2019).

Ex. 14      Complaint, *Trump v. Deutsche Bank AG*, No. 1:19-cv-03826 (S.D.N.Y. filed Apr. 29, 2019).

Ex. 15      U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214 (1982).

Ex. 16      Brief for United States as Amicus Curiae, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023).

JA-192

Ex. 17      U.S. Office of Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal Agencies* (Feb. 15, 2018).

Ex. 18      U.S. Dep't of Justice, Office of Legal Counsel, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. OLC 222 (2000).

Ex. 19      U.S. Dep't of Justice, Office of Legal Counsel, *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office* (Sept. 24, 1973).

Ex. 20      Decision & Order, *People v. The Trump Corporation*, Ind. No. 1473/2021 (Sup. Ct. N.Y. Cnty. Sept. 6, 2022).

Ex. 21      Information, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018).

Ex. 22      Hearing Transcript, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018).

Ex. 23      Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice President* (Dec. 19, 1974).

Ex. 24      Protective Order, *People v. Donald J. Trump*, Ind. No. 71543-23 (Sup. Ct. N.Y. Cnty. May 8, 2023).

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454 (D.C. Cir. 1995).....................26

*American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)....................................11

*Arizona v. Manypenny*, 451 U.S. 232 (1981)..........................................................1, 2, 9

*Armstrong v. Thompson*, 759 F. Supp. 2d 89 (D.D.C. 2011) ........................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................16

*BDA Inv. Properties LLC v. Sosa*,
    CV 11-03684, 2011 WL 1810634 (C.D. Cal. May 12, 2011) ..............................26

*Bond v. United States*, 572 U.S. 844 (2014) ..................................................................1

*Cameron v. Johnson*, 390 U.S. 611 (1968)..................................................................28

*Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) ............................................................31

*Clinton v. Jones*, 520 U.S. 681 (1997)................................................................9, 14, 19, 21

*Colorado v. Symes*, 286 U.S. 510 (1932).......................................................................8

*County of San Mateo v. Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ..................................................................................7

*Dewald v. Wriggelsworth*, 748 F.3d 295 (6th Cir. 2014) ............................................24

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010).......................30

*Healy v. Ratta*, 292 U.S. 263 (1934).............................................................................32

*Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) ......................16

*Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001).........................................................13

*Imbler v. Pachtman*, 424 U.S. 409 (1976).....................................................................18

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998).............................................................15

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
    712 F.3d 185 (5th Cir. 2013) ..........................................................................24-25

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999) ............................................................15

*Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994) ....................................25

*Kirschner v. Klemons*, 225 F.3d 227 (2d Cir. 2000) ...................................................27

*Kugler v. Helfant*, 421 U.S. 117 (1975) ....................................................................27

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) ...........................9

*Lockert v. Faulkner*, 843 F.2d 1015 (7th Cir. 1988) .................................................17

*Maryland v. Exxon Mobil Corp.*, 352 F. Supp. 3d 435 (D. Md. 2018) .......................26

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) ............................................1, 8, 10, 20

*Matter of Application of Donovan*, 601 F. Supp. 574 (S.D.N.Y. 1985) ................11, 13

*Mesa v. California*, 489 U.S. 121 (1989) ............................................................. *passim*

*New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007) ...........................13, 17

*New York v. Tanella*, 239 F. Supp. 2d 291 (E.D.N.Y. 2003) .......................................1

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004) ........................................13, 19, 21

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) .....................................................9, 18, 19, 20

*North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir 1991) .......................................26

*North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ...............................13-14, 16, 17

*Ohio v. Meade*, No. 21-CV-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022) .........13

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020) ...........................................25

*Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543 (8th Cir. 1984) .............25

*Snodgrass v. Jones*, 957 F.2d 482 (7th Cir. 1992) ....................................................12

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991) ...........................................24, 25

*Tennessee v. Davis*, 100 U.S. 257 (1879) ...................................................................9

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) .............................................7, 13, 16

*Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448 (1957) ........................26

*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022) .............................................20

*Trump v. James*, No. 1:21-cv-1352, 2022 WL 1718951 (N.D.N.Y. May 27, 2022) .......28

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) ............................................10, 11

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ..............................................................10, 18

*United Food & Comm. Workers Union v.*
  *CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298 (2d Cir. 1994) ..................7

*United States v. Burr*, 25 F. Cas. 30 (CC Va. 1807)................................................14

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ............................................3

*United States v. Moll*, No. 22-cr-00266,
  2023 WL 2042244 (D. Colo. Feb. 16, 2023) ....................................................13

*United States v. Mouat*, 124 U.S. 303 (1888) ........................................................30

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) ............................................24

*Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) ....................................................24

*Willingham v. Morgan*, 395 U.S. 402 (1969) ................................................7, 9, 13

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ............................................24

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006)......................................9, 13

*Younger v. Harris*, 401 U.S. 37 (1971).................................................................27

### STATE CASES

*Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979)............................28

*People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105 (2008) ....................25

*People v. Bloomfield*, 6 N.Y.3d 165 (2006)............................................................25

*People v. Blount*, 90 N.Y.2d 998 (1997)................................................................28

*People v. Houghtaling*, 79 A.D.3d 1155 (3d Dep't 2010)........................................23

*People v. Lugo*, 190 A.D.3d 434 (1st Dep't 2021) ..................................................29

*People v. Mahboubian*, 74 N.Y.2d 174 (1989)......................................................23

*People v. McCumiskey*, 12 A.D.3d 1145 (4th Dep't 2004) ......................................23

*People v. Myles*, 58 A.D.3d 889 (3d Dep't 2009)....................................................29

*People v. Sosa-Campana*, 167 A.D.3d 464 (1st Dep't 2018)....................................29

*People v. Taveras*, 12 N.Y.3d 21 (2009) ..................................................23, 29

*People v. Thompson*, 124 A.D.3d 448 (1st Dep't 2015).........................23, 29

*People v. Thompson*, 206 A.D.3d 1708 (4th Dep't 2022) ............................23

*People v. Trump Org., Inc.*, 205 A.D.3d 625 (1st Dep't 2022) ....................28

*People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625
    (Sup. Ct. N.Y. Cnty. Feb. 17, 2022) .....................................................29

*Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) ............................................13

## Federal & State Laws

U.S. Const. art. II, § 1, cl. 1 ........................................................................19

Title 18, U.S. Code
    § 202(c) ....................................................................................................2

Title 28, U.S. Code
    § 1442(a)(1) ..................................................................................*passim*
    § 1455(a) ................................................................................................20
    § 2671 .....................................................................................................31
    § 2679(d)(1) ............................................................................................12

Title 52, U.S. Code
    § 30116 ...................................................................................................25
    § 30143(a) ...............................................................................................22

Fed. R. Evid. 801(d)(2)(D) ...........................................................................3

Removal Clarification Act of 2011,
    Pub. L. No. 112-51, 125 Stat. 545 (Nov. 9, 2011)...................................9

N.Y. Penal Law § 175.10................................................................1, 3, 22

## Other Authorities

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726
    (rev. 4th ed.)...........................................................................................31

Jonah E. Bromwich *et al.*, *Trump Judge's Dilemma: Whether to Muzzle
    the Former President*, N.Y. Times (Apr. 7, 2023) ..................................27

JA-197

### INTRODUCTION

"Perhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Bond v. United States*, 572 U.S. 844, 858 (2014). Given the primacy of state criminal enforcement in our federal system, the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), provides only a narrow exception to the "strong judicial policy against federal interference with state criminal proceedings." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975)). Because none of the requirements for federal-officer removal are satisfied in this case, the Court should reject defendant Donald J. Trump's effort to remove this prosecution from state court.

On April 4, 2023, defendant was arraigned in Supreme Court, New York County on thirty-four counts of Falsifying Business Records in the First Degree, N.Y. Penal Law § 175.10. These charges arose from defendant's falsification of the business records of various New York-based private enterprises in 2017 to conceal an illegal scheme that was largely perpetrated before defendant became President. On May 4, 2023, defendant filed a Notice of Removal pursuant to 28 U.S.C. § 1442, seeking to remove this prosecution on federal-officer grounds. But defendant has failed to satisfy the legal prerequisites to invoke "so exceptional a procedure," *Maryland v. Soper (No. 1)*, 270 U.S. 9, 35 (1926), that would require that the state criminal charges against him be litigated in a federal forum. This Court should accordingly remand this matter to state court.

Federal-officer removal is available only when (1) a federal officer (2) faces criminal charges for conduct arising under color of his office and (3) identifies a colorable federal defense. *New York v. Tanella*, 239 F. Supp. 2d 291, 294 (E.D.N.Y. 2003), *aff'd*, 374 F.3d 141 (2d Cir. 2004). A defendant's inability to satisfy even one of these prerequisites requires remand. Here, defendant fails to establish all three. Most fundamentally, defendant's alleged criminal conduct had no connection to his official duties and responsibilities as President, but instead arose from his

1

unofficial actions relating to his private businesses and pre-election conduct. Defendant also has invoked no colorable federal defense because there is no plausible basis to invoke official immunity for his unofficial actions, and because no federal law preempts New York's regulation of the record-keeping of private enterprises. And, although the Court need not reach this issue here, there is a serious question about whether the President of the United States is an "officer" entitled to invoke removal at all, since that term typically does not encompass the President when used in federal statutes. *Cf., e.g.*, 18 U.S.C. § 202(c).

In our federal system, the duty of dealing with crime is "pre-eminently a matter for the States." *Manypenny*, 451 U.S. at 243. Because defendant has failed to identify a colorable ground for federal-officer removal, this criminal prosecution should be returned to New York state court.

## STATEMENT OF THE CASE

### I.  Defendant and His Private Business Entities.

Defendant Donald J. Trump is the beneficial owner of a collection of private business entities known by the trade name the Trump Organization. Statement of Facts ¶ 5 (Ex. E).[1] The Trump Organization comprises approximately 500 separate entities that, among other business activities, own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties. Statement of Facts ¶ 5 (Ex. E). Defendant has claimed that, during his presidency, he deliberately separated the Trump Organization from his official presidential functions. *See* Notice of Removal ¶ 19 (ECF No. 1) ("Notice"); Morgan Lewis White Paper 2 (Ex. B).[2]

---

[1] Pursuant to Rule II.C.i.III of this Court's Individual Rules, citations to exhibits marked by letters are to defendant's exhibits filed with the Affirmation of Susan R. Necheles dated May 4, 2023 (ECF No. 01-1). Citations to exhibits marked by numbers are to the People's exhibits filed with the accompanying Declaration of Matthew Colangelo dated May 30, 2023.

[2] In citing the Morgan Lewis White Paper, the People do not concede the truth of every statement in that document. Where cited in the People's motion for the fact that defendant's Trust held the assets of the Trump Organization after he was elected President specifically to manage defendant's

Defendant is the sole beneficiary of the Donald J. Trump Revocable Trust, a trust created under the laws of New York in 2014 for business-succession and estate-planning purposes. Statement of Facts ¶¶ 4-5 (Ex. E). The Trust held the assets of the Trump Organization entities after defendant was elected President. Statement of Facts ¶ 4 (Ex. E); Morgan Lewis White Paper 2 (Ex. B).

From approximately June 2015 to November 2016, defendant was a candidate for the office of President of the United States. On January 20, 2017, he became President of the United States. Statement of Facts ¶ 6 (Ex. E).

## II.    The Conduct Charged in the People's Indictment.

Defendant was indicted by a New York County grand jury on March 30, 2023, on thirty-four felony counts of Falsifying Business Records in the First Degree, in violation of N.Y. Penal Law § 175.10. *See* Indictment (Ex. A). The People allege that defendant fraudulently falsified the business records of his private business entities to conceal criminal conduct during the 2016 presidential election that sought to hide damaging information from the voting public. Indictment (Ex. A); Statement of Facts ¶ 1 (Ex. E); People's Response to Defendant's Request for a Bill of Particulars 5-6 (Ex. 2).

Defendant's falsification of these business records was the culmination of an unlawful scheme that began in August 2015, shortly after defendant announced his candidacy for President. Statement of Facts ¶¶ 2, 8-9, 24-34 (Ex. E). Specifically, the People allege that in August 2015, defendant met in his Trump Tower office with the Chairman and Chief Executive Officer of a media company that owned and published supermarket tabloids (the "AMI CEO"), and Michael

---

personal affairs distinct from official responsibilities, that fact is admissible against defendant as an opposing party's statement under Fed. R. Evid. 801(d)(2)(D). The Court may otherwise consider the White Paper not for its truth but as evidence that the statements in that document were made. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (citing Fed. R. Evid. 801(c) advisory committee's note).

Cohen, a lawyer who then worked for the Trump Organization as Special Counsel to defendant. These individuals agreed that they would take steps to influence the 2016 presidential election by identifying and purchasing negative information about defendant to suppress its publication and benefit defendant's electoral prospects. Statement of Facts ¶¶ 1-3, 7, 9-14, 16-21, 23 (Ex. E).

One of several components of the charged scheme was that, at defendant's request, Cohen used a shell company he created for this purpose to make a covert payment of $130,000 to an adult film actress in October 2016—shortly before the 2016 presidential election—to prevent her from publicizing a sexual encounter with defendant.[3] Statement of Facts ¶¶ 3, 16-21 (Ex. E); Ex. 3 (Sealed Exhibit). Defendant has characterized the nondisclosure agreement that the adult film actress signed in exchange for the $130,000 payment as a "private contract" and "private agreement." Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54AM, and 7:00 AM) (Ex. 4). Defendant's attorney at the time, Rudy Giuliani, also stated publicly that "[t]he payment was made to resolve a personal and false allegation . . . ." May 4, 2018 Statement from Rudy Giuliani, *reprinted in* Politico Staff, *Full text: Rudy Giuliani issues statement clarifying his earlier remarks*, Politico (May 4, 2018) (Ex. 5).

The People allege that after the election and before his inauguration as President, defendant and Cohen, in coordination with the Trump Organization's Chief Financial Officer (the "TO CFO"), agreed that defendant would reimburse Cohen for his illegal $130,000 payment through a series of monthly reimbursements that would be falsely characterized as payments for legal

---

[3] For his participation in this scheme, Michael Cohen pleaded guilty in August 2018 to two counts of making unlawful campaign contributions in violation of the Federal Election Campaign Act, which he committed "in coordination with, and at the direction of, a candidate for federal office"— later identified as defendant here—"for the principal purpose of influencing the election." *See* Information ¶¶ 24-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21); Hearing Tr. 23-24, 27-28, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 22); *see also* Statement of Facts ¶¶ 3, 43-44 (Ex. E).

services rendered pursuant to a retainer agreement. Statement of Facts ¶¶ 20, 24-26 (Ex. E). Defendant's lawyer has publicly described these payments as reimbursements for Cohen's pre-election payment of $130,000 to the adult film actress. *See* Transcript 25-26, 28, *Hannity* (Fox News broadcast May 2, 2018) ("[Giuliani]: That was money that was paid by [Cohen] . . . . The president reimbursed that over a period of several months.") (Ex. 6); Transcript 4, *This Week* (ABC News broadcast May 6, 2018) ("[Giuliani]: [E]ven if it was considered a campaign contribution, it was entirely reimbursed out of personal funds") (Ex. 7).

The parties agreed to a repayment amount of $420,000, a figure they reached by adding the $130,000 payoff amount to a separate $50,000 payment for which Cohen also claimed a reimbursement; doubling that amount to $360,000 so Cohen could characterize the payment as income on his tax returns, instead of a reimbursement; and adding $60,000 as a supplemental year-end bonus. Statement of Facts ¶ 25 (Ex. E). Defendant, Cohen, and the TO CFO then agreed that Cohen would be repaid the $420,000 total through twelve monthly payments of $35,000 each over the course of 2017. Statement of Facts ¶ 26 (Ex. E); *see also* Transcript 26, *Hannity* (Fox News broadcast May 2, 2018) ("[Giuliani]: When I heard Cohen's retainer of $35,000 when he was doing no work for the president, I said that's how he's repaying – that's how he's repaying it with a little profit and a little margin for paying taxes for Michael.") (Ex. 6). The TO CFO memorialized these calculations in handwritten notes on a copy of a bank statement showing the $130,000 payment from Cohen's shell company. Statement of Facts ¶¶ 24-25 (Ex. E); Ex. 8 (Sealed Exhibit).

Pursuant to that agreement, Cohen submitted invoices to executives of the Trump Organization each month from February 2017 to December 2017 requesting "payment for services rendered" pursuant to a "retainer agreement," although there was no such retainer agreement and Cohen was not being paid for services rendered in any month of 2017. Indictment (Ex. A);

Statement of Facts ¶¶ 28-29 (Ex. E); Ex. 9 (Sealed Exhibit). Each invoice was processed by the Trump Organization accounting department, which recorded each payment in an electronic accounting system consistent with the Trump Organization's practices for defendant's other unofficial expenses. Statement of Facts ¶¶ 30-33 (Ex. E); Ex. 10 (Sealed Exhibit).

Defendant then reimbursed Cohen through a series of eleven monthly checks that the Trump Organization sent to Cohen each month between February 2017 and December 2017. Indictment (Ex. A); Statement of Facts ¶¶ 28-34 (Ex. E); Ex. 11 (Sealed Exhibit). The monthly payments stopped after the December 2017 payment. Statement of Facts ¶ 34 (Ex. E). The first two checks were paid from the Donald J. Trump Revocable Trust account and signed by trustees of the Trust, and the remaining nine checks were paid from defendant's personal bank account and signed by defendant personally. Indictment (Ex. A); Statement of Facts ¶¶ 4, 32-33 (Ex. E); Ex. 11 (Sealed Exhibit). Defendant's personal account was frequently used to pay many other personal and other unofficial expenditures in 2017. *See* Ex. 12 (Sealed Exhibit).

A New York County grand jury charged defendant with thirty-four felony counts of Falsifying Business Records in the First Degree: eleven counts for the eleven falsified monthly invoices that Cohen submitted via e-mail to the Trump Organization, *see* Ex. 9 (Sealed Exhibit); twelve counts for the twelve entries in the Trump Organization's electronic general ledger falsely characterizing each reimbursement payment as a "legal expense," *see* Ex. 10 (Sealed Exhibit); and eleven counts for the eleven checks and check stubs falsely recording the reimbursement payments to Cohen as "Retainer" for a given month, *see* Ex. 11 (Sealed Exhibit).

## ARGUMENT

Defendant seeks to remove this state criminal prosecution to federal court on the basis of federal-officer removal under 28 U.S.C. § 1442(a)(1). *See* Notice ¶ 14. In relevant part, that statute provides that a state criminal prosecution may be removed to federal court if the prosecution is

JA-203

against "any officer . . . of the United States or of any agency thereof, in an official or individual

capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To sustain

removal under this provision, a defendant must establish that he was an "officer . . . of the United

States"; that the charges against him are "for or relating to any act under color of office"; and that

he has a colorable federal defense. *Texas v. Kleinert*, 855 F.3d 305, 311-12 (5th Cir. 2017). The

defendant bears the burden of demonstrating by a preponderance of the evidence that removal is

proper. *See County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022); *United

Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d

Cir. 1994). And, in contrast to a civil proceeding, a defendant seeking to remove a state criminal

proceeding must make a "more detailed showing" of these factors given the "more compelling

state interest in conducting criminal trials in the state courts." *Willingham v. Morgan*, 395 U.S.

402, 409 n.4 (1969).

Defendant fails to satisfy these requirements for federal-officer removal. *First*, the criminal

charges against defendant do not arise from actions he took under color of the Office of the

President. Rather, they concern his unofficial actions to falsify the records of his personal business,

while reimbursing his "personal lawyer" (Notice ¶ 19) for a pre-election expenditure, to conceal

criminal conduct that largely occurred before his inauguration.

*Second*, defendant has not identified a colorable federal defense to the criminal charges

against him. To the extent that defendant's Notice has adequately alleged a defense based on

presidential immunity, such immunity would not extend to a President's unofficial actions. And

federal preemption is also unavailable because the narrow preemption provision of the Federal

Election Campaign Act ("FECA") does not extend to state laws governing fraud or record-

keeping—particularly when, as here, the charged offenses require proof only of general intent to

conceal or commit another crime, and do not require the People to specify, let alone obtain convictions for, those other crimes; and the People's theory does not depend solely on underlying violations of federal law in any event.

*Third*, defendant's invocation of the theory of protective jurisdiction also fails. Notice ¶ 31. The Supreme Court declined to adopt that theory for federal-officer removal in *Mesa v. California*, 489 U.S. 121 (1989), and every court that has considered the theory has rejected it.

*Finally*, although this Court need not reach this issue, there is also a serious question about whether defendant was an "officer . . . of the United States" under 28 U.S.C. § 1442(a)(1). The Supreme Court and Executive Branch have long shared the view that references to an "officer of the United States" in federal statutes exclude the President and Vice President unless expressly included, because those positions are elected, not appointed. Defendant's own submission to this Court concedes this point. *See* Morgan Lewis White Paper 1 (Ex. B) ("[T]he term 'officer' typically includes neither the President nor Vice President."). Defendant has thus arguably failed to establish the most basic element of the test for removal.

I.   **Defendant Fails to Establish That His Alleged Criminal Conduct Arose "Under Color of . . . Office."**

A defendant's actions are "under color of . . . office" for purposes of federal-officer removal when the state criminal charges are "based on or arise[] out of the acts he did under authority of federal law in the discharge of his duty and only by reason thereof." *Soper (No. 1)*, 270 U.S. at 33. It is thus not enough that the defendant was a federal official at the time of the alleged crime. *Cf. Colorado v. Symes*, 286 U.S. 510, 518 (1932) ("Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law."). Rather, the conduct underlying the state criminal prosecution must have occurred "while [he

was] performing [his] duties" under federal law. *Willingham*, 395 U.S. at 409; *see also Manypenny*, 451 U.S. at 241 (federal-officer removal "to raise a defense arising out of his official duties").[4]

This limitation is consistent with the historic purpose of federal-officer removal: to prevent states from interfering with the implementation of unpopular federal laws. *See Willingham*, 395 U.S. at 405-06 (describing statute's history). Protecting the effective "operations of the [federal] government" justifies securing a federal forum for disputes involving federal officials who are "acting . . . within the scope of their authority" and engaged in conduct "warranted by the Federal authority they possess." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). But this rationale is inapplicable to a federal official's *unofficial* conduct, which does not implement any federal policy or vindicate any federal interest. *See Mesa*, 489 U.S. at 138-39; *cf. Wyoming v. Livingston*, 443 F.3d 1211, 1219 (10th Cir. 2006) (asking, in related context of Supremacy Clause immunity, whether "the federal officer [was] reasonably discharging his authorized federal duties").

The principle that federal-officer removal must be carefully limited to cases involving the exercise of federal authority applies equally to suits against a former President. Not every action taken by a President constitutes an official act. There exists an "outer perimeter" to presidential responsibilities beyond which a President engages in "unofficial conduct." *Clinton v. Jones*, 520 U.S. 681, 693 (1997) (cleaned up); *see Nixon v. Fitzgerald*, 457 U.S. 731, 755-56 (1982). And, as particularly relevant here, the Supreme Court has already recognized that this defendant, while

---

[4] Congress amended the federal-officer removal statute in 2011 to make removal available in actions "for *or relating to*" a federal official's conduct under color of federal office. *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b), 125 Stat. 545, 545 (Nov. 9, 2011) (inserted material italicized). Courts have not applied this amendment uniformly. *See, e.g., Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (noting different interpretations of this language). But even under the broadest reading of "relating to," removal is appropriate only if a federal officer's actions are "*connected* or *associated*, with acts under color of federal office." *Id.* Here, as explained below, there is no connection or association between the conduct charged in the indictment and defendant's official duties and responsibilities as President.

acting as President, had "personal papers" involving the Trump Organization, Donald J. Trump Revocable Trust, and similar entities that were distinct from his "official documents" and that were thus not subject to any executive privilege or other auspices of the Presidency. *Trump v. Vance*, 140 S. Ct. 2412, 2429 (2020); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2033 (2020) (emphasizing "distinctions between privileged and nonprivileged information, between official and personal information").

Here, the state-law criminal charges against defendant are not based on "acts done by him under color of federal authority and in enforcement of federal law." *Soper (No. 1)*, 270 U.S. at 33. Rather, defendant is charged with falsifying the records of his private enterprises—in the course of making payments to his "personal lawyer" Michael Cohen (Notice ¶ 19) to reimburse him for a pre-election expenditure—in order to conceal criminal conduct that was largely committed before his inauguration. Statement of Facts ¶¶ 3, 8-21, 24-26 (Ex. E). For several reasons, this alleged conduct concerns only defendant's unofficial acts, even though the relevant business records were falsified while he was President.

*First*, the objective of the alleged conduct had nothing to do with defendant's duties and responsibilities as President. Instead, the falsified business records at issue here were generated as part of a scheme to reimburse defendant's personal lawyer for an entirely unofficial expenditure that was made before defendant became President—namely, Michael Cohen's October 2016 payment of $130,000 to an adult film actress, in exchange for her signing of a nondisclosure agreement regarding her sexual encounter with defendant. Statement of Facts ¶¶ 3, 16-21, 24-34 (Ex. E); Ex. 3 (Sealed Exhibit); Transcript 28, *Hannity* (Fox News broadcast May 2, 2018) (defendant's lawyer, Rudy Giuliani, describing these payments as reimbursement) (Ex. 6); Transcript 4, *This Week* (ABC News broadcast May 6, 2018) (same) (Ex. 7).

There is no question that Cohen's payment to the adult film actress was made before defendant became President, and defendant himself has characterized the nondisclosure agreement as a "private contract" and "private agreement." Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54 AM, and 7:00 AM) (Ex. 4); *cf. American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct" (quotation marks omitted)). Moreover, although defendant did not repay Michael Cohen until after he became President, his counsel has publicly confirmed that the 2017 payments to Cohen were reimbursements for Cohen's pre-election expenditure (Ex. 6; Ex. 7), and defendant has conceded in his filings here that Cohen was acting purely as defendant's "personal lawyer" handling his "personal affairs" (Notice ¶ 19) after the inauguration. Defendant's post-inauguration reimbursement of an illegal, pre-inauguration expenditure made by his personal lawyer for an unofficial and criminal purpose has nothing to do with the official duties of the presidency. *See Matter of Application of Donovan*, 601 F. Supp. 574, 579 (S.D.N.Y. 1985) (criminal charges based on actions taken before the defendant became Secretary of Labor precluded a finding that those actions were taken under color of the defendant's federal office).

*Second*, the manner by which defendant made these payments and generated the associated business records confirms their unofficial nature. As the Supreme Court has already recognized, the papers held by the private enterprises here—including the Trump Organization and Donald J. Trump Revocable Trust—are defendant's "personal" or "private" papers, as distinguished from official "Executive Branch" documents, *Mazars*, 140 S. Ct. at 2033; and the allegedly falsified records documenting these payments were created and maintained by corporate employees of these enterprises, not federal officials, *see* Statement of Facts ¶¶ 2-4, 24-34 (Ex. E).

Moreover, all of the payments here drew from accounts that were also unofficial in nature. The Donald J. Trump Revocable Trust, from which the first two payments were made, was created in 2014—well before defendant became President—and the Trust held the assets of the entities constituting the Trump Organization after the election specifically to manage defendant's continued personal affairs as distinct from his official responsibilities, as defendant concedes. *See* Notice ¶ 19; Morgan Lewis White Paper 1-2 (Ex. B). The remaining payments were made from defendant's personal bank account, which was used to pay many other personal and unofficial expenditures in 2017. *See* Ex. 12 (Sealed Exhibit). The payments and associated false business records here were thus executed like many other indisputably unofficial transactions that defendant continued to make from his unofficial accounts even after becoming President. *Cf. Snodgrass v. Jones*, 957 F.2d 482, 485 (7th Cir. 1992) (holding that FBI agent was not acting within the scope of his employment under the Westfall Act while "hanging out with other law enforcement officials" at a bar).[5]

*Finally*, defendant's Notice of Removal identifies no official duty or responsibility that defendant was fulfilling, or official authority that defendant was invoking, when he made the payments and falsified the business records at issue in this criminal proceeding. None of the payments from defendant's personal accounts here relied for their authorization on defendant's presidential powers; and the business records here were generated in the course of the Trump Organization's usual course of operations, not by dint of any federal authority. Statement of Facts ¶¶ 30-33 (Ex. E). Under comparable circumstances, courts have declined to find that federal employees were engaged in official conduct for purposes of various immunity-related doctrines.

---

[5] The Westfall Act provides that when a tort action is brought against a federal employee in his individual capacity, the Attorney General may certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," at which point the United States is substituted as defendant in place of the employee. 28 U.S.C. § 2679(d)(1).

*See, e.g.*, *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 94 (D.D.C. 2011) (under Westfall Act, federal employee's "conduct was not of the kind she was employed to perform"); *cf. Trump v. Carroll*, 292 A.3d 220, 232 (D.C. 2023) ("there must still be some relationship or nexus between the tortious conduct and the [federal] employee's responsibilities").

The facts here thus contrast sharply with cases where federal officers were prosecuted while performing their official duties or exercising their official authority.[6] *See Willingham*, 395 U.S. at 409 (federal defendants' "relationship to [plaintiff] derived solely from their official duties"). Absent such a connection to federal office, federal courts have appropriately remanded criminal prosecutions back to state court. For example, in *Matter of Application of Donovan*, 601 F. Supp. 574 (S.D.N.Y. 1985), the district court concluded that a state prosecution could proceed against the Secretary of Labor based on criminal charges arising from his construction company's fraudulent procurement of a subway contract prior to his federal appointment. *Id.* at 578-79. In *New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007), a state criminal prosecution was remanded when defendant, an FBI agent, identified no authority for passing information to a confidential informant that led to several murders. *Id.* at 462. In *Ohio v. Meade*, No. 21-CV-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022), the district court granted a motion to remand after it found that a special deputy U.S. marshal was acting under his state authority, not his federal authority, when he pursued a criminal suspect. *Id.* at *6-*7. And in *North Carolina v. Ivory*, 906

---

[6] *See, e.g.*, *Kleinert*, 855 F.3d at 312-13 (local police officer pursued and arrested robbery suspect while deputized to work for an FBI task force); *Livingston*, 443 F.3d at 1216 (U.S. Fish and Wildlife Service employees entered private ranch while tracking gray wolves); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004) (federal Drug Enforcement Agent apprehended target of a federal buy-and-bust operation); *Idaho v. Horiuchi*, 253 F.3d 359, 364 (Federal Bureau of Investigation agent involved in the law enforcement action at Ruby Ridge), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *United States v. Moll*, No. 22-cr-00266, 2023 WL 2042244, at *6-*7 (D. Colo. Feb. 16, 2023) (inspector for U.S. Postal Inspection Service charged for actions taken while responding to the scene of an arson at the direction of his supervisor in an official government car).

F.2d 999 (4th Cir. 1990), the Fourth Circuit remanded the criminal prosecution of a military driver who had violated local traffic laws when he was under no official duty to do so. *Id.* at 1002.

Defendant's alleged criminal conduct here is similarly divorced from any official duty or responsibility: the pre-election scheme and $130,000 payment to an adult film actress predated defendant's inauguration, and his post-inauguration actions all derived from this pre-inauguration conduct, rather than any presidential duty, because defendant sought to conceal facts and to reimburse payments that preceded his time in office. Under these circumstances, defendant has failed to establish that the criminal conduct alleged here related to any acts performed under color of the Office of the President.

Defendant's contrary arguments are unavailing. Defendant principally claims that the payments to Michael Cohen at issue here were official in character because he retained Cohen as a "personal lawyer" "solely because he was President of the United States." Notice ¶ 19; *see also id.* ¶ 28. That argument is self-refuting. As discussed, the President of the United States, despite his immense official responsibilities, continues to have a personal capacity through which he can engage in unofficial actions—his duties are not so "unremitting" as to "demand his whole time for national objects."[7] *United States v. Burr*, 25 F. Cas. 30, 34 (No. 14692D) (CC Va. 1807) (Marshall, C.J.); *cf. Clinton*, 520 U.S. at 695 ("Petitioner's effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent."). Defendant's admission that he "hired a personal lawyer—Michael Cohen—to handle his personal

---

[7] Defendant himself has admitted as much. In the litigation that led to the Supreme Court's opinion in *Trump v. Mazars*, defendant, while serving as President, sued the House Committee on Oversight and Reform to enjoin enforcement of a congressional subpoena for personal records "solely in his capacity as a private citizen." *See* Compl. ¶¶ 8-10, 13, *Trump v. Cummings*, No. 19-cv-1136 (D.D.C. filed Apr. 22, 2019) (Ex. 13); *see also* Compl. ¶¶ 13, 17-18, 23, *Trump v. Deutsche Bank AG*, No. 1:19-cv-03826 (S.D.N.Y. filed Apr. 29, 2019) ("President Trump brings this suit solely in his capacity as a private citizen.") (Ex. 14).

affairs" (Notice ¶ 19) firmly places his relationship with Cohen on the unofficial side of the line. *See In re Lindsey*, 158 F.3d 1263, 1283 (D.C. Cir. 1998) (noting that President's official counsel "is in a fundamentally different position" from his personal counsel). Thus, even "credit[ing] [defendant's] theory of the case," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), the Notice makes clear that the charges against defendant do not arise from his federal office.

For similar reasons, defendant cannot support removal by asserting (Notice ¶¶ 19-20) that, after being elected, he took steps to transition into his eventual official role as President, including by placing his businesses into a preexisting trust and hiring a personal lawyer. For one thing, all of these transitional actions took place *before* defendant became President, when he was merely anticipating federal office and not yet acting under color of that office. In addition, the criminal charges here do not arise out of these transitional actions—for example, the Morgan Lewis White Paper (Ex. B) does not mention Michael Cohen, the payment to the adult film actress, the agreement to reimburse Cohen for that payment, or the subsequent payments and associated business records that are the actual subjects of the Indictment, *see* Statement of Facts ¶¶ 24-26 (Ex. E). And most fundamentally, as just discussed, defendant's transitional actions make clear that he sought to separate his personal life—including all operations of the Trump Organization and Donald J. Trump Revocable Trust—from his official actions as President. Defendant can hardly claim that actions undertaken in an area that he has expressly carved out as unofficial somehow qualify as being under color of the Office of the President.

Finally, defendant claims that any actions he took during the election "relate to" the official duties of the office he was seeking (Notice ¶ 29), but that claim is also meritless. Even in the context of a sitting President, authorities recognize that electioneering activities are categorically distinct from the President's official duties. For instance, the Executive Branch has recognized that

15

electioneering activities are not among the President's official functions. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214, 216 (1982) (Ex. 15); Brief for United States as Amicus Curiae 21-22, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023) ("A President . . . does not act within the outer perimeter of his office when he takes a variety of actions connected with his reelection campaign, such as hiring and directing his campaign staff.") (Ex. 16). And Hatch Act restrictions on electioneering by federal employees on federal property distinguish between a candidate's campaign activities and his official conduct and apply only to the former. *See* U.S. Office of Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal Agencies* 1-2 (Feb. 15, 2018) (Ex. 17). If an elected official's political campaign activities do not amount to official conduct, then the campaign activities of a person who has not yet been elected to a federal office do not amount to official conduct either.

## II.  Defendant Fails to Allege a Colorable Federal Defense.

Removal here independently fails because defendant has not identified a "colorable federal defense." *Mesa*, 489 U.S. at 129. At the removal stage, a federal defense need only be "plausible, not 'clearly sustainable.'" *Kleinert*, 855 F.3d at 313 (quoting *Jefferson Cnty.*, 527 U.S. at 432). But judicial review is still meaningful: because the presence of a colorable federal defense "alone confers Article III jurisdiction, the 'colorable' standard requires that a federal court carefully weigh the plausibility of the proffered defense." *Holden v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 140 (D. Mass. 2009). To be plausible, the facts alleged in a defendant's notice of removal must state a theory that is more than "possible" or "merely consistent with" a federal defense. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see, e.g., Ivory*, 906 F.2d at 1002 (reversing district court's removal order).

16

Here, defendant proffers two potential federal defenses: a defense that the charged conduct purportedly arose in part out of defendant's duties as President (Notice ¶¶ 19-20); and federal preemption (Notice ¶¶ 2, 11, 21-24). Neither defense is colorable.

## A.   Defendant has not articulated a plausible immunity defense.

Defendant asserts a defense based on personal "steps taken solely because he was President" or a personal "decision [that] arose out of his duties as President." Notice ¶¶ 19-20. The Notice, however, does not actually identify what such a defense would be. Defendant's failure to articulate a legal defense waives any basis for removal on this ground. In *Ivory*, the Fourth Circuit reversed the district court's removal order because the defendant "did not aver a federal defense," explaining that the defendant was required to "allege[] a defense of federal immunity" and that simply tracking the language of the removal statute "is insufficient to satisfy *Mesa*'s requirement that a federal defense be averred in the removal petition." *Ivory*, 906 F.2d at 1000-01 & n.4. Defendant's ambiguous reference here to an unnamed federal defense based on acts that "arose out of his duties as President" (Notice ¶ 20) likewise fails to aver a federal defense for this Court to consider. *See also De Vecchio*, 468 F. Supp. 2d at 462 (holding that FBI agent's "general claim that everything he did was in the context of the discharge of his federal duties . . . simply cannot satisfy the more stringent requirements for [removal of] criminal cases").

If the People were to speculate, *but cf. Lockert v. Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988) ("A district judge should not have to guess what arguments an objecting party depends on when reviewing a magistrate's report."), the language in the Notice is gesturing at a defense based on absolute presidential immunity. Even ignoring waiver, however, any such claim would not be a colorable basis for removal here.

As an initial matter, there is a serious question about whether a former President can claim absolute presidential immunity against criminal liability at all. Although the President is immune

from civil suits for damages based on his official conduct, *Fitzgerald*, 457 U.S. at 749, a majority of the Court took pains to emphasize in *Fitzgerald* that this "immunity is limited to civil damages claims," *id.* at 759 (Burger, C.J., concurring), and that "immunity from damages actions carries no protection from criminal prosecution," *id.* at 780 (White, J., dissenting); *see also Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law.").[8] The Supreme Court has also made clear—in a case involving this defendant—that a sitting President is subject to both federal and state criminal process, including "when the President is under investigation," and that "state grand juries are free to investigate a sitting President with an eye toward charging him after completion of his term," as has occurred here. *Vance*, 140 S. Ct. at 2426-27; *see also Fitzgerald*, 418 U.S. at 706. And although the Department of Justice has long taken the position that a President cannot be criminally prosecuted while in office, it has also emphasized that this temporary immunity "would not preclude such prosecution once the President's term is over." U.S. Dep't of Justice, Office of Legal Counsel, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. OLC 222, 255 (2000) (Ex. 18); *see also* U.S. Dep't of Justice, Office of Legal Counsel, *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office* 32 (Sept. 24, 1973) (Ex. 19). There is thus no clear support for a former President claiming immunity against criminal charges for his conduct while in Office.

---

[8] The United States has likewise taken the position in other litigation that the absolute immunity standard "concerns only a President's liability in a 'private suit for damages.'" Brief for United States as Amicus Curiae 3 n.1, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023) (quoting *Fitzgerald*, 457 U.S. at 754) (Ex. 16).

At most, however—and, again, assuming that defendant's Notice adequately raises this defense—any immunity would go no further than the President's immunity from civil damages liability, or the related Supremacy Clause immunity of federal employees facing state prosecution for acts performed when carrying out their federal duties. Both of these immunity doctrines are limited to actions by a federal official that are plausibly within his official responsibilities. Thus, in *Fitzgerald*, the Supreme Court held that the President possesses "absolute immunity from damages liability predicated on his official acts," which extends to "acts within the 'outer perimeter' of his official responsibility." 457 U.S. at 749, 756. But there is "no support for an immunity for *unofficial* conduct"—*i.e.*, conduct "beyond the scope of any action taken in an official capacity." *Clinton*, 520 U.S. at 694-95 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Similarly, under the analogous doctrine of Supremacy Clause immunity, courts have recognized that federal officials may be immune from state criminal prosecutions, but only when (1) the official was performing an act he was authorized by federal law to do as part of his duty, and (2) in doing so, he did "no more than what was necessary and proper for him to do." *Tanella*, 374 F.3d at 147 (quoting *In re Neagle*, 135 U.S. 1, 75 (1890)).

Here, to the extent that there is presidential immunity from criminal prosecution at all, defendant has not raised any colorable immunity defense because he has failed to identify any official purpose for the charged conduct. First, defendant's Notice alleges a federal defense based exclusively on steps defendant took *before* becoming President. The Notice alleges that "shortly before assuming the Office of the Presidency," defendant, "in an abundance of caution, placed his businesses in a Trust" and "hired a personal lawyer . . . to handle his personal affairs." Notice ¶ 19. Whatever the scope of a President's official responsibility, decisions and actions taken before he becomes President cannot, by definition, constitute official acts. *See* U.S. Const. art. II, § 1, cl. 1

(incumbent President is vested with all executive power under the Constitution). Defendant's Notice does not identify any official act *after* he became President that would support a claim of immunity, notwithstanding his obligation to allege a "short and plain statement of the grounds for removal." 28 U.S.C. § 1455(a). The Notice's exclusive focus on pre-presidential conduct is thus "not sufficiently informing and specific to make a case for removal," *Soper (No. 1)*, 270 U.S. at 34, based on official immunity.

Defendant's claim to have anticipated a *future* need to "fulfill various constitutional obligations" (Notice ¶ 19) cannot plausibly shield him from prosecution for alleged crimes committed in transacting his personal businesses. Because "[t]he Office of the President has no preference for who occupies it," *Thompson v. Trump*, 590 F. Supp. 3d 46, 82 (D.D.C. 2022), steps taken to become or to prepare to become President have no official purpose. *See id.* ("A function of the presidency therefore is *not* to secure or perpetuate incumbency."). The Executive Branch has long agreed. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214, 216 (1982) (partisan electioneering activities are not among the President's official functions) (Ex. 15).

Second, for the reasons described in Point I above, there is no genuine dispute that defendant was engaged in unofficial—not official—conduct when he undertook allegedly criminal conduct during his time in office. In *Fitzgerald*, the Supreme Court granted the President absolute immunity from civil liability only because the damages claim there was premised on the exercise of "the President's constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force." 457 U.S. at 757. Defendant has identified no similar connection between the falsification of business records alleged here and any official duty and responsibility. This case is thus more similar to *Clinton*, where the Court denied immunity

20

when the challenged conduct—an alleged assault before the defendant became President, and defamatory statements made after the defendant became President—had no relation to any exercise of presidential authority. *See* 520 U.S. at 684-86, 694. And the United States recently took the position that defendant would not enjoy absolute immunity from damages claims based on injuries sustained during the assault on the Capitol on January 6, 2021, because "[n]o part of a President's official responsibilities includes the incitement of imminent private violence." Brief for United States as Amicus Curiae 16, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023) (Ex. 16). So too here, even the "outer perimeter" of the President's official responsibility does not include falsifying private business records, while reimbursing a personal attorney for a pre-election expenditure, in order to cover up criminal conduct preceding the inauguration. Nor were such falsifications acts that defendant was authorized by federal law to do as part of his presidential duties. *See Tanella*, 374 F.3d at 147.

The Supreme Court has long made clear that the President "is otherwise subject to the laws for his purely private acts." *Clinton*, 520 U.S. at 696. Defendant's vague allegation that he has a federal defense based on pre-presidency steps that "arose out of his duties as President" (Notice ¶ 20) does not amount to plausible grounds for removing any federal defense to this court for adjudication.[9]

### B.    Defendant has not articulated a plausible federal preemption defense.

To be convicted of falsifying business records in the first degree, the People must establish that defendant made or caused a false entry in the business records of an enterprise, and that he did

---

[9] Because defendant does not raise a colorable federal defense under any conceivable test for potential presidential immunity from state criminal prosecution, this Court need not determine the precise contours of any such immunity. It suffices to resolve this motion in the People's favor that any viable immunity defense would require that the charged conduct arguably serve some official purpose, which defendant has not—and cannot—allege here.

so with intent to defraud that included "an intent to commit another crime or to aid or conceal the commission thereof." N.Y. Penal Law § 175.10. Defendant claims that the "another crime" that he is charged with intending to commit or conceal includes "violations of New York Election Law § 17-152" and FECA's campaign-contribution limitations, and that those "predicate charges" are preempted by FECA. Notice ¶¶ 21-22. That statute contains an express preemption provision that states that FECA and its implementing regulations "supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a).

Defendant fails to identify a colorable preemption defense for several reasons. First, defendant's preemption argument relies on an erroneously narrow characterization of the charges against him. As the People articulated in response to defendant's request for a Bill of Particulars, the crimes that defendant is alleged to have intended to commit or conceal here are not limited to violations of New York Election Law § 17-152 and FECA—the only "predicate charges" that defendant claims would be preempted—but also include "New York Tax Law §§ 1801(a)(3) and 1802" and "New York Penal Law §§ 175.05 and 175.10."[10] People's Response to Defendant's Request for a Bill of Particulars 5 (Ex. 2); *see also* Statement of Facts ¶ 2 (Ex. E). Defendant's Notice identifies no grounds on which these additional criminal laws are preempted, thus undercutting the starting premise of his claimed preemption defense.

Second, defendant's preemption argument also fundamentally misunderstands the elements of the crime of falsifying business records in the first degree under Penal Law § 175.10. Defendant appears to assume that, if FECA preemption prevents the People from *directly* pursuing

---

[10] In responding to defendant's request for a Bill of Particulars, the People stated that their identification of particular crimes that defendant may have intended to commit or to aid or conceal was "expressly without limiting the People's theory at trial." People's Response to Defendant's Request for a Bill of Particulars 5 (Ex. 2). The People adhere to this express reservation of rights here.

charges under New York Election Law § 17-152 and FECA, then the People also may not pursue charges under Penal Law § 175.10 for falsifying business records with intent to commit or conceal these (and other) crimes. This assumption relies on a misunderstanding of New York law. When, as here, a criminal statute requires proof of intent to commit or conceal another crime, there is "no requirement that the People allege or establish what particular crime was intended, or that the intended crime actually be committed." *People v. Mahboubian*, 74 N.Y.2d 174, 193 (1989) (citing *People v. Mackey*, 49 N.Y.2d 274, 278-81 (1980)). Rather, the People need only establish "general intent to commit a crime . . . not [defendant's] intent to commit a specific crime." *People v. Thompson*, 206 A.D.3d 1708, 1708 (4th Dep't 2022); *see also People v. Taveras*, 12 N.Y.3d 21, 27 (2009) (first-degree falsification of business records includes "an enhanced intent requirement . . . not any additional actus reus element" over the second-degree offense); *People v. Thompson*, 124 A.D.3d 448, 449 (1st Dep't 2015) (for conviction under Penal Law § 175.10, "[t]he People were not required to establish that defendant committed, or was convicted of, the crime he intended to conceal"). For this reason, courts have upheld convictions under Penal Law § 175.10 even when the defendant was *acquitted* of the crimes that he intended to commit or conceal, so long as the evidence showed that, notwithstanding the acquittal, defendant falsified business records with the requisite general intent. *See, e.g.*, *People v. Houghtaling*, 79 A.D.3d 1155, 1157-58 (3d Dep't 2010); *see also People v. McCumiskey*, 12 A.D.3d 1145, 1145 (4th Dep't 2004) ("The jury could therefore convict defendant of falsifying business records if the jury concluded that defendant had the intent to commit or conceal another crime, even if he was not convicted of the other crime."). Thus, even assuming that FECA would preempt any effort to directly prosecute defendant for violations of New York Election Law § 17-152 or FECA, that would be immaterial because

23

preemption would not preclude the People from establishing, as a matter of fact, defendant's general intent to commit or conceal those crimes (as well as others).

Under comparable circumstances, courts have recognized that federal prosecutors may pursue mail or wire fraud claims that are predicated on state-law violations, even when Congress would lack the power to directly regulate those violations. *See United States v. Sawyer*, 85 F.3d 713, 722-23 (1st Cir. 1996) ("Congress may protect the integrity of the interstate mails and wires by forbidding their use in furtherance of schemes to defraud a state and its citizens, whether or not it can forbid the scheme itself."). By the same token, preemption of what defendant calls a "predicate" crime would not preclude defendant's conviction for falsifying business records in the first degree when preemption would not preclude the People from establishing defendant's general intent to commit or conceal some crime as a matter of fact.

Finally, defendant has no viable argument that FECA directly preempts New York's criminal laws against falsifying business records—nor does the Notice identify any such argument. Courts recognize a "strong presumption against [FECA] preemption" and have long applied the statute "narrowly" to preserve general state laws targeting fraud, deception, and the like, even when those laws are applied in the context of a federal election or federal campaign contributions. *E.g.*, *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993); *see Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 n.3 (2d Cir. 1991) ("[C]ourts have given [FECA] a narrow preemptive effect in light of its legislative history."). Thus, courts have concluded that FECA does not prevent the enforcement of state consumer-deception laws against a political action committee raising money for federal elections, *WinRed, Inc. v. Ellison*, 59 F.4th 934, 942-44 (8th Cir. 2023); state criminal laws prohibiting fraud as applied to solicitations for a presidential campaign, *see Dewald v. Wriggelsworth*, 748 F.3d 295, 302-03 (6th Cir. 2014); state fraudulent-transfer claims brought to

recover funds transferred to political action committees, *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200-01 (5th Cir. 2013); and state-law provisions prohibiting the waste of corporate assets, *see Stern*, 924 F.2d at 474-75.[11]

New York's criminal laws prohibiting falsification of business records easily survive preemption under these precedents. That result makes sense, given that the two regimes target different conduct and serve different interests. New York's statute enforces a general obligation for all New York enterprises—including but not limited to those contributing to federal campaigns or reimbursing campaign contributions—to engage in honest record-keeping. *See, e.g., People v. Bloomfield*, 6 N.Y.3d 165, 171 (2006). By contrast, FECA is more narrowly focused on limiting the size and nature of federal campaign contributions. *See* 52 U.S.C. § 30116 *et seq.* The state and federal laws simply do not cover the same domains: for example, a person would not violate the falsifying-business-records statute if he honestly maintained records of excessive campaign contributions, even though those contributions would violate federal law. Thus, as the New York Court of Appeals has decided in closely analogous contexts, the narrow requirements of FECA do not supplant New York's distinct requirement that businesses "refrain from fraud" in their business records. *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 115 (2008) (federal disclosure requirements under the Truth in Lending Act do not preempt New York's anti-fraud statutes).

---

[11] Courts have likewise found no FECA preemption even beyond the context of state anti-fraud laws. *See Priorities USA v. Nessel*, 978 F.3d 976, 984 (6th Cir. 2020) (FECA likely does not preempt state ban on paid voter transportation); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280-81 (5th Cir. 1994) (FECA does not preempt state corporations law); *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 546 (8th Cir. 1984) (FECA does not preempt state law prohibiting police officers from making political contributions).

III.   **Defendant's Invocation of Protective Jurisdiction Fails.**

Defendant claims that this Court has "so-called 'protective jurisdiction'" because the criminal indictment against him was "politically motivated" and was brought "because a local politician—here D.A. Bragg—disfavored [defendant's] acts and policies as President." Notice ¶ 31. This claim fails because "protective jurisdiction" does not exist as a recognized basis for federal court jurisdiction, and because defendant could not satisfy the predicates for invoking that theoretical basis for federal court jurisdiction even if it did exist.

At its broadest, the theory of protective jurisdiction posits that Congress may create a federal forum for any case involving a federal officer, even if there is no colorable federal defense. No court has ever endorsed such a theory for removal. In the Supreme Court's only decision to address the theory directly, a majority of the Court believed that endorsing it would pose "grave constitutional problems." *Mesa*, 489 U.S. at 137; *see also Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 474 (1957) (Frankfurter, J., dissenting) (asserting that protective jurisdiction "cannot be justified under any view of the allowable scope to be given to Article III"). And lower courts that have addressed the theory have rejected it outright. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1461 (D.C. Cir. 1995); *North Carolina v. Cisneros*, 947 F.2d 1135, 1140 & n. (4th Cir 1991); *see also Maryland v. Exxon Mobil Corp.*, 352 F. Supp. 3d 435, 448 (D. Md. 2018); *BDA Inv. Properties LLC v. Sosa*, CV 11-03684, 2011 WL 1810634, at *3-*4 (C.D. Cal. May 12, 2011). There is simply no foundation for defendant's assertion that protective jurisdiction provides a basis for removal here.

Nevertheless, defendant contends that the Supreme Court "has never definitively decided" whether protective jurisdiction is permissible. Notice ¶ 31. But *Mesa* did definitively decide that Congress did not intend to confer protective jurisdiction through 28 U.S.C. § 1442(a)(1). Interpreting the statute to include such a theory, the Court explained, "would eliminate the

26

substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems." *Mesa*, 489 U.S. at 137.

In any event, there would be no basis for invoking protective jurisdiction here even if it were available as a statutory or constitutional matter. Justice Brennan's concurrence in *Mesa* suggested that protective jurisdiction might be appropriate in cases involving "local hostility to federal authority" akin to the "widespread resistance by state and local governmental authorities to Acts of Congress and to decisions of this Court in the areas of school desegregation and voting rights." 489 U.S. at 140 (Brennan, J., concurring). The majority remarked that any such factual predicates for invoking the theory were absent, since in that case there was no evidence of "hostile state prosecutors and collaborationist state courts interfering with federal officers." *Id.* at 138.

Those factual predicates are also missing here. First, defendant has not established, or even alleged, that the New York State courts are incapable of impartially adjudicating his defenses in this criminal prosecution—including, if he chooses to raise it, any claim of selective prosecution. "[O]rdinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler v. He.fant*, 421 U.S. 117, 124 (1975); *see Younger v. Harris*, 401 U.S. 37, 45 (1971). And although defendant has made public statements critical of the trial court judge presiding over his criminal case, *see* Jonah E. Bromwich *et al.*, *Trump Judge's Dilemma: Whether to Muzzle the Former President*, N.Y. Times (Apr. 7, 2023), at A13, "[m]ere conclusory allegations of bias are insufficient" to warrant federal-court intervention in state-court proceedings, *Kirschner v. Klemons*, 225 F.3d 227, 236 (2d Cir. 2000).

Second, defendant's bare assertion that "the instant indictment is politically motivated" (Notice ¶ 31) falls far short of plausibly alleging that the criminal charges against him were initiated or pursued for any improper purpose. Establishing a claim of bad faith sufficient to warrant federal-

court intervention in a state-court criminal proceeding would require, at minimum, a showing that the People's enforcement was undertaken "with no expectation of convictions but only to discourage exercise of protected rights," *Cameron v. Johnson*, 390 U.S. 611, 621 (1968)—a standard that defendant does not even allege here. And to the extent Defendant's claim of political motivation is intended to state a defense of selective prosecution, the burden to substantiate such a claim is "a weighty one," given the presumption that "the enforcement of laws is undertaken in good faith and without discrimination." *Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686, 694 (1979).

Nor could defendant sustain such a claim if this Court were to entertain it. New York law requires a defendant alleging selective prosecution to establish both (1) that the law was not applied to others similarly situated, and (2) that the selective application of the law was "deliberately based upon an impermissible standard." *Id.* at 693; *see also People v. Blount*, 90 N.Y.2d 998, 999 (1997). Here, defendant has not credibly alleged either of these requirements—and courts have routinely rejected his conclusory allegations of improper political motivation in lawsuits or prosecutions involving him and his corporate entities. *See* Decision & Order 7, *People v. The Trump Corporation*, Ind. No. 1473/2021 (Sup. Ct. N.Y. Cnty. Sept. 6, 2022) (rejecting selective-prosecution claim by defendant's business entities) (Ex. 20); *People v. Trump Org., Inc.*, 205 A.D.3d 625, 626-27 (1st Dep't 2022) (rejecting claims of selective prosecution in civil investigation into defendant's business), *appeal dismissed*, 38 N.Y.3d 1053 (2022); *Trump v. James*, No. 1:21-cv-1352, 2022 WL 1718951, at *4 (N.D.N.Y. May 27, 2022) (dismissing claims under 42 U.S.C. § 1983 alleging that civil investigation was based on unconstitutional political retaliation).

Contrary to defendant's assertions (Notice ¶¶ 11-13), this prosecution involves neither the suggestion of an impermissible motivation nor a "novel theory." The investigation here was instigated by widely publicized evidence of potential criminal conduct in New York. In August

2018, Michael Cohen pleaded guilty in this Court to, among other crimes, two counts of making unlawful campaign contributions "in coordination with, and at the direction of" defendant "for the principal purpose of influencing the election." *See* Information ¶¶ 24-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21); Hearing Tr. 23-24, 27-28, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 22). The federal government's Information further alleged that Cohen made one of the unlawful payments through a shell corporation funded with his personal funds; that Cohen sent invoices for reimbursement to defendant through executives of the Trump Organization; and that defendant reimbursed Cohen a total of $420,000 through a series of monthly payments that were falsely accounted for in various business records as legal expenses. *See* Information ¶¶ 32-35, 37-40, 43-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21). On their face, these facts indicated the possibility that defendant or others may have violated New York's criminal prohibition on falsifying business records. The district attorney's decision to follow up on this evidence hardly suggests an impermissible motivation; to the contrary, for the district attorney "not to have investigated" in light of these facts "would have been a blatant dereliction of duty." *People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625, at *5 (Sup. Ct. N.Y. Cnty. Feb. 17, 2022).

In addition, the alleged offenses here—felony counts for falsifying business records to commit or conceal another crime—are charges that this Office brings routinely, based on a wide variety of underlying crimes.[12] The Notice purports to identify unique aspects of this prosecution,

---

[12] *See, e.g., Taveras*, 12 N.Y.3d at 23-24 (defendant allegedly doctored records putting young boys on the payroll of a summer program to induce them into sexual activity); *People v. Lugo*, 190 A.D.3d 434 (1st Dep't 2021) (defendant allegedly falsified records in order to hide a sexual assault); *People v. Sosa-Campana*, 167 A.D.3d 464, 464 (1st Dep't 2018) (defendant allegedly used a fraudulent driver's license to conceal the fact that he was engaged in unlicensed driving); *Thompson*, 124 A.D.3d at 448-49 (defendant allegedly falsely filled out a firearm disposal form to disguise his continued unlawful possession of a firearm); *see also People v. Myles*, 58 A.D.3d 889,

but any such aspects stem from the unique nature of defendant's alleged crime: no other President has falsified the business records of his private enterprises while in office as part of an unlawful scheme to pay off an adult film actress during the election, concealing election law, tax law, and honest book-keeping crimes along the way. The unusual facts are thus of defendant's making, not evidence of selective prosecution. For this reason too, defendant fails to identify any basis for removal based on protective jurisdiction.

## IV.    Defendant Is Not a Federal "Officer" Entitled to Seek Removal.

The arguments above defeat defendant's attempt to remove this state criminal prosecution and require remanding this matter to state court. Although this Court need not go further, remand would also be independently mandated by defendant's failure to establish that he was an "officer . . . of the United States" entitled to invoke removal at all under 28 U.S.C. § 1442(a)(1).

In construing a variety of other constitutional and statutory provisions, the Supreme Court has long interpreted "officer" to exclude the President and Vice President because those officials are elected to their positions rather than appointed. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497-98 (2010) ("The people do not vote for the 'Officers of the United States.'" (quoting U.S. Const. art. II, § 2, cl. 2)); *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("[A] person in the service of the government" who does not "hold[] his place by virtue of an appointment . . . is not, strictly speaking, an officer of the United States.").

The Executive Branch shares this view. *See, e.g.*, Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice*

---

892 (3d Dep't 2009) (defendant convicted of falsifying the business records of a utility company to steal electricity where he applied jumper cables to a meter box in order to make the meter record less electricity than he was actually using).

*President* 2 (Dec. 19, 1974) ("[W]hen the word 'officer' is used in the Constitution, it invariably refers to someone *other than* the President or Vice President. . . . This use of the word 'officer' in the Constitution has led the Department of Justice consistently to interpret the word in other documents as not including the President or Vice President unless specifically stated.") (Ex. 23).

Defendant's own filings with this Court concede the point. The Morgan Lewis White Paper—which defendant cites as part of the basis for removal (Notice ¶ 19)—itself takes the position that "the term 'officer' typically includes neither the President nor Vice President." Morgan Lewis White Paper 1 (citing 1974 Scalia Memorandum) (Ex. B). The Court should therefore conclude—consistent with the views of the Supreme Court, the Executive Branch, and defendant himself—that the President is not an "officer" of the United States, and thus may not invoke federal-officer removal under 28 U.S.C. § 1442(a)(1).[13]

---

[13] The Second Circuit recently determined that the President is an "employee" of the federal government for purposes of the Westfall Act. *See Carroll v. Trump*, 49 F.4th 759, 767 (2d Cir. 2022). Although some sources have analogized this inquiry to the under-color-of-office requirement for federal-officer removal, *see* Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726 (rev. 4th ed.), the statutory language is distinct, and the Second Circuit's reasoning in *Carroll* would support a different result for the term "officer." Specifically, the Westfall Act defines an "employee" as, inter alia, an "officer[] . . . of any federal agency." 28 U.S.C. § 2671. But the Second Circuit conspicuously declined to find that the President was such an "officer[]," instead concluding that the Act's listing of potential federal "[e]mployee[s]" merely provided non-exhaustive "examples of who are covered by that term." 49 F.4th at 768.

**CONCLUSION**

Defendant was charged by a New York County grand jury with New York crimes for falsifying the business records of private New York enterprises while reimbursing his personal lawyer for a pre-election expenditure. He does not plausibly meet the required elements to justify removal to federal court under 28 U.S.C. § 1442(a)(1). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). The People's motion for remand should accordingly be granted.

DATED: May 30, 2023                 Respectfully submitted,

                                    ALVIN L. BRAGG, JR.
                                    *District Attorney*
                                    *New York County*

                                    By: */s/ Matthew Colangelo*
                                    Matthew Colangelo
                                    Steven C. Wu
                                    Philip V. Tisne
                                    New York County District Attorney's Office
                                    1 Hogan Place
                                    New York, NY 10013
                                    212-335-9000
                                    colangelom@dany.nyc.gov

                                    *Attorneys for the People of the State of New York*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                                  :
THE PEOPLE OF THE STATE OF NEW YORK,          :
                                                                  :          23 Civ. 3773 (AKH)
             v.                                                   :
                                                                  :
DONALD J. TRUMP,                                        :
                                                                  :
                                      Defendant.        :
                                                                  :
------------------------------------------------------------------x

### PRESIDENT DONALD J. TRUMP'S MEMORANDUM OF LAW IN OPPOSITION TO THE PEOPLE OF THE STATE OF NEW YORK'S MOTION FOR REMAND

Todd Blanche                          Susan Necheles
Blanche Law                           NechelesLaw LLP
99 Wall Street                        1120 Sixth Avenue, 4th Floor
New York, New York 10005              New York, New York 10036
212-716-1250                          212-997-7400
toddblanche@blanchelaw.com            srn@necheleslaw.com

## TABLE OF CONTENTS

                                                                                    **Page**

INTRODUCTION ............................................................................................. 1

LEGAL ARGUMENT ...................................................................................... 2

POINT I: THE PRESIDENT IS AN OFFICER OF THE UNITED STATES WHO CAN
REMOVE CASES TO FEDERAL COURT ..................................................... 2

POINT II: DANY CAN ONLY ATTEMPT TO DEFEAT PRESIDENT TRUMP'S
REMOVAL MOTION BY IGNORING A) THE AMENDMENTS TO THE REMOVAL
STATUTE AND B) PRESIDENT TRUMP'S THEORY OF THE CASE ........................... 10

   A. Removal Is Appropriate Where the Officer's Actions Were For Or Relating to
   Any Act Under Color of Federal Office .............................................. 11

   B.  DANY's Theory of the Case is Irrelevant to this Motion ......................... 13

POINT III:  PRESIDENT TRUMP'S REMOVAL NOTICE MORE THAN ADEQUATELY
ASSERTS "COLORABLE" FEDERAL DEFENSES .......................................... 14

   A.  President Trump's Minimal Burden ................................................. 14

   B.  President Trump Has Adequately Articulated A Federal Preemption Defense............ 18

     1.  DANY has advanced various theories as to a "predicate" offense that are
     preempted by federal law, and they refuse to abandon them. ........................ 18

     2.  Federal election law preempts DANY's underlying "intent to defraud" theory,
     requiring dismissal of even lesser-included misdemeanor falsifying business
     records charges.......................................................................... 20

   C. President Trump Is Immune From State Prosecution For Actions Taken As A
   Result of His Role as President ...................................................... 21

POINT IV: GIVEN THE MORE THAN ADEQUATE SHOWING BY PRESIDENT
TRUMP OF A FEDERAL DEFENSE THIS COURT NEED NOT REACH THE ISSUE OF
PROTECTIVE JURISDICTION ............................................................. 25

CONCLUSION.................................................................................... 27

i

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Albrecht v. A.O. Smith Water Products*, 2011 WL 5109532 (S.D.N.Y. Oct. 21, 2011) .............. 15

*Arizona v. Manypenny,* 451 U.S. 232 (1981) ........................................................................ 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 14

*Bragg v. Jordan*, No. 1:23-CV-3032 (MKV), 2023 WL 2999971 (S.D.N.Y. Apr. 19, 2023) ............................................................................................................................. 26

*Brown & Williamson Tobacco Corp. v. Williams,* 62 F.3d 408 (D.C. Cir. 1995) ............... 3, 6

*Brunson v. Adams*, 2021 U.S Dist. LEXIS 224203 (D. Utah Oct. 19, 2021) ......................... 6

*Buckley v Valeo*, 424 U.S. 1 (1976) ....................................................................................... 5

*Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) ................................................................ 3, 8, 9

*Cherichel v. Holder*, 591 F.3d 1002 (8th Cir. 2010) .............................................................. 5

*Cleveland, C. etc. R.R. v. McClung*, 119 U.S. 454 (1886) ...................................................... 8

*Clifton v. Cox*, 549 F.2d 722 (9th Cir.1977) ........................................................................ 24

*Clinton v. Jones*, 520 U.S. 681 (1997) ................................................................................. 22

*Colorado v. Symes,* 286 U.S. 510 (1932) .............................................................................. 11

*Commonwealth of Kentucky v. Long,* 837 F.2d 727 (6th Cir. 1988) ..................................... 23

*Cunningham v. Neagle*, 135 U.S. 1 (1890) ...................................................................... 23, 24

*Cuomo v. Crane Co.*, 771 F.3d 113 (2d Cir. 2014) ............................................................... 16

*Dist. of Columbia v. Trump*, 17-cv-1596 (D. Md.) ................................................................. 5

*Durham v. Lockheed Martin Corp.,* 445 F.3d 1247 (9th Cir. 2006) ...................................... 16

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ............................. 4

*Guidry v. Durkin*, 834 F.2d 1465 (9th Cir. 1987) ........................................................ 7

*Hagen v. Benjamin Foster Co.,* 739 F. Supp. 2d 770 (E.D. Pa. 2010) ......................... 15

*Hill Parents Ass'n. v Giaimo*, 287 F Supp 98 (D. Conn. 1968)....................................... 6

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.,* 790 F.3d 457 (3d Cir. 2015) .............................................................. 11-12

*Isaacson v. Dow Chemical Co.,* 517 F.3d 129 (2d Cir. 2008) ..................................... 16

*Jefferson County v. Acker,* 527 U.S. 423 (1999) ......................................... 10, 13, 15

*K&D LLC v. Trump Old Post Of. LLC,* 951 F.3d 503 (2020) ........................................ 3

*Kircher v. Putnam Funds Trust,* 547 U.S. 633 (2006)........................................... 15-16

*Latiolais v. Huntington Ingalls, Inc.,* 951 F.3d 286 (5th Cir. 2020) ............................ 12

*Maryland v. Soper,* 270 U.S. 9 (1926)........................................................................ 11

*Matter of Application of Donovan,* 601 F. Supp. 574 (S.D.N.Y. 1985) ..................... 11

*Mayor v. Cooper,* 73 U.S. 247 (1867) ....................................................................... 18

*Mesa v. California,* 489 U.S. 121 (1989).......................................... 7, 8, 11, 16, 25

*National Audubon Soc'y v. Department of Water & Power*, 496 F. Supp. 499 (E.D. Cal. 1980) ...................................................................................................................... 18

*National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974)............................. 7

*National Wildlfe Federation v. U.S.*, 626 F.2d 917 (D.C. Cir. 1980)............................ 7

*New York v. De Vecchio,* 468 F. Supp. 2d 448 (E.D.N.Y. 2007) ................................. 11

*New York v. Tanella,* 374 F.3d 141 (2d Cir. 2004)..................................................... 24

*North Carolina v. Ivory,* 906 F.2d 999 (4th Cir. 1990) .............................................. 11

*People v. Keller*, 176 Misc.2d 466 (N.Y. Sup. Ct. 1998) ........................................... 20

*People v. Mackey,* 49 N.Y.2d 274 (1980) ................................................................. 19

*Perkins v. Air & Liquid Systems Corp.*, 2014 WL 1389750 (S.D.N.Y. Apr. 8, 2014)................ 15

iii

*Preston v Edmondson*, 263 F. Supp 370 (N.D. Okla. 1967)............................................ 6

*Richards v. Harper*, 864 F.2d 85 (9th Cir. 1988) ................................................... 3-4, 6

*Tennessee v. Davis,* 100 U.S. 257 (1879) ............................................................... 8, 11

*Texas Dept. of Hous. & Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015)................................................................................................. 6

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) ......................................................... 2

*Trump v. Carroll,* 292 A.3d 220 (D.C. 2023) ............................................................ 24

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) ................................................. 7

*Trump v. Vance*, 140 S. Ct. 2412 (2020) .................................................................... 8

*United States v Hendee*, 124 U.S. 309 (1888) ............................................................ 5

*United States v. Mouat*, 124 U.S. 303 (1888) ............................................................. 5

*White v. Wellington*, 627 F.2d 582 (2d Cir. 1980) .................................................... 15

*Whitehead v. Senkowski*, 943 F.2d 230 (2d Cir. 1991) ............................................. 23

*Williams v. Brooks*, 945 F.2d 1322, 1324 (5th Cir. 1991) ..................................... 3, 6

*Willingham v. Morgan*, 395 U.S. 401 (1969) ................................................. 8, 11, 16

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ......................................... 20, 21

*Wm. Spencer & Son Corp. v. Lowe*, 152 F.2d 847 (2d Cir 1945)............................... 6

*Yates v. United States*, 354 U.S. 298 (1957)............................................................. 19

*Yi Tai Shao v. Roberts*, 2019 U.S. App. LEXIS 33895 (D.C. Cir. Nov. 13, 2019) ....... 3

**Statutes**

28 U.S.C. § 1442(a)(1).......................................................................................... 2, 11

28 U.S.C. §1361 ........................................................................................................ 7

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 8 ............................................................................ 24

U.S. Const. art. II, § 1 ...................................................................................... 4

U.S. Const. art. II, § 3 .................................................................................... 24

U.S. Const. art. II, § 4 ...................................................................................... 4

U.S. Const. art. II, § 2, cl. 2 ............................................................................. 4

**Congressional Reports**

H.R. Rep. No. 112-117, pt. 1 (2011) ......................................................... 10, 12

H.R. Rep. No. 798, 104th Cong., 2d Sess., at 20 (1996) ............................... 16

**Other Authorities**

14C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §3733 (rev.
    4th ed. 2020) ........................................................................................... 16

4 Duke Journal of Constitutional Law & Public Policy 107 (2009) ................ 3

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) ................ 6

Josh Blackman and Seth Barrett Tillman, Why the Manhattan DA's Trump Case Cannot
    Be Removed to Federal Court, Lawfare, May 18, 2023 .......................... 2

Michael Cohen, Disloyal: A Memoir: The True Story of the Former Personal Attorney to
    President Donald J. Trump (2020) ......................................................... 22

Seth Barrett Tillman & Josh Blackman, Offices and Officers of the Constitution, Part I:
    An Introduction, 61(3) S. TEX. L. REV. 309 (2021) ............................... 3

Seth Barrett Tillman and Josh Blackman, Offices and Officers of the Constitution, Part
    III: The Appointments, Impeachment, Commissions, and Oath or Affirmation
    Clauses, 62(4) S. TEX. L. REV. 349 (May 2023) .................................... 3

Seth Barrett Tillman, Why Our Next President May Keep His or Her Senate Seat: A
    Conjecture on the Constitution's Incompatibility Clause ("Our Next President") ................ 3

## INTRODUCTION

The Facts and the law all point to this Court being the appropriate jurisdiction for this case, one which was brought solely due to the political motivation of the Manhattan District Attorney. It is in fact the Manhattan District Attorney's Office ("DANY") that made the decision to wrongfully prosecute President Trump for lawful conduct that took place while the President was in office. Now DANY chooses to seek to remand the case back to New York County by deceptively mischaracterizing and ignoring the applicable facts and body of law.

For example, DANY argues that the removal statute does not apply to the President of the United States because he is an elected official and thus not an "officer of the United States," never once citing or otherwise acknowledging the numerous cases—including those involving President Trump—rejecting that proposition. *See* Point I, *infra*. According to DANY, the crux of its case was a purportedly "illegal scheme that was largely perpetrated before defendant became [P]resident." DANY's Remand Memorandum of Law ("RMOL") at 1. Such an alleged scheme, albeit nonexistent, could only violate federal, not state, campaign finance laws, as made clear by both the federal jurisprudence and the New York State election board. Indeed, federal preemption is a classic example of a federal defense justifying removal. *See* Point III, *infra*.

DANY also relies on cases—some more than 150-years old—for the meaning and purpose of the removal statute, *see, e.g.,* RMOL at 9, and relegates to a footnote the fact that the removal statute was substantially amended in 2011. Under the amended statute, there can be little dispute that President Trump meets the requirements for removal to federal court. *See* Point II, *infra*.

JA-236

In sum, removal to this Court is well supported, and DANY's motion for remand back to New York State court should be summarily denied.

## LEGAL ARGUMENT

A criminal case is removable to federal court where (1) a federal officer (2) is charged for conduct "for or relating to any act under color of federal office arising under color of his office and (3) identifies a colorable federal defense. *Texas v. Kleinert*, 855 F.3d 305, 311-12 (5th Cir. 2017). Here, President Trump has more than adequately shown all three and DANY's arguments to the contrary are unavailing.

### POINT I: THE PRESIDENT IS AN OFFICER OF THE UNITED STATES WHO CAN REMOVE CASES TO FEDERAL COURT

The President of the United States is an "officer . . . of the United States" under 28 U.S.C. § 1442(a)(1). DANY's argument to the contrary is unconvincing and the Court should reject it.

Although DANY disappointingly never gives them any credit, DANY's argument is cribbed, at times nearly word-for-word, from a recent Lawfare blog post by Professors Blackman and Tillman. *See* Josh Blackman and Seth Barrett Tillman, Why the Manhattan DA's Trump Case Cannot Be Removed to Federal Court, Lawfare, May 18, 2023, available at https://www.lawfareblog.com/why-manhattan-das-trump-case-cannot-be-removed-federal-court. But while this argument—that elected officials, including the President, are not "officers of the United States"—has been advocated by these professors for some time,[1] to our knowledge it has never been accepted by any court.

---

[1] *See, e.g.,* Seth Barrett Tillman, Why Our Next President May Keep His or Her Senate Seat: A Conjecture on the Constitution's Incompatibility Clause ("Our Next President"), 4 Duke Journal of Constitutional Law

JA-237

In fact, the blog post—but not DANY—forthrightly acknowledges the existence of contrary precedent.  In *K&D LLC v. Trump Old Post C₂f. LLC*, 951 F.3d 503, 505 (2020), the D.C. Circuit affirmed President Trump's removal of a civil action to federal court under § 1442.  And, while it is true that the D.C. Circuit did not expressly rule on whether the President is an "officer of the United States," § 1442 was the only basis for federal subject matter jurisdiction, *id.* at 508, and the court was required to consider *sua sponte* whether the President is an "officer of the United States," if it thought that issue meritorious.  *See Yi Tai Shao v. Roberts*, 2019 U.S. App. LEXIS 33895, at *5 (D.C. Cir. Nov. 13, 2019) ("Courts are obligated to consider *sua sponte* issues related to subject matter jurisdiction") (internal brackets and quotation marks omitted).  *Cf. Carroll v. Trump*, 49 F.4th 759, 771 (2d Cir. 2022) (noting that "in previous cases where substitution of the President occurred, the applicability of the Westfall Act was not questioned.") (citing cases).

Moreover, under DANY's flawed logic that "officials . . . elected to their positions rather than appointed" are not "officers of the United States," (RMOL at 30), members of Congress also could not remove cases to federal court under § 1442.  But courts have routinely and consistently allowed such removals.  *See Brown & Williamson Tobacco Corp. v. Williams,* 62 F.3d 408, 412-415 (D.C. Cir. 1995) (allowing two Congressman to remove their case to federal court); *Williams v. Brooks*, 945 F.2d 1322, 1324, n. 2 (5th Cir. 1991) (holding that "removal is proper under section 1442(a)(1)" because a congressman "is an 'officer of the United States' within the meaning of that subsection."); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988) ("Baucus and Williams [a

---

& Public Policy 107 (2009); Seth Barrett Tillman & Josh Blackman, Offices and Officers of the Constitution, Part I: An Introduction, 61(3) S. TEX. L. REV. 309 (2021); Seth Barrett Tillman and Josh Blackman, Offices and Officers of the Constitution, Part III: The Appointments, Impeachment, Commissions, and Oath or Affirmation Clauses, 62(4) S. TEX. L. REV. 349 (May 2023).  To be clear, we mean no disrespect to either of these fine academics but their views on this matter are idiosyncratic, *see, e.g.*, Our Next President, at 5-6 (collecting the contrary views of numerous scholars), and of limited use to this Court.

Senator and Congressman, respectively] as officers of the United States may remove an action from state to federal court.").

DANY offered no response to this case law, in fact, they deceivingly did not cite it. Instead, DANY cites two cases, but neither even purports to address the reach of § 1442. The first is *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 497-98 (2010), which addresses the President's removal power under the Art. II Appointments Clause. DANY (again cribbing from the Lawfare blogpost) quotes *Free Enterprise Fund* to the effect that "[t]he people do not vote for the 'Officers of the United States.'" RMOL at 30. This language purportedly shows that "the Supreme Court has long interpreted 'officer' to exclude the President and Vice President because those officials are elected to their positions rather than appointed." Upon review of the language and context, however, it is clear that the Supreme Court was not deciding that meaning of "officer of the United States" as used in every clause in the Constitution, let alone in every statute in the United States Code. Rather, the Court was simply describing the meaning of "other officers of the United States" *as used in* U.S. Const. art. II, § 2, cl. 2. There, the Constitution addresses the President's "power" to "appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States[.]" Obviously, the President cannot appoint himself, *see* art. II, § 1 (providing for the election of the President), or members of Congress, *see* art. I, § 4 (providing for the election of members of Congress), and so, "other officers of the United States" as used in art. II, § 2, cl. 2, must be a reference to non-elected officials. Thus, contrary to DANY's misleading suggestion, this stray line in *Free Enterprise Fund* says nothing about the meaning of "officer of the United States" in other contexts such as the relevant context this Court must consider here.

4

Similarly unavailing is DANY's reliance on *United States v. Mouat*, 124 U.S. 303 (1888). *Mouat* addressed not whether the President (or members of Congress) are ever "officers of the United States," but when a government official is, in the modern parlance, a mere employee and not someone "holding employment or appointment under the United States." *Id.* at 305. *See generally Buckley v Valeo*, 424 U.S. 1, 126, n. 162 (1976) ("'Officers of the United States' does not include all employees of the United States . . . . Employees are lesser functionaries subordinate to officers of the United States").[2]

In fact, *Mouat* undercuts DANY's claim that "officer of the United States" has a single uniform meaning throughout the Constitution and United States Code. The Court reached a different conclusion acknowledging that "[u]ndoubtedly Congress may have used the word 'officer' in some other connections in a more popular sense, . . . in which case it will be the duty of the court in construing such an act of Congress to ascertain its true meaning and be governed accordingly." *Mouat*, 124 U.S. at 308. *See also United States v Hendee*, 124 U.S. 309, 313 (1888) ("We have just decided, in the case of *United States v. Mouat*, ante, 303, that a paymaster's clerk is not, in the constitutional sense of the word, an officer of the United States; but we added also that Congress may have used the word 'officer' in a less strict sense in some other connections, and in the passage of certain statutes might have intended a more popular signification to be given to that term."). In fact, the Second Circuit, in discussing *Mouat* and *Hendee*, has noted that

---

[2] DANY also cites to a 1974 OLC opinion, *but see, e.g., Cherichel v. Holder*, 591 F.3d 1002, 1016, n. 17 (8th Cir. 2010) ("We note, however, that while OLC opinions are generally binding on the Executive branch, the courts are not bound by them." (internal citation omitted)), and a Morgan Lewis white paper. RMOL at 30–31. But neither of these documents so much as discuss § 1442 and are, at any rate, largely focused on the meaning of "officer" in the Constitution. Moreover, DANY's claim that the "Executive Branch shares th[e] view" that the word "officer" does not include the President is not true. *See, e.g., Dist. of Columbia v. Trump*, 17-cv-1596 (D. Md.), Dkt. #100 at 4, n. 2 (DOJ Statement of Interest on behalf of the President in his official capacity) ("We assume for purposes of this Statement that the President is subject to the Foreign Emoluments Clause.")

"[l]egislative intent may be defeated by giving an invariable definition to the same word in different statutes." *Wm. Spencer & Son Corp. v. Lowe*, 152 F.2d 847, 849 (2d Cir 1945).

In other words, whatever the original public meaning of "officer" in a given constitutional clause, the meaning of "officer" as used in statutory provisions is to be determined contextually. Here, the meaning of "officer of the United States," as used in § 1442, a provision enacted in 1948 and amended as recently as 2013, clearly includes both the President and members of Congress.[3] Recently, the meaning of the phrase was considered by a federal magistrate judge who concluded that "there can be no question that . . . President Biden, Vice President Harris, and former Vice President Pence" could have actions removed to federal court under §1442 because they are "high-level, federal executive branch officers." *Brunson v. Adams*, 2021 U.S Dist. LEXIS 224203, at *27 (D. Utah Oct. 19, 2021) (Bennett, Mag. J.).

The fact that a President is an officer of the United States under § 1442 is also consistent with how the phrase has been interpreted in another mid-twentieth-century statute, the Mandamus

---

[3] These amendments are particularly relevant in light of the prior caselaw interpreting "officer" in § 1442 to include elected officials like members of Congress. *See Brown & Williamson Tobacco Corp.*, 62 F.3d 408, 412-415 (D.C. Cir. 1995) (allowing two Congressman to remove their case to federal court); *Williams v. Brooks*, 945 F.2d 1322, 1324, n. 2 (5th Cir.1991) (holding that "removal is proper under section 1442(a)(1), however, as a congressman is an 'officer of the United States' within the meaning of that subsection."); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988) ("Baucus and Williams [a Senator and Congressman, respectively] as officers of the United States may remove an action from state to federal court."); *Hill Parents Ass'n. v Giaimo*, 287 F Supp 98, 99 (D. Conn. 1968) ("A member of Congress is unquestionably an officer of the United States as this term is commonly used and must be considered as such pursuant to Section 1442(a)(1)"); *Preston v Edmondson*, 263 F. Supp 370, 372 (N.D. Okla. 1967) ("The Court finds and concludes that it is within the intent and meaning of Title 28 U.S.C. Section 1442(a)(1) that the term 'officer of the United States' includes a United States Congressman."). "Against this background understanding in the legal . . . system, Congress' decision to amend" removal statute "while still adhering to the operative language in" §1442 "is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings" *Texas Dept. of Hous. & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-537 (2015), of the lower courts that "officer" is not limited to appointed officials. *See also id.* (""If a word or phrase has been given a uniform interpretation by inferior courts, a later version of that act perpetuating the wording is presumed to carry forward that interpretation."" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) (internal ellipses omitted)).

Act, which was enacted by Congress in 1962 and provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an *officer or employee of the United States* . . . to perform a duty owed to the plaintiff." 28 U.S.C. §1361 (emphasis added). In *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), a federal employees' union sued President Nixon in his official capacity to compel him to implement a pay raise for employees as required by a federal pay statute. The D.C. Circuit found it had jurisdiction under the Mandamus Act "to mandamus the President to perform the ministerial duty" of effectuating legally required pay raises. *Id.* at 616. *See also National Wildlfe Federation v. U.S.*, 626 F.2d 917, 923 (D.C. Cir. 1980) ("Mandamus is not precluded because the federal official at issue is the President of the United States.").

The alternate rule proposed by DANY—that elected officials cannot remove criminal cases to federal court—makes little sense in light of the "purpose of" § 1442, which is that "the Federal Government can act only through its officers and agents, and they must act within the States." *Mesa v. California*, 489 U.S. 121, 126 (1989) (internal quotation marks omitted). But if "those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess . . . the operations of the general government may at any time be arrested at the will of one of its members." *Id. See also Guidry v. Durkin*, 834 F.2d 1465, 1468 (9th Cir. 1987) ("The purpose of this statute is to provide a federal forum, presumably free of whatever local prejudice might exist in a state court, in which federal officers may defend claims arising out of the performance of their duties.").

These concerns apply equally, if not more forcefully, when the federal officer in question is the President of the United States, who "is the only person who alone composes a branch of government." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). It makes little sense to

suggest that Congress meant to protect from state interference, for example, postal workers, *Mesa v. California*, 489 U.S. 121, revenue officers, *Tenn. v. Davis*, 100 U.S. 257, 260 (1879), and customs officers, *Cleveland, C. etc. R.R. v. McClung*, 119 U.S. 454, 460 (1886), but leave Presidents (and members of Congress) subject to the whims of "state prosecutors [who] may have political motivations." *Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020).[4]   *Cf. Carroll v. Trump*, 49 F.4th 759, 772 (2d Cir. 2022) ("In light of this contextual evidence, there is no reason to assume that Congress in enacting the FTCA meant to exclude the President . . . .")

DANY does cite, albeit in a footnote, the Second Circuit's recent decision in *Carroll v. Trump*, 49 F.4th 759, 767, holding that the President is an employee of the federal government who enjoys immunity for official acts under the Westfall Act.   Much of the Second Circuit's reasoning applies *mutatis mutandis* to this case as well, especially in light of the Supreme Court's holding that "the test for removal should be broader, not narrower, than the test for official immunity." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).   DANY's claim, on the other hand, is that while the President has immunity for his official acts, he must litigate that immunity defense in state court.   But the *Willingham* Court rejected almost this identical argument, holding that it is untenable to claim that a government official may be "protected from a damage suit by the official immunity doctrine," but that the official "ha[s] to litigate their immunity defense in the state courts." So too here.

DANY, in its attempt to distinguish *Carroll v. Trump,* badly misstates its reasoning.   DANY writes that "the Second Circuit's reasoning in *Carroll* would support a different result for the term

---

[4] Notably, the Supreme Court in *Trump v. Vance*, 140 S. Ct. at 2428, stated that the "Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties."   To support this assertion, the Court cited *Tenn. v. Davis*, 100 U. S. 257 (1880).   But under DANY's theory, *Tenn. v. Davis*, a removal case and thus inapplicable to the President, would seem to provide no support for the Supreme Court's holding about the President.

JA-243

'officer,' because the Westfall Act defines an 'employee' as, *inter alia*, an 'officer[] . . . of any federal agency," and the Second Circuit conspicuously declined to find that the President was such an 'officer[],' instead concluding that the Act's listing of potential federal "[e]mployee[s]" merely provided non-exhaustive 'examples of who are covered by that term.'"   RMOL at 31, n. 13 (quoting *Carroll*, 49 F.4th at 768).   However, the issue in *Carroll* was not whether the President is an "officer of the United States," but whether he is an "officer *of any federal agency*."   *See Carroll v. Trump*, 49 F.4th 759, 768 ("Carroll principally argues that the President does not come within the scope of the FTCA and the Westfall Act because he is not an officer or employee *of any 'executive departments.'*" (emphasis added)).   This was also the reasoning of the (subsequently reversed) District Court.   *See Carroll v. Trump*, 498 F. Supp.3d 422, 434-435 (S.D.N.Y. 2020) ("The president is a constitutional officer.   He occupies the highest office in our nation, which is created by Article II of the Constitution.   But that is not what Section 2671 requires.   It speaks only of 'officers . . . *of any federal agency*,' not officers of the United States within the meaning of the Constitution."   (emphasis in the original)).

Here, of course, the relevant statutory language is not "officer of any federal agency," but "officer . . . of the United States," which neither the District Court nor the Second Circuit ever suggested does not include the President.   For these reasons, the Court should reject DANY's argument and hold that the President can remove cases to federal court under § 1442.

9

**POINT II: DANY CAN ONLY ATTEMPT TO DEFEAT PRESIDENT TRUMP'S REMOVAL MOTION BY IGNORING A) THE AMENDMENTS TO THE REMOVAL STATUTE AND B) PRESIDENT TRUMP'S THEORY OF THE CASE**

DANY's motion for remand is disappointing in that it all but ignores the 2011 amendment to § 1442. The amendment changed the relevant element from "for any act under color of such office," to "for or relating to any act under color of such office."

In fact, DANY begins Point I of its brief with the argument that this case must be remanded to State Court because "Defendant fails to establish that his alleged criminal conduct arose 'under color of . . . office.'" RMOL at 8 (capitalizations changed). Whether President Trump's action "arose under color of office" is a misleading standard, as under the current language of the statute this case is removable if President Trump's action were "relat[ed] to any act under color of . . . office."

The legislative history makes plain that the purpose in adding the words "or relating to" was intended to "broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. Rep. No. 112-117, pt. 1 (2011), reprinted in 2011 U.S.C.C.A.N. 420, 425. DANY only acknowledges this amendment in a footnote and even then, as discussed below, dishonestly claims that "[c]ourts have not applied this amendment uniformly." RMOL at 9 n. 4. DANY likewise ignores the factual positions set forth in the Notice of Removal, basing its argument solely on its view and theory of the case, a standard inapplicable to removal motions. *See Jefferson County v. Acker,* 527 U.S. 423, 432 (1999) ("Accordingly, we credit the [the party seeking removal's] theory of the case for purposes of both elements of our jurisdictional inquiry . . . .").

10

**A. Removal Is Appropriate Where the Officer's Actions Were For Or Relating to Any Act Under Color of Federal Office**

The federal removal statute permits, *inter alia*, a criminal prosecution to be removed to federal court where such action is against "any officer" of the United States and the action "for *or relating to* any act under color of such office. 28 U.S.C. § 1442(a)(1) (emphasis added). The emphasized language was added by Congress in 2011, and almost all cases relied on by DANY in their remand motion preceded this amendment. For example, *Maryland v. Soper* was decided in 1926,[5] *Colorado v. Symes* was decided in 1932,[6] *Willingham v. Morgan* in 1969,[7] *Arizona v. Manypenny* was decided in 1981,[8] *Tennessee v. Davis* was decided in 1879,[9] *Mesa v. California* was decided in 1989,[10] *Matter of Application of Donovan* was decided in 1985,[11] *New York v. De Vecchio* was decided in 2007,[12] and *North Carolina v. Ivory* was decided in 1990.[13] These cases are no longer controlling to the extent that they fail to adhere to the current statutory standard.

As the Third Circuit explained in *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.,* 790 F.3d 457 (3d Cir. 2015) prior to the statute's amendment in 2011, § 1442 required a showing that the defendant "ha[d] been sued for any act under color of [federal] office," meaning for acts that were "at least in part because of what they

---

[5] 270 U.S. 9 (1926) RMOL at 8.

[6] 286 U.S. 510 (1932), RMOL at 8.

[7] 395 U.S. 401 (1969), RMOL at 9.

[8] 451 U.S. 232 (1981), RMOL at 9.

[9] 100 U.S. 257 (1879), RMOL at 9.

[10] 489 U.S. 121 (1989), RMOL at 8.

[11] 601 F. Supp. 574 (S.D.N.Y. 1985), RMOL at 11.

[12] 468 F. Supp. 2d 448 (E.D.N.Y. 2007), RMOL at 13.

[13] 906 F.2d 999 (4th Cir. 1990), RMOL at 13.

were asked to do by the Government." 790 F.3d at 470 (internal quotation marks omitted). After "the statute was amended to encompass suits for *or relating* to any act under color of [federal] office' it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *In re Commonwealth's Motion* found that its understanding of the statute comported with the legislative history relating to the 2011 amendment to § 1442(a)(1), which indicated that the addition of the words "or relating to" was intended to "broaden the universe of acts that enable Federal officers to remove to Federal court." *In re Commonwealth's Motion,* 790 F.3d at 471 (*quoting* H.R. Rep. No. 112-117, pt. 1 (2011), reprinted in 2011 U.S.C.C.A.N. 420, 425).

Recognizing that the amendment is fatal to its position, DANY, in a footnote, weakly attempts to dismiss the significance of this new language by falsely claiming that "[c]ourts have not applied this amendment uniformly." RMOL at 9 n. 4 (citing *Latiolais v. Huntington Ingalls, Inc.,* 951 F.3d 286, 292 (5th Cir. 2020)). Contrary to DANY's description of the holding in *Latiolais*, the Fifth Circuit overruled its prior decisions which continued to impose a "direct causal nexus" requirement even after the 2011 amendment to §1442. In doing away with this requirement, *Latiolais* noted:

> The Supreme Court has recognized, the ordinary meaning of the words relating to is a broad one – to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with. Congress added this broad' term to for. … By the Removal Clarification Act, Congress broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office.

*Latiolais*, 951 F.3d at 292.

In sum, DANY's entire argument—that President Trump has not shown that his actions were taken "under color of office"—is wrong because it is premised on no-longer-operative statutory text.

**B.   DANY's Theory of the Case is Irrelevant to this Motion**

Not only does DANY rely on an irrelevant test, DANY also incorrectly dismisses and ignores the factual allegations in President Trump's Notice of Removal.   Instead, in seeking remand, DANY bases its entire argument on a failed and previously rejected theory that the payments to Michael Cohen were solely reimbursements for campaign contributions, and therefore not acts done under color of federal law.   *See* RMOL at 10-12.   But the case law is clear that in evaluating whether a removing defendant has adequately plead § 1442 jurisdiction, the Court must credit the removing party's theory of the case.   *See Jefferson County v. Acker,* 527 U.S. 423, 432 (1999) ("Accordingly, we credit the [party seeking removal's)] theory of the case for purposes of both elements of our jurisdictional inquiry . . . .").   DANY's brief, however, fails to respond to President Trump's theory of the case as laid out in the Notice of Removal:

> President Trump will assert that the statements in the purported business records at issue were in fact truthful statements because the money paid to Michael Cohen was, in part, "retainer" or legal payments to Michael Cohen to act as President Trump's personal attorney.   At the time of his election, there was some public expressions of concern about potential conflicts of interest, corruption, and possible constitutional violations due to President Trump's extensive business interests and wealth.   Thus, shortly before assuming the Office of the Presidency, and in order to assure the American public that he had separated his personal business from his public duties, *see* Morgan Lewis White Paper, attached as Exhibit B, as well as to fulfill various constitutional obligations, *e.g.,* the Foreign Emoluments Clause, Art. I, sec. 9, cl.8, and the Take Care Clause, Art. II, sec. 3, President Trump, in an abundance of caution, placed his businesses in a Trust.   Additionally, President Trump hired a personal lawyer – Michael Cohen – to handle his personal affairs.   These steps were taken solely because he was President of the United States.

Notice of Removal ¶ 19.

Once the Court applies the correct standard of law to the correct set of factual assertions, the question becomes whether there is a "connection or association" between President Trump's activity—after he was elected and in order to fulfill his constitutional obligations, of hiring Mr. Cohen as his personal lawyer, and notating payments to Mr. Cohen as retainer payments.   The

question answers itself—clearly these actions were "connected or associated" with President Trump's official duties of ensuring that there was no doubt that he was complying with the Constitution of the United States of America, including the Foreign Emoluments Clause and the Take Care Clause.

Accordingly, President Trump, as required under § 1442, has more than adequately shown a sufficient nexus between the alleged acts charged in the indictment and the performance of his official duties.

> **POINT III:  PRESIDENT TRUMP'S REMOVAL NOTICE MORE THAN ADEQUATELY ASSERTS "COLORABLE" FEDERAL DEFENSES**

### A.  President Trump's Minimal Burden

In its remand motion, DANY argues that the case should be remanded to state court because, in its view, President Trump has failed to articulate a "colorable" federal defense in his notice of removal that is at least "plausible."  RMOL at 16-25.  Relying on the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), DANY asserts that a "colorable" federal defense in this context means a theory that is more than "possible" or "merely consistent with" a federal defense. RMOL at 16.  President Trump's anticipated federal defenses of preemption and Supremacy Clause immunity more than meet this standard.

The Court should reject DANY's underhanded attempt to heighten President Trump's burden for removal.  In actuality, the requirement that a federal defense be "colorable," as it relates to removal, is even less onerous than the *Twombly/Iqbal* "plausibility" standard for stating a claim. As one district court persuasively observed, although courts may sometimes speak loosely of "plausibility" in the context of removal notices, removals are actually governed by a different standard from affirmative pleadings:

14

JA-249

> [T]he term "plausible" is generally used differently in the Section 1442(a)(1) context than in cases determining whether a complaint should be dismissed under Rule 12(b)(6) in accordance with *Twombly* and its progeny. The latter standard, which defines plausible factual allegations as those that go beyond the speculative level, seems more exacting than that required by many courts deeming a colorable defense a plausible one when evaluating whether to grant a plaintiff's motion to remand.

*Hagen v. Benjamin Foster Co.,* 739 F. Supp. 2d 770, n. 9 (E.D. Pa. 2010) (citation omitted). The *Hagen* court concluded that a federal defense is "colorable" for removal purposes if the defendant asserting the defense "identifies facts which, *viewed in the light most favorable to the defendant,* would establish a complete defense at trial." *Hagen*, 739 F. Supp. 2d at 783 (emphasis added). Several district courts in this Circuit have expressly endorsed the *Hagen* approach.[14]

The burden imposed on a removing defendant is minimal, irrespective of the applicable standard for "plausibility." The leading Supreme Court case construing the "colorable" defense requirement recognizes that a defendant who seeks removal need not "virtually . . . win his case before he can have it removed." *Jefferson County, Ala. V. Acker*, 527 U.S. 423, 431 (1999) (internal quotation marks omitted). Indeed, DANY readily concedes that a "colorable" federal defense sufficient for removal does not have to be "clearly sustainable" on the facts. RMOL at 16 (citing *Kleinert*, 855 F.3d at 313). *See also White v. Wellington*, 627 F.2d 582, 587 (2d Cir. 1980) (a notice of removal may be sufficient for removal purposes even if it "contain[s] inconsistent allegations").

---

[14] *See Perkins v. Air & Liquid Systems Corp.*, 2014 WL 1389750, at *1 (S.D.N.Y. Apr. 8, 2014) ("I am prepared to follow *Hagen* . . . and conclude that removing defendant . . . has, using the standard of *Hagen*, 'identified facts which, viewed in the light most favorable to the defendant, entitle him or her to a complete defense'"). *See also Albrecht v. A.O. Smith Water Products*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citing *Hagen*: "an analysis under §1442 must view the evidence and facts in the light most favorable to the defendant").

Instead, on a remand motion, a district court's inquiry is jurisdictional in nature, meaning that a "colorable" federal defense is one that is sufficient to "assure the federal court that it has jurisdiction to adjudicate the case." *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n. 12 (2006). *See also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §3733 (rev. 4th ed. 2020) (for removals generally, it is enough "if the court is provided the facts from which its jurisdiction can be determined"). As a result, "neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014).

Consistent with the *Hagen* approach, the Supreme Court has stated that public policy supports guaranteeing a federal forum to defendants with a "colorable" federal defense, and therefore "[t]his policy should not be frustrated by a narrow, grudging interpretation of §1442(a)(1)." *Willingham*, 395 U.S. at 406-7. *See also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1249 (9th Cir. 2006) ("We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal").

As for what qualifies as a "colorable" federal defense, courts have imposed few limitations. *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 138 (2d Cir. 2008). A federal defense is one that is both "defensive" in nature and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129-30 (1989). Immunity is unquestionably a federal defense, and "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407. Of course, an immunity defense is not the only "colorable" federal defense that justifies removal to federal court. *Isaacson*, 517 F.3d at 139. Federal preemption is another such federal defense. In fact, when amending §1442(a)(1) in 1996, Congress identified

16

the adjudication of preemption defenses in federal court as one of the rationales for removal by a federal officer. *See* H.R. Rep. No. 798, 104th Cong., 2d Sess., at 20 (1996) (§1442(a)(1) provides a federal forum for "important and complex federal issues such as preemption").

Against this backdrop, the Court should reject DANY's invitation to wade into disputed factual matters concerning President Trump's anticipated federal defenses. Although his removal notice need only have raised a single "colorable" federal defense, President Trump has raised multiple such defenses. For example, he has raised a federal preemption defense based on DANY's allegations of criminality in an area of exclusive federal concern—federal campaign finance laws—through which DANY hopes to transform time-barred misdemeanors into felonies. Moreover, even as misdemeanors without a predicate offense, the charges are invalidly premised on the same preempted untrue theory that President Trump intended to defraud the federal electorate. President Trump has also raised an immunity defense under the Supremacy Clause based on the direct, proximate relationship between the alleged criminal conduct, which indisputably occurred in 2017 during his term as President, and the discharge of his official duties as President. A federal officer who is reasonably discharging his federal duties remains immune from state prosecution.

These anticipated federal defenses are "colorable" under even an *Twombly/Iqbal* standard and would provide President Trump a complete defense to prosecution. DANY's remand motion should therefore be denied.

### B. President Trump Has Adequately Articulated A Federal Preemption Defense

As noted above, Congress explicitly identified federal preemption as a quintessential federal defense which the federal-officer removal statute is designed to cover. DANY's argument that such a defense is unavailing here is not persuasive.

#### 1. DANY has advanced various theories as to a "predicate" offense that are preempted by federal law, and they refuse to abandon them.

DANY bizarrely claims that a finding of federal preemption as to election law offenses would not give rise to a viable federal defense because DANY purports to retain the right to allege at any time that President Trump intended to commit or conceal some other crime that might not be preempted by federal law. DANY's fanciful argument is beside the point.

To the extent the charges are or could be based on an intent to commit or conceal an election law offense, federal preemption would provide a complete defense to the charges. The gravamen of the charged "scheme" is that President Trump was allegedly reimbursing Mr. Cohen in 2017 for hush-money payments Mr. Cohen made for the alleged purpose of influencing the presidential election. President Trump therefore has a defense that this state prosecution is precluded because federal law has entirely preempted state law in the area of federal elections, and he should be entitled to raise this defense in federal court. If President Trump's federal preemption defense is "colorable" as to even just *one* theory of the case, removal of the entire case is required. *National Audubon Soc'y v. Department of Water & Power*, 496 F. Supp. 499, 509 (E.D. Cal. 1980) ("It is well settled that if one claim cognizable under Section 1442 is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims"). *See also Mayor v. Cooper*, 73 U.S. 247, 252-53 (1867) (observing that "[n]or is it any objection [to federal jurisdiction] that questions are involved which are not all of a Federal character. If one

of the latter exist, if there be a single such ingredient in the mass, it is sufficient. That element is decisive upon the subject of jurisdiction.").  There is no question that DANY intends to argue to the jury that it may convict even if all it finds is that President Trump falsified business records with the intent to conceal a violation of election laws (and no other crime).  Therefore, the defense that such a theory of the prosecution is preempted is a full federal defense to the charges.

Even the mere possibility that the grand jury based any of its charging decisions, or that the petit jury could base its verdict, on President Trump's alleged intent to commit or conceal violations of N.Y. Election Law §17-152 would render the indictment and resulting verdict invalid. *See generally, Yates v. United States*, 354 U.S. 298, 311-312 (1957) (where jury is presented with two theories as a basis for conviction, only one of which is legally valid, "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.").

Recognizing the problematic nature of their position, DANY next argues that identifying the other "crime" that President Trump allegedly intended to commit or conceal is irrelevant because, in DANY's understanding of the falsifying business records statute, all they need to prove is a "general intent to commit a crime . . . not [defendant's] intent to commit a specific crime." RMOL at 23.  Even assuming DANY is correct,[15] there is still a need to prove that the defendant

---

[15] DANY's reliance on *People v. Mackey*, 49 N.Y.2d 274, 278-281 (1980), a burglary case, is misplaced. Falsifying business records is distinguishable from burglary, where a defendant's intent to commit some other crime can often easily be inferred from the circumstances surrounding his knowing and unlawful entry onto the premises.  For example, in *Mackey*, the jury was permitted to infer the intruder's general criminal intent from, *inter alia*, his removal of a storm window screen before entering into the house from a darkened alley.  By contrast, a defendant must act with a particular or specified intent to "defraud" in order to be guilty of falsifying business records.  And for the offense to be a felony, the defendant's intent to "defraud" must include an intent to either commit another crime *or* to aid *or* conceal the commission thereof.  By employing such specific and disjunctive language, the Legislature could not have intended to permit a felony conviction on the basis of a general criminal intent, especially when a particular criminal intent is already required for a misdemeanor conviction.

intended to commit or conceal a "crime" as part of an intent to defraud. To the extent that N.Y. Election Law §17-152 is preempted, a conspiracy "to promote or prevent" a presidential election is simply not a crime, and there can be no general or specific intent to commit a non-existent crime.[16]

### 2. Federal election law preempts DANY's underlying "intent to defraud" theory, requiring dismissal of even lesser-included misdemeanor falsifying business records charges.

Wholly apart from the fact that N.Y. Election Law §17-152 is preempted by federal law, President Trump will argue that he cannot be convicted of either misdemeanor or felony charges of falsifying business records because an element of both of those charges requires an intent to defraud, and here DANY has taken the position that President Trump intended to defraud "the voting public during the 2016 presidential election." DANY's Statement of Facts (Exhibit A) at ¶1. Aside from the fact that the falsifying business record statute requires an intent to cause pecuniary harm (*see People v. Keller*, 176 Misc.2d 466 (N.Y. Sup. Ct. 1998) (dismissing falsifying records charge premised on a scheme to falsify credit card charge slips that falsely reflected "escort" charges as limousine charges)), any alleged scheme to defraud the voting public by failing to report purported campaign contributions or expenditures is expressly preempted by FECA.

DANY's backdoor attempt to enforce FECA's campaign contribution regulations through the rubric of policing "business records" fails and is not supported by the cases it cites. On the contrary, in *WinRed, Inc. v. Ellison*, 59 F.4th 934, 942-44 (8th Cir. 2023) relied on by DANY, the Eighth Circuit declined to enjoin, on FECA preemption grounds, a state investigation of a political

---

[16] Nor can a FECA violation serve to be a predicate (even assuming a federal crime can be a predicate) since to the extent 175.10 is interpreted as covering violations of federal election offenses, the statute would be preempted under the Supremacy Clause.

action committee for alleged violations of Minnesota's consumer-protection law which the Court held fits into one of the categories of statutes expressly *not* superseded by FECA under the regulations. However, as *WinRed, Inc.* recognized, the regulations do specifically preempt state laws that regulate conduct related to the "[d]isclosure of receipts and expenditures." 59 F.4th at 943 (*citing* 11 C.F.R. § 108.7(b)(2)). In other words, where a statute seeks to enforce "honest record-keeping" (RMOL at 25) with respect to federal campaign contributions and expenditures, such conduct is preempted by FECA.

### C. President Trump Is Immune From State Prosecution For Actions Taken As A Result of His Role as President

DANY argues that there is a "serious question . . . whether a former President can claim absolute presidential immunity against criminal liability." RMOL at 17. This Court need not decide this "serious question" for purposes of this motion because President Trump has not raised it in his removal notice. If he had raised the defense, the Court's inquiry on this motion would be limited to assessing whether the defense is at least "colorable." *See* Point III.A, *supra*. In any event, this Court can safely ignore DANY's lengthy discussion in their motion papers concerning the viability of an absolute presidential immunity defense. On the narrower question of Supremacy Clause immunity, however, DANY concedes that a federal employee enjoys immunity from state prosecution for acts he has performed when carrying out his federal duties. RMOL at 19.

According to DANY's mistaken belief, a claim of Supremacy Clause immunity would have to fail here because "the President's official responsibility does not include falsifying private business records." RMOL At 21. In making this argument, DANY ignores a fundamental, bedrock principle in American law: the presumption of innocence. The allegation that President Trump falsified business records is just that, an allegation, and neither President Trump nor this

Court are obligated to accept it as true. Instead, as indicated in his removal notice, the facts viewed in the light most favorable to the defendant support President Trump's position that the payments to Mr. Cohen were made at least in part as payment for services rendered to President Trump as his personal attorney, and therefore his purported "business records"—which in actuality were his personal check register—were not falsified at all. As President Trump prepared to assume the Office of the Presidency on January 20, 2017, Mr. Cohen resigned from his position within the Trump Organization to assume the role of "personal counsel to President Donald J. Trump" and represent President Trump combatting the "liberal media and anti-Trump advocacy groups inten[t] on attacking" President Trump." *See* Exhibit B (emails from Mr. Cohen announcing his resignation from the Trump Organization). And, not surprisingly, Mr. Cohen expected and was indeed compensated for his work for President Trump when serving in this capacity, which included handling personal legal matters for President Trump, along with addressing "open matters that need to be handled" (excerpts from Michael Cohen, Disloyal: A Memoir: The True Story of the Former Personal Attorney to President Donald J. Trump (2020) [hereinafter Disloyal]). According to Mr. Cohen, President Trump and Mr. Cohen agreed at that time that Mr. Cohen would receive $420,000 as a "retainer" for the work that Mr. Cohen would be doing for President Trump while he was President. *See* Disloyal pgs. 308-10.

Viewed in this context, DANY's arguments necessarily require rejection. Indeed, this case is not akin to *Clinton v. Jones*, 520 U.S. 681 (1997), where the parties did not dispute that President Clinton's alleged wrongdoing of Paula Jones occurred in 1991, long before he became President in 1993, was entirely unrelated to his conduct as President. Here, by contrast, the payments to Mr. Cohen and the allegedly false ledger entries were made during President Trump's first year as President of the United States, when Mr. Cohen was acting as President Trump's personal counsel

after having been hired in an effort to comply with President Trump's obligations and assurances to the American public that his personal affairs would be conducted separate and apart from the Office of the Presidency. As a result, President Trump has more than adequately demonstrated a federal defense entitling him to Supremacy Clause immunity.

The doctrine of Supremacy Clause immunity, which protects federal officers from state prosecution under certain circumstances, dates back more than a century to the Supreme Court's decision in *Cunningham v. Neagle*, 135 U.S. 1 (1890). In ruling that a deputy U.S. Marshal was immune from state prosecution after killing a man he believed was about to kill a Supreme Court Justice, although the deputy was not specifically authorized to protect the Justice, the Supreme Court announced the rule that "if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under . . . [state] law . . . ." *Id.* at 75.

*Neagle* established a two-part test for determining whether a state court has jurisdiction to prosecute a federal official for his conduct that is in violation of state law, *i.e.*, "a state court has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." *Whitehead v. Senkowski*, 943 F.2d 230, 234 (2d Cir. 1991) (quoting *Commonwealth of Kentucky v. Long,* 837 F.2d 727, 752 (6th Cir. 1988)).

To satisfy the "scope of authority" part of the test, a federal officer's conduct need not necessarily be specifically authorized by statute. As the Supreme Court explained in *Neagle*, "[i]n the view we take of the constitution of the United States, any obligation fairly and properly inferable from that instrument or any duty of the officer to be derived from the general scope of

23

his duties under the laws of the United States, is a 'law,' within the meaning of this phrase." *Neagle*, 135 U.S. at 59. President Trump's decision to separate his personal business from his public duties derived from his position as President of the United States and were rooted in constitutional concerns such as the Foreign Emoluments Clause, Art. 1, §9, cl. 8 and the Take Care Clause contained in Art. II, §3. A federal officer may be acting within his "scope of authority" for purposes of the *Neagle* test "even though his acts may have exceeded his express authority." *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004) (citing *Cl.fton v. Cox*, 549 F.2d 722, 728 (9th Cir.1977)). The "necessary and proper" part of the test means that Supremacy Clause immunity "applies where petitioner 'had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable belief' that his actions were necessary and proper." *Tanella*, 374 F.3d at 151 (quoting *Long*, 837 F.2d at 745).

DANY can only respond to President Trump's "colorable" *Neagle* immunity defense with speculation and bare assertions disputing that President Trump was acting within the scope of his authority and honestly and reasonably to discharge his duties. These are necessarily factbound determinations that cannot possibly be disproven at this stage by DANY on the basis of the record as it exists. *See, e.g., Trump v. Carroll,* 292 A.3d 220, 225 (D.C. 2023) (declining to answer "factbound" certified question from the Second Circuit as to whether President Trump was acting within the scope of his employment). If President Trump is ultimately able to demonstrate his entitlement to *Neagle* immunity, either the indictment will be dismissed on motion or he will be acquitted at trial. It is a complete defense.

President Trump should be able to test his immunity defense by this Court "early in the proceedings" so that he will not have to "run the gauntlet of standing trial and having to wait until later to have the [immunity] issue decided." *Tanella*, 374 F.3d at 147 (citing *Long,* 837 F.2d at

24

752). Indeed, in considering *Neagle* and its progeny, *Long* held that a district court "has a duty to make a prompt ruling" when a federal officer raises Supremacy Clause immunity. *Long*, 837 F.2d at 752. The Sixth Circuit continued, "[w]e further hold that if the state fails to come forward with any evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer, the district court should sustain the defense of immunity under the Supremacy Clause." *Id.* In other words, "the state cannot overcome that defense merely by way of allegations." *Id.*

President Trump's removal notice more than adequately raises the "colorable" defenses of preemption and federal immunity. Accordingly, the Court should deny DANY's remand motion.

**POINT IV: GIVEN THE MORE THAN ADEQUATE SHOWING BY PRESIDENT TRUMP OF A FEDERAL DEFENSE THIS COURT NEED NOT REACH THE ISSUE OF PROTECTIVE JURISDICTION**

According to DANY, the Supreme Court has never endorsed the theory of protective jurisdiction, and *Mesa* noted that endorsing it would "pose 'grave constitutional problems.'" RMOL at 26 (*quoting Mesa*, 489 U.S. at 137). DANY overstates *Mesa*. What *Mesa* actually said—in response to the government's urging that such jurisdiction exists—is that in a case where "no state court hostility or interference has even been alleged by petitioners" (such as the driving violations that were the subject of *Mesa*), there was no need to adopt a theory of protective jurisdiction. Yet, as Justice Brennan noted in his concurring opinion, the "Court today rightly refrains from deciding whether removal in such a situation is possible, since that is not the case before us. But the Court leaves open the possibility that, where a federal officer is prosecuted because of local hostility to his function." *Mesa*, 489 U.S. at 140.

DANY's suggestion that President Trump cannot establish such local hostility in this case is unconvincing because the allegations lodged by DANY center on nothing more than it claims

25

to be a "routine" falsifying business records case for which DANY's failure to prosecute "would have been a blatant dereliction of duty," RMOL29.  Indeed, DANY offers no explanation why this "routine" case took six years to prosecute (notwithstanding the fact that a New York County grand jury was convened in 2019 to investigate this very conduct), why the case was known as the "zombie" case within DANY, or why the former lead prosecutor opined that "the facts surrounding the payments did not amount to much in legal terms," and that there "appeared to be no felony state crime in play."  *Bragg v. Jordan*, No. 1:23-CV-3032 (MKV), 2023 WL 2999971, at *1-2 (S.D.N.Y. Apr. 19, 2023).

This case is anything but a "routine" prosecution.  Nevertheless, for the reasons noted above, this Court need not decide the question of protective jurisdiction because President Trump has more than adequately alleged a federal defense.  If the Court were to disagree, however, we request the opportunity for a hearing (pursuant to 28 U.S.C. § 1455(b)(5)) at which President Trump can establish the local hostility evident in this prosecution.

JA-261

**CONCLUSION**

For the foregoing reasons, as well as those contained in President Trump's Notice of

Removal, DANY's remand motion should be denied, and this Court should maintain jurisdiction.

Dated:   New York, New York
         June 15, 2023

                                    Respectfully submitted,

                                    */s/ Todd Blanche*
                                    Todd Blanche
                                    Blanche Law
                                    99 Wall Street
                                    New York, New York 10005
                                    212-716-1250
                                    toddblanche@blanchelaw.com

                                    */s/ Susan Necheles*
                                    Susan R. Necheles
                                    NechelesLaw LLP
                                    1120 Sixth Avenue, 4th Floor
                                    New York, New York 10036
                                    212-997-7400
                                    srn@necheleslaw.com

                                    *Attorneys for President Donald J.
                                    Trump*

JA-262

**CERTIFICATE OF SERVICE**

I, Todd Blanche, do certify that on June 15, 2023, I caused a copy of President Donald J. Trump's Memorandum of Law in Opposition to the People's Motion to Remove and a copy of the Affirmation accompanying that Motion to be served via email to the attorneys representing the People on this matter.  I certify this under penalty of perjury.

Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche
Blanche Law
99 Wall Street
New York, New York 10005
212-716-1250
toddblanche@blanchelaw.com

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK

    -against-

DONALD J. TRUMP,

               Defendant.

23 Civ. 3773 (AKH)

**PEOPLE'S REPLY MEMORANDUM**
**IN SUPPORT OF MOTION FOR REMAND**

JA-264

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AFFIDAVITS AND EXHIBITS ............................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    The Conduct Charged in the People's Indictment Is Not For or Related
         to Any Act Under Color of the Office of President. ........................................ 2

    II.   Neither Supremacy Clause Immunity nor Federal Preemption Provides a
         "Colorable Federal Defense" to the Crimes Charged in the People's
         Indictment. ................................................................................................................ 7

        A.   Defendant has not raised a colorable defense of Supremacy
            Clause immunity .............................................................................................. 8

        B.   Defendant has not raised a colorable defense of federal
            preemption. ...................................................................................................... 11

    III.  This Court Need Not Reach the Parties' Remaining Arguments. ................ 15

CONCLUSION .............................................................................................................. 18

JA-265

## TABLE OF AFFIDAVITS AND EXHIBITS

The following affidavits and exhibits accompany this motion:

Declaration of Matthew Colangelo dated June 23, 2023 (appending exhibits).

Ex. 25    Mem. Supp. Donald J. Trump's Mot. to Dismiss, *Thompson v. Trump*, No. 21-cv-400-APM (D.D.C. May 26, 2021).

JA-266

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arizona v. Files*, 36 F. Supp. 3d 873 (D. Ariz. 2014) .................................................9

*Arizona v. Manypenny*, 451 U.S. 232 (1981) ...............................................................3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................7

*Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010) .................................................7

*Betzner v. Boeing Co.*, 910 F.3d 1010 (7th Cir. 2018) .............................................7-8

*Brunson v. Adams*, 2021 WL 5403892 (D. Utah Oct. 19, 2021) ...............................17

*Clinton v. Jones*, 520 U.S. 681 (1997) .....................................................................9, 10

*Colorado v. Symes*, 286 U.S. 510 (1932) ................................................................3, 10

*County Bd. of Arlington Cnty. v. Express Scripts Pharm., Inc.*,
   996 F.3d 243 (4th Cir. 2021) ....................................................................................7

*County of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022)........................6

*Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81 (2014)..................7

*Dewald v. Wriggelsworth*, 748 F.3d 295 (6th Cir. 2014) ...........................................12

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ...........................................................15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)...........17

*Georgia v. Heinze*, 2022 WL 15265493 (N.D. Ga. Oct. 25, 2022) ..............................2

*Graves v. 3M Co.*, 17 F.4th 764 (8th Cir. 2021) ...........................................................7

*Hagens v. Benjamin Foster Co.*, 739 F. Supp. 2d 770 (E.D. Pa. 2010)........................8

*Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440 (1960)..............13

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998)............................................................4

*In re Neagle*, 135 U.S. 1 (1890).....................................................................8, 9, 11

*Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423 (1999)..................................................3, 6

*K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503 (D.C. Cir. 2020)...................2

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) .......................................3, 7, 8

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) ...........................................................................8

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926).................................................................................3

*Matter of Application of Donovan*, 601 F. Supp. 574 (S.D.N.Y. 1985) ...............................3, 6, 7

*Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022) ...........................3

*Mesa v. California*, 489 U.S. 121 (1989)............................................................................3, 16, 18

*Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703 (8th Cir. 2023).................................3

*New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007) ..............................................3, 11

*New York v. Tanella*, 239 F. Supp. 2d 291 (E.D.N.Y. 2003)..........................................................6

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004).............................................................8, 9, 11

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)......................................................................................9

*North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ...........................................................3, 11

*Ohio v. Meade*, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022)........................................................2

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495 (1988) ..............15

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991).............................................................12, 13

*Tennessee v. Davis*, 100 U.S. 257 (1879) .......................................................................................3

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) .............................................................................7

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) .....................................................................9

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ....................................................................................5, 9

*United States v. Mouat*, 124 U.S. 303 (1888) .............................................................................17

*Veneruso v. Mt. Vernon Neighborhood Health Ctr.*, 586 F. App'x 604 (2d Cir. 2014).................2

*Willingham v. Morgan*, 395 U.S. 402 (1969) .......................................................................6, 7, 10

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ..................................................................12

*Yates v. United States*, 354 U.S. 298 (1957)................................................................................14

### STATE CASES

*People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105 (2008) ......................................12

*People v. Barnes*, 50 N.Y.2d 375 (1980) ......................................................................................14

*People v. Jackson*, 87 N.Y.2d 782 (1996) ....................................................................................14

*People v. Mackey*, 49 N.Y.2d 274 (1980) ...............................................................................13, 14

*People v. Ribowsky*, 77 N.Y.2d 284 (1991) .................................................................................14

*People v. Taveras*, 12 N.Y.3d 21 (2009) .....................................................................................13

### FEDERAL & STATE LAWS

Title 28, U.S. Code
    § 1442(a)(1) ........................................................................................................... *passim*
    § 1446(a) ........................................................................................................................7
    § 1455(a) ........................................................................................................................7
    § 1455(b)(2) ....................................................................................................................8
    § 1455(b)(5) ....................................................................................................................6

Title 11, Code of Federal Regulations
    § 108.7(b)(2) .................................................................................................................12
    § 108.7(c) ......................................................................................................................12

N.Y. Election Law § 17-152 ...........................................................................................13, 14, 15

N.Y. Penal Law
    § 140.25 .........................................................................................................................13
    § 175.10 ...............................................................................................................13, 14, 15

JA-269

## INTRODUCTION

In his opposition to remand, defendant Donald J. Trump concedes that the 2017 payments at issue in this criminal proceeding were to his personal attorney handling his personal affairs, "separate and apart from the Office of the Presidency." Opp'n 23.[1] That concession defeats any claim that the conduct charged in the indictment was "for or relating to any act under color of [his federal] office," 28 U.S.C. § 1442(a)(1), particularly when paired with other indicia of the payments' unofficial nature (such as the involvement of purely private enterprises in creating and holding the business records here) that defendant has not contested. Defendant's assertion that he was initially motivated to retain a personal lawyer only because he had been elected president is immaterial, given that the effect of any such decision—indeed, the entire point—was to carve out a personal sphere "separate and apart" from his official functions. If the "under color of . . . office" requirement means anything, it must exclude conduct that a criminal defendant deliberately designates as unofficial.

Defendant also fails to rebut other, independent grounds for remand. In particular, defendant has identified no colorable defense based on immunity as a federal officer since, among other defects, he identifies no federal-law duty to perform the unofficial conduct alleged in the indictment. And his preemption defense—which is focused exclusively on a statute other than the one under which he has been charged—is entirely irrelevant because it would not provide a defense to the People's charges. This case should thus be remanded to state court.

---

[1] Citations to "Opp'n" are to defendant's memorandum of law in opposition (ECF No. 34), and citations to "Mem." are to the People's memorandum of law in support of the motion for remand (ECF No. 19).

1

**ARGUMENT**

I.    **The Conduct Charged in the People's Indictment Is Not For or Related to Any Act Under Color of the Office of President.**

There is no application of the statutory test under which defendant can show that the conduct charged in the People's indictment is for or related to any act under color of the office of President.

As an initial matter, defendant baselessly accuses the People of relying on a "misleading" legal standard (Opp'n 10) rather than the language from the 2011 amendments to 28 U.S.C. § 1442. In fact, the People expressly quoted the 2011 amendments (Mem. 7) and described the relevant change to the statute's text (Mem. 9 n.4). And far from being "dishonest[]" (Opp'n 10), the People's memorandum accurately characterized the federal courts as being split over whether the amendments meaningfully altered the pre-existing "under color of office" standard. *See, e.g.*, *Georgia v. Heinze*, 2022 WL 15265493, at *5 (N.D. Ga. Oct. 25, 2022) ("Circuit courts are split on whether Congress's 2011 amendment broadened the scope of acts that allows federal officers to remove a case to district court."); *Ohio v. Meade*, 2022 WL 486294, at *4 & n.3 (S.D. Ohio Feb. 17, 2022) (also noting split and concluding that "[t]he Sixth, Second, Eighth, and Ninth Circuits . . . maintain that the amendment did not expand the definition of 'under color of office' and continue to apply the traditional causal connection test" (citing *Veneruso v. Mt. Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 607 (2d Cir. 2014))).

The dispositive point here, which the People repeat from their opening memorandum (Mem. 9 n.4), is that no aspect of this remand motion turns on any difference between the pre-2011 and post-2011 standards because—even under the broadest reading of the 2011 amendments' new "relating to" language—defendant has failed to identify any underlying official act, or any connection between such an official act and the allegations in the indictment. *Cf. K&D LLC v. Trump Old Post C₁fice LLC*, 951 F.3d 503, 507-08 n.1 (D.C. Cir. 2020) (noting differing views on

effect of the 2011 amendments, but declining to resolve the question because removal was warranted under any test). At minimum, federal courts have required a federal defendant to establish that the conduct at issue in a state lawsuit "is connected or associated with an act under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020). Even assuming this language is more expansive than the pre-2011 statute, it continues to have teeth, and courts have not hesitated to remand cases when a defendant identifies no underlying federal duty or responsibility, or when any connection between a defendant's conduct and federal authority "is too tenuous to support removal under § 1442." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022); *see also Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715-16 (8th Cir. 2023).[2]

The existence of and connection to an underlying official act is not just tenuous here, but nonexistent, even under defendant's "theory of the case." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999). Defendant asserts that he made the 2017 payments at issue in this criminal proceeding to "Mr. Cohen as his personal lawyer"—who, at the time, was charged with "handl[ing] [defendant's] personal affairs" (Notice ¶ 19)—"for services rendered to President Trump as his

---

[2] Defendant goes too far in dismissing a wide swathe of pre-2011 decisions as "no longer controlling." Opp'n 11. Many of these cases did not turn on the strength of the connection to an underlying official act. *See, e.g., Mesa v. California*, 489 U.S. 121 (1989) (addressing federal-defense requirement); *Arizona v. Manypenny*, 451 U.S. 232 (1981) (addressing applicable law after removal); *Colorado v. Symes*, 286 U.S. 510 (1932) (addressing federal-defense requirement); *Tennessee v. Davis*, 100 U.S. 257 (1879) (addressing predecessor statute's constitutionality). And the decisions that rejected removal based on the absence of *any* underlying federal duty or responsibility remain good law on that point, since the 2011 amendments altered only the language about the degree of connection required. *See Maryland v. Soper (No. 1)*, 270 U.S. 9, 35-36 (1926) (defendant failed to identify actions authorized by federal law); *North Carolina v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990) (no federal duty identified in traffic-accident case); *New York v. De Vecchio*, 468 F. Supp. 2d 448, 462-63 (E.D.N.Y. 2007) (no federal duty associated with the defendant's responsibility for mafia murders); *Matter of Application of Donovan*, 601 F. Supp. 574, 580-81 (S.D.N.Y. 1985) (no federal duty associated with business transactions that occurred before the defendant held federal office).

personal attorney . . . while he was President." Opp'n 13, 22. Defendant does not dispute that the President of the United States can engage in unofficial actions in his personal capacity. Mem. 14 & n.7. His further concession that Cohen was his personal lawyer handling personal affairs during the period covered by the indictment means that his payments to Cohen—even assuming that they were for legal services rendered during defendant's time as President, *but see* infra at 6-7—could not have been "for or relating to any act under color of [his federal] office." 28 U.S.C. § 1442(a)(1). Instead, any legal representation that defendant received "for or relating to" his official responsibilities would have been handled by "a government attorney functioning in his official capacity." *In re Lindsey*, 158 F.3d 1263, 1283 (D.C. Cir. 1998).

The unofficial nature of the 2017 payments to Cohen is further supported by other facts not contested by defendant—including that the business records at issue in this prosecution were held by private enterprises having nothing to do with the presidency, and that the payments were drawn from accounts that were entirely unofficial in nature. Mem. 11-12; *see also* Morgan Lewis White Paper 1-2 (conceding that the Donald J. Trump Revocable Trust held the assets of the entities constituting the Trump Organization after the election specifically to manage defendant's personal affairs apart from his official responsibilities) (Necheles Ex. B).[3] In other words, under the most generous interpretation of defendant's "theory of the case," the question for this Court is whether personal transactions involving the business records of private (not official) enterprises, generated in support of defendant's payments to a personal (not official) attorney handling his personal (not official) affairs, using funds drawn from personal (not official) accounts, are "for or relat[ed] to"

---

[3] Defendant filed two different documents as "Exhibit A" and two different documents as "Exhibit B." *See* ECF Nos. 1-1, 35-1, 35-2. For clarity, the People will refer to the defense exhibits filed at ECF No. 1-1 as "Necheles Ex. A" and "Necheles Ex. B," and will refer to the defense exhibits filed at ECF No. 35-1 and 35-2 as "Blanche Ex. A" and "Blanche Ex. B."

any act under color of" defendant's federal office. Nothing about this conduct touches, relates to, has a nexus or causal connection between, is associated with, or has any other connection to any official responsibility or authority of the President.

Defendant nonetheless asserts that his 2017 payments to Cohen "were 'connected or associated' with" his official duties because he claims that, after being elected, he hired Cohen as a personal lawyer to maintain separation between his personal and presidential functions, in order to comply with various constitutional and statutory obligations. Opp'n 14. The People have previously explained that any anticipatory actions defendant took before becoming President cannot in fact relate to official acts, because he had no official capacity at the time. Mem. 11, 15, 19-20. But even assuming that some of defendant's *initial* transitional steps after being elected could be considered to be "relat[ed] to" the Office of the President—under defendant's theory that he took those steps "solely because he was President of the United States" (Notice ¶ 19)—it would make no sense to say that *further* conduct on the personal side of the line—including payments to a "personal lawyer" hired "to handle his personal affairs" (Notice ¶ 19)—somehow retained an official character. Such a position would entirely undercut the point of the transition, which was to ensure that defendant's "personal affairs would be conducted separate and apart from the Office of the Presidency." Opp'n 23. And it would conflict with the Supreme Court's holding that the business records of defendant's private enterprises—which defendant conveyed to a trust as part of the presidential transition (Morgan Lewis White Paper 2)—were "private papers" rather than "official documents." *Trump v. Vance*, 140 S. Ct. 2412, 2429 (2020). Given defendant's own assertion that he sought to sharply separate his personal affairs from his presidential duties, and that any legal services Cohen performed in 2017 related solely to the personal side, there is no

basis whatsoever to characterize the conduct alleged in the indictment as "for or relating to any act under color" of his federal office, 28 U.S.C. § 1442(a)(1).

Although this Court need not go beyond defendant's presentation of the facts, the case for remand becomes even stronger if the Court declines to accept as true defendant's conclusory factual claims about the nature and purpose of the 2017 payments. To be sure, the Supreme Court has generally instructed that, in civil cases, courts should "credit the [federal party's] theory of the case for purposes of" the removal inquiry. *Jefferson Cnty.*, 527 U.S. at 432. But a defendant still bears the burden of demonstrating by a preponderance of the evidence that removal was proper, as the proponent of federal-court jurisdiction does in every case. *See County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022); *Donovan*, 601 F. Supp. at 579. Because this case is a criminal prosecution, that demonstration requires a "more detailed showing" than for a civil action. *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969); *Donovan*, 601 F. Supp. at 578. And because the removal statute mandates an evidentiary hearing when a defendant seeks to remove a criminal prosecution (but not a civil case), *see* 28 U.S.C. § 1455(b)(5), that "detailed showing" must be supported by evidence, not a defendant's mere say-so.

Although courts adjudicating a removal petition may treat alleged facts in a defendant's notice of removal as true if those facts are uncontested, *see, e.g.*, *New York v. Tanella*, 239 F. Supp. 2d 291, 292 & n.3, 295 (E.D.N.Y. 2003), the People's memorandum does present evidence contesting defendant's asserted facts. In particular, defendant has himself said that the 2016 payment to the adult film actress was a "private" transaction, and his lawyer has publicly acknowledged that the 2017 payments at issue here were reimbursements to Cohen for that earlier expenditure. Mem. 10-11 (quoting Exs. 4, 5, 6, 7). The People's evidence regarding the actual purpose of defendant's 2017 payments to Michael Cohen thus conclusively establishes the absence

6

of any underlying official act: no presidential duty or responsibility obligated defendant to have Cohen make the $130,000 payment to an adult film actress in October 2016, to agree to reimburse Cohen for that payment before his inauguration in January 2017, and then to make regular payments in 2017 to satisfy his pre-existing and pre-presidential debt. Mem. 3-6.

## II.   Neither Supremacy Clause Immunity nor Federal Preemption Provides a "Colorable Federal Defense" to the Crimes Charged in the People's Indictment.

Defendant has not raised a colorable federal defense of either Supremacy Clause immunity or federal preemption, and the People's motion for remand can be granted on that basis alone.

In the removal context, courts have generally equated a "colorable" defense with a "plausible" one. *See, e.g., Graves v. 3M Co.*, 17 F.4th 764, 771 (8th Cir. 2021); *County Bd. of Arlington Cnty. v. Express Scripts Pharm., Inc.*, 996 F.3d 243, 254 (4th Cir. 2021); *Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1089 (6th Cir. 2010); *see also, e.g. Latiolais*, 951 F.3d at 297 ("if a defense is plausible, it is colorable" (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). "Plausibility" is by now a familiar standard for evaluating the sufficiency of pleadings under Federal Rule of Civil Procedure 8. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The Supreme Court has expressly held that notices of removal should be reviewed under Rule 8's plausibility standard, *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87-89 (2014),[4] and lower courts have applied this standard specifically in the context of 28 U.S.C. § 1442, *see, e.g., Betzner v. Boeing Co.*, 910 F.3d 1010,

---

[4] The Supreme Court was articulating the standard for reviewing a notice of removal of a civil action under 28 U.S.C. § 1446(a), rather than a notice of removal of a criminal prosecution under 28 U.S.C. § 1455(a). *See Dart Cherokee Basin Operating Co.*, 574 U.S. at 87. The language of those subsections is identical but for the substitution of "any criminal prosecution" and "such prosecution" in § 1455(a) for "any civil action" and "such action" in § 1446(a), and there is no reason to apply a *lower* standard when reviewing the notice of removal in a criminal matter. *See Willingham*, 395 U.S. at 409 n.4; *Donovan*, 601 F. Supp. at 578.

1015 (7th Cir. 2018); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Defendant is thus off base in complaining that measuring plausibility by the *Iqbal* pleading standard amounts to an "underhanded attempt to heighten [his] burden."[5] Opp'n 14.

Here, defendant's asserted federal defenses are neither colorable nor plausible; as explained below, they are "immaterial" and "wholly insubstantial," and thus cannot support removal. *Latiolais*, 951 F.3d at 297.

**A.    Defendant has not raised a colorable defense of Supremacy Clause immunity.**

Defendant's opposition to the People's motion for remand asserts, for the first time, a claim of Supremacy Clause immunity. Opp'n 21-25. Assuming this argument is not waived as a basis for removal, *but see* Mem. 17; 28 U.S.C. § 1455(b)(2), the Court should conclude that it is not a colorable defense to the People's charges of falsifying business records.[6]

Under the doctrine of Supremacy Clause immunity, a federal officer is immune from state prosecution only if (1) the official was performing an "act which he was authorized to do by the law of the United States [and] which it was his duty to do"; and (2) in doing so, he did "no more than what was necessary and proper for him to do." *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (quoting *In re Neagle*, 135 U.S. 1, 75 (1890)). Defendant's Notice of Removal does not colorably assert either aspect of this test.

---

[5] Defendant's objection relies principally on a footnote from a district court opinion which observed that the *Twombly* standard "seems more exacting" than should be required for removal. *See* Opp'n 14-15 (quoting *Hagens v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 780 n.9 (E.D. Pa. 2010)). Whatever the force of that observation, the cited case predated the Supreme Court's holding in *Dart Cherokee Basin Operating Co.*

[6] Defendant affirmatively disclaims any defense based on absolute presidential immunity. Opp'n 21. The Court therefore need not consider the People's arguments as to why that defense would not present a colorable ground for removal of this prosecution.

8

First, even accepting as true defendant's characterization of the relevant facts, he has failed to show that his generation of business records in connection with his 2017 payments to Michael Cohen was the result of any official presidential duty authorized by federal law. As already discussed, *see supra* at 3-5, defendant concedes that Cohen was his personal attorney handling his personal affairs during the presidency. Defendant nonetheless asserts that Supremacy Clause immunity covers his payments to Cohen (and the business records associated with those payments) because Cohen had "been hired in an effort to comply with President Trump's obligations and assurances to the American public that his personal affairs would be conducted separate and apart from the Office of the Presidency" (Opp'n 22-23). But defendant's interactions with his personal attorney, for personal affairs that are "separate and apart" from his official presidential duties, cannot possibly constitute "act[s] which he was authorized to do by the law of the United States [and] which it was his duty to do." *Tanella*, 374 F.3d at 147 (quoting *Neagle*, 135 U.S. at 75).

Defendant's argument to the contrary would mean that a president's purely personal conduct would *always* be deemed official, contravening the Supreme Court's holdings that there is an "outer perimeter" to the president's official functions beyond which he may engage in "unofficial conduct," *Clinton v. Jones*, 520 U.S. 681, 693 (1997); *see Nixon v. Fitzgerald*, 457 U.S. 731, 755-56 (1982), as well as the Supreme Court's holdings that the business records of the very same private enterprises at issue here were defendant's "personal papers" rather than "official documents" subject to various official privileges, *Vance*, 140 S. Ct. at 2429; *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2033 (2020). In other words, defendant asks the Court to conclude that a president's official duties include all of the *unofficial* conduct he engages in. A Supremacy Clause defense premised on the argument that unofficial conduct is official is not colorable. *See Arizona v. Files*, 36 F. Supp. 3d 873, 878 (D. Ariz. 2014) (although the federal immunity defense

9

is not limited to actions specifically directed by statute, "the case law does not endorse an 'anything goes' approach to fixing the authority of federal officers")

To be clear: reaching this conclusion does not require this Court to resolve any genuine dispute over the merits of defendant's claimed defense of Supremacy Clause immunity. *See Willingham*, 395 U.S. at 407. Here, even crediting the facts that defendant himself has presented, Supremacy Clause immunity is legally unavailable because he does not identify any colorable argument that he had a federal-law duty to perform the personal, unofficial conduct alleged in the indictment—*i.e.*, generating the business records associated with his 2017 payments to Michael Cohen. *See, e.g., Clinton*, 520 U.S. at 694 ("[W]e have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity"); *Symes*, 286 U.S. at 518 ("Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law.").

For similar reasons, defendant is wrong to contend that the presumption of innocence supports his attempt to establish a colorable defense of Supremacy Clause immunity. Opp'n 21-22. No aspect of the People's motion for remand requires the Court to conclude that defendant is guilty of the charged offenses. In particular, this Court need not pass on the veracity of the indictment's allegations that defendant's 2017 payments were reimbursements for Cohen's $130,000 payment to an adult film actress in 2016, or that defendant acted here with intent to defraud that included an intent to conceal or commit another crime. This Court need only look to the facts as defendant himself describes them in his Notice—that he made personal payments to a personal lawyer, based on a pre-presidential decision to sharply separate his personal affairs from his official duties (Notice ¶ 19)—to conclude that the alleged actions that defendant took while serving as President were

entirely unofficial, rather than "act[s] which he was authorized to do by the law of the United States [and] which it was his duty to do."[7] *Tanella*, 374 F.3d at 147 (quoting *Neagle*, 135 U.S. at 75).

Second, defendant does not identify any basis, let alone a colorable basis, to conclude that any purported official conduct was "no more than what was necessary and proper for him to do." *Id.* (quoting *Neagle*, 135 U.S. at 75). To meet this element, a federal official "must subjectively believe that his actions were justified," and "that belief must be objectively reasonable." *Id.* Apart from reciting the legal standard (Opp'n 24), there is no showing anywhere in defendant's removal papers that even attempts to satisfy these two distinct requirements. "[M]erely reciting the magic words 'necessary and proper' will not satisfy *Mesa*'s jurisdictional requirement if the underlying facts averred, or indeed existing on the whole record before the court, do not make out a colorable federal defense." *Ivory*, 906 F.2d at 1001 n.2; *see also De Vecchio*, 468 F. Supp. 2d at 462 ("[A]lthough [the defendant's] general claim that everything he did was in the discharge of his federal duties might well satisfy the broad pleading requirements under *Willingham*'s liberal immunity standard for removal in civil cases, he simply cannot satisfy the more stringent requirements for criminal cases . . . .").

### B.    Defendant has not raised a colorable defense of federal preemption.

Defendant's claim that "federal law has entirely preempted state law in the area of federal elections" (Opp'n 18) is simply wrong. As the People have already explained (Mem. 24-25), federal courts have uniformly held that FECA does not preempt state regulation of fraud,

---

[7] These facts are further supported by the People's unrebutted evidence that defendant and his attorney publicly acknowledged that the reimbursement to Cohen was for a "private contract" and "private agreement" made to "resolve a personal and false allegation." Mem. 4-5 (quoting Ex. 4, Ex. 5); *see also id.* (citing Ex. 6, Ex. 7).

misrepresentation, and deceptive practices, even as applied to political spending or fundraising.[8] *See, e.g.*, *WinRed, Inc. v. Ellison*, 59 F.4th 934, 946 (8th Cir. 2023); *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 (2d Cir. 1991). Federal law does not disable New York from "requir[ing] that [private enterprises] refrain from fraud" in conducting their business. *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 115 (2008).

Defendant is thus wrong to contend that FECA would preclude *any* conviction for falsifying business records that is based on intent to defraud the public. Opp'n 20-21. The fact that FECA preempts state laws concerning "[d]isclosure of receipts and expenditures by Federal candidates," 11 C.F.R. § 108.7(b)(2), does not support defendant's position here. The New York Court of Appeals rejected a nearly identical argument in *Applied Card*. In that case, a credit-card issuer claimed that the New York Attorney General's fraud claims under Executive Law § 63(12) and General Business Law §§ 349 and 350 were preempted by the disclosure requirements and express preemption provision of the federal Truth-in-Lending Act. 11 N.Y.3d at 113-14. The Court disagreed, holding that the Attorney General could enforce New York's general prohibitions against "fraudulent and deceptive misinformation" because the lawsuit was not seeking to interfere with the specific disclosures mandated by federal law, and thus was not covered by the federal statute's express preemption of state laws "relating to the disclosure of information." *Id.* at 114, 117. So too here: because the charges here do not relate to the specific disclosures mandated by FECA, there is no barrier to enforcing New York's general requirements for honest record-keeping. *See also Dewald v. Wriggelsworth*, 748 F.3d 295, 302-03 (6th Cir. 2014) (allowing claim against an individual who solicited money by fraudulently purporting to represent a federally

---

[8] The Federal Election Commission's regulation implementing FECA's preemption provision expressly identifies half a dozen non-preempted categories of state law. *See* 11 C.F.R. § 108.7(c).

registered political action committee); *Stern*, 924 F.2d at 475 (FECA "does not preclude New York from pursuing its independent interest in ensuring that corporate directors exercise sound judgment in the expenditure of corporate funds").

Defendant also claims that "federal preemption would provide a complete defense" to the charges here because (a) he characterizes the charges as alleging that defendant perpetrated business fraud with the intent to commit or conceal a violation of N.Y. Election Law § 17-152, and (b) he claims that federal law would preempt any application of this state election law to the presidential election. Opp'n 18. In addition to the defects with this argument that the People have already identified (Mem. 21-25), defendant's preemption claim fails for several other reasons.

First, the Supreme Court has long "enjoin[ed] seeking out conflicts between state and federal regulation where none *clearly* exists." *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 446 (1960) (emphasis added). Here, defendant's preemption argument has only a tenuous connection to the actual criminal charges against him—and would not provide a "complete defense" (Opp'n 18) by any means. Defendant's sole claim of preemption targets Election Law § 17-152. But the charges here are not for violating that statute, but rather for falsifying business records under Penal Law § 175.10. For that crime, to establish the element of general "intent to commit [or conceal] another crime," *id.*, the People need not prove that defendant intended to commit or conceal (or that anybody actually committed) *any* particular crime— whether a violation of Election Law § 17-152 or something else. *See* Mem. 22-24; *People v. Taveras*, 12 N.Y.3d 21, 26-27 (2009); *People v. Mackey*, 49 N.Y.2d 274, 279 (1980).[9] And even

---

[9] In a footnote, defendant suggests that *Mackey* is inapplicable here because that decision addressed burglary rather than falsification of business records. Opp'n 19 n.15. Defendant identifies no law supporting this argument, and there is none. *Mackey*'s holding turned on the fact that the burglary statute required proof of "intent to commit a crime therein," Penal Law § 140.25, without specifying any particular crime. "Had the Legislature intended" that the People "prove an intent to

if some particular crime did have to be specified for the "intent to commit or conceal" element of Penal Law § 175.10, the People have alleged that defendant intended to conceal or commit multiple other crimes for which defendant has raised no preemption argument whatsoever. Mem. 22; *see also* People's Response to Defendant's Request for a Bill of Particulars 5 ("the crimes defendant intended to commit or to aid or conceal may include violations of . . . New York Tax Law §§ 1801(a)(3) and 1803; [or] New York Penal Law §§ 175.05 and 175.10") (Ex. 2).

Defendant's preemption challenge to Election Law § 17-152 thus does not clearly provide a defense to the actual criminal charges against him. Indeed, defendant implicitly concedes as much when he argues that a general verdict here *might* be overturned on appeal if, based on the evidence presented at trial and charges submitted to the jury, there is "[e]ven the mere possibility" that the petit jury relied in some way on a perceived violation of the election law. Opp'n 19 (citing *Yates v. United States*, 354 U.S. 298 (1957)). But whether the jury's verdict would suffer from such a defect will depend on whether and to what degree the People rely on Election Law § 17-152 at trial, *cf. People v. Barnes*, 50 N.Y.2d 375, 379 n.3 (1980) (noting that prosecution may but is not required to specify an intended crime for burglary); how the state court instructs the jury (*see* Opp'n 19 (speculating about what the People "intend[] to argue to the jury")); and whether the jury returns special verdicts or interrogatory responses that could resolve any ambiguity over

---

commit a particular crime as distinct from the general intent to commit crime," "it could easily in revising the Penal Law have inserted the word 'specified' or the word 'particular' between 'a' and 'crime,'" but it did not. *Mackey*, 49 N.Y.2d at 279. The same reasoning applies to Penal Law § 175.10, which refers to "an intent to commit another crime or to aid or conceal the commission thereof" but, like the burglary statute, does not use the word "specified" or "particular" between "another" and "crime." Far from being novel, such a result would reflect nothing more than the application of the well-established interpretive principle that, when the Legislature omits language from a statute, "an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." *People v. Jackson*, 87 N.Y.2d 782, 788 (1996) (quotation marks omitted).

the basis for its verdict (and thus avoid any chance of reversal under *Yates*), *see People v. Ribowsky*, 77 N.Y.2d 284, 290-91 (1991). Given these contingencies, the "mere possibility" (Opp'n 18) that a verdict here may rely on Election Law § 17-152 "is simply too speculative a basis on which to rest a finding of pre-emption." *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990).

Second, even assuming that the People were to focus only on defendant's intent to commit or conceal a violation of Election Law § 17-152, defendant errs in suggesting that preemption of that statute would mean that there would be no underlying crime to support a conviction for falsifying business records in the first degree. Opp'n 19-20. Unlike in other contexts, where a party argues that the effect of federal preemption is to leave an area *un*regulated, *see Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988), here defendant's preemption claim is based on his characterization of the state-law charges as a "backdoor attempt to enforce FECA's campaign contribution regulations." Opp'n 20. But if a state-law "backdoor attempt" is preempted on this basis, then under defendant's own argument the underlying violations of federal "campaign contribution regulations" necessarily remain—including, here, the violations of FECA for which Michael Cohen pleaded guilty and for which defendant was implicated in the information filed in this Court by the United States Attorney's Office for the Southern District of New York. *See* Information ¶¶ 24-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21). Defendant's intent to commit or conceal a violation of a federal crime would satisfy that element of Penal Law § 175.10. Whether Election Law § 17-152 is preempted is thus immaterial for this reason as well.

## III.   This Court Need Not Reach the Parties' Remaining Arguments.

Defendant agrees that "this Court need not decide the question of protective jurisdiction" (Opp'n 26) but nonetheless requests a backup hearing on the issue if this Court were otherwise to

rule in favor of remand. Opp'n 25-26. No such hearing is warranted because the theory of protective jurisdiction provides no basis for removal.

Contrary to defendant's arguments, the People did not "overstate[]" the Supreme Court's holding in *Mesa* (Opp'n 25) by noting that the Court there had rejected protective jurisdiction as a basis for removal under 42 U.S.C. § 1442(a)(1). The only question arguably left open in *Mesa* was whether, as a *constitutional* matter, Congress could theoretically authorize removal on a purely "protective" basis—*i.e.*, based solely on the fact that a defendant was a federal officer, regardless of whether he raised a colorable federal defense. 489 U.S. at 137-38.[10] But the Court squarely rejected such a basis for removal as a *statutory* matter, holding that "[f]ederal officer removal under 28 U.S.C. § 1442(a) *must* be predicated upon averment of a federal defense." *Id.* at 139 (emphasis added). That conclusion definitively rules out defendant's attempt to rely on protective jurisdiction here to avoid remand.

For this reason alone, the Court should reject defendant's backup request for an additional hearing. Opp'n 26. But any such hearing would also be unwarranted because defendant has failed even to allege the necessary factual basis for invoking protective jurisdiction. As the People have explained (Mem. 27), the concerns about "local hostility to federal authority" that have animated theoretical discussions of protective jurisdiction as a basis for removal, *Mesa*, 489 U.S. at 140 (Brennan, J., concurring), require proof of *both* "hostile state prosecutors *and* collaborationist state courts," *id.* at 138 (emphasis added). Defendant has made no effort to argue here that the New York courts are categorically prejudiced against federal authority—an omission that is itself fatal

---

[10] Justice Brennan's suggestion that the majority had "refrain[ed] from deciding" this constitutional question, *Mesa*, 489 U.S. at 140 (Brennan, J., concurring), is questionable, given the majority's explicit conclusion that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes," *id.* at 136.

to any attempt to invoke protective jurisdiction. And his claim that the People here are improperly

motivated by hostility to federal authority is also wholly unsupported.

Separately, as the People previously noted, this Court also "need not reach [the] issue" of

whether the President can be an "officer . . . of the United States" entitled to seek removal under

28 U.S.C. § 1442(a)(1), in light of other, more obvious defects to removal. Mem. 8.[11] Defendant's

lengthy discussion of this topic merely confirms that there is a serious and unresolved question on

this issue. Defendant identifies no precedent directly addressing this question[12]—little surprise,

given the paucity of state-court litigation, especially criminal proceedings, involving current or

former presidents. And defendant acknowledges (in a footnote, Opp'n 5 n.2) that he previously

took the position that the President is *not* an "officer" of the United States under various constitutional

and statutory provisions (Morgan Lewis White Paper 1); this case is different, he contends, because

the meaning of "officer of the United States" must "be determined contextually" and does not have "a

single uniform meaning throughout the Constitution and United States Code." Opp'n 5, 6.

---

[11] Defendant gratuitously accuses the People of "cribb[ing]" this argument from a blog post. No. The Supreme Court cases the People discussed (Mem. 30) are frequently cited in debates over the meaning of "officer of the United States" under Article II. Indeed, in other litigation, defendant himself has relied on those passages from the same Supreme Court cases in discussing the meaning of "officer." *See* Mem. Supp. Donald J. Trump's Mot. to Dismiss 16-17, *Thompson v. Trump*, No. 21-cv-400-APM (D.D.C. May 26, 2021) (quoting *United States v. Mouat*, 124 U.S. 303, 307 (1888), and *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010)) (Ex. 25).

[12] Defendant quotes an unpublished report and recommendation by a magistrate judge in a pro se lawsuit, but the ellipsis in his quotation omits that the hundreds of defendants there included not just the President, Vice President, and former Vice President, but also "129 members of the United States House of Representatives" and "94 United States Senators," *Brunson v. Adams*, 2021 WL 5403892, at *1 (D. Utah Oct. 19, 2021). Perhaps given the sheer number of defendants, neither the plaintiff nor the federal government engaged at all in the question of whether the President specifically qualified as an "officer" under 2 U.S.C. § 1442(a)(1). *See* Motion to Remand, ECF No. 5 (seeking remand based solely on alleged bias and lack of federal-question jurisdiction) & Memorandum Opposing Motion to Remand 1, ECF No. 11 (saying only that defendants included "nearly four hundred current or former federal officers," one of whom was the President), *Brunson v. Adams*, No. 21-00111 (D. Utah Aug. 9 & Aug. 30, 2021).

JA-286

This Court need not and should not wade into this morass. The other arguments for remand raised by the People rest on settled legal doctrines and facts specific to this case—including defendant's own characterizations of the nature and purpose of the charged conduct. Granting remand solely on those grounds would thus be more than sufficient to return this criminal proceeding to the state court where it belongs. And it would avoid embroiling this case in appellate litigation on a novel and unsettled legal issue. This Court should thus order remand based on defendant's failure to identify an act under color of office or any colorable federal defense.

**CONCLUSION**

The People's motion for remand should be granted.

DATED: June 23, 2023             Respectfully submitted,

ALVIN L. BRAGG, JR.
*District Attorney*
*New York County*

By: */s/ Matthew Colangelo*
Matthew Colangelo
Steven C. Wu
Philip V. Tisne
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013
212-335-9000
colangelom@dany.nyc.gov

*Attorneys for the People of the State of New York*