# 24-2299-CV

## United States Court of Appeals

*for the*

## Second Circuit

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellee,*

– v. –

DONALD J. TRUMP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

TODD BLANCHE
EMIL BOVE
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*Attorneys for Defendant-Appellant
President Donald J. Trump*

# Table of Contents

Table of Authorities ............................................................ iii

Introduction .................................................................... 1

Jurisdictional Statement ....................................................... 5

Issues Presented ............................................................... 6

Statement Of The Case ......................................................... 7

   I.    The New York County Indictment ................................... 7

   II.   President Trump's First Removal Notice ............................ 8

   III.  Preemption Litigation In New York County ......................... 9

   IV.   Recusal Litigation In New York County ........................... 10

   V.    Presidential Immunity Litigation In New York County ............. 11

   VI.   DANY's Unconstitutional Official-Acts Evidence At Trial.......... 14

   VII.  New York County Jury Instructions ............................... 15

   VIII. The Supreme Court's Decision In *Trump v. United States* ........ 16

   IX.   Post-Trial Litigation In New York County ........................ 17

   X.    President Trump's Second Removal Notice ......................... 18

Summary Of Argument ........................................................... 19

Standard Of Review ............................................................ 24

Argument ...................................................................... 24

   I.    The District Court Erred By Relying On The § 1455(b)(4) Summary Remand Procedure ........................................ 24

      A.  The Second Removal Notice Satisfied Jurisdictional Requirements ................................................... 25

      B.  Procedural Removal Rules Are Not A Basis For Summary Remand ....................................................... 28

   II.   *Trump v. United States* Was Good Cause For The Second Removal Notice ................................................ 30

      A.  President Trump Is Entitled To A Federal Forum For Presidential Immunity Litigation .............................. 33

      B.  The Supreme Court Superseded Supremacy Clause Immunity Caselaw ....................................................... 34

C. The District Court Ignored The Supreme Court's Relevant Holding ................................................................. 37

D. DANY Contradicted Prior Representations Regarding Presidential Immunity ............................................. 38

  1. Testimony From White House Personnel ........................... 40

  2. President Trump's Official Public Statements Via Twitter .. 42

  3. President Trump's Official Acts In Response To FEC Inquiries .................................................................. 44

  4. Official-Acts Evidence Relating To Investigations By Congress And Prosecutors .................................... 45

  5. President Trump's Official Disclosures On OGE Form 278e 47

III. The District Court Erred By Abstaining From Consideration Of The Remainder Of President Trump's Good-Cause Arguments. 48

  A. There Was No Basis For *Rooker-Feldman* Abstention ............ 48

  B. The District Court's Comity Concerns Were Misplaced .......... 50

IV. The Good-Cause Considerations Ignored By The District Court Further Justified The Second Removal Notice ........................... 53

  A. New Evidence Of Judicial Bias ................................. 53

  B. Irreparable Harm From Election Interference ..................... 58

  C. Potentially Inadequate New York Procedures ..................... 61

  D. Intervening Supreme Court Decisions Supporting FECA Preemption ......................................................... 63

  E. DANY's Contradictory Trial Positions Regarding FECA And Preemption ..................................................... 65

Conclusion .............................................................. 67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agyin v. Razmzan,*
  986 F.3d 168 (2d Cir. 2021) ........................................................ 24, 29

*Air Transp. Ass'n of Am., Inc. v. Cuomo,*
  520 F.3d 218 (2d Cir. 2008) ............................................................. 28

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ........................................................... 27, 59, 65

*Arizona v. Manypenny,*
  451 U.S. 232 (1981) ................................................................. 51, 52

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................ 28

*Badilla v. Midwest Air Traffic Control Serv., Inc.,*
  8 F.4th 105 (2d Cir. 2021) .............................................................. 25

*BP P.L.C. v. Mayor & City Council of Baltimore,*
  141 S. Ct. 1532 (2021) ...................................................................... 6

*Bradford v. Harding,*
  284 F.2d 307 (2d Cir. 1960) ............................................................ 33

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ........................................................................ 41

*Clinton v. Jones,*
  520 U.S. 681 (1997) ........................................................................ 52

*Colorado v. Symes,*
  286 U.S. 510 (1932) ........................................................................ 52

*Comm. of Unsecured Creditors of Color Tile, Inc. v.*
  *Coopers & Lybrand, LLP,*
  322 F.3d 147 (2d Cir. 2003) ............................................................ 31

*Cuomo v. Crane Co.,*
  771 F.3d 113 (2d Cir. 2014) ............................................................ 25

iii

*Davis v. Baldwin*,
   594 F. App'x 49 (2d Cir. 2015) ............................................................ 49

*Doe v. Am. Red Cross*,
   14 F.3d 196 (3d Cir. 1993) .................................................................. 31

*Elrod* v. *Burns*,
   427 U.S. 347 (1976) ........................................................................... 61

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
   544 U.S. 280 (2005) ........................................................................... 48

*FEC v. Democratic Senatorial Campaign Committee*,
   454 U.S. 27 (1981) ............................................................................. 63

*Fritsch v. Swift Transp. Co. of Arizona, LLC*,
   899 F.3d 785 (9th Cir. 2018) ............................................................. 31

*Gibson v. Berryhill*,
   411 U.S. 564 (1973) ........................................................................... 57

*Gonzalez v. Thaler*,
   565 U.S. 134 (2012) ........................................................................... 30

*Green v. R.J. Reynolds Tobacco Co.*,
   274 F.3d 263 (5th Cir. 2001) ............................................................. 31

*Hoblock v. Albany Cnty. Bd. of Elections*,
   422 F.3d 77 (2d Cir. 2005) ................................................................ 24

*Hunter v. McMahon*,
   75 F.4th 62 (2d Cir. 2023) ................................................................ 49

*In re Neagle*,
   135 U.S. 1 (1890) ........................................................................ *passim*

*Isaacson v. Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008)......................................................... 27, 33

*Jefferson Cnty., Ala. v. Acker*,
   527 U.S. 423 (1999) ........................................................................... 37

*Kansas v. Gilbert*,
   2023 WL 2397025 (10th Cir. 2023).................................................... 24

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
    928 F.3d 226 (2d Cir. 2019) ........................................ 42

*Kruebbe v. Beevers*,
    692 F. App'x 173 (5th Cir. 2017) ............................... 29

*Lance v. Dennis*,
    546 U.S. 459 (2006) ................................................... 49

*Landmark Commc'ns v. Virginia*,
    435 U.S. 829 (1978) ................................................... 59

*League of Women Voters of N. Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................... 61

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ........................................ *passim*

*Mayor & Aldermen of City of Nashville v. Cooper*,
    73 U.S. 247 (1867) ..................................................... 52

*Mesa v. California*,
    489 U.S. 121 (1989) ........................................... *passim*

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012) ................................................... 50

*Myers v. United States*,
    272 U.S. 52 (1926) ..................................................... 40

*New York v. Tanella*,
    374 F.3d 141 (2d Cir. 2004) .............................. 35, 36

*New York v. Trump*,
    683 F. Supp. 3d 334 (S.D.N.Y. 2023) ......... 9, 35, 37, 64

*Niagara Mohawk Power Corp. v. Hudson River-Black Regulating Dist.*,
    673 F.3d 84 (2d Cir. 2012) ....................................... 48

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ................................................... 42

*Pennsylvania v. Haring*,
    2022 WL 17076037 (3d Cir. 2022) .......................... 29

*Republican Party of Minnesota v. White,*
    536 U.S. 765 (2002) ............................................................... 59

*Rooker v. Fid. Tr. Co.,*
    263 U.S. 413 (1923) .......................................................... 48, 49

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) .......................................................... 41, 44

*Snyder v. Phelps,*
    562 U.S. 443 (2011) .......................................................... 41, 60

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................... 60

*Tennessee v. Davis,*
    100 U.S. 257 (1879) ............................................................... 33

*Teper v. Miller,*
    82 F.3d 989 (11th Cir. 1996) ............................................... 63

*Texas v. Kleinert,*
    855 F.3d 305 (5th Cir. 2017) ............................................... 34

*Trump v. Anderson,*
    601 U.S. 100 (2024) ...................................................... 22, 63, 64

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................... 43

*Trump v. Mazars USA, LLP,*
    591 U.S. 848 (2020) ............................................................... 46

*Trump v. Merchan,*
    2024 WL 4152277 (N.Y. Sept. 12, 2024) ........................... 59

*Trump v. Merchan,*
    227 A.D.3d 569 (1st Dep't 2024) ............................... 11, 13, 61

*Trump v. United States,*
    144 S. Ct. 1027 (2024) ...................................................... 12, 13

*Trump v. United States,*
    144 S. Ct. 2312 (2024) .................................................... *passim*

*Trump v. Vance,*
591 U.S. 786 (2020) ............................................................ 33, 52, 53, 60

*Trump v. Vance,*
941 F.3d 631 (2d Cir. 2019) ................................................. 51

*United States v. Aron,*
98 F.4th 879 (7th Cir. 2024) ................................................ 32

*United States v. Klein,*
80 U.S. 128 (1871) .............................................................. 46

*United States v. Nixon,*
418 U.S. 683 (1974) ............................................................ 41

*United States v. Ruiz,*
536 U.S. 622 (2002) ............................................................ 50

*Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976) ............................................................ 60

*White v. Wellington,*
627 F.2d 582 (2d Cir. 1980) ................................................. 52

*Willingham v. Morgan,*
395 U.S. 402 (1969) ........................................................ 25, 37

*WinRed, Inc. v. Ellison,*
59 F.4th 934 (8th Cir. 2023) ................................................ 63

## Statutes & Other Authorities:

U.S. Const. art. II, § 2, cl. 1 ..................................................... 42

28 U.S.C. § 1257 ...................................................................... 62

28 U.S.C. § 1291 ........................................................................ 5

28 U.S.C. § 1442 ...................................................................... 33

28 U.S.C. § 1442(a)(1) ........................................................ *passim*

28 U.S.C. § 1446(b) ................................................................. 31

28 U.S.C. § 1447(d) ................................................................... 5

vii

28 U.S.C. § 1450 ................................................................ 58

28 U.S.C. § 1455 ................................................................ 29

28 U.S.C. § 1455(a) ...................................................... 25, 26

28 U.S.C. § 1455(b)(1) ................................................ *passim*

28 U.S.C. § 1455(b)(2) ................................................ *passim*

28 U.S.C. § 1455(b)(4) ................................................ *passim*

28 U.S.C. § 1455(b)(5) ................................................ 20, 30

3 U.S.C. § 105(a)(1) .......................................................... 40

52 U.S.C. § 30101 .............................................................. 8

52 U.S.C. § 30143 .............................................................. 9

52 U.S.C. § 30143(a) ................................................ 63, 64, 67

5 C.F.R. § 2634.104(a) ...................................................... 47

11 C.F.R. § 108.7 .......................................................... 9, 63

11 C.F.R. § 108.7(c)(4) ...................................................... 10

1 Annals of Cong. 463 (1789) ............................................ 44

CPL § 255.10(1) ................................................................ 12

CPL § 255.20 .................................................................... 12

CPL § 255.20(1) ................................................................ 12

CPL § 255.20(3) ................................................................ 12

Fed. R. Civ. P. 54(b) .......................................................... 32

Fed. R. Crim. P. 1(a)(4) ...................................................... 28

Fed. R. Crim. P. 12(c)(3) .................................................... 32

M. Pomerantz, *People vs. Donald Trump: An Inside Account* (2023) ...... 7

N.Y. Election Law 17-152 ............................................ *passim*

N.Y. Penal Law § 175.05 .................................................. 7, 8

N.Y. Penal Law § 175.10 .............................................. *passim*

viii

N.Y. Tax Law § 1801(a)(3) ........................................................................8

N.Y. Tax Law § 1802 .................................................................................8

## Introduction

This case presents complex first-impression issues relating to the Supremacy Clause, federal-officer removal, appearances of impropriety and conflicts in connection with an unprecedented and baseless prosecution of the leading candidate in the 2024 Presidential election, and the ability of future Presidents to serve the American people without fear of reprisal from hostile local officials. In a rushed and conclusory summary remand order issued without adversarial briefing or a required hearing, the district court ignored most of these issues based on a misapplication of the *Rooker-Feldman* doctrine, and engaged in profoundly flawed analysis with respect to the issues that it chose to address. Reversal is necessary, and removal is appropriate.

The underlying proceedings arise from a politically motivated investigation by the Manhattan District Attorney's Office ("DANY"), dubbed the "zombie case" by former Special Assistant District Attorney Mark Pomerantz because DANY refused to abandon efforts to target President Trump until star witness, felon, and serial perjurer Michael Cohen—bolstered by other financially motivated witnesses such as Stormy Daniels—concocted the type of false and implausible story

President Trump's political opponents wanted to hear. In 2023, the district court granted DANY's remand motion in response to President Trump's initial removal notice, under 28 U.S.C. § 1442(a)(1), based on federal defenses involving immunity and preemption (the "First Removal Notice").

Subsequent to the remand, DANY litigated the case in New York County in a manner that directly contradicted the representations they made to the district court in connection with the First Removal Notice. DANY did so by offering evidence of President Trump's official Presidential acts during the trial, and by requiring the jury to evaluate the type of complex federal campaign finance issues that the Federal Election Campaign Act ("FECA") expressly preempts.

During the remanded proceedings, the Supreme Court issued three intervening opinions that support President Trump's position regarding removal, including his federal defenses. The most significant of the three, *Trump v. United States*, was decided after the New York County trial. The decision established a broad Presidential immunity defense to criminal prosecutions with features, such as mandatory exclusion of official-acts evidence, that had not previously been recognized—not by

2

the district court in 2023, not by DANY at any point, and not by the presiding judge in the New York County case, Acting Justice Juan Merchan. To preserve his state-law rights, President Trump filed a motion to dismiss DANY's case in New York County based on Presidential immunity violations, which was not fully briefed until July 31, 2024. That motion is still pending.

On August 13, 2024, Justice Merchan denied a recusal motion that was based on, among other key issues, 2019 evidence indicating that he previously criticized President Trump's use of Twitter, which is a central issue in the Presidential immunity motion. Justice Merchan also made improper political contributions in 2020 to groups opposed to President Trump and his candidacy in the 2020 election, including "Stop Republicans," which described its purpose as "resisting the Republican Party and Donald Trump's radical right-wing legacy." In addition, evidence emerged that a company partially owned and operated by Justice Merchan's daughter, Authentic Campaigns, Inc. ("Authentic"), received millions of dollars from political opponents of President Trump who have been soliciting donations based on DANY's prosecution of President Trump in front of Justice Merchan.

3

Justice Merchan's daughter has a longstanding relationship with Vice President Harris, President Trump's opponent in the 2024 election. She was a senior staffer for Harris's failed 2020 Presidential campaign, and Harris's current Presidential campaign made at least one publicly disclosed disbursement to Authentic in July 2024 while the Presidential immunity motion was pending. President Trump is subject to an unlawful prior restraint regarding these issues because, following the New York County trial, despite no conceivable risk to the integrity of any remaining proceedings in that case, Justice Merchan insisted on maintaining an unconstitutional gag order that restricts President Trump's First Amendment-protected campaign speech and impedes his ability to respond to political attacks based on DANY's case from the Harris-Walz Campaign, Democrats in Congress, and other political adversaries.

On August 29, 2024, based on the foregoing considerations—intervening Supreme Court decisions, DANY's mischaracterizations and shifting positions, judicial bias, and the apparent inadequacy of state-law procedures to allow Presidential immunity litigation as required by the Supreme Court—President Trump filed a new removal notice pursuant

4

to § 1442(a)(1) (the "Second Removal Notice"). Two business days later, on September 3, the district court issued a conclusory summary remand order that misapplied binding precedent and statutory removal procedure, ignored key evidence supporting the Second Removal Notice, and misapprehended the obligation of federal courts to provide an unbiased federal forum for fair litigation of federal defenses pursuant to the federal-officer removal statute.

The district court's rulings cannot withstand scrutiny and must be reversed. President Trump is entitled to removal so that he can seek appropriate relief pursuant to applicable federal procedures based on DANY's violations of the Presidential immunity doctrine and FECA's preemption clause.

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. § 1442(a)(1). On September 3, 2024, the district court entered a final summary remand order pursuant to 28 U.S.C. § 1455(b)(4). President Trump timely filed a notice of appeal on the same day.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d), and that jurisdiction extends to all aspects of the district court's summary

5

remand order and the grounds for removal encompassed in the Second Removal Notice. *See BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1537-38, 1543 (2021).

## Issues Presented

1. Whether the district court erred by relying on the summary remand procedure, 28 U.S.C. § 1455(b)(4), to address the good-cause requirements set forth at 28 U.S.C. § 1455(b)(1)-(2) without adversarial briefing or a hearing.

2. Whether the district court erred by concluding that "[n]othing" in *Trump v. United States*, 144 S. Ct. 2312 (2024), affected President Trump's Presidential immunity defense.

3. Whether the district court erred by invoking the *Rooker-Feldman* doctrine to avoid consideration of the remaining good-cause arguments in the Second Removal Notice.

4. Whether the Second Removal Notice established good cause for the timing and any new grounds for removal under 28 U.S.C. § 1455(b)(1)-(2).

5. Whether the Second Removal Notice established that removal was appropriate under 28 U.S.C. § 1442(a)(1).

6

## Statement Of The Case

### I.    The New York County Indictment

On March 30, 2023, a New York County grand jury returned an Indictment charging President Trump with 34 alleged violations of falsifying business records in the first degree, in violation of N.Y. Penal Law § 175.10.  JA-23.[1]  The charges were based on records from 2017, created while President Trump was serving his first term as President. Although former Special Assistant District Attorney Mark Pomerantz was so committed to unjustly charging President Trump that he resigned in protest when charges were not filed on his preferred timetable, even Pomerantz believed that this "zombie case" "did not amount to much in legal terms."  M. Pomerantz, *People vs. Donald Trump: An Inside Account* 40-41 (2023).

DANY sought to create felonies out of their misdemeanor business-records allegations, *see* N.Y. Penal Law § 175.05, by arguing that the "intent to defraud includes an intent to commit *another crime* or to aid or conceal the commission thereof," N.Y. Penal Law § 175.10 (emphasis

---

[1] Citations to "JA-" are to the Joint Appendix, and citations to "SPA-" are to the Special Appendix.  Unless otherwise indicated, all case citations omit internal quotations and internal citations.

7

added).  JA-23.  In a Bill of Particulars, DANY asserted that the alleged

predicate offenses—the "another crime[s]"—that they would rely upon at

trial "may include" violations of N.Y. Election Law ("NYEL") § 17-152,

N.Y. Tax Law §§ 1801(a)(3) and 1802, N.Y. Penal Law §§ 175.05 and

175.10, and FECA, 52 U.S.C. § 30101 *et seq*.  JA-114.

## II.    President Trump's First Removal Notice

On May 4, 2023, President Trump filed the First Notice of Removal

in the Southern District of New York pursuant to 28 U.S.C. § 1442(a)(1).

President Trump argued that removal was appropriate because DANY's

Indictment related to acts "under color" of the Presidency, *id.*, including

alleged actions that occurred while President Trump "was President of

the United States."  JA-11, 122.  The First Removal Notice also identified

federal defenses based on immunity and FECA preemption, and argued

that the district court should exercise protective jurisdiction because the

prosecution was politically motivated.  JA-15-18.

On May 30, 2023, DANY moved to remand the case.  DANY argued

that there was "no connection" between their allegations and President

Trump's official acts, and "no clear support" for the immunity defense.

JA-189, 197, 214.  Regarding preemption, DANY argued that N.Y. Penal

8

Law § 175.10 and FECA "target different conduct" and "do not cover the same domains." JA-221. DANY also contended that preemption was not a viable federal defense because they might not even "rely" on NYEL § 17-152 at trial. JA-282.

The district court remanded the case on July 19, 2023. *New York v. Trump*, 683 F. Supp. 3d 334 (S.D.N.Y. 2023). Based on DANY's representations in briefing and at an evidentiary hearing on June 27, 2023, the district court held that the prosecution did not relate to Presidential acts "under color of such office," 28 U.S.C. § 1442(a)(1). *See New York*, 683 F. Supp. 3d at 346. The district court also held that immunity was "not a colorable defense" to DANY's charges. *Id.* at 347. In this regard, the district court relied on FEC regulations at 11 C.F.R. § 108.7, which purport to interpret FECA's preemption provision, *see* 52 U.S.C. § 30143, and reasoned that "NYEL § 17-152 does not fit into any of the three categories of state law that FECA preempts." *New York*, 683 F. Supp. 3d at 346-47, 350.

## III. Preemption Litigation In New York County

On September 29, 2023, President Trump moved to dismiss DANY's Indictment based on preemption and other grounds. JA-528-29. DANY

9

asked Justice Merchan to follow the district court's ruling. JA-448. Justice Merchan obliged. JA-574. Similar to the district court, Justice Merchan reasoned that "there is no preemption by FECA in this matter" because, as interpreted by the FEC at 11 C.F.R. § 108.7(c)(4), FECA "does not affect the states' rights to pass laws concerning voter fraud and ballot theft"—neither of which was alleged by DANY. JA-575.

## IV. Recusal Litigation In New York County

President Trump moved to recuse Justice Merchan three times. JA-455. Despite conflicts and appearances of impropriety that have escalated as the 2024 Presidential election approaches, Justice Merchan denied each motion.

The second motion, filed on April 3, 2024, included a 32-page evidentiary affirmation that established, *inter alia*, the following:

- Based on public disclosures relating to the 2024 Presidential election, clients of Authentic—where Justice Merchan's daughter is a senior executive and partner—were actively advocating against President Trump and soliciting political contributions based on DANY's prosecution before Justice Merchan. *E.g.*, JA-1038-44, 1068-74.

- Authentic clients, including those soliciting political contributions based on developments in the New York County proceedings, had disbursed more than $18 million to Authentic since Justice Merchan began presiding over DANY's case. JA-1056.

- Under the leadership of Justice Merchan's daughter, Authentic was actively marketing itself based on services to President Trump's opponents and attacks on President Trump. JA-1059-61.

- Justice Merchan's daughter was a senior staffer on Vice President Harris's 2020 Presidential campaign and made social media posts critical of President Trump when he left the White House in 2020. JA-1064-67, 1087-89.

- In a 2019 podcast, Justice Merchan's daughter discussed a conversation that she had with Justice Merchan in which they were critical of President Trump's use of Twitter during his first term in Office. JA-1065.

Justice Merchan denied the recusal motion by mischaracterizing President Trump's evidence as "innuendos and unsupported speculation." JA-731. Prior to that ruling, President Trump relied on the same evidence to challenge Justice Merchan's failure to recuse through an Article 78 proceeding in New York's Appellate Division, First Department. The First Department asserted that the challenge was "not ripe at the time of filing" and that any review "may occur in a direct appeal." *Trump v. Merchan*, 227 A.D.3d 569, 570 (1st Dep't 2024).

## V.    Presidential Immunity Litigation In New York County

Prior to the New York County trial, on March 7, 2024, President Trump submitted a motion seeking an adjournment and preclusion of evidence relating to his "official acts" based on the Presidential immunity

11

doctrine. JA-783-84. The motion was precipitated by (1) the Supreme Court's February 28, 2024 order granting certiorari (and scheduling argument for the week of April 22, 2024) to address "[w]hether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office," *Trump v. United States*, 144 S. Ct. 1027 (2024); and (2) a February 22, 2024 motion *in limine* in which DANY argued that evidence relating to President Trump's official acts was admissible because they believed it was relevant to a so-called "pressure campaign" relating to their star witness, Michael Cohen. JA-783-84.

On April 3, 2024, Justice Merchan denied the Presidential immunity motion by erroneously adopting DANY's legally indefensible argument that the motion was untimely under CPL § 255.20(1). JA-825.[2] On April 10, 2024, President Trump challenged the Presidential immunity ruling in the same Article 78 petition in which he sought

_____

[2] In addition to being an abuse of discretion given the significance of the Constitutional issues at stake, *see* CPL § 255.20(3), Justice Merchan's reliance on DANY's timeliness argument was erroneous because CPL § 255.20 applies only to "Pre-trial motions," which is a statutory term that expressly did not include President Trump's motion to preclude official-acts evidence. *See* CPL § 255.10(1).

review of Justice Merchan's refusal to recuse himself. The First Department dismissed the petition based in part on the position—which is inconsistent with the U.S. Supreme Court's subsequent decision in *Trump v. United States*—that President Trump would have to wait to challenge the ruling until a "direct appeal." *Merchan*, 227 A.D.3d at 571.

On April 15, 2024, President Trump again argued to Justice Merchan that Presidential immunity barred certain of the evidence DANY planned to offer at trial. JA-734-35, 831. DANY responded with assertions that the Supreme Court has since explicitly rejected. They argued, for example, that "presidential immunity from criminal liability does not exist," and that "there is no corresponding evidentiary privilege." JA-834.

Justice Merchan adopted DANY's arguments and advised that it would be "hard to convince me" that President Trump's public statements "somehow constitute an official presidential act." JA-735. The Supreme Court has since stated the opposite. Following an exchange of written submissions, Justice Merchan stated that his Presidential immunity ruling "remain[ed] the same," and "will not be addressed any further,"

but that defense counsel could raise Presidential immunity objections during the trial.  JA-736.

## VI. DANY's Unconstitutional Official-Acts Evidence At Trial

During the trial, notwithstanding DANY's prior representations to the district court in connection with the First Removal Notice, Justice Merchan permitted DANY to offer at least five categories of evidence relating to President Trump's official acts.

Former White House Communications Director Hope Hicks and Executive Assistant Madeleine Westerhout testified about President Trump's activities in the Oval Office in 2017 and 2018.  JA-737-41, 744-55.  DANY presented evidence of five official statements by President Trump via Twitter in 2018.  JA-862, 1119-28.  DANY used Cohen to present evidence relating to President Trump's strategy and response relating to inquiries by the FEC—an Executive branch agency under the President's supervision—and alleged conversations with then-Attorney General Jeff Sessions.  JA-758-60.  DANY presented official-acts evidence relating to President Trump's public responses to investigations by Congress and federal prosecutors, and his alleged deliberations relating to the pardon power.  JA-756-57.  DANY also offered evidence concerning

President Trump's financial disclosures relating to 2017 on Office of Government Ethics ("OGE") Form 278e.  JA-1134-35.

## VII.  New York County Jury Instructions

During the trial, on May 13, 2024, DANY submitted proposed jury instructions that narrowed their felony-predicate theory under N.Y. Penal Law § 175.10 to focus exclusively on NYEL § 17-152.  JA-665-66. Contrary to DANY's arguments to the district court, JA-218-21, DANY sought extensive instructions regarding the elements of NYEL § 17-152 and FECA's restrictions on campaign contributions, JA-665-68.

In a subsequent submission, DANY objected to President Trump's request that the jury be required to make unanimous findings in special interrogatories regarding any findings on "unlawful means" under NYEL § 17-152.  JA-712.  Despite DANY's suggestion to the district court that special interrogatories would be appropriate, JA-282, they argued at the charge conference that Justice Merchan would need to "rewrite the law" in order to require unanimous findings regarding "unlawful means" under NYEL § 17-152, JA-776.

Justice Merchan instructed the jury in a manner that was largely consistent with DANY's requests, including their exclusive reliance on

15

NYEL § 17-152 as a felony predicate for the Penal Law § 175.10 charges and their proposed definitions of FECA's limitations on individual and corporate contributions.  JA-777-79.

## VIII. The Supreme Court's Decision In *Trump v. United States*

After the jury returned disputed guilty verdicts on the 34 counts in the Indictment on May 30, 2024, the Supreme Court issued an opinion on July 1, 2024 in *Trump v. United States*, 144 S. Ct. 2312 (2024), which rejected several of the positions DANY took in the district court in connection with the First Removal Notice and during subsequent proceedings in New York County.

First, President Trump is entitled to "absolute" immunity from prosecution "with respect to the President's exercise of his core constitutional powers."  *Trump v. United States*, 144 S. Ct. at 2327. President Trump is also entitled to "at least a presumptive immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility."  *Id.* at 2331.  This outer perimeter "cover[s]" Presidential actions "so long as they are not manifestly or palpably beyond [his] authority."  *Id.* at 2333.

16

Second, the Supreme Court held that it would "eviscerate" Presidential immunity if prosecutors could—as DANY did in grand jury proceedings and at President Trump's trial—"invite the jury to examine acts for which a President is immune from prosecution to nonetheless prove his liability on any charge." *Trump v. United States*, 144 S. Ct. at 2340-41.

Third, the Supreme Court also held that there is a "need for pretrial review" of Presidential immunity arguments, and "a district court's denial of immunity would be appealable before trial." *Trump v. United States*, 144 S. Ct. at 2343.

## IX. Post-Trial Litigation In New York County

On July 10, 2024, President Trump moved to dismiss the Indictment and vacate the jury's verdicts based on the Presidential immunity doctrine, *Trump v. United States*, and DANY's use of official-acts evidence in grand jury proceedings and at trial. JA-846.

On July 31, 2024, President Trump submitted a reply in further support of the Presidential immunity motion, as well as a third recusal motion. JA-972, 1101. The recusal motion incorporated proof from the prior motions, and emphasized two new arguments:

- President Trump's 2018 Tweets were central to the Presidential immunity motion, and the above-described 2019 podcast involving Justice Merchan's daughter indicated that Justice Merchan was biased against President Trump's use of Twitter while he was in Office. JA-1101.

- Justice Merchan's daughter and Authentic had close ties to Vice President Harris, who had emerged by the time of the third recusal motion as President Trump's direct opponent in the 2024 Presidential election. Harris, as well as running mate Governor Tim Walz and other opponents of President Trump, have emphasized proceedings conducted by Justice Merchan as a significant campaign theme. JA-1101.

Justice Merchan denied the third recusal motion on August 13, 2024. JA-1112. Despite the significance of President Trump's Tweets to the recently filed Presidential immunity motion, and Vice President Harris's emergence as the Democrat Party nominee in the rapidly approaching 2024 Presidential election, Justice Merchan ruled that President Trump's concerns were based on "innuendo" and asserted—wrongly—that the third motion included "nothing new." JA-1114.

## X.    President Trump's Second Removal Notice

On the evening of Thursday, August 29, 2024, President Trump filed the Second Removal Notice in the district court. JA-433. On September 3, 2024, after Labor Day weekend, President Trump refiled the Second Removal Notice with a formal motion based on guidance from

18

the district court's clerk's office. JA-1139-40. U.S. District Court Judge Alvin K. Hellerstein erroneously denied the motion, issuing a summary remand order based on 28 U.S.C. § 1455(b)(4) on the same day. SPA-1.

## Summary Of Argument

President Trump is entitled to a federal forum to seek relief based on federal constitutional defenses rooted in structural protections for the institution of the Presidency and the Supremacy Clause. This unprecedented case presented an extraordinary combination of factors that warranted post-trial removal pursuant to the Second Removal Notice. In concluding otherwise, the district court committed numerous legal errors.

The Second Removal Notice satisfied the jurisdictional and procedural requirements for federal-officer removal. As to jurisdiction, the Notice established that DANY's case related to acts "under color" of the Presidency because DANY had relied on evidence of President Trump's official acts in grand jury proceedings and at the New York County trial. 28 U.S.C. § 1442(a)(1). The Notice also set forth colorable federal defenses based on Presidential immunity and FECA preemption. Regarding procedure, the Second Removal Notice devoted 12 pages to

19

discussion of six considerations that, collectively, established good cause as to the timing and substance of the Notice.  *See* 28 U.S.C. § 1455(b)(1)-(2).

The district court erred by relying on the summary remand procedure in § 1455(b)(4) to issue a conclusory decision, on a highly expedited basis, in response to President Trump's good-cause showings under § 1455(b)(1)-(2).  The court hardly addressed President Trump's grounds for good cause, and did not establish that remand was "clearly" appropriate.  28 U.S.C. § 1455(b)(4).  In any event, the good-cause requirements are procedural rather than substantive, and thus had to be raised by DANY—or waived—in a remand motion.  Therefore, the requirements of § 1455(b)(1)-(2) are not subject to *sua sponte* screening by the district court without adversarial briefing and the hearing required by § 1455(b)(5).

The reasoning in the district court's ruling was also deeply flawed. The court began by mischaracterizing the Second Removal Notice as presenting only "two grounds" for good cause: Presidential immunity and an "improper trial."  The district court ignored the significance and key features of *Trump v. United States* and proceeded to a merits analysis of

20

the Presidential immunity defense, which was wholly improper in the context of threshold removal proceedings and ended with the entirely incorrect assertion that "[n]othing" in the Supreme Court's post-trial decision impacted the district court's prior remand ruling.

The district court mischaracterized the remaining good-cause factors identified by President Trump by attempting to fit them into a single, contrived "improper trial" category, and then declined to consider any of them by wrongly invoking *Rooker-Feldman* abstention. The *Rooker-Feldman* doctrine was not applicable because the New York County proceedings are ongoing and have not resulted in a final judgment. The district court seems to have been concerned about comity and federalism, but those concepts do not support the court's refusal to address issues such as judicial bias and hostility where that evidence is relevant to good cause under § 1455(b)(1)-(2). Just the opposite. Removed proceedings do not infringe on states' interests in enforcing their criminal laws; removal simply allows litigation under substantive state laws pursuant to federal procedures. To refrain from consideration of such evidence undercuts the purpose of federal officer removal, which

is to provide an unbiased forum, free from local hostilities, for litigation of federal defenses.

Finally, the Second Removal Notice established "good cause" under § 1455(b)(1)-(2), and that removal is appropriate pursuant to § 1442(a)(1). The Presidential immunity defense is viable and requires federal relief because the intervening decision in *Trump v. United States* establishes that DANY's use of official-acts evidence in grand jury proceedings and at trial violated the Constitution and threatens the ability of all future Presidents to fulfil that role with the vigor and energy contemplated by the Framers. President Trump's efforts to litigate that defense in New York County have been severely undermined by conflicts of interest and appearances of impropriety faced by Justice Merchan, including evidence of judicial bias toward President Trump's use of Twitter, which is one of the main types of evidence subject to the Presidential immunity defense.

Similar to Presidential immunity, the FECA preemption defense is supported by the Supreme Court's intervening decisions in *Trump v. Anderson*, 601 U.S. 100 (2024) and *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), and DANY's trial theory contradicted material

22

preemption-related representations that it made to the district court to achieve remand in 2023. Based on these developments, DANY's state-law charges seeking to regulate federal campaign finance issues relating to the 2016 election are void under FECA's express preemption provision and the Supremacy Clause.

New York's appellate courts have thus far declined to provide a mechanism for substantive review of these problems. The First Department has wrongly asserted that Presidential immunity litigation must wait until direct appeal, which directly contradicts *Trump v. United States*. The First Department issued a similarly unjust ruling, which implicates the Due Process Clause, regarding Justice Merchan's conflicts. New York's Court of Appeals ruled that an unconstitutional post-trial gag order targeting President Trump's campaign speech and resulting in irreparable First Amendment harm somehow does not present a Constitutional issue.

For all of these reasons, the district court's *sua sponte* ruling was erroneous, and this Court should remand the matter with instructions that § 1442(a)(1) removal is appropriate, and that President Trump must

be allowed to seek relief based on Presidential immunity and FECA preemption pursuant to applicable federal procedures.

## Standard Of Review

This Court "review[s] an appeal from an order of remand *de novo*." *Agyin v. Razmzan*, 986 F.3d 168, 173-74 (2d Cir. 2021); *Kansas v. Gilbert*, 2023 WL 2397025, at *1 (10th Cir. 2023) (unpublished opinion) (conducting de novo review of district court's § 1455(b)(1)-(2) rulings).

"Because *Rooker-Feldman* goes to subject-matter jurisdiction," this Court also "review[s] de novo the district court's application of the doctrine." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 83 (2d Cir. 2005).

## Argument

## I. The District Court Erred By Relying On The § 1455(b)(4) Summary Remand Procedure

The district court issued a conclusory summary remand order less than three business days after President Trump filed the 64-page Second Removal Notice, which included over 600 pages of exhibits. The order was procedurally improper, as well as substantively meritless, and issued on the type of "highly expedited basis" that the Supreme Court criticized in *Trump v. United States*. *See* 144 S. Ct. at 2332; *see also id.* at 2346

24

(referring to "expedited treatment in the lower courts and in this Court," "[d]espite the unprecedented nature of this case, [and] the significant constitutional questions that it raises").

## A. The Second Removal Notice Satisfied Jurisdictional Requirements

"The Supreme Court has cautioned that the scope of the federal officer removal statute 'is not narrow or limited.'" *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)). President Trump was only required to provide "a short and plain statement of the grounds for removal." 28 U.S.C. § 1455(a). The pertinent grounds for removal are that the local prosecution is "for or relating to any act under color of [federal] office," 28 U.S.C. § 1442(a)(1), and the case involves an "allegation of a colorable federal defense." *Mesa v. California*, 489 U.S. 121, 129 (1989). These requirements are to be applied "broadly," and § 1442(a)(1) is to be construed "liberally." *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 120 (2d Cir. 2021); *see also Willingham*, 395 U.S. at 407 ("Th[e] policy [of providing the protection of a federal forum to federal officers] should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).").

25

The Second Removal Notice met the jurisdictional requirements of § 1442(a)(1), and was filed in compliance with § 1455(a). In 2023, DANY assured the district court that their prosecution did not "relat[e]" to acts by President Trump "under color" of the Presidency for purposes of § 1442(a)(1). JA-210. In 2024, DANY contradicted that representation at trial by seeking to prove their case through evidence of President Trump's official acts, including evidence relating to President Trump's communications with White House advisors and the Attorney General, his management style in the Oval Office, his official public statements, and his handling of investigations by Executive Branch agencies he oversaw as President. *See infra* Part II.D. The Second Removal Notice established that, by offering the official-acts evidence over President Trump's objection, DANY made their case one that "relat[ed]" to "act[s] under color" of the Presidency. 28 U.S.C. § 1442(a)(1). JA-463-69.

The Second Removal Notice also presented two "colorable" federal defenses. *Mesa*, 489 U.S. at 129. First, based on the Supreme Court's intervening decision in *Trump v. United States*, which was decided after the New York County trial, President Trump argued that DANY had

violated the Presidential immunity doctrine by relying on official-acts evidence in grand jury proceedings and at trial. JA-470-75.

Second, President Trump argued that DANY's charges, as presented during the trial, were preempted by FECA. In support of the preemption defense, President Trump relied on the Supreme Court's intervening decisions in *Anderson* and *Loper Bright*, as well as DANY's decision to submit complex federal campaign finance questions to the New York County jury in violation of FECA's express preemption clause—which also contradicted their 2023 representations to the district court in connection with the First Removal Notice. JA-475-86.

President Trump's Presidential immunity and preemption defenses were both based on changed circumstances since the First Removal Notice and sufficiently "colorable" to warrant removal under § 1442(a)(1). *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 139 (2d Cir. 2008). The substantive "validity" of those defenses "is a distinct subject" that "involves wholly different inquiries" that have "no connection whatever with the question of jurisdiction." *Mesa*, 489 U.S. at 129.

That said, the imperative for removal to provide an unbiased federal forum is supported by the fact that both defenses warrant relief

27

under applicable federal procedural and Constitutional rules. *See, e.g.*, Fed. R. Crim. P. 1(a)(4). As to Presidential immunity, courts may not even "adjudicate" a prosecution, like DANY's, that "examines . . . Presidential actions." *Trump v. United States*, 144 S. Ct. at 2328. FECA preemption, based on express and occupied-field theories, "invalidates" the New York statutes on an as-applied basis because DANY attempted to use those laws to regulate the 2016 Presidential election during the New York County trial. *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) (holding that state laws that impose regulations in a federally occupied field "must . . . give way" and are "displace[d]" by federal law). For all of these reasons, the Second Removal Notice satisfied the jurisdictional requirements of §§ 1442(a)(1) and 1455(a).

## B. Procedural Removal Rules Are Not A Basis For Summary Remand

The district court erred by invoking the § 1455(b)(4) summary remand procedure in an order relating to the "good cause" requirements of § 1455(b)(1)-(2). SPA-1, 4 (citing and quoting § 1455(b)(4)).

28

Subparagraphs (b)(1)-(2) of § 1455 set forth non-jurisdictional "procedures pursuant to which actions may be removed." *Pennsylvania v. Haring*, 2022 WL 17076037, at *1 (3d Cir. 2022) (unpublished opinion); *see also Kruebbe v. Beevers*, 692 F. App'x 173, 176 (5th Cir. 2017) (reasoning that, "as the provision's heading and plain language indicate, § 1455 merely provides procedures that must be followed"). Procedural requirements for removal are waivable. *See Agyin*, 986 F.3d at 182 ("[I]f an opposing party does not object to an untimely notice of removal by timely filing a motion to remand, the objection is waived."). In contrast, the substantive removal provision relied upon by President Trump, § 1442(a)(1), is "a pure jurisdictional statute" with requirements that bear directly on district courts' subject-matter jurisdiction. *Mesa*, 489 U.S. at 136. So too does the federal defense requirement for removal under § 1442(a)(1), which addresses district courts' Article III "'arising under' jurisdiction." *Id.* at 136. The screening function contemplated by § 1455(b)(4) is addressed to these jurisdictional requirements. That interpretation of § 1455(b) is consistent with the fact that federal courts are "obligated" to "consider *sua sponte*" their own subject-matter

29

jurisdiction, including issues "that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

Particularly in light of the 12 pages of argument devoted to "good cause" in the Second Removal Notice, JA-482-94, it was not apparent for purposes of the summary remand provision—much less "clearly" so—that removal "should not be permitted." 28 U.S.C. § 1455(b)(4). For example, the district court did not even mention preemption in the summary remand order, and the court addressed Presidential immunity in a superficial and erroneous fashion. *See infra* Parts II, III. Accordingly, the district court erred by invoking § 1455(b)(4) to rule on the separate procedural requirements in § 1455(b)(1)-(2) without adversarial briefing and the "evidentiary hearing" required by § 1455(b)(5).

## II. *Trump v. United States* Was Good Cause For The Second Removal Notice

The district court's improper summary remand relied on cursory and erroneous treatment of first-impression Presidential immunity issues that established good cause for purposes of § 1455(b)(1)-(2). The timing of the Second Removal Notice was justified by the fact that the Supreme Court decided *Trump v. United States* after the district court's

2023 remand order and following the New York County trial. *See* 28 U.S.C. § 1455(b)(1). There was also good cause under § 1455(b)(2) because the Presidential immunity defense established in the Supreme Court's decision did not "exist at the time of the filing" of the First Removal Notice. *Id.* § 1455(b)(2).

"An intervening change in the law that gives rise to a new basis for subject-matter jurisdiction qualifies as a subsequent event that justifies a successive removal petition." *Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 789 (9th Cir. 2018); *cf. Doe v. Am. Red Cross*, 14 F.3d 196, 200 (3d Cir. 1993) (finding second civil removal petition permissible under 28 U.S.C. § 1446(b) based on an "intervening order of the highest court in the land"); *Green v. R.J. Reynolds Tobacco Co.*, 274 F.3d 263, 267-68 (5th Cir. 2001) (applying the Third Circuit's holding in *Doe*).

Finding "good cause" under § 1455(b) based on a significant intervening Supreme Court decision is consistent with the manner in which courts apply "good cause" requirements in other contexts. *Cf. Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (reasoning that "an intervening change of controlling law" is a consideration that supports

31

reconsideration of a Fed. R. Civ. P. 54(b) order); *United States v. Aron*, 98 F.4th 879, 883 (7th Cir. 2024) (reasoning that "[i]t is well-established that an intervening legal decision that overturns settled law amounts to good cause" for an otherwise-untimely motion under Fed. R. Crim. P. 12(c)(3)).

The district court made at least four errors in its rejection of *Trump v. United States* as a basis for § 1455(b) good cause. First, the district court failed to acknowledge the significance of the federal Constitutional considerations and public interests identified by the Supreme Court, which support the need for a federal forum for unbiased Presidential immunity litigation. Second, the district court overlooked the manner in which the Supreme Court's ruling directly supported § 1442(a)(1) removal by broadening Supremacy Clause immunity and superseding limitations associated with that defense. Third, the district court improperly leaped ahead to a flawed merits analysis of Presidential immunity—in a summary remand order—that ignored the operative aspect of the Supreme Court's holding. Fourth, the district court did not address the fact that DANY contradicted their 2023 representations in connection with the First Removal Notice, and violated the Presidential

32

immunity doctrine, by offering official-acts evidence at the New York County trial.

### A. President Trump Is Entitled To A Federal Forum For Presidential Immunity Litigation

The federal interest in providing President Trump access to an unbiased federal forum for litigation of first-impression Presidential immunity issues could not be stronger.

"The Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties." *Trump v. Vance*, 591 U.S. 786, 806 (2020). Section 1442(a)(1) functions in part as an enforcement mechanism for the Supremacy Clause. "[T]he purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Isaacson*, 517 F.3d at 139. Section 1442 "vindicates . . . the interests of government itself; upon the principle that it embodies 'may depend the possibility of the general government's preserving its own existence.'" *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (quoting *Tennessee v. Davis*, 100 U.S. 257, 262 (1879)).

Presidential immunity undoubtedly presents issues of that magnitude, which involve "peculiar constitutional concerns" and "question[s] of lasting significance." *Trump v. United States*, 144 S. Ct.

33

at 2341, 2346. Violations of the Presidential immunity doctrine threaten the "prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next." *Id.* at 2346. The result would be the "enfeebling of the Presidency and our Government." *Id.* Thus, Presidential immunity "seek[s] to protect not the President himself, but the institution of the Presidency." *Id.* at 2341. There exists "the greatest public interest" in fair litigation of the defense, which will have "enduring consequences upon the balanced power structure of our Republic." *Id.* at 2326, 2329. The district court erred by failing to account for these serious considerations as a basis for good cause to litigate in federal court the Presidential immunity issues arising from the intervening decision in *Trump v. United States.*

## B. The Supreme Court Superseded Supremacy Clause Immunity Caselaw

*Trump v. United States* constituted good cause for the additional reason that the decision superseded caselaw regarding Supremacy Clause immunity—"a seldom-litigated corner of constitutional law"—as applied to current and former Presidents. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017). In 2023, the district court held that this

immunity was not even a "colorable" defense to DANY's charges *New York v. Trump*, 683 F. Supp. 3d at 346-47. That is no longer true today as a result of the Supreme Court's decision following the New York County trial.

"The defense of Supremacy Clause immunity from state prosecution has been recognized since the landmark case of *In re Neagle*, 135 U.S. 1 (1890)." *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *see also New York v. Trump*, 683 F. Supp. 3d at 346 (citing *Neagle*). *Neagle* limited immunity to a federal employee "held in the state court to *answer for an act which he was authorized to do* by the law of the United States." 135 U.S. at 75 (emphasis added). Presidential immunity is broader. Under *Trump v. United States*, prosecutors may not rely on evidence of a President's official acts "even on charges that purport to be based only on his unofficial conduct." 144 S. Ct. at 2341.

*Neagle* requires that immunity derive from a "law of the United States." 135 U.S. at 75. But "some Presidential conduct . . . certainly can qualify as official"—and, thus, be subject to immunity—"even when not obviously connected to a particular constitutional or statutory provision." *Trump v. United States*, 144 S. Ct. at 2333.

35

*Neagle* includes a proportionality element, *i.e.*, whether a federal employee's official actions entailed "no more than what was necessary and proper for him to do." 135 U.S. at 75. Under *Trump v. United States*, a President's official actions are no less immune simply because a prosecutor or a court deems the actions to be disproportionate to the matter at hand. The Supreme Court left open the possibility that prosecutors could rebut presumptive immunity for official acts within the "outer perimeter" of Presidential power, but only where prosecutors can establish that use of the official-acts evidence "would pose no dangers of intrusion on the authority and functions of the Executive Branch." *Trump v. United States*, 144 S. Ct. at 2331-32.

This Court has applied *Neagle* to require examination of whether the federal employee "subjectively believe[d] that his action is justified" and whether "that belief must be objectively reasonable." *Tanella*, 374 F.3d at 147. The Supreme Court forbade that type of inquiry for purposes of Presidential immunity. "[C]ourts may not inquire into the President's motives." *Trump v. United States*, 144 S. Ct. at 2333.

Therefore, *Trump v. United States* served as good cause for the additional reason that the intervening decision superseded Supremacy

36

Clause immunity under *Neagle* and broadened the scope of the immunity defense available to President Trump.

### C. The District Court Ignored The Supreme Court's Relevant Holding

The district court ignored the foregoing considerations, and instead made a categorical and flawed pronouncement that "[n]othing" in *Trump v. United States* "affect[ed] my previous conclusion" that immunity is unavailable to President Trump. SPA-3. It was inappropriate for the district court to address the merits of the defense in connection with removal proceedings, and even more so in a summary remand pursuant to § 1455(b)(4). *See Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999) (reasoning that courts must "credit" the removing party's "theory of the case for purposes of both elements of [the] jurisdictional inquiry"); *Willingham*, 395 U.S. at 407 ("The officer need not win his case before he can have it removed."). Apart from the procedural defect, the district court's reasoning cannot withstand scrutiny.

The district court relied on its prior conclusion that immunity did not apply to charges based on "private schemes with private actors." SPA-3; *see also New York v. Trump*, 683 F. Supp. 3d at 346-47. The district court was wrong to assign dispositive significance to that finding.

37

As noted above, the Supreme Court made equally clear that prosecutors cannot use official-acts evidence to "help secure [a President's] conviction, even on charges that purport to be based only on his unofficial conduct." *Trump v. United States*, 144 S. Ct. at 2341. In addition to "counterproductive burdens on the vigor and energy of the Executive," the use of official-acts evidence under those circumstances "raise[s] a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.* at 2331, 2341. The practice would "eviscerate" the Presidential immunity doctrine, and "the intended effect of immunity would be defeated." *Id.* at 2340-41. The district court ignored these aspects of *Trump v. United States*, which were significant to the existence of "good cause" under § 1455(b)(1)-(2).

## D. DANY Contradicted Prior Representations Regarding Presidential Immunity

Because the district court misapplied the operative aspects of *Trump v. United States*, the court never reached another pivotal aspect of President Trump's good-cause showing. During the New York County trial, DANY contradicted representations that they made to the district

court regarding Presidential immunity when seeking remand of the First Removal Notice.

For example, as part of the 2023 remand motion, DANY assured the district court that there was "no connection" between President Trump's "official duties" and the "alleged criminal conduct." JA-197, 205. They argued that "[n]othing about this conduct touches, relates to, has a nexus or causal connection between, is associated with, or has any other connection to any official responsibility or authority of the President." JA-273. DANY took the same broad position at the June 27, 2023 hearing on their remand motion: "There's no argument that anybody here was doing anything in carrying out their job as a government actor." JA-392.

During the subsequent trial, DANY acted as if those words were never uttered. As discussed in more detail below, DANY offered at least five categories of official-acts evidence over President Trump's objection. DANY then emphasized the official-acts evidence during summations as "devastating" and called the jury's attention to President Trump's actions as "President of the United States." JA-865-66. DANY's switched position violated *Trump v. United States* and added to President Trump's good-cause showing in the Second Removal Notice.

39

### 1. Testimony From White House Personnel

DANY relied on testimony from Hope Hicks and Madeleine Westerhout. Both served as official advisers to President Trump during his first term in Office, and he relied on them to assist in his exercise of Article II and statutory authority. *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates."); *see also* 3 U.S.C. § 105(a)(1) (authorizing Presidents "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law regulating the employment or compensation of persons in the Government service"); *Trump v. United States*, 144 S. Ct. at 2327 ("Domestically, he must 'take Care that the Laws be faithfully executed,' § 3, and he bears responsibility for the actions of the many departments and agencies within the Executive Branch.").

DANY elicited testimony from Hicks concerning private conversations with President Trump regarding matters of public concern

relating to Cohen and his activities,[3] which occurred in the Oval Office while Hicks served as White House Communications Director. JA-737-41. President Trump's Executive power to "supervise" someone who was "wield[ing] executive power on his behalf" is an authority that "'follows from the text of Article II.'" *Trump v. United States*, 144 S. Ct. at 2328 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020)); *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.").[4]

Westerhout testified about how President Trump operated the Executive Branch, which she observed while working for President

---

[3] "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

[4] *Accord Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) ("[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated.").

Trump from a desk situated immediately outside the Oval Office. JA-744-55. Westerhout's testimony included details regarding national security matters such as President Trump's practices with respect to Air Force One, Marine One, and the Situation Room, all of which concerned President Trump's Commander In Chief power. *See* U.S. Const. art. II, § 2, cl. 1. This testimony constituted another unwarranted, unconstitutional intrusion on the confidentiality of White House activities, President Trump's "supervisory" responsibilities as President, and the "management of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

## 2. President Trump's Official Public Statements Via Twitter

DANY presented evidence of five official statements by President Trump in 2018, via Twitter, regarding matters of public concern. JA-862, 1119-28. This Court already concluded that the Twitter account in question "and the webpage associated with it [bore] all the trappings of an official, state-run account." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

42

With respect to the same Twitter account, the Supreme Court explained that President Trump's "communications in the form of Tweets" were consistent with the President's "'extraordinary power to speak to his fellow citizens.'" *Trump v. United States*, 144 S. Ct. at 2339 (quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)). This "long-recognized aspect of Presidential power" arises from the Executive Vesting Clause and the Take Care Clause of the Constitution. *Id.* at 2340.

In addition to those core constitutional authorities, the Supreme Court recognized that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump v. United States*, 144 S. Ct. at 2340. President Trump addressed matters of public concern "in a manner that promote[d] the President's view of the public good" and that President Trump "believe[d] would advance the public interest." *Id.* at 2338-40. Thus, the Tweets DANY improperly used at trial reflected official acts by President Trump exercising recognized Presidential powers.

### 3. President Trump's Official Acts In Response To FEC Inquiries

DANY offered official-acts testimony and evidence from Cohen regarding President Trump's strategy and response relating to FEC inquiries. JA-758-60. This evidence included a text message indicating that President Trump had approved a 2018 public statement by Cohen regarding an FEC complaint, and testimony that President Trump allegedly "told" Cohen that the FEC inquiry would be "taken care of" by then-Attorney General Jeff Sessions. JA-760.

President Trump's actions in response to an investigation by the FEC—an Executive Branch agency he was responsible for overseeing— were part of his core Presidential power to "decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 144 S. Ct. at 2334.[5] DANY's arguments regarding motive and intent for these actions is irrelevant for purposes of Presidential immunity. *See id.* at 2333-34.

---

[5] *Accord Seila Law*, 591 U.S. at 213 ("As Madison explained, '[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" (quoting 1 Annals of Cong. 463 (1789))).

The existence of this core Presidential power is also clear with respect to alleged conversations between President Trump and Attorney General Sessions, which President Trump does not concede occurred but DANY insisted on presenting to the jury through a witness with a documented history of perjury. *See Trump v. United States*, 144 S. Ct. at 2335 ("The President may discuss potential investigations and prosecutions with his Attorney General and other Justice Department officials to carry out his constitutional duty to 'take Care that the Laws be faithfully executed.' Art. II, § 3.").

Finally, President Trump's public statements regarding these matters, including any statements that he allegedly authorized Cohen to make, were consistent with his Presidential authority to address the public.

### 4. Official-Acts Evidence Relating To Investigations By Congress And Prosecutors

DANY presented official-acts evidence relating to President Trump's public responses to investigations by Congress and federal prosecutors, and his alleged deliberations relating to the pardon power. JA-756-60. Cohen testified: (i) about President Trump's public position in response to the investigations by Congress and Special Counsel

45

Mueller; (ii) that Cohen was seeking the "power of the President" in 2017 to protect him in connection with the congressional investigations; and (iii) that a June 2018 email referred to "potential pre-pardons," which Cohen and his attorney discussed after President Trump allegedly referenced the concept through a "back channel communication to the President." JA-468, 756-57, 761.

DANY's evidence relating to alleged pardon-related activities was squarely within President Trump's core official powers: "To the executive alone is intrusted the power of pardon." *United States v. Klein*, 80 U.S. 128, 147 (1871). President Trump's actions in response to inquiries from prosecutors working for Special Counsel Mueller were part of his duties under the Take Care Clause, and related public statements during the Presidency were well within the outer perimeter of Presidential authority. *See Trump v. United States*, 144 S. Ct. at 2335. President Trump's actions in response to the congressional investigation were part of his authority to engage in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020).

### 5. President Trump's Official Disclosures On OGE Form 278e

DANY also offered evidence relating to President Trump's disclosures on OGE Form 278e, which related to his financial activities during the Presidency in 2017 and President Trump signed in 2018 as "President of the United States of America." JA-1134.

President Trump made these disclosures pursuant to the requirements of the Ethics in Government Act, which were being administered by OGE—another Executive Branch agency he was overseeing at the time as President. One of the purposes of the Form is "to ensure confidence in the integrity of the Federal Government by demonstrating that they are able to carry out their duties without compromising the public trust." 5 C.F.R. § 2634.104(a). Thus, President Trump's submission of the Form was part of the "Presidential conduct" that involved "speaking to . . . the American people," which the Supreme Court acknowledged "certainly can qualify as official . . . ." *Trump v. United States*, 144 S. Ct. at 2333. President Trump's submission of the Form was certainly not "palpably beyond" that authority, and was therefore within the outer perimeter of Presidential power. *Id.*

47

### III. The District Court Erred By Abstaining From Consideration Of The Remainder Of President Trump's Good-Cause Arguments

The district court incorrectly treated all of President Trump's remaining good-cause arguments as fitting within a single "improper trial" category, including arguments relating to judicial hostility and appearances of impropriety, FECA preemption, irreparable First Amendment harm from a post-trial gag order, and potential inadequacy of state-law appellate procedures to address Presidential immunity disputes. SPA-2. The district court then compounded that error by refusing to consider any of these issues based on a misapplication of the *Rooker-Feldman* doctrine.

### A. There Was No Basis For *Rooker-Feldman* Abstention

The district court "misperceived the narrow ground occupied by *Rooker-Feldman.*" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "[T]here is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Niagara Mohawk Power Corp. v. Hudson River-Black Regulating Dist.*, 673 F.3d 84, 99 (2d Cir. 2012). The Second Removal Notice did not meet those requirements.

"*Rooker-Feldman* applies when the losing party in state court filed suit in federal court *after the state proceedings ended.*" *Hunter v. McMahon*, 75 F.4th 62, 65 (2d Cir. 2023) (emphasis in original). The doctrine does not limit a district court's authority to adjudicate federal claims and defenses just because there is a nexus to an ongoing local case. *See Davis v. Baldwin*, 594 F. App'x 49, 50 (2d Cir. 2015) ("[T]he *Rooker-Feldman* doctrine does not apply here because Davis does not invite review and rejection of a 'final state-court judgment[.]'" (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006))).

The district court incorrectly suggested that the Second Removal Notice sought to "reverse or modify state judgments" based on "'appellate jurisdiction.'" SPA-2 (quoting *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 416 (1923)). *Rooker* involved a state-court judgment that had been "affirmed by the Supreme Court of the state" and was therefore final. 263 U.S. at 415. Here, there was no final state judgment based on DANY's New York County proceedings. That is still true.

Nor was abstention justified by the district court's assertions relating to the limits of its "'strictly original'" jurisdiction. SPA-2 (quoting *Rooker*, 263 U.S. at 416). Federal-officer removal pursuant to 28 U.S.C.

49

§ 1442(a)(1) is a form of "original" federal-question jurisdiction. *Acker*, 527 U.S. at 430-31; *see also Mesa*, 489 U.S. at 136. Consequently, President Trump did not ask the district court to exceed the bounds of its jurisdiction by seeking full consideration of the Second Removal Notice.

Moreover, "it is familiar law that a federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002). Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 376 (2012). Accordingly, the district court had not only the power, but also an obligation, to evaluate all of President Trump's good-cause arguments under § 1455(b)(1)-(2). The court erred by invoking *Rooker-Feldman* abstention to shirk that responsibility.

### B. The District Court's Comity Concerns Were Misplaced

In connection with the faulty *Rooker-Feldman* reasoning, the district court misapprehended the comity and federalism implications of the Second Removal Notice by asserting that it would be "highly improper" to "evaluate" President Trump's good-cause arguments relating to "bias, unfairness or error in the state trial." SPA-2. To the

50

contrary, the entire point of federal-officer removal is to prevent local hostility from interfering with valid federal interests, and there is good-cause for removal where the type of bias identified by President Trump exists.

"Comity is a two-way street, requiring a delicate balancing of sometimes-competing state and federal concerns . . . ." *Trump v. Vance*, 941 F.3d 631, 638 (2d Cir. 2019), *aff'd and remanded*, 591 U.S. 786 (2020). From the local perspective, federal-officer removal cannot reasonably be considered an "invasion of the sovereignty of a State." *Davis*, 100 U.S. at 266. To suggest otherwise "ignores entirely the dual character of our government." *Id.* Removal does not impair a state's interest in the valid enforcement of its criminal laws. In removed proceedings, district courts enforce "federal rules of procedure while applying the criminal law of the State." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). The result is consideration of "the state-law question free from local interests or prejudice." *Id.* at 242.

On the other hand, from the federal perspective, there is a strong "interest in protecting federal officials from possible local prejudice," which "underlies the authority to remove certain cases brought against

federal officers from a state to a federal court." *Clinton v. Jones*, 520 U.S. 681, 691 (1997). As a result, "the right to remove is statutory, jurisdictional and absolute, regardless of motivation, when it is found to exist." *White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980). These removal procedures "safeguard officers and others acting under federal authority" from the "peril of punishment for violation of state law or obstruction or embarrassment by reason of opposing policy on the part of those exerting or controlling state power." *Colorado v. Symes*, 286 U.S. 510, 517 (1932). These exact safeguards are necessary here.

Federal removal is therefore "necessary" to provide an "impartial setting" where "the federal defense of immunity can be considered during prosecution under state law." *Manypenny*, 451 U.S. at 242. This is particularly true with respect to Presidents. *See Vance*, 591 U.S. at 806 ("[F]ederal law allows a President to challenge any allegedly unconstitutional influence in a federal forum"). "[H]arassing litigation in the State courts" will lead to a federal government "of pitiable weakness, and would wholly fail to meet the ends which the framers of the Constitution had in view." *Mayor & Aldermen of City of Nashville v. Cooper*, 73 U.S. 247, 253 (1867). Accordingly, the district court's

abstention decision was not only substantively incorrect, but also inconsistent with the application of comity and federalism principles to the issues raised in the Second Removal Notice.

## IV. The Good-Cause Considerations Ignored By The District Court Further Justified The Second Removal Notice

The good-cause factors that the district court wrongly abstained from considering further justified the timing and substance of the Second Removal Notice. These factors, considered together with the Presidential immunity issues discussed above, demonstrated that § 1442(a)(1) removal was necessary in light of changed circumstances since the First Removal Notice to provide an "avenue [that] protects against local political machinations interposed as an obstacle to the effective operation of a federal constitutional power." *Vance*, 591 U.S. at 810.

### A. New Evidence Of Judicial Bias

New evidence of conflicts and appearances of impropriety concerning Justice Merchan's role in the New York County proceedings—including with respect to Presidential immunity litigation—bolstered President Trump's showing under § 1455(b)(1)-(2). *See Mesa*, 489 U.S. at 140 (Brennan, J., concurring) (noting that "the Court leaves open the possibility that where a federal officer is prosecuted because of local

53

hostility to his function" removal may be appropriate even in the absence of a federal defense).

Most importantly, the Second Removal Notice described evidence that Justice Merchan had displayed bias towards President Trump's use of Twitter while in Office, which was an issue that was central to President Trump's post-trial Presidential immunity motion. JA-487-90. According to statements by Justice Merchan's daughter during a 2019 podcast, Justice Merchan "hate[s]" Twitter-using politicians like President Trump, and he found Tweets by President Trump, as President, to be "unprofessional" and "not how a politician should behave." JA-488-89, 1065. Justice Merchan's bias was partly informed by his daughter's view that President Trump should not have been "using" Twitter to communicate with the American people in the way that he did as President (and still does). JA-489, 1065.

This evidence of acute bias on an important issue created a fundamental due process problem with significant implications for the "institution of the Presidency." *Trump v. United States*, 144 S. Ct. at 2341. On July 31, 2024, the same day that President Trump filed his reply in support of the post-trial Presidential immunity motion, he filed

54

a recusal motion based in part on the judicial hostility that the podcast revealed toward the pending motion. JA-1101. The motion was also supported by the fact that, around the time of the podcast in 2019, Justice Merchan's daughter was acting as the "Director of Digital Persuasion" for the ultimately-unsuccessful Presidential campaign of Vice President Harris. JA-1064. By 2020, Justice Merchan's daughter was elevated to "part-owner" and "partner" of Authentic, having been credited with "ground-breaking, historical work" for Vice President Harris and others, and providing services to the Biden-Harris campaign. JA-1066-67.

In 2020, while President Trump was in Office, Justice Merchan made improper political contributions to "Biden for President," the "Progressive Turnout Project," and "Stop Republicans"—a group that described its purpose as "resisting the Republican Party and Donald Trump's radical right-wing legacy." JA-1098. Justice Merchan was subsequently cautioned by New York ethics authorities for those violations of New York's Rules Governing Judicial Conduct. *See id.* Thus, at a time when President Trump was still wielding the Executive power at issue in the Presidential immunity motion, Justice Merchan

55

was improperly supporting a group seeking to "Stop" President Trump and his political party.

After President Trump left Office, while Justice Merchan's daughter continued as an owner and senior executive at Authentic, President Trump's political adversaries paid tens of millions of dollars in disbursements to Authentic. Between 2021 and 2022, Authentic received over $29 million from Democrat-affiliated and left-leaning political entities. JA-1055. Between DANY's filing of the Indictment in March 2023 and the April 2024 trial, Authentic received more than $18 million from similar interests, which included proceeds from fundraising pitches that referenced developments in the New York County proceedings run by Justice Merchan. JA-1056.

The founder of Authentic, and thus a partner of Justice Merchan's daughter, currently leads a group called "White Dudes for Harris," which has raised millions of dollars for Harris's current campaign against President Trump. JA-1101. After the Second Removal Notice was filed, President Trump learned that Authentic had disclosed to the FEC that it received at least one disbursement directly from the Harris campaign

in July 2024.[6]   Therefore, Vice President Harris's 2024 Presidential campaign is a client of the company run by Justice Merchan's daughter, and that campaign paid her company before sentencing in the New York County case and while President Trump's Presidential immunity motion was pending before Justice Merchan.

The Supreme Court has made it "sufficiently clear" that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).   Justice Merchan has such an impermissible interest by virtue of his daughter's role at Authentic and her longstanding relationship with Vice President Harris.   The conflicts and appearances of impropriety resulting from these circumstances are manifest.   Justice Merchan nevertheless denied President Trump's recusal motions, including on August 13, 2024, without addressing the substance of these issues.   The mounting evidence of judicial bias arising since the First Removal Notice was good cause for the Second Removal Notice.

---

[6] FEC Form 3P, Harris for President (Aug. 20, 2024), *available at* https://docquery.fec.gov/cgi-bin/fecimg/?202408209675189812.

## B. Irreparable Harm From Election Interference

There was also good cause for the Second Removal Notice based on the need to protect the integrity of the 2024 Presidential election by providing President Trump with a federal forum to seek prompt relief from an unconstitutional gag order that improperly restricts his campaign speech. *See* 28 U.S.C. § 1450 (providing that local orders issued prior to removal "shall remain in full force and effect *until dissolved or modified by the district court*" (emphasis added)).

In March and April 2024, prior to the New York County trial, Justice Merchan imposed—and then expanded—a gag order prohibiting certain extrajudicial statements by President Trump. The ostensible basis for the gag order, which President Trump vigorously disputes, related to concerns about impacting potential jurors and witnesses. JA-491-92.

Following the trial, in July 2024, Vice President Harris and her surrogates made DANY's case a central campaign theme by seeking to frame the election as a contest of "prosecutor vs. convicted felon." JA-1101. Justice Merchan refused to modify the gag order to permit President Trump to respond to those attacks by presenting arguments to

58

voters about the appearances of impropriety arising from the professional and financial connections between Vice President Harris and Justice Merchan's daughter. On that issue, President Trump sought little more than the ability to summarize arguments and evidence already set forth in publicly filed motion papers. Contrary to Justice Merchan's decision, there was no evidence, much less the required "solidity of evidence," to support such an unprecedented prior restraint after the New York County trial had concluded. *Landmark Commc'ns* v. *Virginia*, 435 U.S. 829, 845 (1978).

President Trump has pursued appeals of Justice Merchan's gag order rulings, but the New York Court of Appeals wrongly found—remarkably—that "no substantial constitutional question is directly involved." *Trump v. Merchan*, 2024 WL 4152277, at *1 (N.Y. Sept. 12, 2024). That cannot be true, as the Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minnesota v. White*, 536 U.S. 765, 782 (2002). "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983).

Where a "President is intensely unpopular in a particular district—and that is a common condition—targeting the President may be an alluring and effective electoral strategy." *Vance*, 591 U.S. at 839 (Alito, J., dissenting). "But it is a strategy that would undermine our constitutional structure." *Id.*

Adding to the Supremacy Clause implications, the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). "Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011).

The First Amendment's protections apply "to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). The gag order on President Trump's campaign speech inflicts a "reciprocal" injury on the hundreds of millions of Americans who listen to him. *Id.* at 757. "The loss of First Amendment freedoms, for even minimal periods of time,

60

unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976). "[O]nce the election occurs, there can be no do-over and no redress" for the voters. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

The district court erred by declining to even consider this ongoing, irreparable harm as another basis for removal.

### C. Potentially Inadequate New York Procedures

Removal was also appropriate because Justice Merchan has not allowed sufficient time for an interlocutory appeal of an adverse Presidential immunity ruling, and New York's appellate procedures may be inadequate to protect the interests underlying that key constitutional defense. JA-493-94.

The First Department declined interlocutory review of Presidential immunity objections to DANY's official-acts evidence prior to the New York County trial. In response to an Article 78 petition, the court refused to reach the merits and indicated, incorrectly, that the arguments could wait to be addressed until "direct appeal." *Merchan*, 227 A.D.3d at 571. That result is flatly inconsistent with the Supreme Court's subsequent ruling that there is a "need for pretrial review" of Presidential immunity,

61

and that "denial of [Presidential] immunity would be appealable before trial." *Trump v. United States*, 144 S. Ct. at 2343. The First Department's ruling deprived President Trump of those opportunities and resulted in the sort of "extended proceeding" involving a President that "[t]he Constitution does not tolerate," which included "[v]ulnerability to the burden of a trial and to the inevitable danger of its outcome." *Id.* at 2344.

At the time of the Second Removal Notice, and currently, Justice Merchan insisted on a schedule that does not allow adequate time prior to the scheduled sentencing date for an interlocutory appeal of a potential adverse Presidential immunity ruling.[7] Although President Trump will pursue all available avenues for relief in the event of such a ruling, there is no indication that New York's appellate courts will entertain an interlocutory appeal, which could unfairly impact President Trump's right to seek Supreme Court review prior to any sentencing. *See* 28

---

[7] At the time of the Second Removal Notice, Justice Merchan was scheduled to rule on the Presidential immunity motion on September 16, 2024, and to sentence President Trump on September 18, 2024. Currently, Justice Merchan is scheduled to rule on the Presidential immunity motion on November 12, 2024, and to sentence President Trump on November 26, 2024. Neither schedule leaves adequate time for interlocutory appeal of his decision on immunity.

U.S.C. § 1257. The schedule and the lack of a clear procedural mechanism for interlocutory review bolstered President Trump's showing of good cause in the Second Removal Notice.

### D. Intervening Supreme Court Decisions Supporting FECA Preemption

In addition to *Trump v. United States*, the Supreme Court's intervening decisions in *Trump v. Anderson*, 601 U.S. 100 (2024), and *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), supported findings of good cause for removal to a federal forum for litigation of President Trump's FECA preemption defense. JA-484-85.

In the 2023 remand ruling, the district court cited caselaw affording *Chevron* deference to an FEC regulation, 11 C.F.R. § 108.7, which purports to narrow FECA's preemption clause, 52 U.S.C. § 30143(a). *See New York v. Trump*, 683 F. Supp. 3d at 347 (citing *Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996)).[8] The court reasoned that "FECA's general language . . . is defined by FECA's implementing regulation, and the

---

[8] The district court also cited *WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023), which cited *Teper* and *FEC v. Democratic Senatorial Campaign Committee*, a pre-*Chevron* case where the Supreme Court reasoned that the FEC "is precisely the type of agency to which deference should presumptively be afforded." 454 U.S. 27, 37 (1981).

caselaw," to restrict preemption to "[t]hree specific categories of state law." *Id.* The district court then disregarded the scope of § 30143(a), and ruled that NYEL § 17-152 "does not fit into any of the three categories of state law that FECA preempts." *New York v. Trump*, 683 F. Supp. 3d at 350.

Months after the first remand decision, the Supreme Court decided *Anderson*, which emphasized the federal interests of federalism principles that are also relevant to preemption analysis. Under *Anderson*, New York's "power over governance . . . does not extend to *federal* . . . candidates." 601 U.S. at 111 (emphasis in original). In *Loper Bright*, which was decided after the New York County trial, the Supreme Court overruled *Chevron* and, as a result, abrogated the caselaw affording atextual deference to the FEC's preemption regulation. *See* 144 S. Ct. at 2273 ("[C]ourts need not and under the [Administrative Procedure Act] may not defer to an agency interpretation of the law simply because a statute is ambiguous."). "Congress expects courts to handle technical statutory questions," and "the basic nature and meaning of a statute does not change when an agency happens to be involved." *Id.* at 2267, 2271.

Similar to the impact of *Trump v. United States* on the Presidential immunity defense, *Anderson* and *Loper Bright* are intervening Supreme Court decisions that bolstered President Trump's preemption defense. The reasoning in these opinions establishes that the defense is at least "colorable" because the FEC's regulation cannot limit the text of FECA. The district court erred by failing to address these developments.

### E. DANY's Contradictory Trial Positions Regarding FECA And Preemption

DANY also changed positions relating to the relevance of FECA between the first remand motion and the New York County trial in a way that mirrored their Presidential immunity contradictions and supported the Second Removal Notice. JA-486.

In response to the First Removal Notice, DANY wrongly argued that President Trump had presented an "erroneously narrow characterization" of the charges because DANY planned to rely on other "another crime" predicates besides NYEL § 17-152 to establish felony violations of Penal Law § 175.10. JA-218. Along the same lines, DANY assured the district court that "the charges here do not relate to the specific disclosures mandated by FECA." JA-280. They added that Penal Law § 175.10 and FECA "target different conduct and serve different

interests," and "simply do not cover the same domains." JA-221. DANY also suggested that the preemption defense would "depend on whether and to what degree the People rely on Election Law § 17-152 at trial," "how the state court instructs the jury," and "whether the jury returns special verdicts or interrogatory responses that could resolve any ambiguity over the basis for its verdict." JA-282-83.

During the New York County trial, DANY departed from these representations. As it turned out, President Trump's characterization of the charges in connection with the First Removal Notice had not been "erroneously narrow," and the preemption defense was not "speculative." DANY elected to rely on NYEL § 17-152 as the only felony predicate for the Penal Law § 175.10 charges. JA-665-66. In proposed jury instructions submitted long after the trial started, DANY demonstrated that their charges did, in fact, "relate to the specific disclosures mandated by FECA." The prosecutors requested, and Justice Merchan provided, instructions regarding FECA violations relating to limitations on individual and corporate contributions to federal candidates. JA-665-68, 777-79. Finally, although DANY had suggested that "special verdicts or interrogatory responses that could resolve any ambiguity" relating to

preemption, less than a year later at trial DANY strenuously and successfully opposed President Trump's request that Justice Merchan provide interrogatories to the jury so that the basis for the verdict would be clear. JA-712-13.

Accordingly, contrary to what DANY told the district court in 2023, at trial they relied on legal theories that concerned the particulars of federal oversight of "election to Federal office" under FECA's express preemption provision, 52 U.S.C. § 30143(a). This was another tactical change, in violation of the Supremacy Clause, that supported good-cause findings for the Second Removal Notice.

## Conclusion

The Court should vacate the district court's summary remand order, and remand the case with instructions that the Second Removal Notice was sufficient to establish removal pursuant to § 1442(a)(1), and that the matter should proceed to substantive litigation in federal court over President Trump's defenses and appropriate relief.

Dated:    October 14, 2024
          New York, N.Y.

By: /s/ Emil Bove
Emil Bove
Todd Blanche
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1250
emil.bove@blanchelaw.com

*Attorneys for President Donald J. Trump*

68

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPESTYLE REQUIREMENTS

I, Emil Bove, counsel for Defendant-Appellant President Donald J. Trump and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 32(a) and 32(g), that the foregoing motion is proportionately spaced, has a typeface of 14 points, and contains 12,678 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

October 14, 2024

By:  /s/ Emil Bove
     Emil Bove

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Order and Opinion of The Honorable Alvin K.
    Hellerstein, dated September 3, 2024 ................... SPA-1

U.S. Const. art. VI, cl. 2 ............................................ SPA-5

28 U.S.C. § 1442 ...................................................... SPA-6

28 U.S.C. § 1455 ...................................................... SPA-8

52 U.S.C. § 30143 .................................................... SPA-10

11 C.F.R. § 108.7 ..................................................... SPA-11

N.Y. Penal Law § 175.05 .......................................... SPA-13

N.Y. Penal Law § 175.10 .......................................... SPA-16

N.Y. Election Law § 17-152 ...................................... SPA-17

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                              :
THE PEOPLE OF THE STATE OF NEW YORK,    :
                                                              :
        -against-                                             :
                                                              :
DONALD TRUMP,                                                 :
                                                              :
                                Defendant.    :
                                                              :
                                                              :
------------------------------------------------------------- x

**ORDER AND OPINION
DENYING MOTION FOR
LEAVE TO FILE REMOVAL
PAPERS**

23 Civ. 3773 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Former President Donald Trump again seeks removal of the criminal case against him,

from the Supreme Court of New York to this Court.[1]  Upon removal, as the district judge to

whom this case was assigned, my task, pursuant to 28 U.S.C. § 1455(b)(4), is to "examine the

notice promptly," and if it "clearly appears on the face of the notice and any exhibits annexed

thereto that removal should not be permitted," I am to "make an order for summary remand."  If

summary remand is not appropriate, I am to "order an evidentiary hearing to be held promptly

and, after such hearing, [to] make such disposition of the prosecution as justice shall require."

28 U.S.C. § 1455(b)(5).  Since Defendant filed his notice after he was tried, he must show "good

cause" and seek "leave" from the district court "to file the notice at a later time."  28 U.S.C. §

1455(b)(1).  The second notice may argue only "grounds not existing at the time of the original

notice," or show "good cause" why the district court should "grant relief from the limitations"

above stated.  28 U.S.C. § 1455(b)(2).

        Defendant seeks leave from this Court to file a second notice of removal.  As to "good

cause," he advances two grounds.  First, he asserts that the New York courts were biased against

---

[1] Mr. Trump requests, in the alternative, that he be permitted to amend the First Removal Notice.  Because the
prosecution was completed through trial, this request is denied as academic.

1

him, resulting in an improper trial.  As support for this argument, Trump writes that Judge

Merchan had a conflict of interest in presiding over the trial, as evidenced by his daughter's

statements concerning her father's views on politicians' use of twitter; by Judge Merchan's

daughter's involvement in Vice President Kamala Harris's 2019 presidential campaign; and by

Judge Merchan's prior financial contributions to Democratic politicians.  Mr. Trump also states

that Judge Merchan failed to conduct the proper pretrial review of the presidential immunity

issue in light of intervening Supreme Court decisions, and prohibited Mr. Trump from pursuing

interlocutory review of that decision.  Second, Mr. Trump argues that *Trump v. United States*,

603 U.S. __ (No. 23-939, July 1, 2024) grants him immunity from prosecution.

This Court does not have jurisdiction to hear Mr. Trump's arguments concerning the

propriety of the New York trial.  "The jurisdiction possessed by the District Courts is strictly

original." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).  District courts may not

reverse or modify state judgments, even those containing constitutional infirmities, because "[t]o

do so would be an exercise of appellate jurisdiction." *Id.* at 415-16; *see also Hoblock v. Albany

County Board of Elections*, 422 F.3d 77, 84 (2d Cir. 2005) (discussing how federal courts

generally lack jurisdiction over suits that are, in essence, appeals from state court judgments).

Instead, the proper recourse for parties seeking to remedy alleged errors made during a state trial

is to pursue a state appeal or, at the highest level, to seek review from the Supreme Court of the

United States.  *Id.*  It would be highly improper for this Court to evaluate the issues of bias,

unfairness or error in the state trial.[2]  Those are issues for the state appellate courts.  Accordingly,

only the second ground argued by Mr. Trump deserves attention.

---

[2] Mr. Trump also implicitly requests that this Court enjoin the state sentencing set for September 18, 2024.  For the
same reasons set out in this paragraph under the Rooker-Feldman doctrine, this request is improper and outside of
the district court's jurisdiction.

SPA-3

## I.    DISCUSSION

In *Trump*, the Supreme Court held that a former President is entitled to absolute immunity from criminal prosecution for actions taken in exercise of his core constitutional powers, to at least presumptive immunity for acts within the outer perimeter of his official responsibility, and to no immunity for his unofficial acts. Criminal courts trying the former President are required to evaluate his actions to distinguish official from unofficial conduct. *Trump*, 603 U.S. at 17. The outer perimeter of the former President's official responsibilities extends to those actions that were "'not manifestly or palpably beyond his authority.'" *Id.* (citing *Blassingame v. Trump*, 87 F. 4th 1, 13 (D.C. Cir. 2023)). Private schemes with private actors, unconnected to any statutory or constitutional authority or function of the executive, are considered unofficial acts. *See id.* at 27-28.

I held in my Order and Opinion of July 19, 2023 (ECF No. 43) that "[h]ush money paid to an adult film star is not related to a President's official acts. It does not reflect in any way the color of the President's official duties." *Id.* at 13. My holding followed an evidentiary hearing where The People showed conclusively that Mr. Trump reimbursed Michael Cohen for advancing the hush money payments, including two checks signed in the White House by Mr. Trump. I held that Mr. Trump had not satisfied the burden of proof required to show the basis of removal. My holding of a hush money reimbursement remains true regardless of who has the burden, whether the People or Mr. Trump. Nothing in the Supreme Court's opinion affects my previous conclusion that the hush money payments were private, unofficial acts, outside the bounds of executive authority.

SPA-4

**II.    CONCLUSION**

It "clearly appears on the face of the notice and . . . exhibits attached thereto" that removal should not be permitted.  Good cause has not been shown, and leave to remove the case is not granted.  The Clerk shall terminate ECF No. 48.

SO ORDERED.

Dated:        September 3, 2024
              New York, New York

                                            ALVIN K. HELLERSTEIN
                                            United States District Judge

SPA-5

Clause 2. Supreme Law of Land, USCA CONST Art. VI cl. 2

United States Code Annotated
    Constitution of the United States
        Annotated
            Article VI. Debts Validated--Supreme Law of Land--Oath of Office

U.S.C.A. Const. Art. VI cl. 2

Clause 2. Supreme Law of Land

Currentness

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Notes of Decisions (2290)

U.S.C.A. Const. Art. VI cl. 2, USCA CONST Art. VI cl. 2
Current through P.L. 118-105. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 1442. Federal officers or agencies sued or prosecuted, 28 USCA § 1442

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1442

§ 1442. Federal officers or agencies sued or prosecuted

Effective: January 2, 2013

Currentness

**(a)** A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

**(1)** The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

**(2)** A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

**(3)** Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

**(4)** Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

**(b)** A personal action commenced in any State court by an alien against any citizen of a State who is, or at the time the alleged action accrued was, a civil officer of the United States and is a nonresident of such State, wherein jurisdiction is obtained by the State court by personal service of process, may be removed by the defendant to the district court of the United States for the district and division in which the defendant was served with process.

**(c)** Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer--

**(1)** protected an individual in the presence of the officer from a crime of violence;

**(2)** provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or

**(3)** prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury.

**(d)** In this section, the following definitions apply:

**(1)** The terms "civil action" and "criminal prosecution" include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued. If removal is sought for a proceeding described in the previous sentence, and there is no other basis for removal, only that proceeding may be removed to the district court.

**(2)** The term "crime of violence" has the meaning given that term in section 16 of title 18.

**(3)** The term "law enforcement officer" means any employee described in subparagraph (A), (B), or (C) of section 8401(17) of title 5 and any special agent in the Diplomatic Security Service of the Department of State.

**(4)** The term "serious bodily injury" has the meaning given that term in section 1365 of title 18.

**(5)** The term "State" includes the District of Columbia, United States territories and insular possessions, and Indian country (as defined in section 1151 of title 18).

**(6)** The term "State court" includes the Superior Court of the District of Columbia, a court of a United States territory or insular possession, and a tribal court.

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 938; Pub.L. 104-317, Title II, § 206(a), Oct. 19, 1996, 110 Stat. 3850; Pub.L. 112-51, § 2(a), (b), Nov. 9, 2011, 125 Stat. 545; Pub.L. 112-239, Div. A, Title X, § 1087, Jan. 2, 2013, 126 Stat. 1969.)

Notes of Decisions (914)

28 U.S.C.A. § 1442, 28 USCA § 1442
Current through P.L. 118-105. Some statute sections may be more current, see credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 89. District Courts; Removal of Cases from State Courts (Refs & Annos)

28 U.S.C.A. § 1455

§ 1455. Procedure for removal of criminal prosecutions

Currentness

**(a) Notice of removal.**--A defendant or defendants desiring to remove any criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such prosecution is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

**(b) Requirements.--(1)** A notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier, except that for good cause shown the United States district court may enter an order granting the defendant or defendants leave to file the notice at a later time.

**(2)** A notice of removal of a criminal prosecution shall include all grounds for such removal. A failure to state grounds that exist at the time of the filing of the notice shall constitute a waiver of such grounds, and a second notice may be filed only on grounds not existing at the time of the original notice. For good cause shown, the United States district court may grant relief from the limitations of this paragraph.

**(3)** The filing of a notice of removal of a criminal prosecution shall not prevent the State court in which such prosecution is pending from proceeding further, except that a judgment of conviction shall not be entered unless the prosecution is first remanded.

**(4)** The United States district court in which such notice is filed shall examine the notice promptly. If it clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted, the court shall make an order for summary remand.

**(5)** If the United States district court does not order the summary remand of such prosecution, it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require. If the United States district court determines that removal shall be permitted, it shall so notify the State court in which prosecution is pending, which shall proceed no further.

**(c) Writ of habeas corpus.**--If the defendant or defendants are in actual custody on process issued by the State court, the district court shall issue its writ of habeas corpus, and the marshal shall thereupon take such defendant or defendants into the marshal's custody and deliver a copy of the writ to the clerk of such State court.

SPA-9

§ 1455. Procedure for removal of criminal prosecutions, 28 USCA § 1455

**CREDIT(S)**

(Added Pub.L. 112-63, Title I, § 103(c), Dec. 7, 2011, 125 Stat. 761.)

Notes of Decisions (1)

28 U.S.C.A. § 1455, 28 USCA § 1455
Current through P.L. 118-105. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

SPA-10

§ 30143. State laws affected, 52 USCA § 30143

---

United States Code Annotated
    Title 52. Voting and Elections (Refs & Annos)
        Subtitle III. Federal Campaign Finance
            Chapter 301. Federal Election Campaigns
                Subchapter II. General Provisions

52 U.S.C.A. § 30143
Formerly cited as 2 USCA § 453

§ 30143. State laws affected

Currentness

**(a) In general**

Subject to subsection (b), the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office.

**(b) State and local committees of political parties**

Notwithstanding any other provision of this Act, a State or local committee of a political party may, subject to State law, use exclusively funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act for the purchase or construction of an office building for such State or local committee.

**CREDIT(S)**

(Pub.L. 92-225, Title IV, § 403, Feb. 7, 1972, 86 Stat. 20; Pub.L. 93-443, Title III, § 301, Oct. 15, 1974, 88 Stat. 1289; Pub.L. 107-155, Title I, § 103(b)(2), Mar. 27, 2002, 116 Stat. 87.)

Notes of Decisions (25)

52 U.S.C.A. § 30143, 52 USCA § 30143
Current through P.L. 118-105. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

SPA-11

Code of Federal Regulations
   Title 11. Federal Elections
      Chapter I. Federal Election Commission
         Subchapter A. General
            Part 108. Filing Copies of Reports and Statements with State Officers (52 U.S.C. 30113) (Refs & Annos)

11 C.F.R. § 108.7

§ 108.7 Effect on State law (52 U.S.C. 30143).

Effective: December 29, 2014
Currentness

(a) The provisions of the Federal Election Campaign Act of 1971, as amended, and rules and regulations issued thereunder, supersede and preempt any provision of State law with respect to election to Federal office.

(b) Federal law supersedes State law concerning the—

   (1) Organization and registration of political committees supporting Federal candidates;

   (2) Disclosure of receipts and expenditures by Federal candidates and political committees; and

   (3) Limitation on contributions and expenditures regarding Federal candidates and political committees.

(c) The Act does not supersede State laws which provide for the—

   (1) Manner of qualifying as a candidate or political party organization;

   (2) Dates and places of elections;

   (3) Voter registration;

   (4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

   (5) Candidate's personal financial disclosure; or

   (6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

SPA-12

**§ 108.7 Effect on State law (52 U.S.C. 30143)., 11 C.F.R. § 108.7**

**Credits**

[67 FR 49119, July 29, 2002; 79 FR 77847, Dec. 29, 2014]

SOURCE: 45 FR 15117, Mar. 7, 1980; 79 FR 77847, Dec. 29, 2014; 84 FR 18700, May 2, 2019, unless otherwise noted.

AUTHORITY: 52 U.S.C. 30102(g), 30104(a)(2), 30111(a)(8), 30113, 30143.

Notes of Decisions (28)

Current through October 8, 2024, 89 FR 81774. Some sections may be more current. See credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

§ 175.05 Falsifying business records in the second degree, NY PENAL § 175.05

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title K. Offenses Involving Fraud
          Article 175. Offenses Involving False Written Statements (Refs & Annos)

McKinney's Penal Law § 175.05

§ 175.05 Falsifying business records in the second degree

Currentness

A person is guilty of falsifying business records in the second degree when, with intent to defraud, he:

1. Makes or causes a false entry in the business records of an enterprise; or

2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or

3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or

4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

Falsifying business records in the second degree is a class A misdemeanor.

**Credits**
(L.1965, c. 1030.)

**Editors' Notes**

### PRACTICE COMMENTARIES

by William C. Donnino

#### Definitions

Unlike forgery, which is concerned with the authenticity of a "written instrument," falsifying business records is concerned with the falsity of a "business record" [defined in Penal Law § 175.00(2)].

The "business record" in issue must be of an "enterprise." An "enterprise" is broadly defined to include virtually any person or group of persons engaged in any organized activity for which records are kept [Penal Law § 175.00(1)]. The "business record," however, is restricted to records "kept or maintained" by the enterprise for the specific purpose of

"evidencing or reflecting" its condition or activity [Penal Law § 175.00(2)]. Thus, various written records with false recitals are excluded from the scope of this crime. *See People v. Bel Air Equipment Corp.,* 46 A.D.2d 773, 774, 360 N.Y.S.2d 465 (2d Dept 1974), *cffd* 39 N.Y.2d 48, 382 N.Y.S.2d 728, 346 N.E.2d 529 (1976) (while the defendants were guilty of "offering a false instrument" (i.e. a padded voucher), they were not guilty of "falsifying business records" for maintaining a "duplicate" set of the padded vouchers because the "duplicate" vouchers were "not made for record keeping purposes or to reflect the corporate defendant's condition or activity. They were, in effect, duplicates of a bill prepared at the request of the customer"); *People v. Papatonis,* 243 A.D.2d 898, 900-01, 663 N.Y.S.2d 341 (3d Dept 1997) ("What is complained of here are false answers to questions contained in an employment application submitted to [a security company] which, presumably, [the company] has kept on file. However, the Grand Jury evidence fails to establish that such application was 'kept or maintained' for the purpose of evidencing or reflecting the condition or activity of [the company], as indeed it could not"). *Compare People v. Davis,* 49 N.Y.2d 910, 428 N.Y.S.2d 195, 405 N.E.2d 677 (1980) ("forms" which the Genesee County Automobile Bureau was required to prepare for the State Department of Motor Vehicles were "business records").

Where a record is kept "is merely a factor, not determinative, of its status as a business record." *People v. Bloomfield,* 6 N.Y.3d 165, 167, 810 N.Y.S.2d 749, 844 N.E.2d 296 (2006). Thus, fraudulent records "kept in the files of an enterprise's legal counsel, rather than at the company's headquarters, were '[b]usiness record[s]'." *Id.*

## The Crimes

"Falsifying business records" is divided into two degrees. The basic offense, "falsifying business records in the second degree" [Penal Law § 175.05], covers a person who: makes or "causes" a false entry [subdivision (1)]; tampers with a true entry [subdivision (2)]; omits a true entry (which the defendant knew he or she had a duty to enter) [subdivision (3)]; or prevents or "causes" the omission of a true entry [subdivision (4)].

The crime is broadly defined and is not limited, for example, to those employees of an enterprise who "kept the books." The employer or others who direct or otherwise cause the false entries or cause true entries to be omitted are, on the face of the statute, liable for the crime. *People v. Kisina,* 14 N.Y.3d 153, 897 N.Y.S.2d 684, 924 N.E.2d 792 (2010) (people may be guilty of falsifying business records even though they are not members of the enterprise which keeps or maintains a record for the purpose of evidencing or reflecting its condition or activity). Thus, documents submitted to an insurance company for the purpose of receiving payments for the work detailed in those documents constituted "business records" of the insurance company. Dr. Kisina was therefore liable for "falsifying business records in the first degree" when he submitted fraudulent medical documentation to an insurance company to receive monies for treatments which were unnecessary or unperformed. *Id. See also People v. Fuschino,* 278 A.D.2d 657, 719 N.Y.S.2d 152 (3d Dept 2000) (where a defendant impersonated a customer of a power company and the company accurately recorded on their records the information the defendant supplied but that information was false, the defendant was liable for causing "false entries" in the business records of the power company).

On the other hand, generating a document and sending it to an enterprise does not necessarily make that document a "business record," i.e. one "kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity" [Penal Law § 175.00(2). *See People v. Golb,* 23 N.Y.3d 455, 991 N.Y.S.2d 792, 15 N.E.3d 805 (2014) (the sending of emails with false information to an enterprise for the purpose of having the enterprise open an investigation does not constitute "the creation or falsification" of a business record of that enterprise).

Critically, the proscribed conduct must be with the "intent to defraud." There is no Penal Law definition of "intent to defraud." For a commentary on "intent to defraud," see Practice Commentary to Penal Law § 15.00 (Culpable Mental States: Intent to Defraud.

§ 175.05 Falsifying business records in the second degree, NY PENAL § 175.05

"Falsifying business records in the first degree" is committed when the miscreant commits the second-degree crime and when the miscreant's "intent to defraud" includes an "intent to commit another crime or to aid or conceal the commission thereof." Penal Law § 175.10. *E.g. People v. Weirfeld*, 65 A.D.2d 911, 911, 410 N.Y.S.2d 472, 474 (4th Dept 1978) ("the proof establishes that defendant with intent to defraud made or completed a false entry in the business records of an enterprise, ... and that his intent to defraud included another crime, to wit: larceny").

The required "intent" to commit another crime or to aid or conceal its commission does not require proof that the defendant committed or was convicted of the intended crime. *People v. McCumiskey*, 12 A.D.3d 1145, 1146, 784 N.Y.S.2d 816, 817 (4th Dept 2004); *People v. Thompson*, 124 A.D.3d 448, 449, 1 N.Y.S.3d 72 (1st Dept 2015); *People v. Houghtaling*, 79 A.D.3d 1155, 1157-58, 912 N.Y.S.2d 155 (3d Dept 2010).

It should be emphasized that for the first-degree crime there must be two separate intents in that the "intent to defraud" must include "an intent to commit another crime or to aid or conceal the commission thereof." The first degree, for example, is not committed when there is an "intent to ... conceal the commission" of a crime but no "intend to defraud," *See People v. Reyes*, 69 A.D.3d 537, 538, 894 N.Y.S.2d 43 (1st Dept 2010) (defendant's false logbook entry done to provide himself with an alibi and thereby conceal his commission of a sexual assault did not constitute, in the absence of an "intent to defraud," "falsifying business records").

It is an affirmative defense to the crime of falsifying business records that the defendant was an employee who, "without personal benefit," was "merely" following the orders of the defendant's superior to falsify the records. Penal Law § 175.15. The defendant has the burden of proof of establishing an affirmative defense by a preponderance of the evidence. Penal Law § 25.00. *See* Practice Commentary to Penal Law § 25.00.

Notes of Decisions (41)

McKinney's Penal Law § 175.05, NY PENAL § 175.05
Current through L.2024, chapters 1 to 424. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

SPA-16

§ 175.10 Falsifying business records in the first degree, NY PENAL § 175.10

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title K. Offenses Involving Fraud
          Article 175. Offenses Involving False Written Statements (Refs & Annos)

McKinney's Penal Law § 175.10

§ 175.10 Falsifying business records in the first degree

Currentness

A person is guilty of falsifying business records in the first degree when he commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof.

Falsifying business records in the first degree is a class E felony.

**Credits**
(L.1965, c. 1030.)

**Editors' Notes**

**PRACTICE COMMENTARIES**

by William C. Donnino

*See* Practice Commentary to Penal Law § 175.05.

Notes of Decisions (90)

McKinney's Penal Law § 175.10, NY PENAL § 175.10
Current through L.2024, chapters 1 to 424. Some statute sections may be more current, see credits for details.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

SPA-17

§ 17-152. Conspiracy to promote or prevent election, NY ELEC § 17-152

McKinney's Consolidated Laws of New York Annotated
    Election Law (Refs & Annos)
        Chapter Seventeen. Of the Consolidated Laws (Refs & Annos)
            Article 17. Protecting the Elective Franchise (Refs & Annos)
                Title 1. Violations of the Elective Franchise (Refs & Annos)

McKinney's Election Law § 17-152

§ 17-152. Conspiracy to promote or prevent election

Currentness

Any two or more persons who conspire to promote or prevent the election of any person to a public office by unlawful means and which conspiracy is acted upon by one or more of the parties thereto, shall be guilty of a misdemeanor.

**Credits**
(L.1976, c. 233, § 1.)

Notes of Decisions (5)

McKinney's Election Law § 17-152, NY ELEC § 17-152
Current through L.2024, chapters 1 to 424. Some statute sections may be more current, see credits for details.

End of Document           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

I, Emil Bove, counsel for Defendant-Appellant President Donald J. Trump and a member of the Bar of this Court, certify, that, on October 14, 2024, the attached brief was filed through the Court's electronic filing system. I certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

October 14, 2024

By:  /s/ Emil Bove
     Emil Bove