# 24-2299

# United States Court of Appeals

For the Second Circuit

————

**PEOPLE OF THE STATE OF NEW YORK,**

*Plaintiff-Appellee,*

- *against* -

**DONALD J. TRUMP,**

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Southern District of New York**

## ADDENDUM FOR APPELLEE

ALVIN L. BRAGG, JR.
District Attorney
New York County
Attorney for Respondent-Appellee
One Hogan Place
New York, New York 10013
(212) 335-9000

STEVEN C. WU
   *Chief, Appeals Division*
JOHN T. HUGHES
   *Assistant District Attorney*

# TABLE OF CONTENTS

**Page**

Opinion of the Advisory Committee on Judicial Ethics, Op. 23-54 (May 4, 2023), *available at* https://tinyurl.com/bdcsmmpu (last accessed Jan. 13, 2025)...ADD-001

*People v. Trump*, Decision & Order on Motion for Order Restricting Extrajudicial Statements (N.Y. Sup. Ct. Mar. 26, 2024), *available at* https://tinyurl.com/3dewa7u8 (last accessed Jan. 13, 2025).......................ADD-004

*Trump v. Merchan*, Order, No. 2024-02413 (App. Div. Apr. 10, 2024) .............ADD-008

*Trump v. Merchan*, Order Denying Stay, 2024 WL 1872283 (App. Div. Apr. 30, 2024) ...............................................................................ADD-010

*People v. Trump*, Decision on Defendant's Motion to Terminate Order Restricting Extrajudicial Statements (N.Y. Sup. Ct. June 25, 2024), *available at* https://tinyurl.com/3jm8k664 (last accessed Jan. 13, 2025) .......................ADD-012

*People v. Trump,* Order (July 2, 2024), *available at* https://tinyurl.com/2s3frp9s (last accessed Jan. 13, 2025) ...............................................................................ADD-017

*People v. Trump*, Decision on Defendant's Mot. For Recusal (N.Y. Sup. Ct. Aug. 13, 2024), *available at* https://tinyurl.com/mw5sz4db (last accessed Jan. 13, 2025) ...............................................................................ADD-019

*People v. Trump*, Order (Sept. 6, 2024), *available at* https://tinyurl.com/yc26d78s (last accessed Jan. 13, 2025) ...............................................................................ADD-022

*People v. Trump,* Decision and Order (Nov. 22, 2024), *available at* https://tinyurl.com/y7exshr8 (last accessed Jan. 13, 2025)........................ADD-026

*People v. Trump,* Decision and Order on Defendant's CPL § 330.30 Motion (N.Y. Sup. Ct. Dec. 16, 2024), *available at* https://tinyurl.com/cjzx8pe3 (last accessed January 13, 2025)...............................................................................ADD-027

*People v. Trump*, Decision and Order on Defendant's *Clayton* Motion (Jan. 3, 2025), *available at* https://tinyurl.com/5cedstnx (last accessed Jan. 13, 2025).......ADD-068

*Trump v. Merchan*, Ordering Denying Interim Stay (N.Y. App. Div. Jan. 7, 2025) (Gesmer, J.)...............................................................................ADD-086

i

*Matter of Trump v. Merchan*, Letter Order (N.Y. Jan. 9, 2025) ..............................ADD-088

*Trump v. New York*, Order, Dkt. No. 24A666 (Jan. 9, 2025) ..............................ADD-089

*People v. Trump*, Sentencing Tr. (N.Y. Sup Ct. Jan. 10, 2025)..............................ADD-090

Opinion 23-54

May 4, 2023

Digest:   (1) A judge's impartiality cannot reasonably be questioned based on (a) de
          minimis political contributions made more than two years ago or (b) the
          business and/or political activities of the judge's first-degree relative,
          where the relative has no direct or indirect involvement in the proceeding
          and no interests that could be substantially affected by the proceeding.
          (2) As a result, the judge is not ethically required to disclose such facts or
          circumstances *sua sponte* in the proceeding, regardless of any surrounding
          publicity or lack thereof.  The judge may continue to preside in the matter
          provided the judge believes he/she can be fair and impartial.

Rules:    Judiciary Law § 14; 22 NYCRR 100.2; 100.2(A); 100.2(B); 100.3(B)(1);
          100.3(E)(1); 100.3(E)(1)(a)-(f); 100.3(E)(1)(d)(iii); 100.3(E)(1)(e); Opinions
          22-183; 22-172; 22-138; 17-126; 15-212; 15-62; 98-22; *People v Moreno*, 70
          NY2d 403 (1987).

Opinion:

        The inquiring judge is presiding in a criminal case involving a defendant who
is a former public official.  Although the judge has searched his/her conscience and
is confident in his/her own ability to be fair and impartial, the judge nonetheless
asks if disclosure and/or disqualification is ethically mandated on one of several
grounds.

        A judge must always avoid even the appearance of impropriety (*see* 22
NYCRR 100.2) and must always act to promote public confidence in the judiciary's
integrity and impartiality (*see* 22 NYCRR 100.2[A]).  A judge must not allow "family,
social, political or other relationships to influence the judge's judicial conduct or
judgment" (22 NYCRR 100.2[B]) and must "not be swayed by partisan interests,
public clamor or fear of criticism" (22 NYCRR 100.3[B][1]).  A judge must disqualify
where required by rule or statute (*see* 22 NYCRR 100.3[E][1][a]-[f]; Judiciary Law §
14) and in any other proceeding where the judge's impartiality "might reasonably
be questioned" (22 NYCRR 100.3[E][1]).  For example, a judge must disqualify when
a relative within the fourth degree of relationship "is likely to be a material witness
in the proceeding" (22 NYCRR 100.3[E][1][e]) or "has an interest that could be
substantially affected by the proceeding" (22 NYCRR 100.3[E][1][d][iii]).  However,
where disqualification is not mandatory, a trial judge is the sole arbiter of recusal
(*see People v Moreno*, 70 NY2d 403 [1987]).

        First, the judge asks if he/she should confirm or deny, as the case may be,
matters that have been reported in the media.  Whether or not something has been

reported in the media is immaterial to the ethical analysis. The judge remains free, of course, to make any disclosures the judge deems appropriate but he/she is not by virtue of such reporting mandated to do so.

The judge also asks if it is mandatory to disclose certain prior political contributions that were made more than two years ago. The total amount contributed, in the aggregate, was less than $50. One contribution was made to the person who opposed the defendant in an election; none was made to the defendant or the prosecutor or anyone else involved in the case before the judge.

We seldom require disqualification or disclosure for more than two years (*see e.g.* Opinion 22-138 ["A set period will be simpler for judges to remember and apply, and two years is a standard we have used regularly since the Committee's inception."]). Indeed, we recently adopted a bright-line two-year rule in an area where we had previously required disclosure indefinitely (*see* Opinion 22-183 [judge's former counsel]).

On the facts before us, it is sufficient to say that these modest political contributions made more than two years ago cannot reasonably create an impression of bias or favoritism in the case before the judge. Accordingly, we conclude the judge's impartiality cannot "reasonably be questioned" on this basis and the judge is not ethically required to disclose them.

The inquiring judge further asks us whether he/she must disclose that his/her relative's agency recently declined to work for the prosecutor now appearing before the judge. A first-degree relative of the judge[1] is a high-ranking officer in a business that works exclusively with one political party's candidates, and that party is different from that of the former elected official now appearing as a defendant in the judge's court. The judge's relative was asked to work for the prosecutor in a political matter but the relative declined the work.

We previously considered a circumstance where a judge's first-degree relative was "employed by a non-party real estate company that does business with one party in the litigation" (Opinion 22-172). We concluded that fact "does not require disqualification, where neither the judge's relative nor the relative's employer has any interests that could be substantially affected by the proceeding" (*id.*).

Here, too, the matter currently before the judge does not involve either the judge's relative or the relative's business, whether directly or indirectly. They are not parties or likely witnesses in the matter, and none of the parties or counsel before the judge are clients of the business. We see nothing in the inquiry to suggest that the outcome of the case could have any effect on the judge's relative, the relative's business, or any of their interests.

We also note that, notwithstanding the strict limits on a judge's own political activities, a judge's relatives remain free to engage in their own bona fide independent political activities (*see e.g.* Opinions 15-62; 98-22). A relative's independent political activities do not provide a *reasonable* basis to question the judge's impartiality (*see e.g.* Opinions 17-126 [judge may continue to preside in a declaratory judgment action, even after learning that the spouse's employer made political contributions to a named respondent, provided the judge believes he/she can be fair and impartial]; 15-212 [judge need not disqualify from cases involving lawyers who sought to contribute to the judge's spouse's recent political campaign, provided the judge believes he/she can be fair and impartial]).

On the facts before us, we conclude the judge's impartiality cannot reasonably be questioned based on the judge's relative's business and/or political activities, and the judge is not ethically required to disclose them.

---

[1] A judge's first-degree relatives include a parent or child of the judge or the judge's spouse, or the spouse of such person. Here, the judge's relative lives and works in another state, but apparently does business with campaigns nationwide.

ADD-004

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | **DECISION and ORDER** |
| - against – | People's Motion for an Order Restricting Extrajudicial Statements |
| DONALD J. TRUMP | |
| Defendant | Indictment No. 71543-23 |

JUAN M. MERCHAN, A.J.S.C.:

### BACKGROUND

Defendant is charged with 34 counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10. The charges arise from allegations that Defendant attempted to conceal an illegal scheme to influence the 2016 presidential election. Specifically, the People claim that Defendant directed an attorney who worked for his company to pay $130,000 to an adult film actress shortly before the election to prevent her from publicizing an alleged sexual encounter with Defendant. It is further alleged that Defendant thereafter reimbursed the attorney for the payments through a series of checks and caused business records associated with the repayments to be falsified to conceal his criminal conduct. Trial on this matter is scheduled to commence on April 15, 2024.

On February 22, 2024, the People filed the instant motion for an order restricting extrajudicial statements by Defendant for the duration of the trial. The restrictions sought are consistent, in part, with those upheld in the U.S. Court of Appeals for the D.C. Circuit in *United States v. Trump,* 88 F4th 990 [2023]. On March 4, 2024, Defendant filed a response in opposition, arguing that his speech may only be restricted by the application of a more strenuous standard than applied by the D.C. Circuit and that the People have failed to meet that standard in this case.

### DISCUSSION

The freedom of speech guaranteed by the First Amendment and the State's interest in the fair administration of justice are implicated by the relief sought. The balancing of these interests must come with the highest scrutiny. "Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance

and then to balance the character of the evil, as well as the likelihood, against the need for free and unfettered expression." *Landmark Communications, Inc. v. Virginia,* 435 US. 829, 842-843 [1978]. The Court has an obligation to prevent outside influences, including extrajudicial speech, from disturbing the integrity of a trial. *Id. at 350-351; see also Sheppard v. Maxwell,* 384 US 333 [1966].

With the standard set forth in *Landmark,* this Court has reviewed the record of prior extrajudicial statements attributed to Defendant as documented in Exhibits 1-16 of the People's Motion for an Order Restricting Extrajudicial Statements. Notably, Defendant does not deny the utterance of any of those extrajudicial statements, or the reported effect those statements had on the targeted parties. Rather, Defendant argues that, as the "presumptive Republican nominee and leading candidate in the 2024 election" he must have unfettered access to the voting public to respond to attacks from political opponents and to "criticize these public figures." *See* Defendant's Opposition to Motion at pgs. 8-9. Yet these extrajudicial statements went far beyond defending himself against "attacks" by "public figures". Indeed, his statements were threatening, inflammatory, denigrating, and the targets of his statements ranged from local and federal officials, court and court staff, prosecutors and staff assigned to the cases, and private individuals including grand jurors performing their civic duty. *See* People's Exhibits 1-16. The consequences of those statements included not only fear on the part of the individual targeted, but also the assignment of increased security resources to investigate threats and protect the individuals and family members thereof. *See* People's Exhibits 1-16*; Trump,* at 996-998. Such inflammatory extrajudicial statements undoubtedly risk impeding the orderly administration of this Court.

Defendant contends that continued compliance with the existing orders, referencing both this Court's admonition at the start of the proceedings (*see* court transcript dated April 4, 2023*)* and the recent Protective Order issued on March 7, 2024, with respect to juror anonymity, is an effective, less restrictive alternative. He supports this position by noting that he has generally refrained from making extrajudicial statements about individuals associated with the instant case in marked contrast from the significant volume of social media posts and other statements targeting individuals involved in every other court proceeding reflected in the People's submission.

This Court is unpersuaded. Although this Court did not issue an order restricting Defendant's speech at the inception of this case, choosing instead to issue an admonition, given the nature and impact of the statements made against this Court and a family member thereof, the District Attorney and an Assistant District Attorney, the witnesses in this case, as well as the nature and impact of the extrajudicial statements made by Defendant in the D.C. Circuit case (which

2

resulted in the D.C. Circuit issuing an order restricting his speech), and given that the eve of trial is upon us, it is without question that the imminency of the risk of harm is now paramount. The Supreme Court in both *Nebraska Press Ass'n v. Stuart*, 427 US 539 [1976] and *Sheppard v. Maxwell*, 384 US 333, 363 [1966] holds that the court has the obligation to prevent actual harm to the integrity of the proceedings. When the fairness of the trial is threatened, "reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice as its inception." *Sheppard, at 363*. On the record submitted, and in keeping with its mandate, this Court need not wait for the realization of further proscribed speech targeted at the participants of this trial.[1]

The People propose an additional restriction on speech with respect to prospective and sworn jurors. The restrictions sought are an extension of the previously issued protective order regarding juror anonymity. While the D.C. Circuit decision addressed only the risks of influencing witnesses and intimidating or harassing other trial participants in accordance with the lower court's ruling, it nevertheless opined that "one of the most powerful interests supporting broad prohibitions on trial participants' speech is to avoid contamination of the jury pool, to protect the impartiality of the jury once selected, to confine the evidentiary record before the jury to the courtroom, and to prevent intrusion on the jury's deliberations." *Trump,* 88 F4th at 1020, *citing In Re Russell*, 726 F2d 1007, 1009, 1010 [4th Cir 1984]. While the protective order related to juror anonymity prevents the dissemination of certain personal information, it is not sufficient to prevent extrajudicial speech targeting jurors and exposing them to an atmosphere of intimidation. The proposed restrictions relating to jurors are narrowly tailored to obtain that result.

The uncontested record reflecting the Defendant's prior extrajudicial statements establishes a sufficient risk to the administration of justice consistent with the standard set forth in *Landmark*, and there exists no less restrictive means to prevent such risk.

---

[1] Defendant argues that references to speech targeted at individual prosecutors in the instant case do not substantiate their claims, adding that the People only cite posts which occurred in March and June 2023. *See* Defendant's Motion pg. 14. Notably, within hours of the court appearance on March 25, 2024, setting the trial date for April 15, 2024, the Defendant targeted an individual prosecutor assigned to this case, referring to him as a "radical left from DOJ put into [...] the District Attorney's Office to run the trial against Trump and that was done by Biden and his thugs" in a press conference. *C-SPAN, press conference video dated March 25, 2024, at minute 2:34.*

**THEREFORE,** it is hereby

**ORDERED**, that the People's motion for a restriction on extrajudicial statements by the Defendant is **GRANTED** to the extent that Defendant is directed to refrain from the following:

a.  Making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding;

b.  Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel or staff member, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result; and

c.  Making or directing others to make public statements about any prospective juror or any juror in this criminal proceeding.

The foregoing constitutes the Decision and Order of the Court.

Dated:  March 26, 2024
        New York, New York

**MAR 2 6 2024**

_____
Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

**HON. J. MERCHAN**

4

ADD-008

FILED: APPELLATE DIVISION - 1ST DEPT 04/11/2024 07:38 AM
2024-02413

FILED: APPELLATE DIVISION - 1ST DEPT 04/10/2024 12:04 PM
NYSCEF DOC. NO. 7

2024-02413

RECEIVED NYSCEF: 04/10/2024

## SUMMARY STATEMENT ON APPLICATION FOR
## EXPEDITED SERVICE AND/OR INTERIM RELIEF
(SUBMITTED BY MOVING PARTY)

Date: April 10, 2024      Case # 2024-02413

Title of Matter: DONALD J. TRUMP, Petitioner    Index/Indict/Docket #

HON. JUAN M. MERCHAN, A.J.S.C., et al., Respondents

Appeal by _____ from

Order ☐   Judgment ☐ of   Decree ☐

Supreme ☐   Surrogate's ☐   Family ☐

County _____   Court entered on _____ ,20__

Name of Judge _____

Notice of Appeal filed on _____ ,20__

If from administrative determination, state agency _____

Nature of action or proceeding: Article 78 Petition on Order to Show Cause relating to rulings exceeding Justice Merchan's jurisdiction and authority under State law and the U.S. Constitution.

Provisions of ☐ order ☐ judgment ☐ decree   appealed from _____

This application by ~~appellant~~ respondent is for a stay of proceedings pending resolution of the Article 78 proceeding in the nature of prohibition.

If applying for a stay, state reason why requested The unconstitutional effects of Justice Merchan's rulings are causing ongoing, irreparable constitutional harms to Petitioner and the voting public and, if not stopped, will prevent Petitioner from receiving a fair trial.

Has any undertaking been posted No.   If "yes", state amount and type _____

Has application been made to court below for this relief No
If "yes", state Disposition _____

Has there been any prior application here in this court No
If "yes", state dates and nature _____

Has adversary been advised of this application Yes   Does he/she consent No

ADD-009

| Attorney for Movant | Attorney for Opposition |
|---|---|

Name  Todd Blanche

Address  Blanche Law PLLC

99 Wall Street, Suite 4460

New York, New York 10005

Tel. No.  212-716-1250

Email  toddblanche@blanchelaw.com

Appearing by _____

Matthew Colangelo

Manhattan District Attorney's Office

One Hogan Place, New York, New York 10013

212-335-9000 / ColangeloM@dany.nyc.gov

Hon. Juan M. Merchan

Acting Justice - Supreme Court, Criminal Term

100 Centre Street, New York, New York 10013

646-386-3934 / JMerchan@nycourts.gov

Judith Vale, Office of the New York State Attorney General

28 Liberty Street, 16th Floor, New York, NY 10005

212-416-8020 / judith.vale@ag.ny.gov

------------------------------------------------------
**(Do not write below this line)**

DISPOSITION

After hearing argument from counsel for all parties, the court denies movant's application for a stay of the proceedings pending resolution of the Article 78 proceeding in the nature of prohibition.

_Ellen Gesmer_
Justice

April 10, 2024
Date

Motion Date  4/22/24   Opposition  4/17   Reply  4/22 10am

EXPEDITE ✓   PHONE ATTORNEYS _____   DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.   _EW_
Court Attorney

"Revised 10/19"

# Supreme Court of the State of New York
# Appellate Division, First Judicial Department

Present – Hon.  Troy K. Webber,                    Justice Presiding,
                Peter H. Moulton
                Saliann Scarpulla
                Manuel J. Mendez
                John R. Higgitt,                   Justices.

---

In the Matter of the Application of       **SEALED**

                                          Motion No.   2024-01822
Donald J. Trump,                          Case No.     2024-02413
                Petitioner,

For a Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules,

                -against-

The Honorable Juan M. Merchan, A.J.S.C.,
and The People of the State of New York by
Alvin L. Bragg, Jr., Manhattan District
Attorney,
                Respondents.

---

An Article 78 proceeding having been commenced in this Court for a writ of prohibition, pursuant to CPLR 7803(2), prohibiting respondent The Honorable Juan M. Merchan, A.J.S.C., based on his having allegedly acted in excess of Supreme Court's jurisdiction, from (1) refusing to recuse himself from the criminal proceedings in *People v Donald J. Trump* (Indictment No. 71543/23), (2) restricting petitioner's ability to file motions in said proceedings and include rulings and submissions in the public record, and (3) ruling that petitioner is foreclosed from relying in said proceedings on the presidential immunity doctrine as an evidentiary objection at trial,

And petitioner having moved for a stay of the criminal proceedings in *People v Donald J. Trump* (Indictment No. 71543/23), pending the hearing and determination of the foregoing Article 78 proceeding,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

ADD-011

Case No. 2024-02413                    -2-                    Motion No. 2024-01822

     It is ordered that the motion is denied.

ENTERED: April 30, 2024

Susanna Molina Rojas
Clerk of the Court

ADD-012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP

Defendant

**DECISION and ORDER**

Defendant's Motion to
Terminate Order Restricting
Extrajudicial Statements

Indictment No. 71543-23

---

JUAN M. MERCHAN, A.J.S.C.:

### BACKGROUND

On February 22, 2024, the People filed a motion for an order restricting extrajudicial statements by the Defendant. He opposed the motion on March 4, 2024. The Court granted the People's motion on March 26, 2024 (hereinafter "March 26 Order"). The Order directed Defendant to refrain from:

    a. Making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding;

    b. Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel or staff member, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result; and

    c. Making or directing others to make public statements about any prospective juror or any juror in this criminal proceeding.

On March 28, 2024, the People filed a motion seeking to clarify whether the Order of March 26 "protects family members of the Court, the District Attorney, and all other individuals mentioned in the Order." People's Supplemental Filing Regarding the Court's March 26, 2024, Order Restricting Extrajudicial Statements at pg. 1. Defendant opposed the People's motion on March 29, 2024. Thereafter, on April 1, 2024, this Court issued a Decision and Order (hereinafter "April 1 Order") clarifying and amending the March 26 Order to the extent that Paragraph (b), now directed the Defendant to refrain from:

> b. Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel, staff member, the Court or the District Attorney, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result;

On April 8, 2024, Defendant filed an Article 78 petition pursuant to CPLR § 7803(2) by Order to Show Cause seeking an interim stay of the trial proceedings pending a resolution of Defendant's challenge to the April 1 Order. Specifically, Defendant argued that: "[t]he unconstitutional features of the gag order are causing ongoing, irreparable harm to Petitioner and the voting public under the New York and U.S. Constitutions." *See* April 8, 2024, Summary Statement of Application for Expedited Service and/or Interim Relief. On April 10, 2024, the Appellate Division – 1st Department heard oral argument on Defendant's request for an interim stay of the trial and that application was denied.

On April 15, 2024, jury selection commenced.

On April 23, 2024, a full panel of the Appellate Division – 1st Department denied Defendant's applications for a stay of the trial and, in the alternative, a stay of the April 1 Order.

On May 14, 2024, the Appellate Division issued its decision on the merits of the Article 78 petition and denied the relief sought by Defendant. More specifically, it held that Defendant's First Amendment Rights had been "properly weighed against the court's historical commitment to ensuring the fair administration of justice in criminal cases, and the right of persons related to

2

tangentially related to the criminal proceedings from being free from threats, intimidation, harassment, and harm." *See In the Matter of Donald J. Trump v. The Honorable Juan M. Merchan*, etc., et al., 227 AD3d 518 (2024). Thus, this Court's Decision and Order was upheld.

On May 30, 2024, Defendant was convicted of 34 counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10 after a trial by jury. Thereafter, the jury was discharged, and the case was adjourned to July 11, 2024, for sentencing.

On June 4, 2024, the Defendant filed a pre-motion letter seeking to terminate the March 26 Order as amended by the April 1 Order. On June 10, 2024, Defendant filed a memorandum of law in support of his motion. On June 20, 2024, the People filed their opposition to Defendant's motion to terminate. In the interim, on June 18, 2024, the Court of Appeals dismissed Defendant's appeal finding that no substantial constitutional question was directly involved. *Matter of Donald J. Trump v. Juan M. Merchan, etc., et al.,* 2024 WL 3032559.

## DISCUSSION

The Defendant seeks (1) termination of the April 1, 2024, Order Restricting Extrajudicial Statements ("April 1 Order")[1] and (2) that the Court revisit the necessity and constitutionality of the April 1 Order. *See* Defendant's Memo pgs. 12-13. The main thrust of Defendant's argument is that the Orders were implemented specifically to protect the integrity of the trial proceedings and that because the trial is over, the Orders are no longer necessary. *Id.* at 11. Specifically, Defendant notes that Paragraph (a) of the Orders prohibits statements concerning witnesses' "potential participation in the investigation or in this criminal proceeding" and that since the trial has concluded, the purpose of the Orders have been satisfied. *Id.* Defendant further argues that the same reasoning applies to Paragraph (c) of the Orders regarding jurors. Finally, the Defendant makes numerous arguments in support of his second request, that the Court "revisit the necessity and constitutionality of the April 1 Order." However, this Court need not address that claim as the Court of Appeals has already determined that no substantial constitutional question is raised by the April 1 Order.

The People do not oppose termination of paragraph (a) pertaining to witnesses. However, the People do oppose termination of Paragraphs (b) and (c). Specifically, the People submit that the proceedings have not yet concluded with respect to the persons referenced in paragraph (b), namely

---

[1] In the Introduction section of Defendant's Memo, the Defendant seeks immediate termination of both the March 26 Order and April 1 Order. For clarity in the Discussion section of this Decision, the Court will refer to each of the orders collectively as "Orders," and will specify each individual Order where necessary.

3

the prosecution, court staff and their families. Thus, termination at this juncture would be premature. With respect to persons referenced in paragraph (c), namely jurors, the People submit that the Court should continue the restrictions on extrajudicial statements as proscribed by the Orders notwithstanding that the jury has been discharged.

DECISION

The basis for the issuance of the Orders was to protect the integrity of the judicial proceedings. As this Court recognized in its Order of April 1, 2024, "the threats to the integrity of the judicial proceeding are no longer limited to the swaying of minds, but also to the willingness of individuals, both private and public, to perform their lawful duty before this Court." Decision and Order dated April 1, 2024, p. 2. Both Orders were narrowly tailored to address the significant concerns regarding the Defendant's extrajudicial speech. The Orders were overwhelmingly supported by the record, and it was upon that record that the Appellate Division First Department and the New York Court of Appeals kept the Orders intact. However, circumstances have now changed. The trial portion of these proceedings ended when the verdict was rendered, and the jury discharged. Therefore, Paragraph (a) is terminated without opposition by the People. As to Paragraph (c), while it would be this Court's strong preference to extend those protections, the Court cannot do so on what is now a different record than what the appellate courts relied upon when they rendered their rulings. Therefore, Paragraph (c) must be terminated. Nonetheless, there is ample evidence to justify continued concern for the jurors. Therefore, the protections set forth in this Court's Protective Order of March 7, 2024, Regulating Disclosure of Juror Information will remain in effect until further order of this Court.

Regarding Paragraph (b), this Court notes that while witness testimony has concluded, a verdict has been rendered, and the jury discharged - the proceedings are not concluded. This matter has been set down for the imposition of sentence on July 11, 2024. Until sentence is imposed, all individuals covered by Paragraph (b) must continue to perform their lawful duties free from threats, intimidation, harassment, and harm.

ADD-016

THEREFORE, it is it is hereby

**ORDERED**, that Paragraph (a) and Paragraph (c) of the Orders Restricting Extrajudicial Statements of the Defendant are terminated effective the date of this Decision and Order, and it is further

**ORDERED**, that Paragraph (b) of the April 1, 2024, Decision and Order restricting extrajudicial statements of the Defendant shall remain in effect until the imposition of sentence.

The foregoing constitutes the Decision and Order of the Court.

Dated: June 25, 2024
      New York, New York

**JUN 2 5 2024**

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

**HON. J. MERCHAN**

5



Supreme Court
of the
State of New York

**JUAN M. MERCHAN**
JUDGE OF THE COURT OF CLAIMS
SUPREME COURT, CRIMINAL TERM
FIRST JUDICIAL DISTRICT

CHAMBERS
100 CENTRE STREET
NEW YORK, N.Y. 10013

<u>Via Email</u>

July 2, 2024

Emil Bove, Esq.
99 Wall Street
Suite 4460
New York, NY 10005

ADA Joshua Steinglass
New York County District Attorney's Office
One Hogan Place
New York, NY 10013

Re: *People v. Trump*, Ind. No. 71543-2023

Dear Counsel:

I write to you in response to your recent communications. I refer specifically to the People's e-mail of July 1, 2024, requesting permission to delay filing of the sentencing recommendation pending further guidance from this Court; Mr. Bove's pre-motion letter of July 1, 2024, seeking leave to file a motion to set aside the jury's verdict, pursuant to CPL § 330.30(1) based on the Supreme Court's decision in *People v. Trump*, 2024 WL 3237603, and requesting until July 10, 2024, to submit a memorandum of law in support of the motion; and the People's letter dated July 2, 2024, requesting a deadline of July 24, 2024, to file and serve a response to Defendant's CPL § 330.30 motion.

The People's request regarding the sentencing recommendation was granted yesterday. Defendant's request to file a CPL § 330.30 motion by July 10, 2024, is granted. The People's request for a deadline of July 24, 2024, to file a response to the motion is also granted.

The July 11, 2024, sentencing date is therefore vacated. The Court's decision will be rendered off-calendar on September 6, 2024 and the matter is adjourned to September 18, 2024, at 10:00 AM for the imposition of sentence, if such is still necessary, or other proceedings.

Very truly yours,

Juan M. Merchan
Judge Court of Claims
Acting Justice Supreme Court

HON. J. MERCHAN

JUL 0 2 2024

cc:     Counsel of record
        Assistant District Attorneys of record
        Court file

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | DECISION ON DEFENDANT'S MOTION FOR RECUSAL |
| - against - | |
| DONALD J. TRUMP | Ind. No. 71543-23 |
| Defendant. | |

HON. JUAN M. MERCHAN A.J.S.C.:

On May 31, 2023, Defendant filed a notice of motion seeking this Court's recusal. In the motion, Defendant argued, among other things, that "the political and financial interest" of a family member of this Court "creates an actual or perceived conflict of interest because rulings and decisions" made by this Court "may result in a financial benefit" to the Court's family member. Defendant's 5/31/23 Memorandum at pg 1. Before Defendant filed his motion, this Court had already written to the Advisory Committee on Judicial Ethics to seek a formal opinion regarding the issues later raised in Defendant's motion of May 31, 2023. In response to the Court's inquiry, the Advisory Committee opined on May 4, 2023, that "[a] judge's relatives remain free to engage in their own bona fide independent political activities (see e.g. Opinions 15-62; 98-22)" and that "[t]he matter currently before the judge does not involve either the judge's relative or the relative's business, whether directly or indirectly." Opinion 23-54 at pg. 3. By Decision dated August 11, 2023, this Court denied Defendant's motion. A copy of the Advisory Committee's opinion was provided with the Court's Decision.

On April 3, 2024, the Defendant filed a second motion seeking this Court's recusal. Raising no new facts or law, the Defendant again premised his motion for recusal on the unsubstantiated claims that a family member of this Court stood to gain financially from this Court's rulings. Defendant's 4/3/24 Memorandum at pgs. 19-20. This second motion for recusal was denied from the bench on April 15, 2024.

On May 30, 2024, a New York County jury returned a unanimous verdict finding Defendant guilty on all 34 counts in the indictment. This Court set a deadline of June 13, 2024, for the filing of post-verdict motions. Defendant did not file any motions by that deadline. On July 31, 2024,

Defendant filed the instant motion for recusal[1] - his third such motion. Defendant did not seek leave to file the motion, 48 days after the deadline set by this Court for the filing of post-verdict motions, nor did he seek an extension of time. Defendant justifies this latest motion for recusal on changed circumstances.

## POSITIONS OF THE PARTIES

Defendant appears to present two arguments in his instant motion. Although not entirely clear, Defendant first argues that the Court's Order Restricting Extrajudicial Statements is "unjust and unconstitutional." Defendant's Memo. This argument does not merit extensive discussion since it does not credibly purport to support the motion for recusal. Rather, it would appear to be nothing more than an attempt to air grievances against this Court's rulings. Defendant has litigated this Court's Order Restricting Extrajudicial Statements numerous times, not only with this Court, but with New York's appellate courts as well. *See Trump v. Merchan*, 227 AD3d 518 [1st Dept May 4, 2024]; *People v. Trump*, 211 NYS3d 744 [Sup Ct, New York County 2024]; *People v. Trump*, 211 NYS3d 784 [Sup Ct, New York County 2024]; *People v. Trump*, Indictment 71543-23, Decision Dated June 25, 2024; *Trump v. Merchan*, 2024 WL 3608030 [1st Dept 2024]. Notably, this Court did modify the Order after trial over the People's objection. However, aside from this Court's own modification, the Order has remained undisturbed by New York's appellate courts. It is therefore difficult to rationalize how Defense Counsel can, in good faith, claim that the Order is unconstitutional.

Defendant's second argument is that the alleged relationship between Vice President Kamala Harris and a member of this Court's family warrants recusal. The Court notes that this same argument was already made by Defendant in his first two motions for recusal. However, Defendant contends that the alleged conflict is more egregious now that Vice President Kamala Harris has been elevated to "Presumptive nominee of the Democratic party" for President. Defendant's Memo.

The People's position is that Defendant's "motion to renew is a vexatious and frivolous attempt to relitigate an issue that was twice addressed by this Court in orders that the First Department then refused to disturb." People's Opposition.

## DECISION

This Court sees no need to repeat the legal analysis contained in its Decision of August 11, 2023, denying Defendant's first motion for recusal. For purposes of this Decision, it suffices to say

---

[1] Hereinafter referred to as "Defendant's Memo."

that "the right to an impartial jurist is a basic requirement of due process." *People v. Trump*, 208 NYS3d 440 [Sup Ct, New York County 2023] citing to *People v. Novak*, 30 N.Y.3d 222, 225 (2017). In "[d]eciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Id.* at pg 6 citing to *In re Drexel Burnham Lambert Inc.*, 861 F2d 1307, 1312 [2d Cir 1988]. Stated plainly, Defendant's arguments are nothing more than a repetition of stale and unsubstantiated claims.

A judge "should participate in establishing, maintaining, and enforcing high standards of conduct, and must personally observe those standards so that the integrity and independence of the judiciary will be preserved, and so that public confidence in the integrity of the judiciary will be promoted." 22 NYCRR §§ 100.1 and 100.2(A). This Court has been consistent that it welcomes "zealous advocacy and creative lawyering" (*People v. Trump*, 208 NYS3d 460 at 3, citing to *Application of Giampa*, 147 Misc2d 397). However, counsel has been warned repeatedly that such advocacy must not come at the expense of professional responsibility in one's role as an officer of the court.

With these fundamental principles in mind, this Court now reiterates for the third time, that which should already be clear – innuendo and mischaracterizations do not a conflict create. Recusal is therefore not necessary, much less required. "On the facts before us, we conclude the judge's impartiality cannot reasonably be questioned based on the judge's relative's business and/or political activities, and the judge is not ethically required to disclose them." Advisory Comm on Jud Ethics Op 23-54 [2023].

As has been the standard throughout the pendency of this case, this Court will continue to base its rulings on the evidence and the law, without fear or favor, casting aside undue influence.

Defendant has provided nothing new for this Court to consider. Counsel has merely repeated arguments that have already been denied by this and higher courts. Defense Counsel's reliance, and apparent citation to his own prior affirmation, rife with inaccuracies and unsubstantiated claims, is unavailing. As such, Defendant's motion is again DENIED.

The above constitutes the Decision of this Court.

Dated: August 13, 2024
    New York, NY

AUG 1 3 2024

ENTERED,

Hon. Juan M. Merchan
Acting Justice of the Supreme Court
Judge of the Court of Claims

HON. J. MERCHAN

3

ADD-022



Supreme Court
of the
State of New York

**JUAN M. MERCHAN**
JUDGE OF THE COURT OF CLAIMS
SUPREME COURT, CRIMINAL TERM
FIRST JUDICIAL DISTRICT

CHAMBERS
100 CENTRE STREET
NEW YORK, N.Y. 10013

Via Email

September 6, 2024

Todd Blanche, Esq.
99 Wall Street
Suite 4460
New York, NY 10005

ADA Matthew Collangelo
New York County District Attorney's Office
One Hogan Place
New York, NY 10013

Re: *People v. Trump*, Ind. No. 71543-2023

Dear Counsel:

By letter dated August 14, 2024, Defendant requests an adjournment of his sentencing, currently scheduled for September 18, 2024, until after the 2024 presidential election. He argues the adjournment is necessary to provide adequate time to "assess and pursue" appellate options in the event this Court denies his pending Criminal Procedure Law ("CPL") § 330.30 motion and to avoid the potential "politically prejudicial" impact that a public sentencing could have on him and his prospects in the upcoming election. He attempts to bolster his application by repeating a litany of perceived and unsubstantiated grievances from previous filings that do not merit this Court's attention and will not be addressed in this Decision. The People, by letter dated August 16, 2024, state that they "defer to the Court on the appropriate post-trial schedule that allows adequate time to adjudicate defendant's CPL § 330.30 motion[.]" Nonetheless, the People, "to assist the Court" with its determination, identify several reasons why an adjournment would be appropriate.

On August 29, 2024, Defendant informed this Court by letter that he had filed a second Removal Notice in the United States District Court for the Southern District of New York ("USDC-SDNY"). Defendant's motion was denied by Judge Hellerstein, and Defendant is currently appealing that decision to the Second Circuit Court of Appeals.

As a threshold matter, this Court finds that, despite the People's stated neutrality, they present concerns in their letter of August 16, 2024, in a manner which seemingly supports Defendant's application for an adjournment. The People certainly do not oppose, and a careful reading of their response can fairly be construed as a joinder of the motion.

Notably, had Defendant been sentenced on July 11, 2024, as originally scheduled, there would of course have been no cause for delay. However, on July 1, 2024, the Supreme Court of the United States rendered a historic and intervening decision in *Trump v. United* States, 144 S Ct 2347 [2024]. Relying on that decision, Defendant immediately sought leave of this Court to file a CPL § 330.30 motion to set aside the verdict on the instant matter and to dismiss the indictment. In light of the Supreme Court's decision which this Court must interpret and apply as appropriate, this Court granted Defendant leave to file his motion. Defendant's application to adjourn sentencing until after resolution of his motion was not opposed by the People in their July 2, 2024, letter response. To allow full briefing by both parties, and this Court the time necessary to adequately consider the motion, sentencing was rescheduled initially to September 6, 2024. It was then adjourned again to September 18, 2024, following the filing of a third defense motion for this Court's recusal. This now means that any adjournment, of even one week beyond September 18, will bring us within approximately 41 days of the 2024 presidential election.

This matter is one that stands alone, in a unique place in this Nation's history, and this Court has presided over it since its inception – from arraignment to jury verdict and a plenitude of motions and other matters in-between. Were this Court to decide, after careful consideration of the Supreme Court's decision in *Trump*, that this case should proceed, it will be faced with one of the most critical and difficult decisions a trial court judge faces - the sentencing of a defendant found guilty of crimes by a unanimous jury of his peers.

This adjournment request has now been decided in the same way this Court has decided every other issue that has arisen since the origination of this case, applying the facts and the law after carefully considering the issues and respective arguments of the parties to ensure that the integrity of the proceeding is protected, justice is served, and the independence of this judiciary kept firmly intact.

If Defendant's CPL § 330.30 motion is denied, the law requires the imposition of sentence following a guilty verdict without unreasonable delay. CPL § 380.30 (1). The public's confidence in the integrity of our judicial system demands a sentencing hearing that is entirely focused on the verdict of the jury and the weighing of aggravating and mitigating factors free from distraction or distortion. The members of this jury served diligently on this case, and their verdict must be respected and addressed in a manner that is not diluted by the enormity of the upcoming presidential election. Likewise, if one is necessary, the Defendant has the right to a sentencing hearing that respects and protects his constitutional rights.

Unfortunately, we are now at a place in time that is fraught with complexities rendering the requirements of a sentencing hearing, should one be necessary, difficult to execute. Thus, in accordance with certain of the grounds submitted by Defendant and the reasons for adjournment provided by the People coupled with the unique time frame this matter currently finds itself in, the decision on the CPL § 330.30 motion and the imposition of sentence will be adjourned to avoid any appearance—however unwarranted—that the proceeding has been affected by or seeks to affect the approaching Presidential election in which the Defendant is a candidate. The Court is a fair, impartial, and apolitical institution. Adjourning decision on the motion and sentencing, if such is required, should dispel any suggestion that the Court will have issued any decision or imposed sentence either to give an advantage to, or to create a disadvantage for, any political party and/or any candidate for any office. Adjournments for sentencing are routinely granted, often several times, in any number of other criminal matters pending in this courthouse, particularly when unopposed, for reasons ranging from personal circumstances to the scheduling needs of the parties involved. Given the unique facts and circumstances of this case, there is no reason why this Defendant should be treated any differently than any other.

This is not a decision this Court makes lightly but it is the decision which in this Court's view, best advances the interests of justice.

Therefore, it is hereby

ORDERED, that decision on Defendant's CPL § 330.30 motion to set aside the jury verdict and to dismiss the indictment will be handed down off-calendar on November 12, 2024; and it is further

ORDERED, that sentencing on this matter, if necessary, is adjourned to November 26, 2024, at 10am; and it is further

ORDERED, that Defendant's motion to preclude the People from filing a pre-sentence memorandum is DENIED. The People's submission, if any, will be filed with the Court under seal pursuant to CPL § 390.50(1).

The above constitutes the Decision and Order of the Court.


Juan M. Merchan
Acting Justice of the Supreme Court
Judge of the Court of Claims

ADD-026

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | DECISION AND ORDER |
| - against - | Ind. No. 71543/2023 |
| DONALD J. TRUMP, | |
| Defendant. | |

HON. JUAN M. MERCHAN A.J.S.C.:

On November 19, 2024, this Court received separate submissions from Defendant and the District Attorney of New York County ("DANY" or the "PEOPLE"), seeking various forms of relief in connection with the above-captioned matter. The respective applications are decided as follows:

IT IS HEREBY ORDERED, that Defendant's request for leave to file a motion to dismiss pursuant to Criminal Procedure Law ("CPL") § 210.40 is GRANTED; and it is further

ORDERED that the joint request for a motion schedule is GRANTED. Defendant's motion is due by the close of business Monday, December 2, 2024. The People's response is due by the close of business Monday, December 9, 2024. The Court will not accept reply briefs; and it is further

ORDERED that the application to stay decision on Defendant's CPL § 330.30(1) motion is GRANTED pending receipt of the papers from all parties submitted in accordance with the motion schedule noted above; and it is further

ORDERED that the joint application for a stay of sentencing is GRANTED to the extent that the November 26, 2024, date is adjourned.

The above constitutes the Decision and Order of the Court.

November 22, 2024
New York, New York

NOV 2 2 2024

_____
Juan M. Merchan
Acting Justice of the Supreme Court
Judge of the Court of Claims

HON. J. MERCHAN

ADD-027

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP,

Defendant.

---

**DECISION and ORDER**

Defendant's Motion to
Dismiss the Indictment and
Vacate the Jury's Verdict
Pursuant to C.P.L.
§ 330.30(1)

Indictment No. 71543-23

JUAN M. MERCHAN, A.J.S.C.:

### PART I: BACKGROUND AND PROCEDURAL HISTORY

Trial commenced on the instant matter on April 15, 2024, and continued through May 29, 2024, when the jury received the case to begin deliberations. The following day, on May 30, 2024, the jury returned a verdict of guilty on 34 counts of Falsifying Business Records in the First Degree. That same day, this Court set a deadline of June 13, 2024, for the filing of post-trial motions and adjourned to July 11, 2024, for the imposition of sentence. The June 13, 2024, deadline passed without Defendant filing motions.

On July 1, 2024, the Supreme Court of the United States, rendered a landmark decision in *Trump v. United States*, 603 US 593 [2024]. Defendant filed a pre-motion letter dated that same day seeking leave of this Court to file the instant motion pursuant to Criminal Procedure Law ("CPL") § 330.30(1). Defendant argued in his letter that the jury's verdict must be set aside pursuant to *Trump* because "DANY should not have been permitted to offer evidence at trial of President Trump's official acts." Defendant's Letter dated July 1, 2024.

Defendant first broached the topic of Presidential immunity on December 22, 2022, in a motion for summary judgment he filed in an unrelated case brought against him for defamation. *Carroll v. Trump*, 680 F.Supp.3d 491, 498 [SD NY 2023]. In that motion, Defendant argued that the suit should be dismissed because a "President is 'entitled to absolute immunity from damages liability predicated on his official acts,'" and that the alleged defamatory statements introduced at that trial fell within the outer perimeter of his official duties as President. *Id.* at ECF No. 109 citing *Nixon v. Fitzgerald*, 457 US 731 [1982].

Defendant was arraigned on the instant matter several months later, on April 4, 2023. Approximately one month later, on May 4, 2023, Defendant filed a Notice of Removal in the Southern District of New York. *New York v. Trump*, 683 F.Supp.3d 334 [SD NY 2023]. In the Notice of Removal, he argued that "this case involves important federal questions" because the indictment contains charges related to conduct that Defendant "committed while he was President of the United States that was within 'the color of his office.'" *Id.* at ECF No. 1. The motion was denied by Judge Hellerstein on July 19, 2023, who found that the Defendant "failed to show that the conduct charged by the Indictment is for or relating to any act performed by or for the President under color of the official acts of a President." *Id.* at 351.

On June 13, 2023, Defendant was indicted in the United States District Court for the Southern District of Florida on charges related to his alleged handling of classified documents. *United States of America v. Trump, et al.*, S.D. Fla, 23 CR 80101, (AMC) (hereinafter the "*Florida Documents Matter*"). On August 3, 2023, the Defendant was indicted in Washington, D.C. for allegedly interfering with the 2020 Presidential election. *United States v. Trump*, US Dist Ct, D.D.C 23 CR 257, (TSC) (hereinafter "*January 6th Matter*").

On September 29, 2023, Defendant filed an omnibus motion in the instant matter in which he did not raise any issues with respect to Presidential immunity or the Supremacy Clause. *See* Defendant's Omnibus Motion *generally*. Five days later, on October 5, 2023, Defendant moved to dismiss the *January 6th Matter* on the grounds of Presidential immunity. *January 6 Matter* at ECF No. 74. On February 22, 2024, Defendant moved to dismiss the criminal indictment in the *Florida Documents Matter* on the grounds of Presidential immunity, arguing that the "charges stem directly from official acts by President Trump while in office." *See Florida Documents Matter* at ECF No. 324. That same day, Defendant filed motions *in limine* in the instant matter wherein he sought, among other things, to: preclude the People from arguing that "President Trump sought to improperly influence the 2016 election;" preclude the testimony of Dino Sajudin, Karen McDougal and Stephanie Clifford; preclude the People "from suborning Michael Cohen's perjury;" and preclude the People from "introducing the nearly 100 statements they seek to attribute to President Trump." Defendant's Motions *in limine* at pg. 40. Notably, Defendant did not raise the defense of Presidential immunity even though he had already done so in the Notice of Removal he filed with the Southern District of New York, the *Florida Documents Matter* and the *January 6th Matter*.[1] In fact, Defendant again

---

[1] Counsel in the instant matter also represented Defendant in the *Florida Documents Matter* and the *January 6th Matter*, both of which have been dismissed.

failed to argue Presidential immunity in his Reply to the People's motions *in limine* which he filed a week later, on February 29, 2024.

On March 7, 2024, 18 days before the then scheduled trial date of March 25, 2024, Defendant for the first time in the instant matter moved to preclude various pieces of evidence on the grounds of Presidential immunity. By Decision and Order dated April 3, 2024, this Court denied the motion as untimely pursuant to CPL § 255.20(3), holding that Defendant "had myriad opportunities to raise the claim of Presidential immunity well before March 7, 2024" but failed to do so. *See* this Court's Decision and Order dated 4/3/24 at pgs. 5-6.[2]

As noted above, Defendant filed the instant CPL § 330.30(1) motion after the Supreme Court rendered its July 1, 2024, decision but after this Court's June 13, 2024, deadline for the filing of post-verdict motions. Nonetheless, this Court granted leave, set a briefing schedule and adjourned sentencing in order to carefully analyze the Defendant's arguments in the context of *Trump* and to determine whether that Decision has any bearing on the case at bar.[3]

The following constitutes the Decision and Order of this Court.

## PART II: *TRUMP V. UNITED STATES*, 603 US 593 [2024]

On August 1, 2023, a federal grand jury indicted Donald J. Trump for conduct that allegedly occurred during his Presidency following the 2020 Presidential election. *Trump* at 602. Trump moved to dismiss the indictment on the grounds of Presidential immunity. *Id.* at 603. The Federal District Court for the D.C. Circuit denied the motion. *Id.* at 604. Defendant appealed and the D.C. Circuit Court of Appeals affirmed. *Id.* The Supreme Court of the United States granted *certiorari* "to answer the following question: '[w]hether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office.'" *Id.* at 605. The Supreme Court identified *Trump* as "the first criminal prosecution in our Nation's history of a former President for actions taken during his Presidency"[4] and then elaborated on the issue before it: "We are called upon to consider whether and under what circumstances such a prosecution may proceed." *Id.*

---

[2] In a letter motion filed with this Court on April 16, 2024, Defendant again raised the argument of evidence preclusion premised on Presidential immunity. The motion incorporated Defendant's March 7, 2024, Presidential immunity motion.

[3] During the pendency of the instant motion, Defendant filed a separate motion to dismiss pursuant to CPL §§ 210.20(1)(h) and 210.40(1). That motion has not yet been decided.

[4] As noted in the Procedural History, *supra*, the instant matter was arraigned on April 4, 2023, months before Defendant was indicted in the *January 6th Matter*.

3

The Supreme Court concluded that, "the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office. At least with respect to the President's exercise of his core constitutional powers, this immunity must be absolute." *Id.* at 606. The *Trump* Court identified some of the duties within his core constitutional powers as commanding the Armed Forces, granting reprieves and pardons, appointing public ministers and foreign relations such as "making treaties, appointing ambassadors, recognizing foreign governments, meeting foreign leaders, overseeing international diplomacy and intelligence gathering, […] terrorism, trade and immigration." *Id.* at 607. As the President's duties within his core constitutional powers are of "unrivaled gravity and breadth," a President must be permitted to make decisions of the utmost import without fear of prosecution. *Id.* Thus, "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609.

The *Trump* Court however, recognized that "not all of the President's official acts fall within his conclusive and preclusive authority." *Id.* The President sometimes acts in a "zone of twilight" and the reasons that justify absolute immunity do not apply to those acts. *Id.* Before analyzing and deciding which acts fall within this "zone of twilight," where the President's authority is shared with Congress, the *Trump* Court "recognize[d] that only a limited number of our prior decisions guide determination of the President's immunity in this context. That is because proceedings directly involving a President have been uncommon in our Nation and 'decisions of the Court in this area' have accordingly 'been rare' and 'episodic.'" *Id.* at 610 citing *Dames & Moore v. Regan*, 453 US 654 661 [1981]. Lacking precedent on point, the *Trump* Court, "[t]o resolve the matter [looked] primarily to the Framers' design of the Presidency within the separation of powers, [its] precedent on Presidential immunity in the civil context, and […] criminal cases where a President resisted prosecutorial demands for documents." *Id.* Notably absent of course, was any precedent where a President was criminally charged for actions taken while in office – the specific issue the *Trump* Court was tasked with resolving. *Id.* at 639 ("No court has ever been faced with the question of a President's immunity from prosecution. All that our Nation's practice establishes on the subject is silence.")

In its analysis of Presidential immunity in the civil context, the *Trump* Court cited and relied in large part, upon *Fitzgerald*, 457 US 731, which held that a President must be absolutely immune from "damages liability for acts within the 'outer perimeter' of his official duties." *Fitzgerald* at 756. Conversely, when considering the issue of document demands upon the President in the criminal context, the *Trump* Court relied upon *United States v. Nixon*, 418 US 683 [1974], which held that when

4

a subpoena is issued to a president to produce certain evidence, there can be no claim of absolute privilege "given the 'constitutional duty of the Judicial Branch to do justice in criminal prosecutions.'" *Trump* at 612. But the *Trump* Court recognized that "[c]riminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession, as in *Burr* and *Nixon*." *Id.* at 613. The *Trump* Court was careful to acknowledge that "[t]he President, charged with enforcing federal criminal laws, is not above them." *Id.* at 614. "Taking into account these competing considerations, we conclude that the separation of powers principles explicated in our precedent necessitate at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility." *Id.*

The *Trump* Court instructed that the first step in analyzing whether a former President is entitled to immunity is to "distinguish his official from unofficial actions" and the first step in doing that is to assess the "President's authority to take that action." *Id.* at 617. The *Trump* Court recognized however, that "no court has thus far considered how to draw that distinction," and the task "can be difficult." *Id.* "Critical threshold issues in this case are how to differentiate between a President's official and unofficial actions, and how to do so with respect to the indictment's extensive and detailed allegation covering a broad range of conduct. We offer guidance on those issues below." *Id.* The *Trump* Court stopped short of resolving, at least completely, the issue before it and notably refrained from deciding what level of immunity was sufficient for official actions lying within the outer perimeter of a President's authority. "At the current stage of proceedings in this case, however, we need not and do not decide whether that immunity must be absolute, or instead whether a presumptive immunity is sufficient." *Id.* at 606. In doing so, the *Trump* Court observed that "[d]espite the unprecedented nature of this case, and the very significant constitutional questions that it raises, the lower courts have rendered their decisions on a highly expedited basis. Because those courts categorically rejected *any* form of Presidential immunity, they did not analyze the conduct alleged in the indictment to decide which of it should be categorized as official and which unofficial. Neither party has briefed that issue before us." *Id.* at 616. As a result, the *Trump* Court remanded the case to the Federal District Court "to determine in the first instance-with the benefit of briefing we lack-whether Trump's conduct in this area qualifies as official or unofficial." *Id.* at 628.

Notwithstanding the determination to remand as to all other claims, the *Trump* Court did find Trump "absolutely immune from prosecution for *the alleged conduct* involving his discussions with

5

Justice Department officials."[5] *Id.* at 621 (emphasis added). In attempting to assuage the concerns expressed by the dissent, Chief Justice Roberts succinctly clarified the majority's holding. "As for the dissent, they strike a tone of chilling doom that is wholly disproportionate to what the Court actually does today – conclude that immunity extends to official discussions between the President and his Attorney General, and then remand to the lower courts to determine 'in the first instance' whether and to what extent Trump's remaining alleged conduct is entitled to immunity;" the *Trump* Court expressly indicating that its holding is no broader than that. *Id.* at 637.

Because the *Trump* Court remanded to the Federal District Court, for it to conduct its own evaluation, the Court provided some guidance for distinguishing "official" from "unofficial" acts and the context within which that analysis should be performed. As framed by Chief Justice Roberts, there "accordingly 'exists the greatest public interest' in providing the President with 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 611 *citing Fitzgerald* at 752, quoting *Ferri v. Ackerman*, 444 US 193, 203 [1979]. And further, the *Trump* Court emphasized the need to safeguard "the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* at 614. But also, "[t]he President enjoys no immunity for his unofficial acts, and not everything the President does is official. The President is not above the law." *Id.* at 642. Thus, while a finding of official conduct of a President acting within the core constitutional authority imparts absolute immunity, presumptive immunity from prosecution for an official act in the outer perimeter is overcome if "the Government can show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch,'" as long as this analysis precludes inquiry into the President's motives. *Id.* at 614, 618.

That the ruling offered some guidance but ultimately remanded to the District Court for a more thorough exploration of the relevant facts, speaks to the narrowness of its holding. *Trump* involves a unique set of facts, applied to a rarely explored area of the law without precedent directly on point in our Nation's history. That holding was guided by the bedrock principle, as first set forth by the Supreme Court in the limited precedent in this area, to wit *Fitzgerald* and *Clinton*, that a sitting

---

[5] The *Trump* Court was able to rule on the applicability of the Presidential immunity doctrine as to charges related to a President's discussions with his Attorney General because it had a sufficient record on that issue. However, the case was remanded for the lower court to develop a similarly robust record for possible review of the other claims on appeal. Remand was necessary in *Trump*, but the Supreme Court did not hold that lower courts *must* conduct such hearings in every instance. Thus, Defendant's claim that the absence of a formal hearing constitutes a mode of proceedings error is unsupported.

President must "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system" without undue fear of criminal repercussions. *Id.* at 611. In extending its ruling to prohibit the use of official conduct evidence in charges premised upon unofficial conduct, the *Trump* Court highlighted its concern that if "official conduct for which the President is immune [is] scrutinized to help secure his conviction, even on charges that purport to be based only on his unofficial conduct, the 'intended effect' of immunity would be defeated." *Id.* at 631 *citing to Fitzgerald* at 756.

The *Trump* Court's decision was principally concerned with a President's ability to make decisions *and* to make those decisions for the public good. Based upon that concern, which Chief Justice Roberts refers to in various ways throughout the *Trump* decision, it is readily apparent that *Trump* addressed a very specific issue: "When may a former President be prosecuted for official acts taken during his Presidency?" *Id.* at 641. That is not the issue currently before this Court. The criminal charges here stem from the private acts of the Defendant made prior to taking the Office of the President – leaving only the question as to whether the *evidence* used to support the instant charges meet the official acts criteria as set forth by the *Trump* Court.

In the case at bar, the trial Court is thoroughly familiar with the legal and factual issues before it – having presided over every stage of the proceedings. And unlike *Trump*, both parties here have argued and now briefed the issues exhaustively. The record before this Court is complete and there is no need for further fact-finding or briefing.

The President of the United States has a duty to the citizenry that is paramount to each and every decision they make. "There accordingly 'exists the greatest public interest' in providing the President with the 'maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 611. This is to ensure the President can take "bold and unhesitating action" free from fear of unwarranted reprisal. *Id.* at 613. But a "President is not above the law." *Id.* at 642.

It is through this lens and pursuant to the guidance provided by the Supreme Court that this Court considers Defendant's CPL § 330.30(1) motion.

### PART III: ARGUMENTS OF THE PARTIES

Defendant moves to dismiss the indictment and vacate the jury verdict on the grounds that the People introduced evidence in the grand jury and at trial relating to Defendant's official acts as President, in violation of the Presidential immunity doctrine as pronounced by the Supreme Court

7

in *Trump*, and the Supremacy Clause.[6] Defendant further argues that the alleged violation is not subject to harmless error analysis and even if it were, the harm caused is irreparable. Defendant's Motion at pgs. 20, 41, 43.

Specifically, Defendant argues that certain "official-acts evidence" admitted at trial "concerned actions taken pursuant to 'core' Executive power for which 'absolute' immunity applies." *Id.* at pg. 2. Defendant further argues that should this Court find that Defendant is not entitled to absolute immunity, then "it is equally clear" that he is entitled to presumptive immunity because the evidence admitted at trial "fit[s] comfortably within" the outer perimeter of the President's authority and the People have failed to rebut this claim with evidence unrelated to motive as required by the *Trump* Court's Decision. *Id.* at pgs. 27, 29.

Defendant identifies the following evidence as improperly received at trial: private communications with Hope Hicks ("Ms. Hicks") as White House Communications Director; Office of Government Ethics Form 278e ("OGE Form 278e"); the observations of Madeleine Westerhout ("Ms. Westerhout"), Director of Oval Office Operations, regarding Defendant's "preferences and practices" in the Oval Office; the testimony of Michael Cohen ("Mr. Cohen") regarding his communications with Defendant and others about the presidential pardon power, testimony regarding a "pressure campaign," and testimony about his conversations with David Pecker ("Mr. Pecker") about a related Federal Election Commission (hereinafter "FEC") inquiry; and "five sets of posts from 2018 on President Trump's official White House Twitter account."[7] *Id.* at pg 14.

The People argue that Defendant failed to preserve the majority of his objections. The People further argue that should the Court consider the merits of the motion, despite the procedural bar, the evidence Defendant identifies is wholly unrelated to any official acts as President and thus, not entitled to any form of immunity whether it be in the grand jury or at trial. In the alternative, the People argue that the evidence at issue relates only to the outer perimeter of the President's authority which is entitled only to presumptive immunity, which the government has successfully rebutted

---

[6] Defendant previously raised a Supremacy Clause argument before Judge Hellerstein who, in his July 19, 2023, decision denying removal, held that Supremacy Clause "immunity requires the defendant to show both that he was performing 'an act which he was authorized to do by the law of the United States' and that, in performing that authorized act, 'he did no more than what was necessary and proper for him to do.'" *New York v. Trump*, 683 F.Supp.3d 334, [SD NY 2023]. Defendant failed to raise this argument in a timely post-judgment motion. Moreover, the issue of Supremacy was not implicated in *Trump* and therefore, that decision does not provide Defendant a new avenue for consideration by this Court of his current Supremacy Clause claim. In any event, this Court adopts Judge Hellerstein's reasoning and finding.

[7] This evidence is discussed in greater detail in the Discussion section below.

8

without inquiring into the President's motives in adherence with *Trump*. Finally, the People argue that if any of the evidence in dispute was admitted in violation of either immunity prohibition, the error was harmless in light of the overwhelming evidence of guilt.

## PART IV: CPL § 330.30(1)

"After rendition of a verdict of guilty and before sentence," a court may set aside a verdict if there is a ground in the record that, if raised on appeal, "would require a reversal or modification of the judgment as a matter of law by an appellate court." CPL § 330.30(1), Defendant's Motion at pg. 18; People's Response at pg. 8. A trial court's inquiry pursuant to § 330.30(1) is generally limited to a determination of whether the trial evidence was "legally sufficient to establish the defendant's guilt of an offense of which he was convicted." *People v. Carter*, 63 NY2d 530, 536 [1984]. A trial court must determine only "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial in order to uphold the verdict." *People v. Bleakly*, 69 NY2d 490 [1987].

The only claim of error that can serve as a basis to set aside a verdict is one that was properly preserved for appellate review. *People v. Everson*, 100 NY2d 609 [2003]. Therefore, in the context of a CPL § 330.30(1) motion, an "argument may not be addressed unless it has been properly preserved for review during the trial." *People v. Hines*, 97 NY2d 56 [2001] citing to *People v. Carter*, 63 NY2d 530 [1984]. As reasoned in *People v. Hawkins*, 11 NY3d 484 [2008], "[s]ound reasons underlie this preservation argument. As we stated in *Gray*, a specific motion brings the claim to the trial court's attention, alerting all parties, in a timely fashion to any alleged deficiency in the evidence, thereby advancing both the truth-seeking purpose of the trial and the goal of swift and final determination of guilt or nonguilt of the defendant." *Hawkins*, 11 NY3d at 492, referencing *People v. Gray*, 86 NY2d 10 [1995]. To "preserve a claim of error in the admission of evidence or a charge to the jury, a defendant must make his or her position known to the court." *Gray*, 86 NY2d at 19.

## PART V: DISCUSSION

**Section A**. Preservation

The threshold issue this Court must consider then, is whether the claims of Presidential immunity were properly preserved for this Court's review.

The People argue that Defendant failed to preserve any claim of Presidential immunity as to the evidence in dispute other than the testimony of Ms. Hicks and OGE Form 278e. People's

Response at pgs. 6, 9-12. While Defendant claims that he preserved objections as to all evidence in his pre-trial filings and at trial, he also argues that the Court should overlook any failure to properly preserve in the "interest of justice" or for "good cause." Defendant's Reply at pg. 2. However, "good cause" and "interest of justice" are not legally viable standards for a CPL §330.30(1) review in the absence of proper preservation. *People v. Carter*, 63 NY2d 530 [1984] (Trial judges have no power to vacate a conviction on interest of justice grounds), *People v. Sudol*, 89 AD3d 499 [1st Dept 2011] (Trial court lacks Appellate Division jurisdiction and may only grant a motion where alleged error was preserved by proper objection at trial.)

Defendant also argues that *Trump* constitutes an intervening decision and therefore, provides an exception to the preservation requirement. Defendant's Reply at pgs. 1-2, 6. This Court disagrees. The New York Court of Appeals in *People v. Cabrera* emphasized that preservation is crucial except in the most limited of circumstances as it "gives the parties an essential opportunity to prove relevant factual and legal issues, thereby ensuring that the record before this Court reflects a full airing of the points that bear upon an ultimate merits determination." 41 NY3d 35, 43 [2023]. It further held that "preservation is essential where the failure to raise a claim in the court of first instance means that the appellate record is inadequate to fairly assess the merits, *even if governing law was altered by an intervening Supreme Court decision.*" *Id.* at 45 (emphasis added). The *Cabrera* court highlighted several New York Court of Appeals decisions that reiterated the need for preservation despite an intervening Supreme Court decision. For example, the Court of Appeals held in *People v. Martin*, 50 NY2d 1029 [1980], that the intervening Supreme Court decision in *Payton v. New York*, 445 US 573 [1980], which changed the law in New York regarding warrantless arrests inside the home, did not excuse a failure to preserve in the lower courts. The intervening decision in *Trump* equally does not excuse a failure by Defendant to adequately preserve his objections to the evidence he now claims was erroneously admitted.

Defendant also claims that the admission of what he has characterized as official acts evidence constitutes a "mode of proceedings" error which does not require preservation. Mode of proceedings errors occupy a very narrow set of claims. *People v. Patterson*, 39 NY2d 288 [1976]. To qualify, the error must "go to the essential validity of the process and [be] so fundamental that the entire trial is irreparably tainted." *People v. Kelly* 5 NY3d 116, 119-120 [2005]. "[M]ost errors of constitutional dimension" must be preserved in the trial court. *People v. Hanley,* 20 NY3d 601, 604-605. Examples of mode of proceedings errors include "changing of the burden of proof, consent to less than a 12-member jury in a criminal case, and deviation from State constitutionally mandated

10

requirements for an indictment." *Gray,* 86 N.Y.2d at 21-22. And more recently, the Court of Appeals held that notwithstanding the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 US 1 [2022], which "effected a substantial change in Second Amendment jurisprudence," and "raises significant questions about whether, in light of *Bruen*, lack of licensure is an essential element of New York's criminal possession of a weapon offense and must therefore be charged to the jury in all cases," it did not qualify as a mode of proceedings error. *People v. David,* 41 NY3d 90, 97 [2023]. The alleged errors here do not satisfy the narrow mode of proceedings exception.

As briefly summarized above, Defendant failed to seek a pre-trial ruling on the issue of Presidential immunity until March 7, 2024, less than three weeks before the scheduled start of trial.[8] Although Defendant argues that the Supreme Court's grant of *certiorari* on the issue of Presidential immunity on February 28, 2024, established the timeliness of his filing, that is not the case, as was thoroughly explained in this Court's Decision of April 3, 2024, which tracked the history of litigation in the instant matter and paralleled it with Defendant's immunity-based filings in his federal matters. That analysis established what can only be explained as Defendant's affirmative decision to not file a timely immunity-based motion here.

On April 15, 2024, the first day of jury selection, Defendant informed this Court of his intent to file another motion for preclusion of evidence on the grounds of Presidential immunity. Tr. 53-55. The following day, Defendant formally filed a pre-motion letter which incorporated by reference his March 7, 2024, submission.[9] In the April 16, 2024, letter, Defendant sought a pre-trial ruling on the grounds of Presidential immunity as to two specific areas of potential evidence, OGE Form 278e and certain social media posts later identified as People's Exhibits 407G through 407I. Defendant also made a sweeping reference to other categories of potential evidence, including "witness testimony regarding [Defendant's] official acts during time in Office, such as anticipated testimony from former White House staff regarding their communications with President Trump during his first term." On April 18, 2024, the People responded by letter arguing the Court should "adhere to

---

[8] The trial date was later adjourned to April 15, 2024, due to a discovery dispute.

[9] In his March 7, 2024, submission, Defendant sought an adjournment of the trial until a decision was rendered in *Trump*, or in the alternative, preclusion of any official acts evidence based on Presidential immunity. In that submission, he referenced three Twitter postings by Defendant from 2018, three public statements Defendant made in 2018 (none of which were introduced at trial), the U.S. Office of Government Ethics form submitted in 2018, testimony from Ms. Hicks regarding communications she had with Defendant between January 2017 and March 2018 and again from March 2020 to January 2021, and conversations between Mr. Cohen and Defendant in February 2017 and 2018 "Twitter posts" testified to by Mr. Cohen in the grand jury. Defendant's March 7, 2024 Motion pgs. 3-4.

11

its previous ruling" that Defendant's motion for pre-trial consideration was untimely and that the Court should instead rule on objections as they are made at trial. On April 19, 2024, this Court reiterated its previous ruling that the motion for a pre-trial ruling was untimely. Notwithstanding, this Court made clear that Defendant was not without recourse. To be clear, this Court did not preclude Defendant from objecting and seeking preclusion of proffered evidence he believed to be in violation of the Presidential immunity doctrine. Decision on the merits of such objections was merely deferred until an actual objection was voiced at trial. "[W]e are going to wait until trial and *you can make your objections at that time.* Both of you have already made your arguments in the letters, so *the Court will decide it at the time of trial when the objection is made.*" Tr. 802 (emphasis added).

In accordance with this Court's ruling, Defendant preserved his claim with respect to the testimony of Ms. Hicks as to "statements by Defendant while he was President of the United States" by making a timely objection prior to her testimony. Indeed, on May 3, 2024, immediately after the People called Ms. Hicks to the stand and before the start of her direct examination, the following colloquy took place:

"MR. BOVE: May I approach?

THE COURT: Sure.

MR. BOVE: Thank you. Judge, I am sorry. We want to put on the record our objection on Presidential immunity grounds. I expect there will be testimony from Ms. Hicks related to statements by President Trump while he was President of the United States. Unless you tell me it is necessary, I prefer not to lodge the objections question by question. We object to the subject of her testimony based on the authorities we submitted, and our position being that the testimony is evidence of official acts being presented at a criminal trial against the President, and it should be precluded.

MR. COLANGELO: I don't anticipate we will be showing any exhibits that fall within that category. We intend to elicit testimony, and we have briefed at length the argument that the rule of inadmissibility that Mr. Bove just described does not exist and is not a rule. The inadmissibility rule was not a rule that was ever recognized. Several cases that we have cited has held the exact opposite in the analogous context of consular immunity. As we cited in other papers holding that evidence of otherwise immune conduct is nonetheless admissible in a trial regarding criminal conduct for non-immune acts. So, the testimony we intend to elicit involves statements by the Defendant, and there is no doctrine that would allow excluding it.

12

THE COURT: I believe I ruled on this as well. So the objection is noted. I don't think you need to object as to each question.

MR. BOVE: Thank you, Judge." Tr. 2120-2122.

Therefore, this Court agrees that the objection was properly preserved as to the testimony of Ms. Hicks pertaining to official acts. Defendant identifies the official acts evidence as "President Trump's private conversations with the White House Communications Director," and separates those conversations into four specific communications. Defendant's Motion at pgs. 2-3, 9-11. Although Defendant now appears to expand his objection to include "[a]ll of Hicks's testimony concerning events in 2018,"[10] there is no reference in the testimony to any alleged official acts other than the four he has identified. In fact, of the 98 pages of transcript memorializing Ms. Hicks's testimony, only 11 pages pertain to the four instances identified by Defendant. Those four objections are preserved and will be addressed individually in the discussion section below.

Defendant objected at trial and properly preserved his Presidential immunity claim with respect to Form OGE 278e. Tr. 2369-2370, People's Exhibit 81.

Defendant failed to object to the testimony of Ms. Westerhout on the grounds of Presidential immunity at any time during the course of the trial and thus, his current claim as to her testimony is unpreserved.

Likewise, Defendant failed to preserve the majority of his Presidential immunity claims with respect to Mr. Cohen's testimony. The subject matter of all of Defendant's claims in the instant motion relate to a so-called "pressure campaign," statements relating to an FEC investigation, and lastly, statements related to Mr. Cohen's testimony before Congress and the Special Counsel's investigation into alleged Russian interference in the 2016 presidential election. Defendant's Motion at pgs. 12-16, 33-40. According to the People, the pressure campaign referred to measures taken by Defendant while President and others, to "dissuade Cohen from cooperating with investigations into the payments to McDougal and Stormy Daniels." People's Response at p. 4. The People sought to introduce evidence of a pressure campaign for three purposes: to demonstrate Defendant's consciousness of guilt, to rebut Defendant's claim that certain witnesses, including Mr. Cohen, were benefitting from their testimony, and to explain to the jury why certain witnesses, including Mr. Cohen, at various times denied certain allegations which they later recanted and acknowledged as true. Tr. 41-58. Defendant sought a pre-trial ruling to exclude evidence of the pressure campaign on

---

[10] Defendant's Motion at pg. 26.

the grounds that such evidence violated the Presidential immunity doctrine, as well as on relevance and other evidentiary grounds. While this Court declined to rule on Defendant's motion on his Presidential immunity claims as untimely, this Court agreed with Defendant on the other evidentiary grounds and in its Decision and Order on Defendant's Motions *in limine*, dated March 18, 2024, excluded testimony about the alleged pressure campaign unless and until such time as Defendant opened the door to such testimony.

Opening statements commenced on April 22, 2024. In his opening statement, Defendant raised the very subject this Court had earlier cautioned would likely open the door to testimony about the alleged pressure campaign. As a result, on April 30, 2024, before introducing certain evidence, the People renewed their request for permission to elicit testimony about the pressure campaign. Tr. 1652. The Court entertained extensive argument whether Defendant had in fact opened the door to such testimony and if so, the purpose for which it could be introduced. Tr. 1652-1662. Defense counsel ultimately agreed that the testimony could properly be elicited to advance the People's theory of the alleged pressure campaign, but maintained his objection that it should not come in to prove consciousness of guilt. "So, with respect to the other proffered reasons for some of this testimony to counter financial benefits to Mr. Cohen and Ms. Daniels and to explain why they changed their story, that makes sense. And I think they are going to talk about that on direct, but consciousness of guilt is of a different order, in our view." Tr. 1660. As a result, this Court modified its previous ruling to the extent that the testimony would be permitted for the limited purpose of rebutting the challenges to Mr. Cohen's, and others', credibility, but could not be introduced as evidence of consciousness of guilt. Tr. 1661-1662. Defendant thereafter objected to the introduction of People's Exhibits 407F through 407I, immediately prior to their introduction.[11] Tr. 3167-3168. Thus, Defendant's claim as to these exhibits was properly preserved. However, at no time immediately prior to, or during, Mr. Cohen's testimony did Defendant voice any further objections to official acts evidence on Presidential immunity grounds. Thus, the remaining claims are not preserved.

The record is clear that Defendant did not make any Presidential immunity-based objections at trial other than those identified above, and Defendant concedes as much. However, Defendant

---

[11] During the lengthy colloquy addressing the purported pressure campaign on April 30, 2024, defense counsel made a passing reference to Defendant's April 16, 2024, filing which included Presidential immunity claims as to People's Exhibits 407F through 407I. On May 10, 2024, Exhibits 407F through 407I were offered into evidence. In lieu of making a speaking objection or requesting a sidebar, the objection voiced by Defendant was "Your Honor, the same objection as discussed last week." Giving broad deference to Defendant and every benefit of the doubt, this Court will recognize an objection Defendant made on Presidential immunity grounds, ten days prior on April 30, 2024, as to exhibits 407F through 407I.

14

claims that he preserved his Presidential immunity claims in pre-trial submissions and was thus not required to object to each piece of evidence when it was offered. This argument not only ignores this Court's clear pre-trial ruling directing him to do precisely that which he now claims he was not required to do, but is contrary to the law. CPL § 470.15(4)(a) is clear that a ruling or instruction of the court must be duly protested by the defendant. *See Gray*, 86 NY2d at 19 ("[I]n order to preserve a claim of error in the admission of evidence or a charge to the jury, a defendant must make his or her position known to the court."). If Defendant genuinely believes that his pre-trial filings satisfy his preservation requirement, it begs the question why he nonetheless voiced a clear objection prior to the testimony of Ms. Hicks? Equally confounding is Defendant's explanation for objecting to the admission of OGE Form 278e as a mere effort "to make clear that [Defendant] maintained the immunity objection as to *documentary* official acts." Defendant's Reply at pg. 5 (emphasis added). This argument is unavailing. In essence, Defendant's argument is that preservation is achieved by voicing a single objection to testimonial evidence he seeks to preclude, presumably the one made prior to the testimony of Ms. Hicks, and a corresponding single objection to documentary evidence, the OGE Form 278e. This is simply not the law. A general motion to preclude "witness testimony" prior to trial, which this Court did not rule on, does not satisfy the obligation of counsel to make timely objections. Again, under Defendant's theory, a defendant need only register a single general objection to testimonial evidence – such as hearsay, for example - at the start of trial and another objection to hearsay contained in documents, to preserve any and all hearsay objections for the entirety of a six-week trial. This argument not only ignores settled law, it also ignores the practical rationale for the preservation requirement in the first place.

With respect to Ms. Westerhout, Defendant did not object to her testimony on Presidential immunity grounds either in pre-trial submissions or at trial. Defendant argues that he preserved an objection in his pre-trial filings, apparently referring to a broadly worded general objection to the introduction of official acts evidence contained in his March 7, 2024, pre-trial motion. That objection lacked any specificity and referred generally to the testimony of witnesses. It is not for a trial court to independently identify, without guidance from counsel, the evidence a party finds objectionable. Lastly, Defendant claims he did not object to Ms. Westerhout's testimony, as he had done prior to the testimony of Ms. Hicks, to "avoid antagonizing the court or testing its patience." Defendant's Reply at pg. 5. However, an examination of the trial record demonstrates that this Court did not curtail counsel or limit his right to object. In fact, the record demonstrates that counsel objected approximately 170 times during the course of the trial.

15

Because Defendant failed to timely object to Ms. Westerhout's testimony about Defendant's "work habits," "preferences," "relationships and contacts," and "social media" practices at the White House,[12] the motion to set aside the verdict on those grounds is denied as unpreserved. Because Defendant failed to timely object to Mr. Cohen's testimony other than that relating to People's 407F through 407I, the motion to set aside the verdict on those grounds is denied as unpreserved.

Despite Defendant's failure to preserve the objections he raises in the instant motion, other than those pertaining to Ms. Hicks and Exhibits 407F through 407I, this Court will nonetheless consider his motion on the merits, in its entirety.

**Section B**: Official and Unofficial Acts

Unlike *Trump*, this court need not decide whether the crimes of which Defendant was convicted constitute official acts because Defendant concedes that they were decidedly unofficial. The much narrower issue presented here is whether a discrete subset of evidence admitted at trial constituted official acts deserving of some level of immunity, whether it be absolute or presumptive. To evaluate each of those claims, it is important to understand the context of the unofficial acts for which Defendant stands convicted.

The evidence adduced at trial established that a meeting between Defendant, Mr. Pecker, Chairman of American Media, Inc. ("AMI"),[13] and Mr. Cohen, took place in 2015 in Trump Tower. At that meeting, the three participants conspired to influence the 2016 presidential election. The scheme required that Mr. Pecker publish positive stories about Defendant to promote his presidential candidacy. Mr. Pecker would also prevent publication of negative stories about Defendant by acquiring the stories and not publishing them. Mr. Pecker would also, among other things, publish negative stories about rival presidential candidates. The jury heard evidence that various stories were published by AMI in accordance with this agreement. The jury also heard about two stories that were obtained to prevent their publication. The stories were purchased subject to non-disclosure agreements ("NDAs") to prevent the public from hearing the allegations contained therein. One NDA was executed between AMI and Karen McDougal ("Ms. McDougal"), a woman who claimed to have had an affair with Defendant prior to his campaign for the presidency. A second NDA was executed between Mr. Cohen, on behalf of Defendant, and Stormy Daniels ("Ms.

---

[12] Defendant's Motion at pgs. 31-33.
[13] American Media is a publishing company that publishes celebrity and health and fitness magazines, including The National Enquirer, the Globe, Life & Style, In Touch, Closer, Us Weekly, Shape and Muscle, and Fitness and Flex. Tr. 914.

16

Daniels") a/k/a Stephanie Clifford, an adult film actress who alleged to have had an intimate encounter with Defendant in 2006.

With respect to Ms. McDougal, the funds to pay the NDA were provided by AMI. With respect to Ms. Daniels, the funds to effectuate the NDA were provided by Mr. Cohen on behalf of Defendant. The testimony further established that Defendant reimbursed Mr. Cohen for those payments with checks he signed and authorized in 2017 when he was President. Those checks and the financial documents related to the checks, falsely reflected the payments as retainer fees for Mr. Cohen in his capacity as private counsel to Defendant and not as reimbursement for Mr. Cohen's payment to Ms. Daniels.

Turning now to the evidence at issue, this Court must first determine whether certain evidence admitted through Ms. Hicks, Ms. Westerhout and Mr. Cohen as well as postings by Defendant on social media, and financial disclosure form OGE Form 278e for 2017 reflected official acts subject to absolute immunity.

In *Trump,* the majority identified only one instance of official conduct entitled to absolute immunity and remanded the matter for the District Court to conduct the remainder of the analysis as to all other conduct at issue.[14] The Court provided guidance to the District Court to assist in differentiating between official and unofficial acts, noting, in part, that "[i]t is the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Trump* at 2322 quoting *Forrester v. White*, 484 US 219, 229 [1988].

As noted by Justice Coney-Barrett in her concurrence in part, in the absence of precedent directly on point, the use of a hypothetical is a highly useful legal tool and one would be hard-pressed to devise a hypothetical more on point to guide the analysis between official and unofficial conduct than the case at bar: is a President's in-office conduct to conceal payments to an adult film actress to keep information from the public eye relating to an encounter that occurred prior to his Presidency official or unofficial?

While Judge Hellerstein in the Southern District of New York did not conduct the type of full-throated analysis proscribed by *Trump* because the Notice of Removal he considered was filed well before Trump was decided, he nonetheless did analyze some of the conduct at issue here. In rejecting Defendant's Supremacy claim *in the instant matter*, Judge Hellerstein concluded that "[r]eimbursing Cohen for advancing hush money to Stephanie Clifford cannot be considered the

---

[14] *Trump* held that Defendant is accorded absolute immunity with respect to the specific conduct alleged in that indictment involving his discussions with Justice Department officials. *Trump* at p. 15.

performance of a constitutional duty," and "[f]alsifying business records to hide such reimbursement, and to transform the reimbursement into a business expense for [defendant] and income to Cohen, likewise does not relate to a presidential duty." *Trump*, 683 FSupp3d at 347.

It is therefore logical and reasonable to conclude that if the act of falsifying records to cover up the payments so that the public would not be made aware is decidedly an unofficial act, so too should the communications to further that same cover-up be unofficial.

### Testimony of Hope Hicks

Ms. Hicks was Director of Communications for the Trump Organization beginning in October 2014. In January 2015, she transitioned to the position of Press Secretary for Defendant's campaign in his run for President. Tr. 2126-2127, 2136. She testified at trial about certain allegations that became public during the final days of the campaign that cast Defendant in a negative light. She further testified about the manner and extent to which she participated in Defendant's response to the allegations. Ms. Hicks worked in the White House from January 20, 2017, until April 2018, and returned in March 2020 until January 2021. Her first position was Director of Strategic Communications. In that role she "worked closely with – with the communications team and the press team on message development and organizing events to help showcase Mr. Trump's accomplishments, the agenda of the Administration. I worked closely with Mr. Trump on media opportunities for him." Tr. 2208. In August 2017, Ms. Hicks assumed the position of Communications Director. Tr. 2207-2208. In that role, she "oversaw the team," "coordinating all of the communication efforts for the Administration from the White House throughout all of the agencies, and making sure that each of [sic] principals of the agencies and the agencies themselves were prioritizing Mr. Trump's agenda, and that we were all working together to maximize the impact of any positive messages that we were trying to get out and share with the American people" and "capitalize on any opportunities to showcase Mr. Trump and his work, the President in a good light." Tr. 2210.

Defendant argues that in her roles at the White House, any communications between Ms. Hicks and Defendant must receive absolute immunity pursuant to the Take Care and Vesting Clauses, as Defendant's ability to speak freely to Ms. Hicks was a core function of the Executive. According to Defendant, because Ms. Hicks wielded executive power on his behalf, authority that exists pursuant to Article II of the Constitution, any communications he had with her are subject to absolute immunity, or at the very least, presumptive immunity. The People argue that the

18

communications Defendant had with Ms. Hicks, which are the subject of this motion, constitute unofficial acts not entitled to any level of immunity and submit that even if the Court were to find that the communications fall within the outer perimeter of Defendant's authority, subject to presumptive immunity, that presumption has been rebutted by ample evidence unrelated to motive as required under *Trump*.

Defendant identifies four communications. Defendant's Motion at pgs. 9-11.[15] They are as follows:

Hicks 1: Ms. Hicks testified she was aware that on March 20, 2018, Ms. McDougal sued AMI over the NDA she entered into with AMI. People's Exhibit 319 is a text message between Ms. Hicks and Ms. Westerhout, then Executive Assistant to Defendant as President. The text was sent on March 20, 2018, the same day the lawsuit was filed. In the text, Ms. Westerhout asks Ms. Hicks, "Hey. The President wants to know if you called David Pecker again?" That was the extent of Ms. Hicks's testimony about that text. Tr. 2210-2213.

Hicks 2: Ms. Hicks testified that shortly after the McDougal lawsuit was filed, Ms. McDougal was interviewed on CNN by Anderson Cooper. Ms. Hicks testified that following that interview, she spoke with Defendant "about the news coverage of the interview, how it was playing out." Ms. Hicks did not testify as to any actual statements Defendant made to her. Tr. 2214-2215. There was no further testimony from Ms. Hicks regarding this interaction with Defendant.

Hicks 3: Ms. Hicks testified about a January 2018 inquiry by the Wall Street Journal ("WSJ") regarding a story it planned to publish about the alleged sexual encounter between Defendant and Ms. Daniels and the NDA which was executed in 2016 in the days leading up to the election. Tr. 2215-22. In her testimony, Ms. Hicks stated that she discussed the story with Defendant and "how to respond to the story, how he would like a team to respond to the story." Tr. 2217. She further testified about the following statements attributed to a White House official in that WSJ article: "[t]hese are old, recycled reports, which were published and strongly denied prior to the election" the official "declined to respond to questions about an agreement with Ms. Clifford." Tr. 2218, People's Exhibit 181. Ms. Hicks testified she was not the official, but that she had "discuss[ed] this statement" with Defendant before it was issued.[16] Tr. 2218-2219.

---

[15] The four communications were not introduced in chronological order. They will be addressed here in the order in which they came into evidence at trial.

[16] Ms. Hicks testified that she was not certain, but that the official referenced was likely the Deputy Press Secretary. Tr. 2218.

Hicks 4: Ms. Hicks testified about a February 2018 conversation she had with Defendant about a statement attributed to Mr. Cohen in a New York Times ("NYT") article the day before. Tr. 2219. In the article, Mr. Cohen is reported as stating, among other things, that he made a payment to Ms. Daniels without Defendant's knowledge. Ms. Hicks further testified that Defendant told her:

> "[h]e spoke to Michael, and that Michael had paid this woman to protect him [Defendant] from a false allegation, um, and that – you know, Michael felt like it was his job to protect him, and that's what he was doing. And he did it out of the kindness of his own heart. He never told anybody about it. You know. And he was continuing to try to protect him up until the point where he felt he had to state what was true." Tr. 2219-2220.

She further testified that Defendant told her:

> "that he thought it was a generous, um, you know, thing to do, and he was appreciative of the loyalty," and that Defendant "wanted to know how it was playing, and just my thoughts and opinion about this story versus having the story – a different kind of story before the campaign had Michael not made that payment," and that Defendant's "opinion was it was better to be dealing with it now, and that it would have been bad to have that story come out before the election." Tr. 2220-2221.

Defendant's argument that any communication he had with Ms. Hicks is subject to absolute immunity by virtue of the position she held in the White House is mistaken. "It is the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Trump* at 2322 quoting *Forrester v. White*, 484 US 219, 229 [1988]. Indeed, the President himself may speak in his unofficial capacity as a candidate or party leader, and certainly he can do so in his private capacity as well. Any argument that private conduct transforms into official conduct by communicating about the same to an individual with a particular title is without merit. Analysis of the trial record demonstrates that Hicks 1 through 4 reflect communications - or mere topics of communications - which manifestly pertain to unofficial or private conduct and are inextricably intertwined with private discussions and events which began before Defendant's Presidency.

All four instances relate to pre-inauguration intimate interactions between Defendant and two different women, and the ongoing effort to conceal those interactions post-inauguration. Defendant's attempts to sweep these communications under the protections afforded by the Take Care and Vesting Clauses is unpersuasive and Defendant has not referenced any Constitutional authority upon which he was acting for any of the four communications with Ms. Hicks.

20

The personal nature of Hicks 1 through 4 is made even clearer when viewed alongside testimony introduced through Mr. Pecker. To begin, Mr. Pecker's testimony reflected that his relationship with Defendant was a personal one and remained so after the inauguration. Mr. Pecker served no government function at any time, official or otherwise. Further, Mr. Pecker's testimony tracked the same subject matter as that referenced in Hicks 1 through 4, yet Defendant did not and could not make a single immunity-based objection to it prior to, during, or after trial. Tr. 1228-1231 (communications between Defendant-President and Mr. Pecker regarding Mr. Pecker's pre-election assistance with the "McDougal matter"); Tr. 1236-1238, 1239 (communications between Defendant-President and Mr. Pecker regarding Ms. McDougal's interview with Anderson Cooper); Tr. 1238-1239 (phone call between Mr. Pecker and Ms. Hicks relating to extending Ms. McDougal's employment contract with AMI so "she would not go out and give any further interviews or talk to the press or say negative comments about American Media or about [President] Trump."). In fact, Hicks 1 through 4 perfectly track the unobjected to conversations previously testified to by Mr. Pecker.

A finding that Hicks 1 through 4 constitute unofficial conduct is consistent with the holding and policy concerns expressed by the Court in *Trump*. Conversations and meetings with a White House Communications Director about personal matters involving an alleged affair and a sexual encounter that occurred prior to taking the Office of the President of the United States are undoubtedly not the "greatest public interest[s]" the Supreme Court contemplated when it wrestled with protecting a President's ability to "deal fearlessly and impartially with the duties of his office." *Trump* at 611, citing *Fitzgerald*, 457 US at 750 quoting *Ackerman*, 444 US at 203.

Defendant's argument that these communications fall at least within the outer perimeter of his authority also fails. The testimony was most certainly palpably beyond any actual authority Defendant possessed in his capacity as President.[17] However, even if this Court were to find that the communications do fall within the outer perimeter of his Presidential authority, it would also find that other, non-privileged trial testimony provided ample non-motive related context and support to rebut a presumption of privilege and that Defendant was acting in his personal capacity and not

---

[17] Contrary to Defendant's interpretation, the Supreme Court in *Clinton* did not hold that a President's communications with his private attorney, thereafter, shared with the public, are within the outer perimeter of his authority. The Court definitively stated that that issue was not before it. *Clinton v. Jones*, 520 US 681, 686 [1997].

21

pursuant to his authority as President. Nor does the introduction of that evidence pose any danger of intrusion on the authority and function of the Executive Branch.

### Testimony of Madeleine Westerhout

Ms. Westerhout testified that she had been employed by the Republican National Committee for three and one-half years until January 2017 when she joined the transition team for Defendant as President-elect. She then worked as Special Assistant to the President and later as Executive Assistant to the President. Tr. 2984. Her function was to assist Defendant in various ways, primarily by facilitating communications with other parties – both personal and professional. Tr. 2984-2996. In the transition year, she engaged often with Rhona Graff, who had been Defendant's Executive Assistant at the Trump Organization, in part, to ensure Ms. Westerhout had access to Defendant's personal contact list. She further testified about Defendant's work habits and preferences, including how and in what form he communicated on social media.

Defendant argues that the introduction of Madeleine Westerhout's testimony relating to "presidential practices" including "work habits," "preferences," "relationships and contacts," and "social media practices" violated the Presidential immunity doctrine. Defendant's Motion at pgs. 11-12, 31-32.

As previously noted, objection to Ms. Westerhout's testimony was unpreserved and thus unreviewable. Nonetheless, as an alternative holding, this Court finds that the argument also fails on the merits because her testimony reflected unofficial conduct in its entirety.[18]

It bears noting that before Ms. Westerhout testified, it was Defendant who first elicited testimony about Defendant's work habits and practices from Ms. Hicks on cross-examination as excerpted below:

> Defense Counsel: And that office that you described the Oval Office and the area around it, that was a very hectic space in 2017, right?
> Ms. Hicks: Yes.
> Defense Counsel: And it sounds like for a period of time when you had that job, you could see from where you were sitting the resolute desk?
> Ms. Hicks: Yes.
> Defense Counsel: That's where the President sat?
> Ms. Hicks: Yes.
> Defense Counsel: When he was acting as President, right?

---

[18] In fact, defense counsel stated he had "no objection" to the People's request to introduce a contact list provided to Ms. Westerhout by Trump Organization employee Rhona Graff at the White House. A line of questioning Defendant now claims was inadmissible. Tr. 3001.

22

Ms. Hicks: That's right.

Defense Counsel: So you got a sense of how chaotic that environment was day to day, right?

Ms. Hicks: Uh-huh. That particular area wasn't necessarily chaotic in a bad way. I just want to clarify. It was very busy. There was a lot going on. There were certainly parts of the experience that were chaotic, but he was constantly moving.

Defense Counsel: People were working very hard to make it not chaotic and keep it orderly?

Ms. Hicks: Yes.

Defense Counsel: But, the fact is, there were many meetings and a lot going on, right?

Ms. Hicks: Yes.

Defense Counsel: And from where you sat, you could see that the President was frequently multitasking, right?

Ms. Hicks: Yes.

Defense Counsel: And people were interrupting what he was doing, right?

Ms. Hicks: Yes.

Defense Counsel: Different priorities would get called out to his attention and he would pivot?

Ms. Hicks: That's right.

Tr. 2239-2240.

Ms. Westerhout's testimony on direct examination, and further explored on cross-examination, paralleled the cross-examination of Ms. Hicks regarding Defendant's work habits and presidential practices. Defense Counsel repeated the strategy when he cross-examined Ms. Westerhout. Through his cross-examination of Ms. Westerhout and Ms. Hicks (as well as Rhona Graff)[19], counsel created a record from which he later argued that Defendant was not fully cognizant of the nature of the checks he signed, which formed the basis for 11 of the 34 counts he was convicted of, because he was busy multi-tasking as President of the United States. Tr. 4484-4487. In fact, counsel's cross-examination of Ms. Westerhout delved much further into Defendant's "work habits" than did her testimony on direct examination:

Defense Counsel: And so, would you see him signing things without reviewing them?

Ms. Westerhout: Yes.

Defense Counsel: And would you see him signing checks without reviewing them?

Ms. Westerhout: Yes.

Defense Counsel: And you would see him signing checks while he was on the phone; right?

Ms. Westerhout: Yes.

Defense Counsel: Would you see him sometimes signing checks when he was meeting with people?

Ms. Westerhout: Yes.

Defense Counsel: And there were different types of people that he was meeting with; right?

Ms. Westerhout: Yes.

---

[19] Defendant also pursued this line of questioning regarding Defendant's practice of multi-tasking while signing checks in his cross-examination of Rhona Graff, Executive Assistant to Defendant at the Trump Organization. Tr. 1523-1524.

Defense Counsel: Sometimes he was meeting with the top foreign leaders in the world; right?

Ms. Westerhout: Yes, uh-huh.

Defense Counsel: And other times he was meeting with you?

Ms. Westerhout: Yeah, uh-huh.

Defense Counsel: And so, he wouldn't be signing the checks when he was meeting with the top people in the world?

Ms. Westerhout: Yes.

Defense Counsel: But maybe when he was meeting with you, talking about something else, he would also be signing documents?

Ms. Westerhout: Yes, talking about the schedule or anything that had been going on.

Defense Counsel: The Chief of Staff that he would be meeting with?

Ms. Westerhout: Yes.

Defense Counsel: And other people, he would be doing that?

Ms. Westerhout: That's right.

Defense Counsel: He was a person who multitasked; right?

Ms. Westerhout: Definitely.

(Tr. 3114-3115).

Indeed, counsel established through his cross-examination of Ms. Westerhout, that her coordination with Trump Organization employee Rhona Graff to obtain Defendant's contact list was decidedly a personal and not a professional function.

Defense Counsel: And you were asked by the Prosecutor if you were – if you coordinated with the Trump Organization during that first year by asking questions of the Trump Organization employees; right?

Ms. Westerhout: Yes.

Defense Counsel: The person that you coordinated with most was Rhona Graff; right?

Ms. Westerhout: Yes.

Defense Counsel: And this did not have to do with the Trump Organization business; did it?

Ms. Westerhout: No.

Defense Counsel: It had to do with his personal affairs; right?

Ms. Westerhout: Yes, uh-huh.

Defense Counsel: For example, you needed his contact list; right?

Ms. Westerhout: Yes, uh-huh.

[...]

Defense Counsel: So that first year you spent a lot of time talking with Rhona Graff; right?

Ms. Westerhout: Yes.

Defense Counsel: But you did not spend time talking with the Trump Organization employees to coordinate business of the Trump Organization; right?

Ms. Westerhout: No, uh- uh.

Defense Counsel: It was just personal aspects for President Trump; right?

Ms. Westerhout: That's correct.

(Tr. 3036- 3037).

24

This is not to say that Ms. Westerhout could never engage in communications subject to Presidential immunity. However, just as was the case with Ms. Hicks, Ms. Westerhout's mere role as Executive Assistant does not *per se* cloak her communications and observations of the President with absolute immunity. Indeed, defense counsel identified certain portions of her testimony as pertaining to private matters. Ms. Westerhout's testimony about her observations that Defendant preferred to work in a dining area rather than at the Resolute Desk, or that he preferred to use a *Sharpie* marker over a ball point pen does not create an unacceptable risk of "undue pressures or distortions" to a President's work. *Trump* at 615. Nor does a reference to the fact that Defendant carried papers when he boarded Air Force One or Marine One – or that he multi-tasked when he met with his Chief of Staff – elevate her observations to the level of a National Security concern.

Defendant alleges that the People "forced" Ms. Westerhout, through an "invasive" direct examination, to reveal details about how the Defendant operated the Executive Branch, for example, "[Defendant] liked speaking with people in person or on the phone," he "liked to read," "[h]e liked hard copy documents," and he took "[a] lot" of calls each day from as early as 6:00 am until "late into the night." Simply stated, Ms. Westerhout's testimony about these observations do not concern the "core Commander In Chief power […] for which 'absolute' immunity applies." Defendant's Motion at pg. 32.

As Ms. Westerhout's testimony did not reference any official conduct, no level of immunity applies. As an alternative finding, even if the testimony did pertain to conduct falling within the outer perimeter of his Presidential authority subject to presumptive immunity, this Court finds that the People have once again rebutted that presumption without invoking the motive for the conduct.

**Office of Government Ethics Form 278e**

Defendant argues that the introduction into evidence of the OGE Form 278e submitted in 2018 (People's Exhibit 81) violated the Presidential immunity doctrine because completion of the form constitutes an official act. OGE Form 278e is an Annual Financial Disclosure Report required to be submitted to the Office of Government Ethics.

Trump Organization Senior Vice President and Controller Jeff McConney, testified that Form 278e is a "Conflict of Interest Form that the Government requires certain individuals to file annually, semi-annually" and that the Defendant filed the form since "when he declared his candidacy in 2015" through January 2017 when Defendant was no longer working at the Trump Organization. Mr. McConney testified that he worked on that form on behalf of Defendant before

he became President for "each year [Defendant] was a candidate or a Federal official." Tr. 2366-2368.

Defendant concedes that the President is not the only person required to complete OGE Form 278e as it is a Conflict of Interest Form for high-level federal officials. Defendant's Motion at pg. 40 citing 5 C.F.R. § 2634.104(a). Thus, simply because Defendant signed the form when in office does not dictate that such function falls within the outer perimeter of his authority. While Defendant's statement that he "was required to make the disclosures on the Form in his official capacity as President" may be true, the disclosures were not made pursuant to his conclusive and preclusive authority. Rather, he did so because the President is one of the federal employees required to complete the Form in the same way that he was required to complete the Form when he was merely a Presidential candidate. As *Trump* made clear, even communications between the President and Vice President must be analyzed to determine whether they constitute official acts protected by the Presidential immunity doctrine. A financial disclosure form that is required to be prepared and filed by other federal government employees cannot be subject to Presidential immunity. Further, no decision-making authority is implicated by the filing of the document other than the decision whether to comply with the requirement, and to complete the form truthfully, the same decisions all other mandated federal employees must make with respect to Form 278e.

As OGE Form 278e does not require communications from Defendant that are within his exclusive and preclusive Article II authority, or within the outer perimeter of his authority, the statements by Defendant on that form are not deemed official conduct and thus, receive no immunity.

### Testimony of Michael Cohen

Mr. Cohen testified that he was employed as Executive Vice President and Special Counsel to Defendant at the Trump Organization from 2007 to January 2017. He participated in the Trump Tower meeting with Defendant and Mr. Pecker in 2015 and thereafter, engaged in conduct in furtherance of the agreement made at that meeting. The conduct included communicating with Mr. Pecker and other employees of AMI, and other individuals who possessed information deemed harmful to Defendant's campaign. This was all carried out at the direction of Defendant. Mr. Cohen testified that, among other things, he executed an NDA with Ms. Daniels on behalf of Defendant to prevent her account from becoming public in the weeks prior to the November 2016 election. He further testified that he paid Ms. Daniels through her attorney, to effectuate the terms of the NDA

26

and that he did so on behalf of Defendant. Mr. Cohen further testified that he left the Trump Organization to become Personal Attorney to the President following Defendant's inauguration, and at no time did he have a position in the White House or anywhere else in government. Tr. 3475, 3494-3495. Mr. Cohen testified that he did not receive any salary or retainer in his position as Defendant's Personal Attorney. Tr. 3499-3501. Rather, Mr. Cohen benefited financially from his role because it created other financial opportunities for him. Tr. 3500. Mr. Cohen testified that Defendant reimbursed him with checks in 2017 for the payment he made to Ms. Daniels. The checks falsely purported to represent payments on a non-existent retainer agreement and the reimbursement was structured that way to conceal the payment Mr. Cohen made to Ms. Daniels, to prevent her allegations from becoming public and to influence the 2016 Presidential election.

Notwithstanding these efforts to conceal the true nature of the payments, testimony from various witnesses established that the allegations by Ms. McDougal about an affair and Ms. Daniels about a sexual encounter, became public after Defendant was sworn in as President of the United States. Initially, Mr. Cohen claimed over the course of many months, that Defendant knew nothing about the NDA or the payments to Ms. Daniels. Later however, he recanted, informing others, including various federal and state prosecutors, that Defendant was indeed aware of and in fact, authorized the payment to Ms. Daniels and that he later reimbursed Mr. Cohen in the manner described above.

Mr. Cohen testified that his representations, and at times prior sworn testimony, changed in the months following disclosure of the NDA and the related reimbursement checks. The People gave prior notice, and introduced evidence of, a "pressure campaign" Defendant mounted to compel Mr. Cohen to remain silent as to the agreement and Defendant's complicity in the efforts to influence the 2016 election. This Court initially precluded testimony about the pressure campaign in its entirety, but later qualified that should Defendant "open the door," the Court would permit its introduction for the limited purpose of rehabilitating Mr. Cohen's credibility to explain why Mr. Cohen had initially denied that Defendant knew about the scheme but later recanted and affirmed that Defendant was indeed complicit. On April 30, 2024, the People argued that the door had been opened by Defendant in his opening statement and that the evidence should be allowed in as per the Court's earlier ruling and caution. This Court agreed the door had been opened and permitted the evidence to be introduced to rebut Defendant's attacks on Mr. Cohen's credibility. The evidence of

27

a pressure campaign came in the form of testimony from Mr. Cohen, e-mails from and to Robert Costello,[20] an attorney, and other evidence including Twitter posts by Defendant.

Defendant argues that the following communications introduced through Mr. Cohen constitute evidence of official-acts subject to absolute immunity:

Cohen 1: Mr. Cohen's testimony regarding his prior testimony before the House Permanent Select Committee on Intelligence on Russian interference in the 2016 election. At trial, Mr. Cohen testified that he "was staying on Mr. Trump's message that there was no Russia-Russia-Russia and again, in coordination with the Joint Defense Team, that's what was preferred," to explain why he was untruthful to Congress. Defendant argues that Mr. Cohen's trial testimony, that he "felt" he "needed" what the People described as "the power of the President" to "protect" him in connection with his testimony before Congress, violated the Presidential immunity doctrine. Defendant's Motion at pgs. 12-13.

Cohen 2: An e-mail sent on June 13, 2018, by Robert Costello to Mr. Cohen stating, in part, "What you do next is for you to decide, but if that choice requires any discussion with my friend's client, you have the opportunity to convey that this evening, but only if you so decide." Mr. Cohen testified on direct examination that he interpreted that e-mail as a reference to "potential pre-pardons, I believe." People's Exhibit 207, Tr. 3603, Defendant's Motion at pg. 13. Mr. Cohen testified further on cross-examination that "I spoke to my attorney about it because we had seen on television President Trump talking about, potentially, pre-pardoning everybody and putting an end to this, what I deemed to be a nightmare," Tr. 3835-3836, Defendant's Motion at pg. 13.

Cohen 3a-b: Defendant argues that the following exhibits and testimony were introduced through Mr. Cohen in violation of the Presidential immunity doctrine:

- Cohen 3a: A February 6, 2018, text from Mr. Cohen to a NYT reporter that Defendant "just approved me responding to [the FEC] complaint and statement. Please start writing and I will call you soon;"[21] Mr. Cohen's February 13, 2018, public response to the FEC complaint in which Mr. Cohen stated that he used his own funds to pay Ms. Daniels and that "[n]either the Trump Organization nor the Trump campaign was a party to the transaction with

---

[20] As discussed in greater detail below, in April 2018, following the execution of search warrants on his office and home, Mr. Cohen sought legal representation. Robert Costello was one of the attorneys he initially consulted. Mr. Costello represented to Mr. Cohen that he had a close relationship with Rudy Giuliani, a lawyer with close ties to Defendant. Mr. Costello represented that these relationships would be beneficial to Mr. Cohen because they would provide a back channel for communicating with Defendant to ensure that Mr. Cohen would be protected. Tr. 3593-3595.

[21] People's Exhibit 260, Defendant's Motion at pg. 13.

[Daniels];"[22] a February 19, 2018, text from Jay Sekulow, private counsel to Defendant, to Mr. Cohen that Mr. Sekulow's "[c]lient says thanks for what you do;"[23] Mr. Cohen's trial testimony that he interpreted the text message to mean Defendant appreciated "the statement that [Cohen] was putting out to the press on the FEC;"[24] and testimony from Mr. Cohen that he "was instructed…by Mr. Trump, to keep in touch with Jay Sekulow because he [Sekulow] was in contact with Mr. Trump."[25]

- Cohen 3b: Mr. Cohen's testimony that he told Mr. Pecker, "the [FEC] matter is going to be taken care of and the person, of course, who is going to be able to do it is Jeff Sessions," and that Defendant "told" Mr. Cohen that Attorney General Sessions would address the matter.[26]

Cohen 4: E-mail communications with Robert Costello on April 21, 2018, relating to Defendant's posts on Twitter earlier that day. People's Exhibit 205, Defendant's Motion at pgs. 14-15. The subject line of the e-mail read "Giuliani" and the heading read "Attorney Client Communication Privileged." Defendant specifically references the last line of the e-mail wherein Mr. Costello wrote, "P.S. Some very positive comments about you from the White House." Mr. Cohen testified that the e-mail from Mr. Costello "let me know that I was still important to the team and stay the course, that the President had my back." Defendant alleges that the communications in the e-mail were from Defendant and thus, constitute official acts. Tr. 3598-3600.

None of the above-referenced communications constitute official acts.

With respect to Cohen 1, the Court finds that this testimony did not in any way introduce evidence of an official act by Defendant. Mr. Cohen testified at trial about testimony he gave under oath to Congress relating to an ongoing investigation, the subject matter of which were allegations of Russian interference in the 2016 election and a Trump Moscow real estate project. Tr. 3550. As Mr. Cohen had admittedly testified untruthfully before Congress, and the false prior testimony was used to attack his credibility, the People were permitted to attempt to rehabilitate him by explaining why he testified untruthfully. The reference to "no Russia Russia Russia" did not reference official conduct of Defendant, but merely Mr. Cohen's explanation that he had perjuriously minimized the frequency and duration of his contacts with Defendant about the Trump real estate project to curry favor with Defendant at a time when Mr. Cohen felt he needed Defendant's support. The trial

---

[22] People's Exhibit 202, Defendant's Motion at pg. 13.
[23] People's Exhibit 217, Defendant's Motion at pg. 13.
[24] Tr. 3573, Defendant's Motion at pg. 14.
[25] Tr. 3571, Defendant's Motion at pgs. 13-14.
[26] Tr. 3577, Defendant's Motion at pg. 14.

evidence was clear, Mr. Cohen lied under oath to a federal body. The challenged testimony was relevant for the jury to hear that Mr. Cohen's motivation for lying to Congress was to remain consistent with the Defendant with whom he had been in lock-step for decades. Significantly, the subject of Cohen 1 relates to matters that occurred prior to Defendant becoming President and do not involve communications with the President.

Cohen 2 and Cohen 4 relate to communications between Mr. Cohen and Mr. Costello. Mr. Cohen testified that when he became the subject of certain investigations, he sought legal representation and Mr. Costello was one of the attorneys he consulted during his search. Mr. Cohen testified that it was of paramount importance that he retain an attorney who would represent his interests. The communications with Mr. Costello paint the picture of an attorney who was attempting to convince Mr. Cohen that his connections to the President made him the best choice for the job of legal counsel to Mr. Cohen. Mr. Cohen ultimately was not convinced. The communications in Cohen 2 and 4 reflect Mr. Costello's approach. Mr. Cohen's testimony that he believed Mr. Costello was referring to potential "pre-pardons" did not purport to be a communication from Defendant and thus, did not implicate any Presidential immunity doctrine. In fact, the record demonstrates that Defendant agrees.

On April 15, 2024, the prosecution and the defense argued at length about certain communications. The parties differed with regard to whether the communications were probative of the pressure campaign. Defendant argued for preclusion of the testimony to prevent witnesses, such as Mr. Cohen, from inculpating the Defendant. Defendant's position at that time, was "there is zero evidence that anything that Mr. Costello said to Mr. Cohen came from President Trump." Tr. 52. Counsel further argued "there is no connection between the communication from Mr. Costello to Mr. Cohen and anything President Trump said or did […]." Tr. 52. The substantive testimony from Mr. Cohen regarding "pardons" which Defendant now argues violated Presidential immunity, was in fact elicited not by the People, but by defense counsel on cross-examination. In fact, defense counsel explored the subject of presidential pardons at length to attack Mr. Cohen's credibility. Defendant's arguments on this point in the instant motion are wholly inconsistent with the position he took at trial:

> Defense Counsel: So, I want to talk now about your testimony to Congress about whether you ever requested a pardon, okay?
> Mr. Cohen: Yes, sir.
> Defense Counsel: On that February 27, 2019, House Committee Hearing you gave a statement under oath that you never asked for, nor would you ever accept a pardon from President Trump, correct?

30

Mr. Cohen: Correct.

Defense Counsel: And that was false, correct?

Mr. Cohen: No sir.

Defense Counsel: Why was that not false?

Mr. Cohen: I never asked for it. I spoke to my attorney about it because we had seen on television President Trump talking about, potentially, pre-pardoning everybody and putting an end to this, what I deemed to be a nightmare. So I reached out to my attorney to ask him whether or not this is legitimate.

Defense Counsel: So, when you were asked – when you provided testimony – and, again, same thing happened on that occasion, you had to prepare remarks that you provided the committee and then you read into the record, right?

Mr. Cohen: Yes, sir.

Defense Counsel: And both of those prepared remarks in writing and also when you said, and I have never asked for, nor would I accept a pardon from President Trump, correct?

Mr. Cohen: Correct.

Defense Counsel: Now, that was on February 27th. Do you remember about ten days later you were deposed in the House Oversight Committee?

Mr. Cohen: Yes, sir.

Defense Counsel: And do you remember being asked the same question about accepting a pardon and you saying that you directed your lawyer to explore the possibility because you were a hundred percent open to accepting it?

Mr. Cohen: Yes, sir.

Defense Counsel: And the lawyer – there were a couple of lawyers that you were talking about, right? One was Mr. Ryan, who worked – who was your lawyer who worked with a law firm called McDermott, Will and Emery?

Mr. Cohen: Yes.

Defense Counsel: And you spoke with a lawyer named Robert Costello about that same issue, about exploring the possibility of a pardon, correct?

Mr. Cohen: I spoke to Mr. Costello about that as well.

Defense Counsel: And in that deposition so, not the sworn testimony on February 27th, but in that deposition, you said that, you directed your lawyers to explore the possibility of a pardon because the possibility was constantly being dangled in your face, right?

Mr. Cohen: Correct.

Defense counsel's cross-examination of Mr. Cohen on the subject of Presidential pardons continued for some time. Tr. 3838-3843. For counsel to ignore his extensive cross-examination on this subject, following what was a passing reference to "pre-pardons" generally on direct examination, mischaracterizes the actual record.

Cohen 3a and 3b relate to communications about investigations by the FEC into conduct by Mr. Cohen and Defendant during the 2016 Presidential campaign. The communications relate to Defendant as candidate for President, not to Defendant as President and reference no official act. Notably, all the participants in these conversations were decidedly related to Defendant in his personal capacity, Mr. Cohen and Mr. Sekulow as prior and then private counsel, and Mr. Pecker, a

31

personal friend. Similarly, Mr. Cohen's attempt to funnel a journalist a story relating to the payments he made to Ms. Daniels, was intended to shine a more favorable light on Mr. Cohen and Defendant - his co-conspirator. That e-mail had nothing to do with official acts by Defendant as President and everything to do with him as candidate.

This Court agrees and is persuaded that the testimony referenced in Cohen 3a and 3b does not implicate Defendant's conclusive and preclusive authority. The People argue, "[a]s relevant here, the FEC has "exclusive jurisdiction with respect to the civil enforcement" of FECA, 52 U.SC. § 30106(b)(1), which is not "subject to control of the Attorney General," *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 92 n.1 (1994) (citing 28 U.S.C. §§ 516, 519)." People's Response at pg. 30. Further, "[b]ecause neither the President nor the Attorney General has authority to interfere with an FEC investigation, this situation is distinct from one in which the President [...] directs the Attorney General to initiate a prosecution or investigation [...]." People's Response at p. 31, n 6.

As previously noted, the objections to Mr. Cohen's testimony were unpreserved and thus unreviewable. Nonetheless, as an alternative holding, this Court finds that the argument also fails on the merits because his testimony reflected unofficial conduct and no level of immunity applies. Even if the testimony did pertain to conduct falling within the outer perimeter of his Presidential authority subject to presumptive immunity, this Court finds that the People have once again rebutted that presumption without invoking the motive for the conduct.

### Defendant's Twitter Posts

Turning to Defendant's claim that certain Tweets he caused to be posted constitute official acts, in dispute are People's 407F, 407G, 407H, and 407I. The Tweets cover a range of topics, including but not limited to: disparaging remarks about a New York Times reporter; explaining what a NDA is; and presumably, advice whether one should retain Mr. Cohen as an attorney.

As previously stated, this Court finds that Defendant has properly preserved his arguments as to this evidence. However, after applying the standards set forth in *Trump*, this Court finds that none of the four posts constitute official acts.

Defendant argues that the social media posts reflect the President's extraordinary power to speak to his fellow citizens and that viewing the context of the Tweets further supports that position. Defendant's Motion at pg. 33. The Twitter account, Defendant contends, was one of the White House's main vehicles for conducting official business. *Id.* In support of this position, Defendant argues that "the official-acts conclusion is further supported by the fact that President Trump relied

32

on a White House employee to help him operate the account." Defendant's Motion at pg. 34. Defendant further argues that the prosecution "relied on false opinions from Cohen and Daniels to try to suggest that these Tweets were directed at them, individually, rather than what they objectively were: communications with the American people regarding matters of public concern bearing on President Trump's credibility as the Commander in Chief." *Id.* Defendant claims that 407I simply reflects Defendant's comments on, and criticism of, federal prosecutors and regulators and that, pursuant to *Trump*, such posts are covered by the Presidential immunity umbrella because "investigative and prosecutorial decision making is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." Defendant's Motion at pg. 36.

The People contend that the Tweets "consist solely of 'unofficial acts' for which 'there is no immunity.'" People's Response at pg. 13 citing *Trump* at 651. They further argue that the "challenged Tweets bear no resemblance to the kinds of public comments that the Supreme Court indicated would qualify as official presidential conduct." *Id.* at 15. The People also argue that, even if the Tweets are deemed "official conduct," the presumptive immunity that attaches is easily rebutted, as there is no danger that introducing the posts into evidence, presents any "intrusion on the authority and functions of the executive branch." *Id.* at 16.[27]

"The justifying purpose of the immunity recognized in *Fitzgerald* and the one we recognize today are not that the President must be immune because he is President…they are to ensure that the President can undertake his constitutional functions free from undue pressure or distortions." *Trump* at 615. The Tweets do not constitute the type of conduct the *Trump* Court intended to protect when it discussed a President's ability to communicate with the public. To find otherwise would effectively mean that every statement ever uttered (or posted on social media) by a sitting President, whether personal or official, in his or her own interests or that of the Country, would be protected by absolute immunity. Were that the case, the *Trump* Court would not have felt it necessary to provide guidance to assist the Federal District Court in properly analyzing and determining which Presidential acts are official and which are not. For example, when discussing Defendant's alleged attempts to undermine the January 6 certification proceeding, the *Trump* Court noted that there may

---

[27] The People also argue that this evidence "consists of a public record of an official act" and is thus admissible even if it is deemed official acts. People's Response pg. 13. This Court is not persuaded that this is an accurate reading of *Trump* as to evidence of a public record and thus, declines to apply this reasoning to the Tweets at issue.

be "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity – perhaps as a candidate for office or party leader." *Trump* at 629. This point was further emphasized by Chief Justice Roberts when he unequivocally wrote that "not everything the President does is official." *Id.* at 642. The analysis and guidance are pragmatic.

Undoubtedly, there are Tweets and other communications that a President makes that qualify as official communications with the public regarding matters of public concern. In the modern world, social media is but one of many forms of communication that a President can employ to convey messages of the utmost import, such as to comfort a hurting nation after a tragedy. The Tweets in question, however, do not fit that mold. As such, none of the disputed Tweets, whether preserved or not, constitute official acts subject to absolute immunity, nor do they fall within the outer perimeter so as to raise a presumption of immunity.

When the *Trump* Court discussed Defendant's Tweets, and in particular his speech on January 6, 2021, the Court reasoned that a President possesses an "extraordinary power to speak to his fellow citizens and on their behalf." *Trump* at 629. The *Trump* Court illustrated that this extraordinary power, could be exercised to advance the public interest, such as when the nation needs to be comforted in the wake of a national tragedy. *Id.* People's 407F reflects Defendant's comments about "The New York Times and a third rate reporter named Maggie Haberman, known as a Crooked H Flunkie […]going out of their way to destroy Michael Cohen and his relationship with me in the hope that he will 'flip.' […] Sorry, I don't see Michael doing that […]." Viewing People's 407F in the context of *Trump,* it leaves little doubt that such a communication does not approach the illustrations provided by the *Trump* Court. People's 407F does not advance a policy concern or other public interest. As such, it is not an official act and it is not protected by any level of immunity. Even if this Court were to find that it falls within the outer perimeter subject to presumptive immunity, it would find that the People have rebutted that immunity without relying on the motive behind the conduct.

This Court finds that People's 407G is also entirely personal in nature. The subject is a personal retainer with an attorney about a personal matter and an NDA. The post asserts that it was a "private agreement" between two individuals, entered into before Defendant took Office. This is precisely the type of personal speech the *Trump* Court contemplated when it held that "although Presidential immunity is required for official actions to ensure that the President's decision making is not distorted by the threat of future litigation stemming from those actions, that concern does not

34

support immunity for unofficial conduct." *Trump* at 615. This Court finds Defendant's argument that the *Trump* Court intended to protect this type of speech unavailing.

This Court also finds that the Tweet in People's 407H does not constitute an official act nor is it the type of communication the *Trump* Court contemplated when it referenced President Theodore Roosevelt's famous "bully pulpit" as a means to "persuade Americans, in ways that the President believes would advance the public interest." *Id.* at 629 ("Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest."). People's 407H, in this Court's view, merely contains Defendant's thoughts on the services of his former private attorney.

Regarding the final Tweet, People's 407I, Defendant argues that this Tweet is afforded the protections of Presidential immunity as it is part of the "core authority of the Nation's Chief Executive" to "comment upon and criticize the conduct of federal prosecutors and regulators" which he derives from Article II authority. Defendant's Motion at pgs. 35, 36. This is because the content of this Tweet, and its context, referred to Mr. Cohen, his former personal attorney, as a person willing to "make up stories" and "break," as opposed to Paul Manafort, Defendant's campaign chairman, who was not. Just as the title of Communications Director does not bestow absolute immunity to any and all communications with Ms. Hicks, neither does mere reference to the Justice Department convert a Tweet to an official act. This Court is not convinced by Defendant's argument. While the *Trump* Court has made clear that the President must be protected, and therefore receive absolute immunity, when conducting official business such as when directing the Office of the Attorney General, the Defendant's Tweet in People's 407I contains nothing of the sort. Nor is this Court persuaded, for the reasons stated in the preceding paragraphs, that this Tweet made in Defendant's personal capacity, constitutes an official act. This Twitter post and the communication contained therein does not constitute a core official act nor does it fall within the outer perimeter of his official duties.

## PART VI: HARMLESS ERROR

The People argue that if this Court concludes that "any evidence of official presidential acts [were] improperly admitted at trial," Defendant's request to "set aside the verdict should be rejected on harmless-error grounds." People's Response at pg. 38. In response, Defendant argues that harmless error does not apply here because "federal constitutional reasoning forecloses harmless-

error analysis under New York law in a manner similar to the treatment of 'structural errors' and 'mode of proceedings errors.'" Defendant's Motion at pg. 44.

Even if this Court did find that the disputed evidence constitutes official acts under the auspices of the *Trump* decision, which it does not, Defendant's motion is still denied as introduction of the disputed evidence constitutes harmless error and no mode of proceedings error has taken place.

The Court of Appeals has held that "'[t]he paramount purpose of all rules of evidence is to ensure that the jury will hear all pertinent, reliable and probative evidence which bears on the disputed issues.'" *People v. Robinson*, 17 NY3d 868 [2011] *citing to People v. Miller*, 39 NY2d 543, 551 [1976]. If the error at issue violates a defendant's constitutional rights, the constitutional test for harmless error applies. *People v. Goldstein*, 6 NY3d 119 [2005]. That is, the burden is on the People to show that any error was harmless beyond a reasonable doubt. *Id.* citing *Chapman v. California*, 386 US 18, 24 [1967] and *People v. Crimmins*, 36 NY2d 230 [1975]. Non-constitutional harmless errors do not involve constitutional provisions. As such, there is a less exacting standard of review. In such instances, the error is deemed harmless if there is overwhelming evidence of a defendant's guilt and there is no significant probability that the error affected the outcome of the trial. *People v. Mairena*, 34 NY3d 473 [2019]; *People v. Vargas*, 154 AD3d 971 [2d Dept 2017]. "Our State test with respect to non-constitutional error is not so exacting as the Supreme Court test for constitutional error." *Crimmins*, 36 NY2d at 241. "We observe that in either instance, of course, unless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error." *Id.* Whether "overwhelming proof of guilt" exists cannot be determined with mathematical precision. *Id.* The vast majority of New York courts, including the court in *Crimmins*, consider two discrete factors when determining whether an error was harmless: (1) the quantum and nature of the evidence against the defendant if the error is excised and (2) the causal effect the error may nevertheless have had on the jury. *People v. Clyde*, 18 NY3d 145 [2011] *citing to People v. Hamlin*, 71 NY2d 750 [1988].

As discussed in Part V(a) supra, mode of proceedings errors occupy a very narrow set of claims and "go to the essential validity of the process and are so fundamental that the entire trial is irreparably tainted." *Kelly* 5 NY3d 116, 119-120, *People v. Cabrera*, 41 N.Y.3d 35 [2023]. These types of errors are not easily defined. *People v. Mack*, 27 NY3d 534 [2016]. Since such errors require "reversal without regard to the prejudice, or lack thereof, to the defendant, the Court of Appeals has

been hesitant to expand this doctrine. *Id.* at 540. "The designation of a mode of proceedings error is therefore 'reserved for the most fundamental flaws.'" *Id.* at 541.

Defendant's primary argument on this point is that "Presidential Immunity errors were not and are never 'harmless.'" Defendant's Reply at pg. 18. This argument is premised on the claim that errors involving Presidential immunity constitute mode of proceedings errors. Defendant argues that the official acts evidence at the heart of his motion fall under the rubric of Presidential immunity and are therefore "structural errors" of the "type of danger that would lead Presidents to be chilled from taking the bold and unhesitating action required of an independent Executive." *Id.* at pgs. 19-20. Defendant points to the Supreme Court's warning that "official acts evidence raises a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.*

The People dispute the "importance or constitutional nature of official acts immunity" and submit that the conduct alleged here is not unique. People's Response at pg. 36. They further argue that many "evidentiary privileges derive from important public policy concerns…[y]et the Court of Appeals has applied harmless error analysis even to extremely important evidentiary privileges."[28] *Id.* Finally, the People argue that even if the disputed evidence was introduced in error at trial, the remaining evidence supports a finding of guilt.[29] People's Response at pg. 39.

As an initial matter, this Court does not agree that the alleged error here qualifies as a mode of proceedings error such that it is not subject to harmless error analysis. Mode of proceedings errors typically involve situations that strike at the heart of a trial, such as a court failing to advise counsel "with meaningful notice of [a] substantive jury note." *People v. Morrison*, 32 NY3d 951 [2018]. In addition to the examples provided in Part V(A) *supra*, other examples of the high procedural bar can include a trial judge's inappropriate commentary before a jury regarding a defendant's decision not to testify (*People v.* McLucas, 15 NY2d 167 [1965]) and the conviction for a crime that does not exist within the Penal Law (*People v.* Martinez, 81 NY2d 810 [1993]. In each of those instances, the Court of Appeals found that the errors were so fundamental to "the organization of the court or the mode

---

[28] In a footnote, the People cite examples such as *People v. Rivera*, 25 NY3d 256 [2015] where harmless error analysis was applied to the physician-patient privilege and *People v. Carmona*, 82 NY2d 603 [1993] where it was applied to the cleric-congregant privilege. People's Response at pg. 36 n8.

[29] As the People tacitly acknowledge in Footnote 9 of their Response, the trial record in this matter is dense. Nonetheless, this Court will be succinct when referencing the selected testimony and exhibits in this portion of its Decision.

of proceedings proscribed by law," that the failure to preserve their objection was of no import. *Patterson*, 39 N.Y.2d at 295.

This Court finds that even if the disputed evidence was admitted in error, such error was harmless. "Not every error committed in the course of a criminal prosecution will necessarily lead to a reversal or modification of a judgment of conviction, and that, subject to certain exceptions, an error will be disregarded if it is determined to have been harmless." The Powers of the New York Court of Appeals, NYCTAPP §21:13, *Crimmins* 36 NY2d at 239. "Even when constitutional errors, as other errors, have occurred in a case, they do not require reversal when a reviewing court can conclude with confidence that they were harmless beyond a reasonable doubt." *Smith*, 97 NY2d at 330.

In addition to presiding over every stage of these proceedings, this Court has carefully scrutinized the trial record, including all evidence such as: invoices, general ledger entries, recorded phone conversations, text messages, e-mails, Mr. Weisselberg's handwritten notes, and video footage. This also includes testimony from Mr. Cohen[30], Ms. Daniels, Mr. McConney, Keith Davidson, Mr. Pecker, and Gary Farro to name but a fraction of the evidence the jury heard and considered, separate and apart from that evidence and select testimony which Defendant challenges on Presidential immunity grounds. Also included was evidence in the form of Defendant's own words from his many published books. This Court concludes that if error occurred regarding the introduction of the challenged evidence, which it does not, and such error were excised, such error was harmless in light of the overwhelming evidence of guilt. *Crimmins* at 230.

## PART VII: USE OF OFFICIAL ACTS IN GRAND JURY

Defendant argues that the use of alleged official acts evidence in the grand jury tainted the proceedings and requires dismissal of the indictment. Defendant's Motion at pg. 41. The official acts referenced by Defendant essentially mirror the trial evidence he has challenged. See Part V above. The only evidence presented in the grand jury, that was not introduced at trial, is the testimony of the witness identified as Trump Counselor.[31]

---

[30] This Court, having had the unique opportunity to hear Mr. Cohen's testimony and to observe his demeanor on direct and cross examination and to form an opinion as to his credibility, does in fact credit his testimony.
[31] As this witness testified in the grand jury and not at trial, they will be referred to as Trump Counselor throughout this Decision.

The People's response in opposition is similar to their arguments discussed *supra*. Specifically, that Defendant did not preserve this claim and even if he had, the argument would fail on the merits. They further argue that any error committed in the grand jury is harmless. People's Response at pgs. 61-63. In response to the People's preservation argument, Defendant once again argues that the *Trump* Court addressed an issue of first impression and therefore, *Trump* "constitutes 'good cause' for the timing of the motion." Defendant's Reply at pg. 2.

In Part V, this Court analyzed the respective arguments of the parties as they apply to the evidence introduced at trial. Here, this Court analyzes the arguments in the context of the grand jury presentation and sees no reason to depart from the conclusion reached *supra*. In Part V(A), this Court ruled that where Defendant failed to make a timely and proper objection to the introduction of evidence at trial, he has failed to adequately preserve his objections to such evidence for purposes of CPL § 330.30(1) review. The same is true in the context of grand jury testimony.

Here, Defendant never lodged an objection to the sufficiency of the grand jury proceedings or the propriety of Trump Counselor's testimony on the grounds of Presidential immunity. Notably, Defendant, in his Reply to the People's Opposition, does not, and it seems cannot, point to any instance where such an objection was made. In Defendant's Reply, he again references "good cause" for the timing of his motion and his failure to preserve his arguments. Defendant's Reply at pg. 2. As this Court reasoned when addressing preservation in Part V(A) *supra*, "good cause" and "interest of justice" are not legally viable standards for a CPL § 330.30(1) review in the absence of preservation. *Carter*, 63 NY2d 530.

In the alternative, were this Court to find that Defendant did properly preserve his objections as to the purported official acts evidence presented to the grand jury, Defendant's claim is nonetheless denied on the merits. It is not necessary for this Court to repeat its detailed analysis in Section V *supra*. The testimony of Trump Counselor did not pertain to official acts as contemplated by *Trump*. Instead, this Court will only address Defendant's arguments with respect to Trump Counselor as well as Mr. Pecker's testimony relating to Attorney General Jeff Sessions.[32]

Trump Counselor testified regarding their role and duties during Defendant's time as President. They further testified that they had "formal and informal" meetings with Defendant. Regarding the instant matter, they testified to having general discussions about Ms. Daniels when news about the payments resurfaced in 2018. This testimony ranged from media appearances the

---

[32] The Court's analysis of the testimony of Mr. Pecker is made in light of the *Trump* Court's ruling that a President has the absolute discretion to "decide which crimes to investigate and prosecute." *Trump* at 621.

witness made, to comments about the news, discussing NDAs with Defendant, to discussing the various media appearances made by Ms. Daniels' attorney at the time, Michael Avenatti. As analyzed above, the discussions between Defendant and Trump Counselor are nothing more than conversations about personal matters. Notably, this witness testified in the grand jury, that their conversations with Defendant about Ms. Daniels, were not related to official conduct and dealt more with Defendant's then private attorney. Indeed, Trump Counselor questioned why they would be asked questions about Defendant's payments to Ms. Daniels when they had nothing to do with the White House or the campaign.

With respect to Mr. Pecker, he testified in the grand jury, in sum and substance, what Mr. Cohen told him: that the United States Attorney General reports to the President. A fact that is public knowledge and involves no official acts such as the Executive Branch deciding which crimes to investigate and prosecute.

Finally, this Court cannot agree with Defendant's interpretation of *People v. Ohrenstein*, 153 AD2d 342 [1st Dept 1989] that an "indictment cannot be legally sufficient if it is based on grand jury testimony which may require inquiry into legislative acts or the motivation for legislative acts." Defendant's Motion at pg. 42. Specifically, Defendant argues that the trial court in *Ohrenstein* "dismissed additional charges based on the finding that two of the remaining defendants were 'prejudiced by the erroneous theory' presented to the grand jury." *Id.* Defendant's reading of *Ohrenstein* presumes that because *Trump* held that a former President cannot be indicted for conduct for which they are immune from prosecution, then the indictment here must be dismissed. This argument is premised on a finding that the evidence in dispute, i.e. that which was presented to the grand jury, constitutes official acts for which Defendant is entitled to immunity. This Court has not made such a finding. As such, Defendant's motion in this respect is denied.

### PART VIII: CONCLUSION

This Court finds that Defendant preserved his claims only as to the testimony of Hope Hicks, OGE Form 278e, and Twitter postings identified as People's Exhibits 407F through 407I. All other claims are denied as unpreserved; and

This Court further finds that the evidence related to the preserved claims relate entirely to unofficial conduct and thus, receive no immunity protections; and

40

As to the claims that were unpreserved, this Court finds in the alternative, that when considered on the merits, they too are denied because they relate entirely to unofficial conduct entitled to no immunity protections; and

Further, even if this Court were to deem all of the contested evidence, both preserved and unpreserved, as official conduct falling within the outer perimeter of Defendant's Presidential authority, it would still find that the People's use of these acts as evidence of the decidedly personal acts of falsifying business records poses no danger of intrusion on the authority and function of the Executive Branch, a conclusion amply supported by non-motive-related evidence; and

Lastly, this Court concludes that if error occurred regarding the introduction of the challenged evidence, such error was harmless in light of the overwhelming evidence of guilt.

Defendant's motion to dismiss the indictment and vacate the jury verdict pursuant to CPL § 330.30(1) is denied.

The foregoing constitutes the Decision and Order of the Court.

Dated: December 16, 2024
New York, New York

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

HON. J. MERCHAN

41

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP,

Defendant.

**DECISION and ORDER**

Defendant's Motion to
Dismiss the Indictment and
Vacate the Jury's Verdict
Pursuant to CPL
§§ 210.20(1)(h) and 210.40(1)

Indictment No. 71543-23

JUAN M. MERCHAN, A.J.S.C.:

### PART I: BACKGROUND AND PROCEDURAL HISTORY

On May 30, 2024, a New York County jury returned a verdict finding Defendant guilty after trial, on 34 counts of Falsifying Business Records in the First Degree. That same day, this Court set a deadline of June 13, 2024, for the filing of post-trial motions. The deadline passed without the filing of any motions.

The Court set the matter down for the imposition of sentence to July 11, 2024. However, that date was adjourned to September 18, 2024, as a direct result of the United States Supreme Court's decision in the matter of *Trump v. United States*, 603 US 593 [2024]. On August 14, 2024, Defendant requested an adjournment of sentencing until after the 2024 Presidential election. The People did not oppose Defendant's request. As a result, on September 6, 2024, this Court adjourned sentencing, if necessary, to November 26, 2024.

On November 10, 2024, following the 2024 Presidential election, Defendant requested a "stay [of] the existing scheduled dates […], and eventual dismissal of the case in the interests of justice, under the US Supreme Court's decision in *Trump v. United States* and the Presidential Transition Act of 1963." On November 22, 2024, this Court granted Defendant leave to file a motion pursuant to Criminal Procedure Law § 210.40(1) (Motion to Dismiss Indictment in Furtherance of Justice – otherwise known as a "Clayton Motion") and set a motion schedule. Defendant filed the

instant motion on December 2, 2024. The People filed their Response on December 9, 2024, and Defendant filed his Reply on December 13, 2024.[1]

The following constitutes the Decision and Order of this Court.

### PART II: ARGUMENTS OF THE PARTIES

Defendant argues that "[t]he Presidential immunity doctrine, the Presidential Transition Act, and the Supremacy Clause all require" dismissal "immediately." Defendant's Motion at pg. 1. In support, Defendant points not only to his status as President-elect, but also to alleged "unlawful" conduct by the prosecution, rulings of this Court allegedly in violation of Defendant's rights, and claimed evidentiary infirmities at trial, which either present a legal impediment to conviction or together, require dismissal in the interests of justice. The allegations of "unlawful" conduct against the New York County District Attorney ("DANY") include claims that DANY engaged in "politically motivated targeting" of Defendant; unlawfully "leaked" information about the investigation; tainted the jury pool by making improper public statements; engaged in repeated misrepresentations to this and other courts before, during, and after trial; and suborned perjury from prosecution witnesses, Michael Cohen and Stormy Daniels. Defendant also accuses this Court of impermissibly presiding over this matter despite the existence of an alleged conflict of interest, and of imposing an "unlawful gag order," a reference to this Court's Order Governing Extrajudicial Statements.[2]

---

[1] On December 16, 2024, the Court issued its Decision and Order denying Defendant's separate Motion to Vacate and Dismiss pursuant to CPL § 330.30(1).

[2] This Court recognizes that the lawyering by both the prosecution and the Defense has been exceptional and spirited throughout the entirety of this case. It is clear that the People have prosecuted this matter to the best of their abilities and the Defense has represented their client zealously. There have however, been instances when in written submissions, counsel has come dangerously close to crossing the line of zealous representation and the professional advocacy one would expect from members of the bar and officers of the court and this Court has at times, made counsel aware of its observations and concerns. Now however, counsel has resorted to language, indeed rhetoric, that has no place in legal pleadings. For example, countless times in their Motion to Dismiss, counsel accuses the prosecution and this Court of engaging in "unlawful" and "unconstitutional" conduct. *See* Defendant's Motion at pgs. 1, 6-9, 11, 43, 51. These same terms are also peppered throughout Defendant's Reply. Those words, by definition, mean "criminally punishable." (Black's Law Dictionary 748-749 [Third Pocket Edition]). Viewed in full context and mindful of the parties to this action, such arguments, in the broader picture, have the potential to create a chilling effect on the Third Branch of government. Indeed, Chief Justice Roberts in his 2024 Year End Report on the Federal Judiciary, felt compelled "to address four areas of illegitimate activity that, in my view, do threaten the independence of judges on which the rule of law depends: (1) violence, (2) intimidation, (3) disinformation, and (4) threats to defy lawfully entered judgments." J.G.

The People oppose Defendant's motion arguing that "President-elect immunity does not exist," and that the "vast majority of defendant's claims involve objections that this Court and others have repeatedly rejected." People's Response at pg. 1. The People submit alternative remedies, short of a dismissal, which they argue still respect the doctrine of Presidential immunity from criminal process while at the same time respecting the verdict rendered by the New York County jury. The alternative proposals include adjourning sentencing until after Defendant completes his term of office or the application of the "Alabama Rule" which would effectively permanently abate proceedings without dismissal or the imposition of sentence.

### PART III: THE JURY VERDICT

As indicated above, the Defendant has been found guilty on 34 felony counts. The significance of the fact that the verdict was handed down by a unanimous jury of 12 of Defendant's peers, after trial, cannot possibly be overstated. Indeed, the sanctity of a jury verdict and the deference that must be accorded to it, is a bedrock principle in our Nation's jurisprudence. "The right to have a jury make the ultimate determination of guilty has an impressive pedigree. Blackstone described 'trial by jury' as requiring that '*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors." *United States v. Gaudin*, 515 US 506 [1995], citing to 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added). Even an examination of *how* a jury reached its verdict must be approached with caution as only extraordinary

---

Roberts, Jr., 2024 Year End Report on the Federal Judiciary at pg. 5. "Public officials, too, regrettably have engaged in recent attempts to intimidate judges – for example, suggesting political bias in the judge's adverse rulings without a credible basis for such allegations. [...]. Attempts to intimidate judges for their rulings in cases are inappropriate and should be vigorously opposed." *Id.* at pg. 7. "Judicial independence is worth preserving. As my late colleague Justice Ruth Bader Ginsburg wrote, an independent judiciary is 'essential to the rule of law in any land' yet it 'is vulnerable to assault; it can be shattered if the society law exists to serve does not take care to assure it's preservation.'" *Id.* at pg. 8 citing R.B. Ginsberg, Remarks on Judicial Independence, Conference of American Judges Association, 2006. "Of course, the courts are no more infallible than any other branch. In hindsight, some judicial decisions [are] wrong, sometimes egregiously wrong." *Id.* at pg. 5.

Wrong – not "unlawful" or deliberately violative of a litigant's constitutional rights - and our Rule of Law provides a system of appellate review for higher courts to consider a litigant's claim of error below. This Court is in complete agreement with Chief Justice Roberts' views on this subject. Dangerous rhetoric is not a welcome form of argument and will have no impact on how the Court renders this or any other Decision.

circumstances warrant second guessing the deliberative process. *See People v. Testa*, 61 NY2d 1008 [1984].

In fact, it is standard practice in criminal courts in this state to instruct jurors at the start of every trial, and to remind them before commencing deliberations, that "[y]ou and you alone are the judges of the facts, and you and you alone are responsible for deciding whether the defendant is guilty or not guilty." CJI2d[NY] Role of the Court and Jury. The practical and policy concerns implicated by these instructions are legion. *People v. Oldham*, 58 Misc 3d 807 [Sup Ct, New York County 2018]. As such, arriving at a unanimous verdict after applying their "collective intelligence and experience" reviewing and analyzing evidence is "regarded as a hallmark of our judicial system." *People v. Brown*, 48 NY2d 388 [1979]. Thus, it is understandably rare, for a trial court to overturn a unanimous jury verdict.

### PART IV: PRESIDENTIAL IMMUNITY FROM CRIMINAL PROSECUTION

Defendant makes clear that the "driving 'compelling factor'" requiring vacatur of the jury's verdict and dismissal of the indictment is "Presidential immunity and the Supremacy Clause." Defendant's Motion at pg. 54. Thus, the primary issue before this Court is: whether a President-elect must be afforded the same immunity protections from a state prosecution as a sitting President? This issue, as far as this Court can discern, is without precedent. Although the parties agree on very little, they both appear to recognize the paucity of available precedent to assist this Court in evaluating Presidential immunity in the instant context. Though the parties arrive at starkly different conclusions, they both rely on the same small universe of legal authority to support their respective arguments. This guidance can be found primarily in *Trump v. United States*, 603 US 593 [2024]; *United States v. Nixon*, 418 US 683 [1974]; *Nixon v. Fitzgerald*, 457 US 731 [1982]; *Clinton v. Jones*, 520 US 681 [1997]; *Trump v. Vance*, 591 US 786 [2020]; The Presidential Transition Act of 1963; 1973 Office of Legal Counsel ("OLC") Memorandum *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office;* and 2000 OLC Memorandum *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291 [Oct. 16, 2000]. The clear concerns confronted by the aforementioned sources, which are detailed in the 2000 OLC Memorandum, and referenced by the parties, are:

1. The actual imposition of a criminal sentence of incarceration;
2. The public stigma occasioned by the initiation of criminal proceedings; and
3. The mental and physical demands of assisting with the preparation of a defense for the various stages of a criminal proceeding.

4

As noted by the Special Counsel's Office in their recent memorandum of dismissal, the 1973 and 2000 OLC memos addressed only federal cases involving Presidents. *See Government's Motion to Dismiss, United States v. Trump*, US Dist Ct, DDC, Chutkan, J. No. 23-cr-257, ECF No. 281 ("As with the 1973 and 2000 OLC Opinions, OLC's analysis addressed only the federal cases pending against the defendant."). A fair reading of the scant legal precedent in this area of the law supports that the decisions rendered by the Supreme Court over the prior decades were also focused on addressing federal cases brought against Presidents, with *Vance* being the one exception.[3] However, it is logical to infer that the three concerns expressed in the 2000 OLC memorandum can overlap with criminal prosecutions that occur in state court. The first consideration set forth in the 2000 OLC memo, incarceration as a criminal sentence, carries the same restrictions as that of a federal sentence, i.e. deprivation of liberty. Second, the "public stigma" of a criminal proceeding will likely occur in both, federal and state courts. Lastly, the "mental and physical burdens" that would befall a defendant assisting in his defense against criminal charges would be largely the same in federal and state proceedings. They both require such exercises as witness preparation, analysis of discovery material and evidence, and overall trial strategy. Furthermore, the balancing of competing public interests, i.e. that of protecting the powers and functions of the Executive Branch, upholding the Rule of Law, and honoring the sanctity of a jury verdict permeate criminal proceedings not only in federal court, but in state court as well. *Government's Motion to Dismiss, United States v. Trump*, No. 23-cr-257, ECF No. 281; People's Response at pg. 6; Defendant's Motion at pg. 49. Therefore, this Court applies that same balancing of competing public interests to the instant state proceeding in its analysis of Defendant's Motion.

### PART V: PRESIDENT-ELECT IMMUNITY FROM CRIMINAL PROSECUTION

Applying the guidance of the aforementioned sources, this Court finds that Presidential immunity from criminal process for a sitting president does not extend to a President-elect. To begin, the Constitution dictates that only a President, after taking the oath of office, has the authority of the Chief Executive, a President-elect does not. Accordingly, a President-elect is not permitted to

---

[3] Though *Vance* directly involved the matter before this Court, the Supreme Court's Decision came long before trial commenced. The issue in *Vance* dealt squarely with "a subpoena issued to the President by a local grand jury operating under the supervision of a state court." *Vance* at 799. As such, although the doctrine of Presidential immunity is discussed within the dicta of that decision, there is nothing directly on point for the issue currently before this Court.

avail himself of the protections afforded to the individual occupying that Office.[4] This finding is consistent with *US v. Williams*, wherein the D.C. Circuit Court of Appeals held that the Presidential Transition Act of 1963, 3 U.S.C. 102, does not "confer 'official' status on a President-elect." 7 F Supp 2d 40, 51 [DC Circ. 1998]. The D.C. Circuit Court further held that the "Act provides money and office space to the President-elect's transition team but does not—and cannot—deem any of the President-elect's actions 'official' before he or she complies with the Oath and Affirmation Clause." *Id.*

Turning to the three concerns identified above, beginning with the second, the case at bar is well past the initiation stage and whatever threat of public stigma from criminal prosecution that might have existed has long passed. Indeed, one of Defendant's most frequent arguments is that this Court should defer to the will of the citizenry who recently re-elected him to the Office of the Executive, notwithstanding an actual guilty verdict in this case. Thus, whatever stigma that might have existed, will most certainly not interfere with Defendant's ability to carry out his duties – both as President-elect and as the sitting President.

The third concern addresses the mental and physical demands of defending against a criminal proceeding. To be clear, neither the United States Supreme Court, nor the Office of Legal Counsel in either their 1973 or 2000 Memoranda, were concerned solely with the time demands of mounting a defense upon a sitting President. *See Clinton*, 520 US at 703 ("The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution."); *Vance*, 591 US at 801 (Rejection of Defendant's contention that "diversion occasioned by a state criminal subpoena imposes an equally intolerable burden on a President's ability to perform his Article II functions."); 1973 OLC Memorandum at 29 ("[C]riminal proceedings against a President in office should not go beyond a point where they could result in so serious a physical interference with the President's performance of his official duties that it would amount to an incapacitation;" 2000 OLC Memorandum at 24 (Referencing the distinction between the demands on a sitting President's time for a civil trial, versus a criminal trial, which may be mitigated by "skillful trial management."). In fact, a sitting President is subject to impeachment proceedings, civil litigation, and service of criminal

---

[4] Undoubtedly, the transition period between election and the taking of the Presidential oath is one filled with enormous responsibility. Yet, even Defendant in his motion refers to Presidential immunity as one relating specifically to a *sitting* President no fewer than 33 times.

process – including subpoenas – all of which impose time demands. *See Nixon*, 418 US 683; *Fitzgerald*, 457 US 731; *Clinton*, 520 US 681; *Vance*, 591 US 786.

The greater concern noted by these same sources is whether the burden impedes on a sitting President's ability to perform his constitutional duties. Defendant analogizes that the same concern applies equally to a President-elect, arguing that the demands on his time to appear at any sentencing would be so significant as to impede his ability to prepare for his constitutional duties during the transition period. This Court is not persuaded. Having addressed and resolved all matters brought before this Court and the verdict now more than half a year behind us, all that remains outstanding in this case is the issuance of this Decision and the imposition of sentence. Scheduling sentence is a function that remains exclusively within the purview of the trial judge and can be easily set down for a date and time certain to minimize disruption and inconvenience, provided that applicable statutory obligations are met.[5] Defendant argues that Special Prosecutor Jack Smith's decision to dismiss the Defendant's federal indictments is evidence of a mandate that all criminal cases pending against the President-elect must cease immediately. The vastly different procedural posture of the instant case renders any comparison to the Special Counsel's indictments unpersuasive.

Further, while Defendant now claims this Court cannot and must not sentence Defendant, the record is clear that Defendant not only consented to, but in fact requested the very adjournment that led us down the path we are on. As the parties are aware, it was on Defendant's application, without opposition from the People, that sentence was adjourned until *after* the Presidential election. Any claim Defendant may have that circumstances have changed as a result of Defendant's victory in the Presidential election, while convenient, is disingenuous. Defendant has always pronounced, since the inception of this case, confidence and indeed the expectation, that he would prevail in the 2024 Election - confidence that has proven well-founded. That he would become the "President-elect" and be required to assume all the responsibilities that come with the transition were entirely anticipated. Thus, it was fair for this Court to trust that his request to adjourn sentencing until after the election carried with it the implied consent that he would face sentence during the window between the election and the taking of the oath of office. The Supreme Court's decision in *Trump* has delayed sentence - not precluded it.[6]

---

[5] CPL Article 380 sets forth, among other requirements, that sentencing must be pronounced without unreasonable delay and afford time for the preparation of a pre-sentence report – which was completed months ago.

[6] The first concern relating to incarceration is addressed in Part IX below.

### PART VI: MOTION TO DISMISS INDICTMENT PURSUANT TO CPL § 210.20(1)(H)

Defendant presents this Court with the novel theory of President-elect immunity as it applies to CPL § 210.20(1)(h), arguing that such immunity presents a "legal impediment to conviction." For the reasons stated above, this Court remains unpersuaded that President-elect immunity is the law and thus, neither that doctrine, nor the Supremacy Clause or Presidential Transition Act present a legal impediment to imposition of sentence. Alternatively, Defendant seeks, in essence, a form of retroactive immunity. Both of these theories are briefly addressed below.

Essentially, what Defendant asks this Court to do is to create, or at least recognize, two types of Presidential immunity, then select one as grounds to dismiss the instant matter. First, Defendant seeks application of "President-elect immunity," which presumably implicates all actions of a President-elect before taking the oath of office. Thus, he argues that since no sitting President can be the subject of any stage of a criminal proceeding, so too should a President-elect be afforded the same protections. Defendant's Motion at pg. 35. Second, as the People characterize in their Response, Defendant seeks an action by the Court akin to a "retroactive" form of Presidential immunity, thus giving a defendant the ability to nullify verdicts lawfully rendered prior to a defendant being elected President by virtue of being elected President. It would be an abuse of discretion for this Court to create, or recognize, either of these two new forms of Presidential immunity in the absence of legal authority. The Defendant has presented no valid argument to convince this Court otherwise. Binding precedent does not provide that an individual, upon becoming President, can retroactively dismiss or vacate prior criminal acts nor does it grant blanket Presidential-elect immunity. This Court is therefore forbidden from recognizing either form of immunity.

### PART VII: THE CLAYTON MOTION

In addition to his claim that Presidential immunity and the Supremacy Clause demand dismissal as a matter of law, he separately argues that President-elect immunity and the Supremacy Clause are factors this Court must consider in connection with his motion to dismiss pursuant to CPL § 210.40(1) in furtherance of justice under this Court's discretionary authority.

CPL § 210.40(1), also known as a Clayton Motion, sets forth ten factors a court should consider individually and collectively when exercising its discretion whether to grant a motion to dismiss in the interests of justice. *See People v. Clayton*, 41 AD2d 204 [2d Dept 1973]. Those factors are:

(a) the seriousness and circumstances of the offense;

8

(b) the extent of harm caused by the offense;
(c) the evidence of guilt, whether admissible or inadmissible at trial;
(d) the history, character and condition of the defendant;
(e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;
(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
(g) the impact of a dismissal upon the confidence of the public in the criminal justice system;
(h) the impact of a dismissal on the safety or welfare of the community;
(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;
(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.

Dismissals in the interests of justice should be issued sparingly and granted in the "'rare' and 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional considerations' (citations omitted)." *People v. Pittman*, 228 AD2d 225, 226 [1st Dept 1996]. Such motions should be granted only where there is "some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment … would constitute or result in injustice." *People v. Rahmen*, 302 AD2d 408, 409 [2d Dept 2003]. When considering such motion, a court must refrain from usurping the role of the jury. *Id.; People v. Hudson*, 217 AD2d 53 [2d Dept 1995].

A motion filed pursuant to CPL § 210.40(1) must normally be made within forty-five days of arraignment. CPL § 255.10(1). Notwithstanding that limitation, Defendant requested leave to file this motion following the 2024 Presidential election. As Defendant's status as President-elect presented a factor for consideration that did not exist within 45 days of his arraignment, this Court granted that request. Defendant presents additional factors which he claims, when applied to the ten enumerated categories individually, or collectively, support the "necessary outcome." Defendant's Motion at pg. 54. To be clear, Defendant's claims, other than those related to Presidential immunity from criminal process relate either to evidentiary issues or prosecutorial conduct which occurred prior to indictment, before trial or during trial, and should have been addressed in a properly and timely filed Clayton motion. Nonetheless, this Court will address the claims on their merits as Defendant argues that Presidential immunity and the Presidential Transition Act individually, or taken together with the traditional Clayton factors, warrant a dismissal in the interest of justice.

9

### PART VIII: APPLICATION OF THE CLAYTON FACTORS

This Court will now apply Defendant's claims to the Clayton factors.

(a) The seriousness and circumstances of the offense, and
(b) The extent of harm caused by the offense

Defendant argues that the 34 counts of Falsifying Business Records in the First Degree in this case pale in comparison to the seriousness of the majority of street crimes prosecuted in New York County, and that, coupled with the decisions of other agencies to not pursue charges against Defendant, provides context for this Court to consider factors (a) and (b).

That violent crimes are, or are not, prosecuted in this same courthouse does not negate the seriousness and circumstances of the instant case. Seriousness and harm are not measured solely by the level of violence inflicted or the extent of financial harm. Seriousness can be gauged by considering the significance of the act under the unique circumstances of the case, as well as by the harm to society as a whole. *Cf People v. Norman*, 6 Misc 3d 317 [Sup Ct Kings Cty 2004] ("[N]ature of the crimes charged militate against, rather than in favor of, dismissal" rejecting motion under factors (a), (b), (d), (f), (g) and (h) in prosecution against New York State Assemblyman for 76 counts of offering false instrument for filing as the harm was in the "impairment of public trust."). Here, 12 jurors unanimously found Defendant guilty of 34 counts of falsifying business records with the intent to defraud, which included an intent to commit or conceal a conspiracy to promote a presidential election by unlawful means. It was the premeditated and continuous deception by the leader of the free world that is the gravamen of this offense. To vacate this verdict on the grounds that the charges are insufficiently serious given the position Defendant once held, and is about to assume again, would constitute a disproportionate result and cause immeasurable damage to the citizenry's confidence in the Rule of Law.

(c) The evidence of guilt

Defendant claims that the evidence at trial was "weak," and argues that DANY relied on perjured testimony and evidence introduced in violation of the Presidential immunity doctrine. As to the latter, this Court recently issued its Decision and Order finding that no official acts evidence was admitted at trial. Thus, that argument is meritless. As to the allegation that Michael Cohen provided unreliable perjured testimony, this Court presided over the entire trial and sat mere feet from all the witnesses who testified. In doing so, this Court had an opportunity to listen to their testimony and to observe their demeanor and therefore to form an opinion as to their credibility, and having done so, it does not agree with Defendant's characterization of Mr. Cohen's testimony.

10

Moreover, a total of 22 witnesses testified at trial, and over 500 exhibits admitted, all of which supported the jury's verdict. This claim does not weigh in Defendant's favor.

(d) The history, character and condition of the defendant

Defendant argues that his "contributions to this City and the Nation are too numerous to count," and concludes his argument under this section by referencing two NY Supreme Court cases which are entirely distinguishable.[7] Defendant's Motion at pg. 59. This Court agrees that Defendant served his country as President and will do so again in a matter of weeks. However, that service is but one of the considerations to weigh under this factor.

Despite Defendant's unrelenting and unsubstantiated attacks against the integrity and legitimacy of this process, individual prosecutors, witnesses and the Rule of Law, this Court has refrained from commenting thereon unless required to do so as when ruling on motions for contempt of court. However, Defendant, by virtue of the instant motion, directly asks this Court to consider his character as a basis to vacate the jury verdict, and this Court must do so in accordance with the requirements of CPL section 210.40(1)(d).

Defendant's disdain for the Third Branch of government, whether state or federal, in New York or elsewhere, is a matter of public record. Indeed, Defendant has gone to great lengths to broadcast on social media and other forums his lack of respect for judges, juries, grand juries and the justice system as a whole. *See* People's Response at Section IV. C. In the case at bar, despite repeated admonitions, this Court was left with no choice but find the Defendant guilty of 10 counts of Contempt for his repeated violations of this Court's Order Restricting Extrajudicial Statements ("Statements Order"), findings which by definition mean that Defendant willingly ignored the lawful mandates of this Court. An Order which Defendant continues to attack as "unlawful" and "unconstitutional," despite the fact that it has been challenged and upheld by the Appellate Division First Department and the New York Court of Appeals, no less than eight times. Indeed, as Defendant must surely know, the same Order was left undisturbed by the United States Supreme Court on December 9, 2024. *Good Lawgic, LLC, et al, v. Merchan*, 604 US 24A328 [2024]. Yet Defendant continues to undermine its legitimacy, in posts to his millions of followers. Indeed,

---

[7] Defendant's reference to *People v. Clifford* in support of dismissal due to lack of a criminal history is misleading; that case addressed Clayton motions submitted as to four defendants, three of whom had no criminal records, with relief granted only as to one. 82 Misc 3d 1068 [Sup Ct, New York County 2024]. The second case involves facts wholly incomparable to the instant matter. *People v. Wooten*, 62 Misc3d 1207(A) [Sup Ct, Kings County, 2019].

this is not the only instance in which Defendant has been held in contempt or sanctioned by a Court.[8] Defendant's character and history vis-a-vis the Rule of Law and the Third Branch of government must be analyzed under this factor in direct relation to the result he seeks, and in that vein, it does not weigh in his favor.

(e)  Any exceptionally serious misconduct of law enforcement personnel

Defendant next alleges several instances of trial misconduct, including: false testimony elicited by DANY from Stormy Daniels and Michael Cohen; alleged misrepresentations by DANY for the unavailability of potential witness Allen Weisselberg; an "unconstitutional crusade" against Defendant; "unlawful investigative leaks"; and alleged misrepresentations by DANY in the Removal proceedings.[9]

Defendant's arguments that the People committed egregious misconduct by eliciting certain testimony from Mr. Cohen and Ms. Daniels is unsupported, and his arguments mischaracterize the record. This Court entertained countless arguments before and during trial regarding the permissible parameters of the testimony of these witnesses and rulings were made in every instance. If those rulings were violated, objections were voiced and when appropriate, questions and/or answers were stricken from the record. Where necessary, curative or limiting instructions were given to the jury. Notably, the jury credited the testimony of Mr. Cohen and Ms. Daniels and returned a verdict consistent with that finding.

Further, this Court does not share Defendant's characterization of the colloquy surrounding the availability of Mr. Weisselberg. The People unsuccessfully argued for the admission of Mr. Weisselberg's severance agreement as proof of his unavailability to the People, while counsel for Defendant argued that he "wouldn't be surprised if there ends up being foundation for a missing witness instruction about the uncalled witnesses being equally unavailable to both sides." Tr. 3241-3242. Equating an unpersuasive argument with misconduct is a leap this Court will not make. Thus, neither of these claims weigh in Defendant's favor.

---

[8] For example, Defendant has been held in contempt by courts within this jurisdiction and sanctioned by others. *People of the State of New York v. The Trump Organization, Inc.*, No. 451G85/2020 [Sup Ct, New York County 2022]; *Trump v. Clinton*, 653 F Supp 3d 1198 [S.D. Fla. 2023] ("Frivolous lawsuits should not be used as a vehicle for fundraising or fodder for rallies or social media. Mr. Trump is using the courts as a stage set for political theater and grievance. This behavior interferes with the ability of the judiciary to perform its constitutional duty).
[9] While several of these claims are clearly designated by Defendant in support of factor 210.40(1)(e), others were raised in earlier portions of Defendant's motion without reference to a specific Clayton factor. Notwithstanding that omission, the Court will consider those claims as most appropriately falling under subsection (e).

As for the alleged misrepresentations by DANY in connection with the Removal proceedings, this Court is not aware of such misrepresentations. Thus far, Defendant's efforts to remove the case to federal jurisdiction have been rejected. What remains is Defendant's appeal of Judge Hellerstein's denial of his motion for leave to move for removal a second time.

With respect to Defendant's claim of an "unconstitutional crusade" against him and "unlawful investigative leaks," both claims have been raised previously and rejected by this Court. *See* Defendant's Omnibus Motion *generally*; Decision and Order on Defendant's Omnibus Motion Dated February 15, 2024; Decision and Order on People's Motions in *Limine* Dated March 18, 2024. The claims are equally unpersuasive now. While significant portions of Defendant's motion reference a book by a former DANY Assistant District Attorney to bolster these claims, this Court is not swayed. That a former prosecutor wrote a book which is critical of the decisions of District Attorney Alvin Bragg, does not render those decisions unethical, unlawful, or evidence of misconduct.

(f)  The purpose and effect of imposing upon the defendant an authorized sentence

Defendant argues that the effect of imposing an authorized sentence violates "the Presidential immunity doctrine, the Supremacy Clause, the Sixth Amendment, the Eighth Amendment and CPL 380.30(1)," and thus, this factor strongly supports dismissal in the interests of justice. Defendant's Motion at pg. 63. In support of that claim, Defendant refers this Court to his earlier argument in his Motion to Dismiss Part I.E in which he contests the legality of deferring proceedings until he completes his Presidential term. This Court rejects Defendant's claim that proceeding with sentencing is precluded as a matter of law. Analysis of this claim pursuant to this Court's *discretionary authority* is consistent with and addressed below under factor (j).

(g)  The impact of a dismissal upon the confidence of the public in the criminal justice system

Defendant argues that a dismissal will "improve public confidence" in the criminal justice system because anything short of a full dismissal will interfere with the Presidency. This Court's perspective is different. To begin, he claims the New York County jury pool was tainted and that he was unable to select an impartial jury.[10] Defendant raised this same issue previously in a motion for a further adjournment based on alleged prejudicial pretrial publicity. That motion was denied on April 12, 2024. Further, this Court presided over the *voir dire,* and nothing raised during the course of the jury selection process, gives this Court pause regarding the jury pool. And while Defendant

---

[10] Referenced within this category are Defendant's arguments regarding DA Bragg's extrajudicial statements during the pendency of this case, publicity arising from the prosecution of Trump Organization Chief Financial Officer Allen Weisselberg, and public statements by witnesses Michael Cohen and Stormy Daniels.

repeatedly refers to that stage in the process when "more than half" of the potential jurors purportedly self-identified as unable to be impartial as proof of an unfair system, this Court construes that very event entirely differently. First, it is standard practice for this Court to ask prospective jurors at the start of every trial, to self-identify if based solely upon what they've heard about the case up to that point they have reason to believe that they cannot be fair and impartial, or if they cannot serve for any other reason. Thus, while not particularly significant, we do not know how many prospective jurors self-excused because they doubted their ability to be fair, and how many self-excused for some other reason, such as travel plans, childcare responsibilities or a scheduled medical procedure. More importantly, a jury panel where half of its members self-identify as not confident in their ability to serve, for whatever reason, is not entirely uncommon, and their departure left us with those members of the panel who believed they could serve. It was these remaining jurors that the parties were given ample opportunity to examine for the existence of bias, partiality, or hostility. Notably, the attorneys did not question the prospective jurors until after the seated jurors had answered an exhaustive questionnaire – which was prepared with the participation of both defense counsel and the prosecution.

What Defendant is asking this Court to do is to assume that the jurors who self-identified were truthful, while those who remained were not. That conclusion is illogical and entirely unsupported. Further, the record is devoid of any instances during *voir dire,* which lasted four days, of defendant asking jurors whether they had been exposed to any extrajudicial statements by DA Bragg, Mr. Cohen or Ms. Daniels. This would appear to contradict Defendant's stated concern. The aforementioned questionnaire, inquired of prospective jurors as to their media and social media exposure, and the parties were permitted to ask follow-up questions. Defendant's conclusory claims that the jurors were tainted by public access to certain content has no support in the record and thus, cannot be considered under this factor to weigh in his favor.

Notwithstanding that Defendant's claims about the jury pool are unsubstantiated, it is important that this Court address the recent letter submissions of both parties dated December 3, 5 and 9, 2024, regarding Defendant's allegations of juror misconduct. As this Court previously stated in its letter of December 16, 2024, claims of such nature go to the very heart of the criminal process. As such, this Court is prepared to consider any claims of juror misconduct, if and when, Defendant properly files a motion that "must contain sworn allegations[.]" *See* CPL section 330.30(2); Court's Letter Order Dated December 16, 2024. Until then, Defendant's claims are merely unsupported allegations – nothing more. Importantly, no such submission has been made.

14

Finally, Defendant alleges, again, that public confidence is fatally impaired by this Court's alleged "disqualifying conflict." Defendant's Motion at pg. 65. And while Defendant "recognize(s), without conceding," the prior rulings of this Court rejecting such a claim, he pursues it once again. What Defendant does not acknowledge is that he has made three applications to the Appellate Division challenging this Court's rejection of Defendant's motions for recusal, which have all been rejected. Further, Defendant is reminded that very early in these proceedings, this Court sought an opinion from the Advisory Committee on Judicial Ethics, regarding the very issues contained in Defendant's subsequent motions for recusal and which he now raises again. The Committee rendered an opinion on May 4, 2023, finding that "the judge's impartiality cannot reasonably be questioned based on the judge's relative's business and/or political activities" and further advising that there was no requirement that this Court recuse from the proceedings. *See* Opinion of the Advisory Committee on Judicial Ethics, Op. 23-54 [May 4, 2023]. Despite the Opinion, of which Defendant has been aware for over one year, and the repeated Decisions of the Appellate Division, Defendant continues to mount the same baseless attacks in each succeeding motion, albeit with increasing ire. The frequency of the claims and escalating rhetoric in each subsequent motion – does not render the claims true or valid. They are not and it is irresponsible and deeply concerning for counsel to insist on advancing these claims.

To be clear, this is not the only example of Defendant pursuing a claim with increasing indignation while simultaneously failing to acknowledge that this Court's rulings on those subjects have been repeatedly upheld. By way of illustration, Defendant's motion papers refer to the "Unconstitutional Continuation of The Gag Order" as an example of this Court's alleged conflicted status. As noted *supra*, as recently as December 9, 2024, the United States Supreme Court denied an application for a stay regarding that Order in *Good Lawgic, LLC, et al v. Merchan*, a denial following repeated rejections of this claim in lower courts. *See* Part VIII (d). It is therefore bewildering to this Court that Defendant continues to file such papers.

(h) the impact of a dismissal on the safety or welfare of the community

Here, Defendant argues that the welfare of the community is at stake as a dismissal "remov[es] obstacles to an orderly transition of Executive power." Despite the alarming nature of the claim, Defendant provides no basis for it. Defendant's Motion at pg. 67. Consideration of this factor is also addressed under factor (j).

15

(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion

This factor provides no relevant consideration which weighs either in favor of, or against Defendant.

(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose

Here, it is appropriate to address Defendant's argument that his status as President-elect, and the enormity of the responsibilities that accompany the transition, together with all of the other factors, weigh heavily in favor of dismissal in the interests of justice. To be clear, none of the concerns raised by the Supreme Court or the OLC, and referenced in Defendant's motion, are relevant to the instant case. However, recognizing the magnitude of the unique scenario before us, the Court has scrutinized the positions of the respective parties. In so doing, this Court recognizes the importance of considering and balancing the seemingly competing factors before it: ensuring that the Executive Branch is free to fully dispense the duties of the President and safeguard the interests of the Nation, unencumbered by pending criminal proceedings; to ensure that the Supreme Court's ruling and the citizenry's expectation be honored that all are equal and no one is above the law; and the importance of protecting the sanctity of a jury verdict. This Court is simply not persuaded that the first factor outweighs the others at this stage of the proceeding, either on its own or in conjunction with the other Clayton factors.

Defendant's position is that nothing short of an outright and complete dismissal of the jury verdict will suffice to properly address his claims. This Court has painstakingly considered the respective arguments of the parties and finds that setting aside the jury verdict is not the best or only way to reconcile the competing interests. To dismiss the indictment and set aside the jury verdict would not serve the concerns set forth by the Supreme Court in its handful of cases addressing Presidential immunity nor would it serve the Rule of Law. On the contrary, such decision would undermine the Rule of Law in immeasurable ways. Just as this Court finds that President-elect immunity is not an actual precept and one which this Court has no authority to create, so too does this Court find that Defendant's status as President-elect does not require the drastic and "rare" application of its authority to grant the Clayton motion in furtherance of justice.

16

## PART IX: SENTENCING

Finding no legal impediment to sentencing and recognizing that Presidential immunity will likely attach once Defendant takes his Oath of Office, it is incumbent upon this Court to set this matter down for the imposition of sentence prior to January 20, 2025. It is this Court's firm belief that only by bringing finality to this matter will all three interests be served. A jury heard evidence for nearly seven weeks and pronounced its verdict; Defendant and the People were given every opportunity to address intervening decisions, to exhaust every possible motion in support of and in opposition to, their respective positions in what is an unprecedented, and likely never to be repeated legal scenario. This Court must sentence Defendant within a reasonable time following verdict; and Defendant must be permitted to avail himself of every available appeal, a path he has made clear he intends to pursue but which only becomes fully available upon sentencing.

This Court has considered and now rejects the People's suggestion that it adopt the "Alabama Rule" which would preserve the jury verdict while terminating the proceedings as such a remedy would deny Defendant the pathway he needs to exhaust his appellate rights.

The Court has also considered the People's alternative proposal of holding sentence in abeyance until such time as Defendant completes his term of Office and finds it less desirable than imposing sentence prior to January 20, 2025. The reasons are obvious. However, if the Court is unable to impose sentence before Defendant takes his oath of office, then this may become the only viable option.

While this Court as a matter of law must not make any determination on sentencing prior to giving the parties and Defendant an opportunity to be heard, it seems proper at this juncture to make known the Court's inclination to not impose any sentence of incarceration, a sentence authorized by the conviction but one the People concede they no longer view as a practicable recommendation. As such, in balancing the aforementioned considerations in conjunction with the underlying concerns of the Presidential immunity doctrine, a sentence of an unconditional discharge appears to be the most viable solution to ensure finality and allow Defendant to pursue his appellate options. Further, to assuage the Defendant's concerns regarding the mental and physical demands during this transition period as well as the considerations set forth in the 2000 OLC Memorandum, this Court will permit Defendant to exercise his right to appear virtually for this proceeding, if he so chooses. *People v. Reyes*, 72 Misc 3d 1133 [Sup Ct New York County 2011].

## PART X: CONCLUSION

THEREFORE, this Court finds that neither the vacatur of the jury's verdicts nor dismissal of the indictment are required by the Presidential immunity doctrine, the Presidential Transition Act or the Supremacy Clause; and

THIS COURT FURTHER FINDS that Defendant's arguments, whether independent of one another, or considered together, in support of his motions pursuant to CPL § 210.40(1) factors (a) through (j) are unpersuasive as no compelling factor, consideration or circumstance submitted demonstrate that imposition of sentence would result in an injustice; and

THIS COURT FURTHER FINDS that there is no legal impediment to imposition of sentence under CPL § 210.20(1)(h); and it is

HEREBY ORDERED that Defendant's motion to dismiss the indictment and vacate the jury verdict pursuant to CPL § 210.20(10)(h) and § 210.40(1) is denied; and it is further

ORDERED, that Defendant appear for sentencing following conviction on January 10, 2025, at 9:30 in the morning, at the Courthouse located at 100 Centre Street in New York County; and it is further

ORDERED, that Defendant may choose to appear at his sentencing in person or virtually. Counsel is directed to inform this Court of Defendant's preference no later than January 5, 2025.

The foregoing constitutes the Decision and Order of the Court.

Dated: January 3, 2025
   New York, New York

**JAN 0 3 2025**

Juan M. Merchan
Acting Justice of the Supreme Court
Judge of the Court of Claims

**HON. J. MERCHAN**

ADD-086

FILED: APPELLATE DIVISION - 1ST DEPT 01/07/2025 01:34 PM
NYSCEF DOC. NO. 18                                    2025-00118

FILED: APPELLATE DIVISION - 1ST DEPT 01/07/2025 11:05 AM      2025-00118
NYSCEF DOC. NO. 4                                    RECEIVED NYSCEF: 01/07/2025

# SUMMARY STATEMENT ON APPLICATION FOR
# EXPEDITED SERVICE AND/OR INTERIM RELIEF
### (SUBMITTED BY MOVING PARTY)

Date: January 7, 2025                                     Case # 2025-00118

Title of Matter: PEOPLE OF THE STATE OF NEW YORK, Respondent      Index/Indict/Docket # 71543-23

DONALD J. TRUMP, Defendant-Movant

Appeal by _____ from     Order ☐ Judgment ☐ of Decree ☐     Supreme ☐ Surrogate's ☐ Family ☐     County 100 Centre St., New York, NY 10013

Court entered on _____,20_____

Name of Judge _____

Notice of Appeal filed on _____,20_____

If from administrative determination, state agency _____

Nature of action or proceeding: Article 78 Petition on Order to Show Cause relating to N.Y. Supreme Court's incorrect Presidential immunity rulings dated Dec. 16, 2024 and Jan. 3, 2025

Provisions of: ☐ order ☐ judgment ☐ decree     appealed from _____

This application by appellant / respondent is for Expedited resolution of President Trump's Article 78 Petition and immediate stay of any further criminal proceedings in the Supreme Court pending resolution of the Petition

If applying for a stay, state reason why requested N.Y. Supreme Court's Presidential immunity rulings are causing ongoing, irreparable harm by depriving President Trump of his constitutional rights

Has any undertaking been posted No                    If "yes", state amount and type _____

Has application been made to court below for this relief No
If "yes", state Disposition _____

Has there been any prior application here in this court No
If "yes", state dates and nature _____

Has adversary been advised of this application Yes
Does he/she consent No

ADD-087

Attorney for Movant             Attorney for Opposition

Name   Todd Blanche

Address   Blanche Law PLLC

99 Wall Street, Suite 4460

New York, NY 10005

Tel. No.  (212) 716-1250

Email   toddblanche@blanchelaw.com

Appearing by _____

_____

_____

_____

_____

**Matthew Colangelo/Manhattan District Attorney's Office**

One Hogan Place, New York, NY 10013

(212) 335-9000 / ColangeloM@dany.nyc.gov

Hon. Juan M. Merchan/Acting Justice Supreme Court, Criminal Term

100 Centre St., New York, NY 10013

(646) 386-3934 / JMerchan@nycourts.gov

Lisa Evans/Office of Court Administration

25 Beaver St., New York, NY 10004

lievans@nycourts.gov

Leticia James, NYS Attorney General

28 Liberty St., NY, NY 10005(212) 416-8020 / appeals.nyc@ag.ny.gov

-----------------------------------------------------------------------------------------------------------------------------

**(Do not write below this line)**

DISPOSITION

<u>After consideration of the papers submitted and the extensive oral argument, movant's application for an interim stay is denied.</u>

_Ellen Gesner_             January 7, 2024

Justice    _EG_           Date

Motion Date _1/21/25_    Opposition _1/14_    Reply _1/21 10 am_

EXPEDITE ____✓____   PHONE ATTORNEYS _____   DECISION BY _____

ALL PAPERS TO BE SERVED PERSONALLY.      _EW_

Court Attorney

"Revised 10/19"

ADD-088



*State of New York*
*Court of Appeals*

Heather Davis, Esq.
Chief Clerk and
Legal Counsel to the Court

Clerk's Office
20 Eagle Street
Albany, New York 12207-1095
518-455-7700

January 9, 2025

***via email only***

Blanche Law PLLC
Attn: Todd Blanche, Esq.
99 Wall Street, Suite 4460
New York, NY 10005

     Re:   <u>Matter of Trump v Merchan</u>

Dear Mr. Blanche:

     Your proposed order to show cause was reviewed by Judge Rivera, who declined to sign the order. As a result of the Judge's determination, no motion is pending in the above title at the Court of Appeals.

     Very truly yours,

Heather Davis

HD/RMM
cc:  Hon. Jenny Rivera
      Steven C. Wu, Esq.
      Lisa Evans, Esq.
      Hon. Letitia James

**(ORDER LIST: 604 U.S.)**

**THURSDAY, JANUARY 9, 2025**

**ORDER IN PENDING CASE**

24A666     TRUMP, DONALD J. V. NEW YORK, ET AL.

The application for stay presented to Justice Sotomayor and by her referred to the Court is denied for, *inter alia*, the following reasons. First, the alleged evidentiary violations at President-Elect Trump's state-court trial can be addressed in the ordinary course on appeal. Second, the burden that sentencing will impose on the President-Elect's responsibilities is relatively insubstantial in light of the trial court's stated intent to impose a sentence of "unconditional discharge" after a brief virtual hearing.

Justice Thomas, Justice Alito, Justice Gorsuch, and Justice Kavanaugh would grant the application.

1

Sentencing

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK - CRIMINAL TERM - PART: 59
     - - - - - - - - - - - - - - - - - - - - - X
3    THE PEOPLE OF THE STATE OF NEW YORK,          Indict. No.
                                                    71543-2023
4
      -against-                                     CHARGE
5
     DONALD J. TRUMP,
6                                           FALSIFYING BUSINESS
                                             RECORDS 1ST DEGREE
7       DEFENDANT.
                                                   SENTENCING
8    - - - - - - - - - - - - - - - - - - - - - X
                            100 Centre Street
9                           New York, New York 10013
                            January 10, 2025
10   B E F O R E :
                          HONORABLE JUAN M. MERCHAN
11                        JUSTICE OF THE SUPREME COURT

12   A P P E A R A N C E S :
     FOR THE PEOPLE:
13   ALVIN BRAGG, JR., ESQ.
     DISTRICT ATTORNEY, NEW YORK COUNTY
14   One Hogan Place
     New York, New York 10013
15   BY:  JOSHUA STEINGLASS, ESQ.
          MATTHEW COLANGELO, ESQ.
16        SUSAN HOFFINGER, ESQ.
          CHRISTOPHER CONROY, ESQ.
17        BECKY MANGOLD, ESQ.
          KATHERINE ELLIS, ESQ.
18   Assistant District Attorneys

19   BLANCHE LAW
     BY:  TODD BLANCHE, ESQ. (Appeared virtually with Defendant,
20   Donald J. Trump)
          EMIL BOVE, ESQ. (In person)
21   Attorneys for the Defendant

22

23                             SUSAN PEARCE-BATES, RPR, CSR, RSA
                               Principal Court Reporter
24

25

                    Susan Pearce-Bates, RPR, CCR, RSA
                      Principal Court Reporter

2

Sentencing

1          SERGEANT:  All rise.

2          Part 59 is now in session.  The Honorable Juan

3     Merchan presiding.

4          THE COURT:  Good morning.

5          Please be seated.

6          THE CLERK:  Calling Part 59 calendar, calendar

7     number one, Donald Trump, indictment 71543 of '23.

8          THE COURT:  Your appearances, please.

9          MR. STEINGLASS:  Good morning.

10          For the People, ADAs Joshua Steinglass,

11     Christopher Conroy, Susan Hoffinger, Beckey Mangold,

12     Matthew Colangelo, and Katherine Ellis.

13          THE COURT:  Good morning, People.

14          MR. BOVE:  Emil Bove for President Trump who is

15     appearing via Teams.  He is co-located with my partner,

16     Todd Blanche.

17          THE COURT:  All right.

18          Good morning, Mr. Bove.

19          Good morning, Mr. Blanche.

20          Good morning, Mr. Trump.

21          MR. BLANCHE:  Good morning.

22          THE COURT:  Although Mr. Bove has already alluded

23     to it, just for the record, I want to make clear that Mr.

24     Blanche is appearing virtually with Mr. Trump.

25          And you are currently in Florida, is that

3

Sentencing

1    correct?

2              MR. BLANCHE:  Yes, that's correct, Your Honor.

3              THE COURT:  Okay.  And Mr. Trump's other

4    attorney, Mr. Bove, is with us here in this courtroom.

5              Pursuant to this Court's Decision and Order dated

6    January 3rd, 2025, Mr. Trump was given the option of

7    appearing virtually, and subsequently counsel for Mr. Trump

8    informed this Court that Mr. Trump had elected to waive

9    personal appearance, and appear virtually.

10             The decision of sentence in this matter is

11   permitted in New York, and I direct your attention to the

12   Matter of People v. Reyes, 72 Misc. 3d 1133, 2021.

13             Before turning to the matter of sentencing, I

14   want to confirm that the People, and defense counsel have

15   both received copies of the probation report.

16             You have not?

17                  (Probation report is handed out.)

18             THE COURT:  Let the record reflect that the

19   People are being handed a copy now.  Mr. Bove is being

20   handed a copy.

21             Why don't you take some time to look at it?

22             Okay.

23             MR. STEINGLASS:  Thank you.

24             THE COURT:  While the parties look at the

25   probation report, Mr. Blanche, I would like to confirm that

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

4

Sentencing

1      you received an E-copy of the report?

2              MR. BLANCHE:  Yes, Your Honor.  We received a

3      copy this morning, and I have it in front of me.

4              THE COURT:  Is there anything about that report

5      that you would like to put on the record?

6              MR. BLANCHE:  Nothing other than the fact that it

7      was -- that some of the facts, and procedural history,

8      especially involving other cases, are not up-to-date

9      because of what has happened since the date of the report,

10     and otherwise, given what we expect is happening today.

11             THE COURT:  Okay.  Thank you.

12             People, is there anything about the probation

13     report that you would like to put on the record?

14             MR. STEINGLASS:  No, Judge.  I just need a couple

15     more minutes.

16             THE COURT:  You need more time?

17             MR. STEINGLASS:  Yes, if you don't mind.

18             THE COURT:  Sure.

19             MR. STEINGLASS:  Thank you, Judge.

20             I don't think there is anything that we need to

21     put on the record about it.

22             THE COURT:  Okay.  Thank you.

23             Let's impose sentence, please.

24             THE CLERK:  Donald Trump, you are before the

25     Court for sentence following your conviction by trial to 34

5

Sentencing

1    counts of falsifying business records in the first degree.

2              Before being sentenced the Court will allow you,

3    your attorney, and the Assistant District Attorney an

4    opportunity to address the Court with any matters relevant

5    to sentence.

6              For the People.

7              MR. STEINGLASS:  Thank you.

8              Judge, where is the preferred place for me to

9    stand?

10             THE COURT:  Wherever you feel comfortable.

11             MR. STEINGLASS:  Okay.  The Defendant in this

12   case, as you know, stands convicted of 34 counts of

13   falsifying business records in the first degree, all Class

14   E Felonies.  Each carries a range of authorized sentencing

15   options from -- for as much as one-and-a-third to four

16   years in state prison, to a variety of non-incarceratory

17   sentences.

18             In this Court's January 3rd Decision on the

19   defendant's Clayton Motion, Your Honor indicated an

20   inclination to impose an unconditional discharge.  Under

21   all the circumstances of this case, its unique posture, and

22   the Defendant's status as President Elect, the People

23   recommend a sentence of an unconditional discharge.

24             In finding the Defendant guilty in this case, the

25   jury necessarily found unanimously that the Defendant

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

6
Sentencing

1    falsified 34 separate entries in his business records with

2    the intent to defraud, which included an intent to commit,

3    or conceal a conspiracy to promote his own election by

4    unlawful means.

5            Having presided over the trial, Your Honor is

6    very familiar with the conduct, its seriousness, and the

7    overwhelming evidence to support the jury's verdict.  I am

8    certainly not going to rehash that now.

9            In last week's decision on January 3rd, this

10   Court referred to the gravamen of the defendant's conduct,

11   his criminal conduct in this case, as constituting quote,

12   premeditated and continuous deception.

13           The verdict was delivered by a jury that was

14   carefully chosen using an extensive questionnaire based on

15   suggestions from both parties, and after thorough

16   questioning of the prospective jurors by both sides.  The

17   verdict in this case was unanimous, and decisive, and it

18   must be respected.

19           As this Court has observed, quote, the sanctity

20   of a jury verdict, and the deference that must be accorded

21   to it, is a bedrock principle in our nation's

22   jurisprudence.

23           The defendant's conduct before, during, and after

24   this trial, also merits consideration.

25           Instead of preserving, protecting, and defending

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

7

Sentencing

1   our constitutionally established system of criminal

2   justice, the Defendant, the once, and future President of

3   the United States, has engaged in a coordinated campaign to

4   undermine its legitimacy.

5         Far from expressing any kind of remorse for his

6   criminal conduct, the Defendant has purposefully bred

7   disdain for our judicial institutions, and the rule of law.

8   And he has done this to serve his own ends, and to

9   encourage others to reject the jury verdict that he finds

10  so distasteful.

11        He has characterized these proceedings as

12  corrupt, rigged, witch hunt, or a sham too many times to

13  tabulate.  The defendant's rhetoric is ratcheted up since

14  this Court's rulings on his Motions to Dismiss.  He has

15  been unrelenting in his unsubstantiated attacks upon this

16  Court and its family, individual prosecutors and their

17  families, the witnesses, the Grand Jury, the trial jury,

18  and the Justice system as a whole.

19        The Defendant has not only been held in contempt

20  by other Jurists in other matters, but this Court alone

21  found the Defendant in contempt for 10 distinct violations

22  of the Order restricting extrajudicial speech.

23        In his legal filings, the Defendant has used

24  dangerous rhetoric in leveling accusations of intentionally

25  unlawful, and unconstitutional conduct on the part of this

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

8

Sentencing

1    Court, and the prosecution.

2         As this Court has noted, the Defendant's conduct

3    quote, constitutes a direct attack on the Rule of Law

4    itself.

5         Moreover, the Defendant has publicly threatened

6    to retaliate against the prosecutors who have sought to

7    hold him accountable in this and other matters, and the

8    Courts who have endeavored to fairly, and faithfully

9    adjudicate these matters.

10        Such threats are designed to have a chilling

11   effect to intimidate those who have the responsibility to

12   enforce our laws in the hopes that they will ignore the

13   defendant's transgressions because they fear that he is

14   simply too powerful to be subjected to the same rule of law

15   as the rest of us.

16        In this 2024 end-of-year report, the United

17   States Supreme Court Chief Justice Roberts, warned of the

18   dangers of such conduct.

19        Quote, public officials too regrettably have

20   engaged in recent attempts to intimidate judges.  For

21   example, suggesting political bias in the Judge's adverse

22   rulings without credible bias for such allegations, end

23   quote.

24        Chief Justice Roberts continued quote, attempts

25   to intimidate Judges for their ruling are inappropriate,

9

Sentencing

1    and should be vigorously opposed.  Public officials

2    certainly have a right to criticize the work of the

3    judiciary, but they should be mindful that intemperance in

4    their statements when it comes to Judges may prompt

5    dangerous reactions by others.

6          Chief Justice Roberts also spoke of the dangers

7    of disinformation, which are quote, magnified by social

8    media which provides a ready channel to instantly spread

9    rumor, and false information.

10          Put simply, this Defendant has caused enduring

11   damage to public perception of the Criminal Justice System,

12   and has placed officers of the court in harms away.

13          In the probation report, which we just received

14   this morning, the author having interviewed the Defendant

15   noted that the Defendant sees himself as above the law, and

16   won't accept responsibility for his actions.  And that is

17   certainly consistent with everything else that we have

18   seen.

19          Now, in a typical case, both the offense conduct,

20   and these other exacerbating factors, would impact the

21   appropriate sentence.  But in this case we must be

22   respectful of the Office of the Presidency, and mindful of

23   the fact that the Defendant will be inaugurated as

24   President in 10 days.

25          Any undischarged portion of a sentence has the

10

Sentencing

 1    potential to interfere with the Defendant's performance of

 2    the duties of his office.

 3              As a practical matter, the most sensible sentence

 4    prior to his inauguration is an unconditional discharge.

 5              The Court has expressed an inclination to do

 6    exactly that because in the Court's words, quote, the most

 7    viable solution to ensure finality, and allow the Defendant

 8    to pursue his Appellate options is to proceed to sentence.

 9              Now, as you know, in New York a conditional

10    discharge is authorized by Penal Law.

11              Quote, if the Court, having regard to the nature,

12    and circumstances of the offense, and to the history,

13    character, and condition of the Defendant, is of the

14    opinion that neither the public interest, nor the ends of

15    Justice would be served by a sentence of imprisonment, and

16    that probation supervision is not appropriate.

17              An unconditional discharge is authorized if the

18    conditional discharge is authorized, and quote, if the

19    Court is of the opinion that no proper purpose would be

20    served by imposing any condition upon the Defendant's

21    release.  Because these crimes are felonies, the Court must

22    set forth in the record the reasons for its action.

23              The American public has the right to a presidency

24    unencumbered by pending court proceedings, or ongoing

25    sentence related obligations, but imposing this sentence

11
Sentencing

1    ensures that finality.

2         Sentencing the Defendant permits this Court to

3    enter judgment, to cement the defendant's status as a

4    convicted felon while he pursues whatever Appeals he

5    intends to pursue, and it gives full effect, and respect to

6    the jury's verdict, while preserving the Defendant's

7    ability to govern.

8         The People, therefore, recommend that this Court

9    impose a sentence of an unconditional discharge.

10        Thank you.

11        THE COURT:  Thank you.

12        Counsel.

13        MR. BLANCHE:  Thank you, Your Honor.

14        I very, very much disagree with much of what the

15   government just said about this case, about the legitimacy

16   of what happened in this courtroom during the trial, and

17   about President Trump's conduct fighting this case from

18   before it was indicted, to while it was indicted, to the

19   jury's verdict, and even to this day.

20        What the government just said presupposes

21   something that we disagree with very much, which was that

22   this was an appropriate case to be brought.

23        It was not.

24        This case, without a doubt, knowing everything we

25   know about the timing of the investigation, the fact that

12

Sentencing

1   multiple prosecutors looked at the facts of this case,

2   including prosecutors within the District Attorney's Office

3   in New York County, and made a decision not to bring

4   charges.

5          As the Court knows, shortly after President Trump

6   announced his intention to run for re-election this case

7   was started for what amounted to a third time, which brings

8   us, ultimately, to where we are today.

9          A lot of what the government just said

10  presupposes that this case is legally appropriate, and that

11  the charges that were brought by the People were consistent

12  with the laws of New York.

13         Again, we very much disagree with that, and as

14  everybody has been noted because it's true, we certainly

15  intend on appealing that.  And it is not, by the way, just

16  counsel and President Trump that feels that way.  There is

17  many, many, many legal experts that share the same views

18  that I just said, which is that legally this case should

19  not have been brought based on the facts that were

20  established at trial, and also on the legal basis for which

21  they were brought.

22         But it is also not just the legal experts, not

23  just counsel, and not just President Trump, but the

24  majority of the American people also agree that this case

25  should not have been brought.  I mean, the interesting

13

Sentencing

1  thing about the fact that there was a trial for the first

2  time in our history, a criminal trial during an election

3  season, is that the American voters got a chance to see,

4  and decide for themselves whether this is the kind of case

5  that should have been brought, and they decided.  And

6  that's why in 10 days President Trump is going to assume

7  the Office of the Presidency of the United States.

8              And, certainly, we are here for the Court to

9  sentence President Trump to an unconditional discharge, and

10  for that it is a very sad day.  It's a sad day for

11  President Trump, and his family, and friends; but it's

12  also, in counsel's view, a sad day for this country because

13  this was a case, without a doubt, that was brought by a

14  District Attorney who promised that he would go after

15  President Trump if elected, and felt like he had to go

16  through with that promise, and so, that's sad.

17              And I hope, and I know that President Trump

18  shares this view, that this will never happen again in this

19  country.

20              And so, we certainly understand where we are

21  today.  We very much intend on pursuing an Appeal of this

22  verdict, and -- and what happened during this

23  investigation.  And we certainly believe that the only

24  appropriate sentence, if one is to be imposed at all, which

25  we very much believe it shouldn't be, and that the case

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

14

Sentencing

1    should be dismissed, is a sentence of an unconditional

2    discharge.

3              Thank you.

4              THE COURT:  Thank you.

5              Would your client like to be heard?

6              MR. TRUMP:  Yes.  Thank you, Your Honor.

7              This has been a very terrible experience.  I

8    think it has been a tremendous setback for New York, and

9    the New York Court System.

10              This was a case that Alvin Bragg did not want to

11    bring.  And he thought it was, from what I read, and from

12    what I hear, inappropriately handled before he got there.

13              And a gentleman from a law firm came in, and

14    acted as a District Attorney.  And that gentleman, from

15    what I heard, was criminal, or almost criminal in what he

16    did.  It was very inappropriate.  It was somebody involved

17    with my political opponent.

18              Part of the records that we are talking about is

19    saying, I just noticed, where he said I was falsifying

20    business records.  Well, the falsification of business

21    records, as they say, it was calling a legal expense in the

22    books where everybody could see them a legal expense.

23              In other words, that legal fees, or legal expense

24    were put down as legal expense by accountants.  They

25    weren't put down by me.  They were put down by accountants.

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

Sentencing

1    I didn't call them construction, concrete work.

2    I didn't call them electrical work.  I didn't call them

3    anything.  They called a legal fee, or a legal expense, a

4    legal expense, and for this I got indicted.  It's

5    incredible actually.

6        Now, if you look, my attorney alluded to it, the

7    top legal scholars, and legal pundits in this country, the

8    ones that are quoted all the time on television that are

9    making their views felt, and highly respected people, have

10   said, every one, virtually every one that I know of,

11   haven't seen any to the contrary, not one, and none of

12   these people are not exactly friends of mine to put it

13   mildly, but they all said this is a case that should have

14   never been brought.  It is an injustice of justice.

15       Very respected Jonathan Turley; Andy McCarthy;

16   Judge David Reffner, a wonderful man who just passed away

17   by the way; Gregg Jarrett; Elie Honig from CNN of all

18   places, CNN said that; Paula Ingrassia; Alan Dershowitz,

19   they all said this is not a case that should be brought.

20   It's not.

21       Think about it.  Legal expenses are down as legal

22   expenses, and I get indicted for business records.

23   Everybody should be so accurate.

24       It's been a political witch hunt.  It was done to

25   damage my reputation so that I would lose the election,

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

Sentencing

1   and, obviously, that didn't work.  And the people of our

2   country got to see this firsthand because they watched the

3   case in your courtroom.  They got to see this firsthand,

4   and then they voted.  And I won it, and had the largest

5   number of votes by far of any republican candidate in

6   history, and won, as you know, all seven swing states.

7          Won conclusively all seven swing states, and won

8   the popularity -- the popular vote by millions and millions

9   of votes.  And they have been watching your trial.  So they

10  understood it.

11         I wasn't allowed to use the lawyer/client

12  privilege, or the reliance on counsel.  I had a lawyer that

13  made this deal, and he admitted that.  And he was also a

14  totally discredited person.

15         We weren't allowed to use the information from

16  the Southern District that totally discredited him.  That

17  wasn't allowed to be put in, and that was terrible,

18  unbelievable.  And this is a man who has got no standing.

19  He has been disbarred on other matters unrelated.  And he

20  was allowed to talk as though he was George Washington, but

21  he is not George Washington.  He shouldn't have been

22  allowed.

23         The Southern District did a book of,

24  approximately, 28 pages where they -- I have never seen

25  anything like it.  They excoriated him.  You wouldn't let

17

Sentencing

1   it be put into evidence.  So he was able to testify as a

2   witness, and I think it's a disgrace to the system.

3          I was under a Gag Order.  I am the first

4   President in history that was under a Gag Order where I

5   couldn't talk about aspects of the case that are very

6   important.  I guess I am still under, so I won't do it now.

7   I assume I am still under a Gag Order, but the fact is that

8   I am totally innocent.  I did nothing wrong.

9          They talked about business records, and the

10  business records were extremely accurately accounted.

11         I had nothing to do with them anyway.  That was

12  done by an accountant, and bookkeeper who gave very

13  credible testimony, and was corroborated by everybody that

14  was asked.

15         And with all that's happening in our country

16  today, with a city that's burning to the ground, one of our

17  largest most important city is burning to the ground, with

18  wars that are uncontrollably going on, with all of the

19  problems of inflation, and attacks on countries, and all of

20  the horrible things that are going on, I got indicted over

21  calling a legal expense, a legal expense, which was called

22  a legal expense.

23         I just want to say I think it's an embarrassment

24  to New York, and New York has a lot of problems, but this

25  is a great embarrassment.  I believe that this, and other

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

18

Sentencing

1    cases that were brought, as you know, the DOJ is very much

2    involved in this case.  It's because that's the political

3    opponent they are talking about.

4         The DOJ is very involved.  You have a gentleman

5    sitting right there from the DOJ, who was from the DOJ's

6    Office who was also involved with the New York State's

7    Attorney General's case and he went from there to here.  He

8    went around and did what he had to do.  He got them to move

9    on me.

10        But in the meantime, I won the election, and a

11   massive landslide, and the people of this country

12   understand what's going on.  This has been a weaponization

13   of government.  They call it lawfare.  It never happened to

14   any extent like this.  It never happened in our country

15   before.  And I just like to explain that I was treated

16   very, very unfairly, and I thank you very much.

17        THE COURT:  Thank you, Mr. Trump.

18        Mr. Trump, you appear before this Court today to

19   conclude this criminal proceeding by the imposition of

20   sentence.

21        Although I have taken the unusual step of

22   informing you in advance of my inclinations, before

23   imposing sentence I believe it is important for you, as

24   well as those observing these proceedings, to understand my

25   reason for the sentence I am about to impose.

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

Sentencing

1      The imposition of sentence is one of the most

2 difficult and significant decisions that any Criminal Court

3 Judge is called upon to make.  Our legislature sets the

4 parameters for an authorized sentence, but it is a Judge

5 that must decide what constitutes a just conclusion to a

6 verdict of guilty.

7      The Court is vested with broad discretion in

8 determining what sources, or evidence it may consider to

9 arrive at an appropriate sentence.  In doing so, the Court

10 must consider the facts of the case, along with any

11 aggravating, or mitigating circumstances.

12     In my time on the bench I have been called upon

13 to grapple with this weighty responsibility for countless

14 defendants who have been found guilty after trial for an

15 assortment of offenses, ranging from non-violent Class E

16 Felonies to the most heinous crimes including homicides,

17 sex trafficking, and child sexual abuse.

18     The task is always difficult, and deserving of

19 careful consideration, whether the sentence be an

20 unconditional discharge or incarceration of 25 years to

21 life.

22     However, never before has this Court been

23 presented with such a unique, and remarkable set of

24 circumstances.  Indeed, it can be viewed fairly that this

25 has been a truly extraordinary case.

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

Sentencing

1   There was unprecedented media attention, public

2   interest, and heightened security involving various

3   agencies; and yet, the trial was a bit of a paradox because

4   once the courtroom doors were closed the trial itself was

5   no more special, unique, or extraordinary than the other 32

6   criminal trials that took place in this courthouse at the

7   exact same time.

8   Jury selection was conducted; the same rules of

9   evidence were followed; opening statements were made;

10  witnesses called and cross-examined; evidence presented;

11  summations delivered; the same burden of proof was

12  supplied; and a jury made up of ordinary citizens delivered

13  a verdict.  And it was all conducted pursuant to the rules

14  of procedure, and guided by the law.

15  Of course, part of what made it feel somewhat

16  ordinary, was the outstanding work, preparation, and

17  professionalism of the clerks, court officers, court

18  reporters, security personnel, and the entire staff of this

19  building who did their jobs as they would with any other

20  criminal trial.

21  So, while one can argue that the trial itself was

22  in many respects somewhat ordinary, the same cannot be said

23  about the circumstances surrounding this sentencing, and

24  that is because of the office that you once occupied, and

25  which you will soon occupy again.

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

Sentencing

1       To be sure, it is the legal protections afforded

2   to the office of the President of the United States that

3   are extraordinary, not the occupant of the office.

4       The legal protections, especially within the

5   context of a criminal prosecution, afforded to the Office

6   of the President have been laid out by our founders, the

7   Constitution, and most recently interpreted by the United

8   States Supreme Court In The Matter Of Trump versus the

9   United States, which was decided on July 1st, 2024.

10      As with every other Defendant in your position,

11  it is my obligation to consider any, and all aggravating,

12  and mitigating factors to inform my decision.  Some of

13  those aggravating factors have already been articulated in

14  my Sandoval Ruling at the start of this trial, and by my

15  recent written decisions on December 16th and January 3rd.

16      Thus, they need not be repeated at this time.

17      However, the considerable, indeed, extraordinary

18  legal protections afforded by the Office of the Chief

19  Executive is a factor that overrides all others.

20      To be clear, the protections afforded the Office

21  of the President are not a mitigating factor.  They do not

22  reduce the seriousness of the crime, or justify its

23  commission in any way.

24      The protections are, however, a legal mandate,

25  which pursuant to the Rule of Law, this Court must respect,

Sentencing

1   and follow.

2         However, despite the extraordinary breath of

3   those protections, one power they do not provide is the

4   power to erase a jury verdict.

5         It is clear from legal precedence, which until

6   July 1st was scarce, that Donald Trump, the ordinary

7   citizen, Donald Trump, the criminal Defendant, would not be

8   entitled to such considerable protections.

9         I am referring to protections that extend well

10  beyond those afforded the average Defendant, who whines

11  their way through the criminal justice system each day.

12        No, ordinary citizens do not receive those legal

13  protections.

14        It is the Office of the President that bestows

15  those far reaching protections to the office holder, and it

16  was the citizenry of this nation that recently decided that

17  you should once again receive the benefits of those

18  protections, which include, among other things, the

19  supremacy clause and Presidential immunity.

20        It is through that lens, and that reality that

21  this Court must determine a lawful sentence.

22        After careful analysis, and obedience to

23  governing mandates, and pursuant to the Rule of Law, this

24  Court has determined that the only lawful sentence that

25  permits entry of a Judgment of Conviction, without

Susan Pearce-Bates, RPR, CCR, RSA
Principal Court Reporter

23

Sentencing

1    encroaching upon the highest office in the land, is an

2    unconditional discharge, which the New York State

3    legislature has determined is a lawful and permissible

4    sentence for the crime of falsifying business records in

5    the first degree.

6              Therefore, at this time, I impose that sentence

7    to cover all 34 counts.

8              Sir, I wish you Godspeed as you assume your

9    second term in office.

10             Thank you.

11             LIEUTENANT:  Remain seated in the audience,

12   please.

13             THE COURT:  Did you give your client written

14   Notice of his Right to Appeal?

15             MR. BOVE:  We will, Judge.

16                  (END OF SENTENCING.)

17

18            C E R T I F I C A T E

19             I, SUSAN PEARCE-BATES, a Principal Court Reporter

20   of the State of New York, do hereby certify that the

21   foregoing is a true and accurate transcript of my

22   stenographic notes.

23

24   _____
     SUSAN PEARCE-BATES
25   PRINCIPAL COURT REPORTER

                  Susan Pearce-Bates, RPR, CCR, RSA
                     Principal Court Reporter