# 24-2299

## In the United States Court of Appeals
## for the Second Circuit

◆◆◆

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellee,*

–v.–

PRESIDENT DONALD J. TRUMP,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Southern District of New York (No. 23-cv-3773)
(Hon. Alvin K. Hellerstein)

## REPLY BRIEF FOR DEFENDANT-APPELLANT

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Ave. NW
Washington, DC 20006
(202) 956-7500

ROBERT J. GIUFFRA, JR.
MATTHEW A. SCHWARTZ
JAMES M. MCDONALD
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendant-Appellant President Donald J. Trump*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................ii

INTRODUCTION .......................................................................1

ARGUMENT .............................................................................4

I.    THIS APPEAL IS NOT MOOT .............................................4

    A.    The Federal-Officer Removal Statute Allows Removal Of A Criminal Prosecution After The State Trial Court Enters Judgment ..................................................................4

    B.    DANY's Efforts To Avoid Removal Are Legally Flawed .............8

II.   PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND, POST-TRIAL REMOVAL NOTICE ...................................12

    A.    President Trump's Second Removal Notice Satisfied The Requirements Of The Federal-Officer Removal Statute .............13

        1.    The prosecution "relates to" President Trump's official acts because DANY used those acts as evidence at trial .......................................................14

        2.    The removal notice asserted colorable federal defenses .................................................................24

    B.    President Trump Had Good Cause To File The Second Removal Notice After Trial ...........................................27

CONCLUSION .......................................................................33

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Aetna Life Ins. Co.* v. *Big Y Foods, Inc.*,
    52 F.4th 66 (2d Cir. 2022) ................................................................... 9

*Arizona* v. *Manypenny*,
    451 U.S. 232 (1981) ............................................................... *passim*

*Caterpillar Inc.* v. *Lewis*,
    519 U.S. 61 (1996) .......................................................................... 16

*Clinton* v. *Jones*,
    520 U.S. 681 (1997) ........................................................................ 23

*Colbert* v. *Rio Tinto PLC*,
    824 Fed. Appx. 5 (2d Cir. 2020) .................................................... 27

*Council on Am. Islamic Relations* v. *Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) ....................................................... 23

*Coventry Health Care of Mo., Inc.* v. *Nevils*,
    581 U.S. 87 (2017) .......................................................................... 15

*FDIC* v. *Keating*,
    12 F.3d 314 (1st Cir. 1993) .............................................................. 7

*Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*,
    415 U.S. 423 (1974) ................................................................. 10, 11

*Harris* v. *U.S. Dep't of Transp. FMCSA*,
    122 F.4th 418 (D.C. Cir. 2024) ............................................. *passim*

*Holtzman* v. *Oliensis*,
    91 N.Y.2d 488 (1998) ..................................................................... 26

*Ingersoll-Rand Co.* v. *McClendon*,
    498 U.S. 133 (1990) ........................................................................ 16

*Isaacson* v. *Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008) ..........................................................17, 20

*Jefferson Cnty.* v. *Acker*,
   527 U.S. 423 (1999)..............................................................14, 19, 24

*K&D LLC* v. *Trump Old Post Off. LLC*,
   951 F.3d 503 (D.C. Cir. 2020)..............................................................17

*Knight First Amend. Inst. at Columbia Univ.* v. *Trump*,
   928 F.3d 226 (2d Cir. 2019) ..............................................................22

*Lamar, Archer & Cofrin, LLP* v. *Appling*,
   584 U.S. 709 (2018)..............................................................................15

*Latiolais* v. *Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020)..............................................................17

*Martin* v. *Hunter's Lessee*,
   14 U.S. (1 Wheat.) 304 (1816) ..........................................................11

*McDonnell* v. *United States*,
   579 U.S. 550 (2016)..............................................................................19

*Mesa* v. *California*,
   489 U.S. 121 (1989)......................................................................24, 25

*Matter of Meyerland Co.*,
   960 F.2d 512 (5th Cir. 1992)..........................................................7, 11

*Moore* v. *Consol. Edison Co. of N.Y.*,
   409 F.3d 506 (2d Cir. 2005) ................................................................4

*Putnam* v. *DeRosa*,
   963 F.2d 480 (1st Cir. 1992) ................................................................7

*Reed* v. *Ross*,
   468 U.S. 1 (1984)..................................................................................28

*Resolution Tr. Corp.* v. *Nernberg*,
   3 F.3d 62 (3d Cir. 1993) ....................................................................11

iii

*In re Savers Fed. Sav. & Loan Ass'n,*
  872 F.2d 963 (11th Cir. 1989) ........................................................... 7

*Tennessee* v. *Davis,*
  100 U.S. 257 (1879) ........................................................................ 18

*Trump* v. *United States,*
  603 U.S. 593 (2024) ................................................................. *passim*

*Willingham* v. *Morgan,*
  395 U.S. 402 (1969) ........................................................................ 19

*Youngstown Sheet & Tube Co.* v. *Sawyer,*
  343 U.S. 579 (1952) ........................................................................ 22

## Statutes

12 U.S.C.
  § 632 ................................................................................................. 7
  § 1789 ............................................................................................... 7
  § 1819 ............................................................................................... 6

28 U.S.C.
  § 1442 ....................................................................................... *passim*
  § 1447 ........................................................................................ 11, 12
  § 1455 ....................................................................................... *passim*
  § 30143(a) ....................................................................................... 26

N.Y. Election Law § 17-152 ........................................... 26, 27, 30, 31

Removal Clarification Act of 2011,
  Pub. L. No. 112-51, 125 Stat. 545 ................................................. 16

## Other Authorities

11 C.F.R § 108.7 ............................................................................. 26

16 Moore's Federal Practice Civil § 107.141 ................................. 11

iv

# INTRODUCTION

In opposing removal, the District Attorney of New York County (DANY) ignores that this is an extraordinary case. Initially, DANY claimed that its prosecution of President Donald Trump was based solely on private acts. But by the time the trial ended, DANY had rested its case on testimony probing President Trump's official acts during his first term, and on a legal theory that would turn any federal-campaign-law violation into a state-law crime. Trial thus made eminently clear that President Trump's appeal of his conviction belongs in federal court.

Under 28 U.S.C. § 1442(a)(1), a federal officer may remove any prosecution "for or relating to any act under color of [federal] office." Supreme Court precedent also requires that the defendant put forward a colorable federal defense. This prosecution of President Trump, which never should have been brought, checks both boxes. By introducing his official acts as President into evidence and permitting those acts to be "scrutinized to help secure his conviction," *Trump* v. *United States*, 603 U.S. 593, 631 (2024), DANY made its prosecution "relate[] to" those acts. And vitally, President Trump has compelling federal defenses of Presidential immunity and preemption under the Federal Election Campaign Act.

Despite the paramount federal interests at stake, the district court erroneously denied President Trump leave to remove.  In a cursory three-page order issued just hours after President Trump filed his 60-page notice, the court found that he did not have "good cause" to explain why he was removing the case only after his trial had concluded.  28 U.S.C. § 1455(b)(1).  But President Trump could not have raised any of the arguments he advanced in his removal notice *before* his trial for a straightforward reason:  those bases for removal arose for the first time *during or after* his trial.  It was not until the middle of the trial that the state court judge permitted the testimony about President Trump's official acts in 2017.  It was not until the very end of trial that DANY finally settled on its state-law theory that is preempted under FECA.  And it was not until a month after trial that the Supreme Court handed down its landmark *Trump* decision.  The district court ignored all of these powerful bases for removal, except to say that (one part of) *Trump* did not change its pre-trial analysis.  Its summary denial of leave to remove was an abuse of discretion.

Unable to defend the district court's erroneous order on the merits, DANY now incorrectly claims that the case has become moot because the state trial court has sentenced President Trump.  Courts have construed broadly

2

the right of federal officers to seek removal, taking care not to "frustrate[]" the statute's purpose with a "narrow, grudging interpretation." *Arizona* v. *Manypenny*, 451 U.S. 232, 242 (1981). Thus, as the D.C. Circuit recently held—in a case that DANY does not cite—a federal officer may remove a pending state court action even after the state trial court imposes its judgment, *Harris* v. *U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 424 (D.C. Cir. 2024), if he can establish "good cause." 28 U.S.C. § 1455(b)(1). As the D.C. Circuit explained, such appellate removal has long been accepted under similarly worded removal statutes. *See Harris*, 122 F.4th at 424-425.

Because President Trump had good cause to remove this case after his trial, this Court should order the district court to grant him permission to do so now. Such an order would transfer the pending appellate proceedings from the New York State Appellate Division to this Court (after a brief administrative stop at the district court). An appeal would then proceed in this Court as if the case has been in federal court all along—as it should have been.

This Court should reverse.

## ARGUMENT

## I.    THIS APPEAL IS NOT MOOT.

An appeal becomes moot only if the court loses its "ability to offer effective relief." *Moore* v. *Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). DANY claims (at 20-27) this appeal became moot when the state court sentenced and entered judgment against President Trump on January 10, 2025. But this criminal case continues on appeal. If this Court allows President Trump to remove, as it should, his appeal will shift from state court to federal court where it belongs. The federal-officer removal statute authorizes such post-trial removal, as the D.C. Circuit recently confirmed in *Harris*. Because that "effective relief" remains available, DANY has not carried its burden to show mootness.

### A.    The Federal-Officer Removal Statute Allows Removal Of A Criminal Prosecution After The State Trial Court Enters Judgment.

Contrary to DANY's argument, a federal officer may remove an appropriate suit at any time that it is still pending, even after trial and judgment. A later removal simply changes the standard: pre-trial removals are as of right, while later removals require a showing of "good cause." The statutory text makes that clear, and precedent and policy confirm it.

4

Section 1455 governs the procedures for federal-officer removal in criminal cases. That provision states that defendants are entitled to remove "a criminal prosecution . . . not later than 30 days after the arraignment . . . or at any time before trial, whichever is earlier, *except that* for good cause shown the United States district court may enter an order granting the defendant or defendants leave to file the notice *at a later time*." 28 U.S.C. § 1455(b)(1) (emphasis added). By its terms, the statute unambiguously permits a defendant to seek leave to remove based on "good cause" after trial has begun—*i.e.*, "at a later time" than the default deadline of "before trial." And the statute imposes no limit on the back end, including any bar on removal after a trial court has entered judgment.

Just over two months ago, the D.C. Circuit held just that in *Harris*, 122 F.4th at 424. *Harris* construed the general federal-officer removal provision, Section 1442, which applies to both civil and criminal cases, including this one. The statute provides that an officer may remove "[a] civil action or criminal prosecution that is commenced in a State court and that is against or directed to" a federal officer to the federal district court "embracing the place wherein it is pending." 28 U.S.C. § 1442(a). *Harris* held that even after a state trial court has entered judgment and while a state appeal is pending, a "federal

5

defendant may remove a case to federal district court from the state appellate court." 122 F.4th at 424. As the court explained:

> No statutory language expressly requires a case removed under section 1442(a)(1) to be pending in the court in which it commenced. Instead, there are two preconditions to removal, each marked by the word "that." As relevant here, the removed action must be one (1) "*that* is commenced" in state court and (2) "*that* is against or directed to" a U.S. agency or federal officer.

*Id.*

To be sure, both the statutory language and common sense require that the case being removed must still be "*pending*" in state court. 28 U.S.C. § 1442(a) (emphasis added); *id.* § 1455(a). But DANY is wrong that a prosecution "is no longer 'pending' for federal removal purposes when the defendant has been sentenced." Opp. 21. As the D.C. Circuit explained in *Harris*, a "case need not be pending in the court in which it originated." 122 F.4th at 422. Under the "plain meaning of the word," a state action is "pending" "as long as the parties are still actively contesting the case in the state court system," regardless of whether they are "contesting the case in the state trial court or on appeal." *Id.* at 422-423 (citations omitted).

DANY also overlooks that courts have applied the same reasoning to parallel federal removal statutes. For example, 12 U.S.C. § 1819(b)(2)(B)

6

provides that the FDIC may "remove any action, suit, or proceeding from a State court" that meets certain criteria "to the appropriate United States district court" within 90 days after "the [FDIC] is substituted as a party." Three courts of appeals have held that this statutory language "permit[s] appellate removal," as its "plain language . . . does not limit removable actions to those that have not yet reached a state trial court judgment." *Matter of Meyerland Co.*, 960 F.2d 512, 515, 516-517 (5th Cir. 1992); *see FDIC* v. *Keating*, 12 F.3d 314, 316 (1st Cir. 1993); *In re Savers Fed. Sav. & Loan Ass'n*, 872 F.2d 963, 966 (11th Cir. 1989) (predecessor statute). Applying similar reasoning, courts have similarly construed 12 U.S.C. § 1789(a)(2), which authorizes the National Credit Union Administration to remove "any . . . action, suit, or proceeding from a State court." *See Putnam* v. *DeRosa*, 963 F.2d 480, 483 (1st Cir. 1992).

By contrast, when Congress "intend[s] to limit the removal power . . . to suits pending before a state trial court," it knows how to "explicitly state[] as much." *Savers*, 872 F.2d at 966. For example, the Federal Reserve removal statute allows removal of a qualifying case "any time *before the trial thereof*." 12 U.S.C. § 632 (emphasis added). That kind of limiting language is not in Section 1442(a) or Section 1455, because Congress did not impose such a limit

7

on federal officers seeking to remove a criminal prosecution. Instead, Congress expressly contemplated that removals could occur "at a later time" than "before trial," provided there is "good cause shown." 28 U.S.C. § 1455(b)(1).

Interpreting the federal-officer removal statute to permit appellate removal also reflects the fundamental purpose of that statute: to "ensure a federal forum" so that "the contours of federal power [are] determined by federal courts," *Harris*, 122 F.4th at 423 (citations omitted), "free from local interests or prejudice," *Manypenny*, 451 U.S. at 242. If the need for a federal forum becomes clear only during or after trial, as happened here, that federal forum should be available then. Defendants cannot be required to rely solely on the availability of Supreme Court review on appeal from state court, given the Court's discretionary docket. The purpose of the removal statute is that federal review be available as soon as practicable, which is precisely what President Trump seeks here.

## B. DANY's Efforts To Avoid Removal Are Legally Flawed.

To escape the plain language of the federal-officer removal statute, DANY offers a hodgepodge of structural inferences, abstention doctrines, and preclusion principles. Because the "inquiry here is satisfied by the plain text,"

8

this Court "need proceed no further." *Aetna Life Ins. Co.* v. *Big Y Foods, Inc.*, 52 F.4th 66, 75 (2d Cir. 2022). Regardless, DANY's arguments are unpersuasive.

*First*, DANY points to 28 U.S.C. § 1455(b)(3), which allows a state prosecution to proceed in state court after the filing of a removal notice "except that a judgment of conviction shall not be entered [by the state court] unless the prosecution is first remanded." DANY contends (at 22) that this "automatic stay of the entry of a final criminal judgment would be pointless and superfluous if such a judgment did not meaningfully affect the availability of removal." But that does not follow. Congress can simultaneously allow for removal at any stage and still recognize that a particular stage—judgment of conviction against a criminal defendant—requires additional guardrails. After all, such judgment may result in immediate incarceration, a highly significant consequence.

*Second*, DANY says (at 23-24) that "principles of *res judicata* . . . support precluding removal after the entry" of the state trial court's judgment. Not so. *Res judicata* requires a federal court to give full faith and credit to a state court judgment. But it does not require that such judgment be given "*more* than the force and effect" it "would have had in state court" had it not been

9

removed. *Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 436 (1974) (emphasis added). A state trial court's judgment is subject to reversal on appeal in state court. So too, such a judgment is reviewable on appeal after proper removal to federal court. That is why *Harris* and the other cases cited above perceived no conflict between *res judicata* and removal of a case currently on appeal in a state court.[1]

*Third*, DANY invokes *Rooker-Feldman* abstention. It argues (at 26) that it would be "anomalous" to "transfer[]" President Trump's "direct appeal of his criminal conviction from state court to the federal district court." But that is not what happens in any practical sense. Under the *res judicata* principles just discussed, a case that is removed from a *state* appellate court belongs in the relevant *federal* appellate court. Indeed, that is what federal appellate courts have unanimously concluded. *See Harris*, 122 F.4th at 428 (Henderson, J., concurring) (citing cases). The federal district court may be a brief waystation and play a facilitating role, and courts have articulated somewhat different views on the appropriate procedural mechanism. *See id.*

---

[1] To be clear, *res judicata* principles *do* preclude any argument that the state trial court's judgment of conviction is itself void solely on jurisdictional grounds. President Trump does not seek to nullify the judgment on the ground that the state court retroactively lacked jurisdiction; he seeks to overturn the judgment in federal court.

(describing different approaches); 16 Moore's Federal Practice Civil § 107.141 (same).[2] But the ultimate result of the process is clear: federal courts do what they always do "[a]fter removal," which is "take[] the case up where the State court left it off." *Granny Goose Foods*, 415 U.S. at 436.

As for *Rooker* and *Feldman*, those judge-made doctrines "do not preclude" federal appellate review of a state trial court judgment if Congress expressly authorizes that review. *Resolution Tr. Corp.* v. *Nernberg*, 3 F.3d 62, 66-67 (3d Cir. 1993); *see Meyerland*, 960 F.2d at 515-516; *see also Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 349 (1816) ("Congress . . . may authorize a removal either before or after judgment."). Post-judgment removal is not "so at odds with Article III jurisprudence that it precludes following the plain language of [a] statute" authorizing that result. *Meyerland*, 960 F.2d at 520.

*Fourth*, DANY points to 28 U.S.C. § 1447(c), which requires district courts to remand any removed case "if at any time *before final judgment* it

---

[2]     *Meyerland* held that the district court could simply "take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to a federal appellate court." 960 F.2d at 520. Other decisions require the district court to "adopt the state court's judgment as its own," after which the removing party may file a notice of appeal. *Harris*, 122 F.4th at 426 (Henderson, J., concurring). President Trump takes no position on the particular procedural mechanism required here.

appears that the district court lacks subject matter jurisdiction." Opp. 23 (emphasis added). That provision is a red herring. Section 1447(c) is plainly referring to the *federal district court*'s jurisdiction and judgment. Obviously, a federal district court may remand a case to state court only until the federal district court enters a final judgment and its jurisdiction ends. That suggests nothing about whether removal is available after the *state trial court* enters judgment.

*Fifth*, DANY suggests (at 26) that it would be odd for a federal appellate court to resolve a "defendant's state-law objections regarding his state criminal conviction." Not at all. Federal appellate review of state law issues is a built-in feature of all removal statutes, including the federal-officer removal statute. After a criminal removal, the federal district court "appl[ies] the criminal law of the State"—just as it does with State civil law in a diversity case. *Manypenny*, 451 U.S. at 241. If the defendant is convicted and appeals, the district court's application of state law is subject to appellate review, just as it would be in a diversity case or in any earlier-removed federal-officer case.

## II.    PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND, POST-TRIAL REMOVAL NOTICE.

DANY is also wrong to argue (at 27-41) that President Trump lacked good cause to file a post-trial removal notice. President Trump plainly had

12

such cause in light of three extraordinary developments that occurred either during or after the trial. *First*, DANY introduced into evidence and asked the jury to scrutinize President Trump's official Presidential acts. *Second*, one month after trial, the Supreme Court unequivocally recognized an immunity prohibiting the use of such acts as evidence at any trial of a former President. *See Trump*, 603 U.S. at 629-632. *Third*, the trial court improperly instructed the jury that it could convict President Trump of a state felony if it found that he had violated a New York election statute by the "unlawful means" of violating FECA.

Separately and taken together, these developments established President Trump's immediate right to a federal forum. And President Trump had the requisite "good cause" for invoking that entitlement after his trial because, in these singular circumstances, he literally could not have done so before it. DANY overlooks the low standard for removability and has little to say—none of it persuasive—on the critical "good cause" question.

## A. President Trump's Second Removal Notice Satisfied The Requirements Of The Federal-Officer Removal Statute.

The Supreme Court's decision in *Trump* makes clear that DANY's prosecution counts as one that is "for or relating to any act under color" of the Presidency. 28 U.S.C. § 1442(a)(1). *Trump* likewise provides a federal defense

13

of Presidential *evidentiary* immunity. And the New York election-law predicate crime on which DANY's prosecution hinges is preempted. President Trump's second removal notice accordingly satisfies both requirements of the federal-officer removal statute.

### 1. The prosecution "relates to" President Trump's official acts because DANY used those acts as evidence at trial.

Off the bat, DANY runs from the appropriate standard of review. President Trump need not definitively persuade this Court that his prosecution is "for or relating to any act" under color of the Presidency. 28 U.S.C. § 1442(a)(1). All that is required is "an adequate threshold showing" on that score. *Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 431-432 (1999). In conducting its analysis, this Court must "credit [President Trump's] theory of the case" so long as it is "colorable." *Id.* DANY disregards that forgiving standard and instead jumps straight to a full merits assessment of President Trump's arguments. But that "defeat[s] the purpose of the removal statute," *id.*, which is "to give officers a federal forum in which to litigate," *id.* at 447 (Scalia, J., concurring in part and dissenting in part).

Under the appropriate standard, DANY's prosecution of President Trump more than *plausibly* qualifies as "for or relating to any act" that he took "under color" of the Presidency.

14

### a. A prosecution "relates to" a President's official acts if the government uses such acts as evidence.

The federal-officer removal statute applies to cases in which the prosecution uses "any act under color of [the President's] office" as evidence at a criminal trial of the President, 28 U.S.C. § 1442(a)(1), regardless of whether the charged conduct itself qualifies as official. In resisting that conclusion (at 33-34), DANY ignores both the plain language of the statute and the reasoning of *Trump*, which recognized a special evidentiary immunity in light of the "peculiar constitutional concerns implicated in the prosecution of a former President." 603 U.S. at 630-632.

As a textual matter, a state prosecution that uses a federal officer's official acts against him as evidence is a prosecution "relating to" those official acts. 28 U.S.C. § 1442(a)(1). Section 1442 applies to prosecutions *either* "for" *or* "relating to" official acts, and the latter category expands the sweep of the removal statute beyond the charged conduct. Indeed, "when asked to interpret statutory language including the phrase 'relating to,'" the Supreme Court "has typically read the relevant text expansively." *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 717 (2018) (collecting cases). "Congress characteristically employs the phrase to reach any subject that has a connection with" the object. *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581

15

U.S. 87, 96 (2017) (internal quotation marks omitted). For example, a state law "'relates to' an employee benefit plan" if it has any effect on such plans, "even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 139 (1990). Thus, a criminal prosecution "relates to" official acts whenever such acts are used as evidence, because that use creates the necessary connection between the prosecution and the acts.

In response, DANY insists that the "appropriate focus" under the removal statute is the relationship between "the *charged conduct* and asserted official authority." Opp. 33.[3] But DANY tellingly relies on cases applying an earlier version of the removal statute, which permitted removal only of prosecutions "for" official acts. In 2011, Congress added the "*or relating to*" language. Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). That amendment specifically "broadened federal-officer removal to actions, not just causally connected, but

---

[3] DANY rightly does not contend that the defendant must be a federal officer at the moment he removes. The defendant need only have been a federal officer when the relevant acts took place. Regardless, President Trump is a federal officer now, and the usual rule is that a defect in an otherwise validly removed case may be cured any time before final judgment. *See Caterpillar Inc.* v. *Lewis*, 519 U.S. 61, 73, 77 (1996).

16

*alternatively* connected or associated, with acts under color of federal office."
*Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020)
(emphasis altered). A prosecution is "for" official acts if the charged conduct
is causally connected to such acts, whereas a prosecution "relates to" official
acts if it is "connected or associated" with official acts in some other way,
including through their use as evidence.

DANY cites a handful of out-of-circuit decisions handed down after the
2011 amendments. Opp. 33-34. But none of them decided whether the use of
official-acts evidence is sufficient; all merely concluded that the charged
conduct itself had a sufficient official nexus. *See, e.g.*, *K&D LLC* v. *Trump Old
Post Off. LLC*, 951 F.3d 503, 507 n.1 (D.C. Cir. 2020). Nor has this Court ever
addressed that argument head on. Instead, it has recognized that even the
pre-2011 version of the statute imposed a "quite low" burden on federal
officers. *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).

At any rate, in the specific context of the Presidency, *Trump* compels
the conclusion that the prosecution's use of official-acts evidence requires
removal to federal court. Congress enacted the federal-officer removal statute
(and its predecessors) to stave off the "weakness" and "paraly[sis]" in the
"general government" that would result if States could prosecute federal

17

officers with impunity. *Tennessee* v. *Davis*, 100 U.S. 257, 262-263 (1879). That concern is at its apex when the officer at issue is the President. As the Supreme Court explained, "[t]he hesitation to execute the duties of his office fearlessly and fairly that might result when a President is making decisions under a pall of potential prosecution . . . raises unique risks to the effective functioning of government." *Trump*, 603 U.S. at 613 (internal quotation marks omitted). Thus, the "Constitution does not tolerate" any prosecution of a former President that might raise "the prospect that [his] official decisionmaking will be distorted" in that way. *Id.* at 631, 636.

Critically, that Presidential immunity not only protects former Presidents from being "indicted based on conduct for which they are immune"—which presumptively includes all official acts—but also bars the use of such acts as "evidence" in the prosecution of a former President. *Trump*, 603 U.S. at 631-632. As the Supreme Court emphasized, even the "[u]se of evidence about such [official] conduct" would "eviscerate the immunity," as it would "raise [the] unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.* at 631-632, 640. The constitutional immunity for a former President now encompasses an evidentiary immunity that bars the use of

18

official-acts evidence to "prove his liability on *any* charge," official or unofficial. *Id.* at 631 (emphasis added).

Following *Trump*, the federal-officer removal statute must be interpreted in light of that "unique" form of evidentiary immunity and the "peculiar constitutional concerns" that animate it. 603 U.S. at 631; *cf. McDonnell* v. *United States*, 579 U.S. 550, 574 (2016) (adopting interpretation of "official act" to avoid "significant constitutional concerns"). Again, "one of the most important reasons for removal" of state prosecutions against federal officers "is to have the validity of the defense of official immunity tried in a federal court." *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969). And under *Trump*, a former President has such a "valid[]" "official immunity" defense whenever the prosecution uses official acts as evidence against him. If the use of such evidence is damaging enough to warrant constitutional immunity, it is undoubtedly important enough to trigger the removal statute.

### b.     DANY used President Trump's official acts as evidence at trial.

President Trump's second removal notice made the required "adequate threshold showing" that DANY's prosecution relates to at least one official act. *Acker*, 527 U.S. at 432.

19

Significant categories of DANY's trial evidence—including testimony about President Trump's Oval Office communications with the Attorney General and the White House Communications Director  about matters of public concern—clearly fell on the official-act side of the line.  DANY claims that "none of the evidence admitted at [President Trump's] trial contravened the Supreme Court's ruling."  Opp. 34.  But again, DANY confuses the ultimate merits with the threshold plausibility inquiry.  The point of the federal-officer removal statute is that such questions about "the scope of [a] Defendant['s] official duties" are "for the federal—not state—courts to answer," *after* the case has been removed.  *Isaacson*, 517 F.3d at 138.  In any event, DANY's merits arguments are misplaced.

**i.    The President's Alleged Discussion With The Attorney General**.  Begin with what is perhaps the most obvious example of "evidence concerning the President's official acts," *Trump*, 603 U.S. at 630:  Michael Cohen's testimony claiming that President Trump discussed a possible Federal Election Commission inquiry with then-Attorney General Jeff Sessions.  JA 758-760.  Under *Trump*, any such discussion with the country's chief law-enforcement officer would have been official conduct, as it "plainly implicate[s] [the President's] 'conclusive and preclusive' authority" to oversee

20

federal law enforcement, including by the FEC.  603 U.S. at 620.  "Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."  *Id.* (internal quotation marks omitted).

DANY has no good response.  It argues that the FEC's "authority is exclusively civil, not criminal," Opp. 38, but that makes no difference to the President's supervisory authority over an executive agency.  And even if it did, FEC investigations can turn into criminal prosecutions.  In fact, Cohen himself was prosecuted by the Justice Department for a FECA violation.  DANY also notes that President Trump "disputes that he actually spoke with the Attorney General about this issue."  *Id.*  Quite right.  But nothing in *Trump* requires a President to admit an alleged official act occurred or else waive Presidential immunity, which exists "to protect not the President himself, but the institution of the Presidency."  603 U.S. at 632.

**ii.    Discussions With The White House Communications Director**.  Testimony by former White House Communications Director Hope Hicks about her Oval Office discussions with President Trump is likewise "readily categorized" as official "in light of the nature of the President's official relationship to the office held by" Hicks.  *Trump*, 603 U.S. at 617.

21

DANY contends that, despite Hicks's official position, President Trump's conversations with Hicks were not "official acts" because they pertained to press stories on the supposed private "hush-money scheme." Opp. 36-37 (citation omitted). But those stories went to the heart of Hicks's official duties, which included responding to public reporting that might affect the President's "prestige as head of state and his influence upon public opinion." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). If Hicks had held a press conference from the White House press room denying the supposed scheme, it clearly would qualify as official. The same must be true of the President's conversations with her about what to say to the press.

**iii.    Official Presidential Statements On Twitter**. Finally, President Trump's "communications in the form of Tweets" introduced at trial were also official acts. *Trump*, 603 U.S. at 629. *Trump* stated quite clearly in discussing Tweets that "most of a President's public communications"—even those on "matters of public concern that may not directly implicate the activities of the Federal Government"—"are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* This Court has adopted a similar principle in a case DANY ignores. *See Knight First Amend. Inst. at*

22

*Columbia Univ.* v. *Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *vacated on other grounds*, 141 S. Ct. 1220 (2021).  And it remains true even for Presidential statements made while in office that concern his conduct before taking office, which the Supreme Court itself has previously stated may "arguably" fall "within th[at] outer perimeter." *Clinton* v. *Jones*, 520 U.S. 681, 686 (1997); *see Council on Am. Islamic Relations* v. *Ballenger*, 444 F.3d 659, 664-665 (D.C. Cir. 2006) (congressman acted within scope of his office in discussing marital status with reporter).  That is more than enough to make the argument colorable and thus to trigger removal.

DANY responds that "prosecutor[s] may point to the public record" of President Trump's Tweets even if they were official acts.  Opp. 35 (citing *Trump*, 603 U.S. at 632 n.3).  But DANY misreads the footnote it cites.  The Court was addressing Justice Barrett's argument that it would be odd to exclude *all* evidence of official acts in a prosecution of the President for bribery, which depends on showing an official act.  603 U.S. at 632 n.3.  To avoid that conundrum, the Court explained that prosecutors may use public records *merely to establish that such an act took place.*  That is not what DANY did with President Trump's Tweets.  On the contrary, DANY did exactly what the footnote said it "may not do" with official acts:  it "invite[d]

the jury to inspect the President's motivations." *Id.* DANY used the Tweets to argue (wrongly) that President Trump was pressuring Cohen to stay silent, which DANY claimed proved the President's knowledge and intent. JA 899.

### 2. The removal notice asserted colorable federal defenses.

In addition to establishing that DANY's prosecution relates to his official acts as President, President Trump's second removal notice also "allege[d] a colorable defense under federal law." *Mesa* v. *California*, 489 U.S. 121, 129 (1989). Again, the Court must "credit" President Trump's "theory of the case for purposes of" its limited "jurisdictional inquiry." *Acker*, 527 U.S. at 432. Here, at least two federal defenses—Presidential immunity and FECA preemption—are certainly colorable and indeed correct.

### a. *President Trump has an immunity defense.*

To start, because DANY introduced evidence at trial concerning President Trump's official acts, the second removal notice stated not just a colorable but compelling defense of Presidential immunity. To overcome that presumptive immunity, DANY had to show that using the relevant evidence "pose[d] no dangers of intrusion on the authority and functions of the Executive Branch." *Trump*, 603 U.S. at 615. But the state trial court did not require DANY to make such a showing before allowing the evidence.

24

President Trump's second removal notice therefore plausibly "rais[ed] . . . a federal question," *Mesa*, 489 U.S. at 136: whether the state court violated the Constitution by "adjudicat[ing] a criminal prosecution that examine[d]" certain actions protected by Presidential immunity. *Trump*, 603 U.S. at 609.[4]

### b. President Trump has a preemption defense.

To transform President Trump's supposed falsification of business records from a misdemeanor into a felony, DANY had to identify "another crime" that President Trump allegedly intended to "conceal" or "commit." Only at the very end of trial did DANY finally settle on such a predicate crime: N.Y. Election Law § 17-152, which prohibits conspiracies to "promote or prevent the election of any person to a public office by unlawful means." According to DANY, such "unlawful means" included a violation of FECA's prohibition on contributions to Presidential candidates in excess of $2,700. JA 666, 777. DANY's far-fetched theory was that President Trump had falsified

---

[4]    Although DANY has argued separately (and unpersuasively) that any violation of *Trump's* evidentiary prohibition was harmless, *Trump* suggests that such violations are not subject to harmless-error review. *See* 603 U.S. at 609 (courts may not "adjudicate a criminal prosecution that examines [official] Presidential actions"); *id.* at 631-632 (normal evidentiary rules "are an inadequate safeguard"). Regardless, DANY's official-acts evidence was not harmless at all, as proven by prosecutors' repeated references to that evidence during closing argument. *See* JA 865-866. At a minimum, such issues are for the merits stage on appeal, not the threshold jurisdictional inquiry here.

business records to conceal the fact that Cohen's $130,000 payment to Stormy Daniels was, in reality, an "unlawful means" of affecting the 2016 Presidential election under N.Y. Election Law § 17-152, because it was an unlawful contribution under FECA. *See* JA 673-673, 952-953.

FECA preempts that application of Section 17-152. By its terms, FECA expressly "preempt[s] *any* provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a) (emphasis added). That broad language plainly covers any state "regulation of the conduct and financing of campaigns for Federal elective office." *Holtzman* v. *Oliensis*, 91 N.Y.2d 488, 495 (1998); *see* 11 C.F.R. § 108.7(b)(3) (similar interpretation by FEC). If making a contribution prohibited by FECA amounts to an "unlawful means" of influencing an election under N.Y. Election Law § 17-152, then Section 17-152 necessarily "regulate[s] the conduct and financing of [federal] campaigns" and is therefore preempted. *Holtzman*, 91 N.Y.2d at 495. Otherwise, 50 different States and thousands of counties could enforce FECA's contribution limits through prosecutions in state court—precisely what DANY has done here. That is what FECA's broad preemption clause was designed to prevent. DANY offers no response.

26

**B.      President Trump Had Good Cause To File The Second Removal Notice After Trial.**

President Trump had good cause to pursue a post-trial removal for a simple reason:  he could *not* have raised any of the arguments set forth herein until well after his trial began.  DANY does not even contest that point. Instead, it defends the district court's denial of leave simply by parroting the abuse-of-discretion standard.  Opp. 18-19.

Even if that standard might generally apply, it cannot save the three-page order at issue here, in which the district court ignored all of the key legal issues.  *See, e.g.*, *Colbert* v. *Rio Tinto PLC*, 824 Fed. Appx. 5, 12 (2d Cir. 2020) (district court abused its discretion "by failing to address" central issue).  The order said nothing about whether DANY's prosecution was "for or relating to" official acts.  It said nothing about the evidentiary immunity established by *Trump*.  And it said nothing about FECA preemption.  President Trump's colorable arguments on each of those issues met the criteria for removal, and none was available to him before trial.  That was plainly good cause for the former and now current President of the United States to remove his unprecedented criminal prosecution.

1.      Although no court has defined the term in this context, "good cause" generally includes factual or legal developments that materially affect

27

a party's rights or arguments, but were not "reasonably available" within the default statutory period. *See Reed* v. *Ross*, 468 U.S. 1, 16 (1984) (habeas petitioner "has cause" for procedural default of an argument if its "legal basis [was] not reasonably available to counsel" during earlier state proceedings). Indeed, the federal-officer removal statute expressly entitles a defendant to file "a second notice" of removal "on grounds not existing at the time of the original notice." 28 U.S.C. § 1455(b)(2). When such grounds arise only after trial, that must be "good cause" to remove.

2. Before trial, President Trump could not have made the argument he makes now that his prosecution "relates to" official acts. Nor could he have raised the federal defense of Presidential evidentiary immunity. Both arguments stemmed from the Supreme Court's post-trial decision in *Trump*. Even DANY admits that *Trump* "announced *new rules* for determining whether a President is immune from criminal prosecution," Opp. 32 (emphasis added), which included new "guidance on" the "unprecedented and momentous question[]" of how to separate a President's "official from unofficial actions," 603 U.S. at 616-617.

Both arguments also did not crystallize into a basis for removal until the trial itself, when DANY was permitted (over President Trump's objection) to

28

introduce and probe his official acts. Before that point, there had been no violation of President Trump's "entitlement not to have to answer for his" official acts as evidence. *Trump*, 603 U.S. at 630. Given the "peculiar constitutional concerns implicated" by "allowing [DANY] to ask or suggest that the jury probe official acts," the state court's failure to prevent that harm to the "institution of the Presidency," *id.* at 631-632, was good cause for removal to federal court. President Trump argued as much at length in his removal notice. JA 463-475.

Remarkably, the district court's three-page order denying leave to remove did not say a word about Presidential *evidentiary* immunity. In addressing *Trump*, the court merely invoked its "previous conclusion" that the supposed "hush money payments were private, unofficial acts," and stated that "[n]othing in the Supreme Court's opinion" changed that conclusion. SPA 3. But that previous conclusion was irrelevant to the evidentiary immunity issue, which applied "even [if] [the] indictment allege[d] only unofficial conduct." *Trump*, 603 U.S. at 631. And it was likewise irrelevant to President Trump's argument that DANY's "trial presentation" made this "a prosecution 'relating to' official acts," JA 463. The district court's failure to address these key legal arguments was an abuse of discretion.

29

3.     The same holds true for President Trump's FECA preemption defense.  Because DANY refused to articulate its FECA-based theory of N.Y. Election Law § 17-152 until the last possible moment at trial, President Trump had no opportunity to raise his preemption defense before trial.  Indeed, in opposing President Trump's first removal, DANY identified Section 17-152 as only one among several predicate offenses.  JA 218, 282-283.  DANY even represented to the district court that it might not "rely on Election Law § 17-152 at trial," and argued that "the mere possibility that a verdict [could] rely on Election Law § 17-152" was "simply too speculative a basis on which to rest a finding of preemption."  JA 282-283 (internal quotation marks omitted). DANY also represented that the "charges here do not relate to the specific disclosures mandated by FECA."  JA 280.  The district court accepted DANY's representations, explaining that "NYEL § 17-152 [was] not preempted by FECA" because its "application" by DANY in these circumstances did not "target campaign contributions and expenditures."  JA 429-430.  But that is exactly the application of Section 17-152 that DANY later sprang at trial to secure President Trump's unlawful conviction.

Thus, by obscuring its theory from the district court, DANY succeeded at defeating preemption during the initial remand proceedings.  President

30

Trump therefore plainly had good cause to return to the district court making that argument after DANY finally laid its cards on the table. Yet the court's opinion denying President Trump leave to file says nothing about the preemption issues. That again was a clear abuse of discretion.

In its opposition, DANY barely defends its hide-the-ball tactics and offers no response on the merits of FECA preemption. *See* Opp. 50. It says only that President Trump can raise his preemption "argument on direct appeal." *Id.* But that is not responsive to the removal question. President Trump is entitled not just to an appeal *somewhere* but to raise his federal preemption argument in this federal appellate court, which will be "free from local interests or prejudice," *Manypenny*, 451 U.S. at 242; *see* Opening Br. 53-62.

4.     DANY also claims (at 40) that regardless of the strength of President Trump's case for post-trial removal, he simply waited too long to make it. That is absurd. President Trump filed his 60-page second removal notice (plus 38 exhibits) less than two months after the Supreme Court's decision in *Trump* in the stretch run of his successful campaign for the Presidency. During those two months, his campaign was upended by multiple shocking events, including a near-miss assassination attempt and President

31

Biden's exit from the race. At the same time, President Trump's counsel were drafting time-limited post-trial briefs to try to forestall another unprecedented development: the criminal sentencing of a Presidential candidate weeks before the general election.

In light of these extraordinary circumstances, DANY's citations (at 40-41) to cases involving discovery deadlines and expert depositions ring hollow. President Trump did not sleep on his rights or fail to exercise "diligence." Opp. 40. He took a reasonable amount of time, while fighting on many other fronts, to prepare a thorough removal notice specifying his right to a federal forum notwithstanding the conclusion of his trial. The time between the *Trump* decision and the filing of that notice did not affect the legal arguments or the availability of post-trial removal. It did not affect the state court proceedings. It caused absolutely no prejudice to DANY. And the district court below mentioned nothing about it. DANY's insistence on an unwritten, immaterial deadline runs counter to the Supreme Court's repeated instruction to courts not to "frustrate[]" the goals of the federal-officer removal statute with a "narrow, grudging interpretation." *Manypenny*, 451 U.S. at 242.

## CONCLUSION

The Court should reverse the district court's order denying President Trump leave to file the removal notice and remand for the district court to enter an order to permit this Court's direct appellate review of this prosecution of President Trump.

MARCH 3, 2025

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*

ROBERT J. GIUFFRA, JR.
MATTHEW A. SCHWARTZ
JAMES M. MCDONALD
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Ave. NW
Washington, DC 20006
(202) 956-7500

*Counsel for Defendant-Appellant President Donald J. Trump*

33

## CERTIFICATE OF COMPLIANCE

This Brief complies with Second Circuit Rule 32.1(a)(4)(B) because it contains 7,000 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.

MARCH 3, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of March, 2025, I electronically filed the foregoing Brief with the Clerk of Court using the ACMS system.  I certify that service will be accomplished by the ACMS system for all participants in this case who are registered ACMS users.


/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.


MARCH 3, 2025